TM:NMA/RJN/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    10 CR 147 (S-4)(SLT)

     - against -

FRANCIS GUERRA, <u>et al.</u>,

          Defendants.

- - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S SECOND MOTION <u>IN LIMINE</u>

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

NICOLE ARGENTIERI
RACHEL NASH
ALLON LIFSHITZ
Assistant United States Attorneys
     (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in support of its motion <u>in</u> <u>limine</u> to admit at trial the following evidence: (1) recorded 911 calls to the New York Police Department ("NYPD") on October 20, 1993, which were placed immediately after Joseph Scopo was killed; (2) recorded statements by (a) John "Sonny" Franzese, the underboss of the Colombo organized crime family and one of the defendants' co-conspirators; (b) Ralph DeLeo, another co-conspirator; and (c) Edward Garofalo, a co-defendant and co-conspirator.  For the reasons set forth below, the government respectfully submits that this evidence is admissible at trial.

In addition, the government further moves the Court to reconsider its May 1, 2012 order severing Michael Sciaretta and Louis Romeo from Francis Guerra, Michael Persico, Theodore Persico, Jr. and Edward Garofalo.

I.   <u>The 911 Calls Are Admissible</u>

Racketeering Act Three of Count One of the above-captioned indictment charges defendants Michael Persico ("Persico"), Theodore Persico, Jr., ("Persico, Jr.") and Francis Guerra ("Guerra") with conspiring to murder and murdering Joseph Scopo on October 20, 1993.  Scopo was shot as he pulled up in his car outside his residence in Ozone Park, Queens.  Immediately after the shooting, several individuals, including members of

1

Scopo's family, called 911 to report the shooting. The recorded 911 calls are contained on the enclosed disc as Exhibit A.

The statements of the 911 callers contained on the 911 tapes are admissible because they are not testimonial and fall within two exceptions to the rule against hearsay. These statements are both present sense impressions and excited utterances, under Federal Rules of Evidence 803(1) and 803(2). Statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter," are admissible as present sense impressions because "the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002); Fed. R. Evid. 803(1). Similarly, statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" are admissible as excited utterances because "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998); Fed. R. Evid. 803(2).

Statements made by individuals who call 911 to report an emergency have frequently been found to fall within both the present sense impression and the excited utterance exceptions to

the prohibition on hearsay evidence because the callers report events during or immediately after they occur.  See, e.g., United States v. Harper, No. 05 Cr. 6068L, 2009 WL 140125, at *2 (W.D.N.Y. Jan. 20, 2009); United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994); United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007); United States v. Thomas, 453 F.3d 838, 843-44 (7th Cir. 2006); United States v. Allen, 235 F.3d 482, 493 (10th Cir. 2000).  Here, the witnesses called 911 immediately after Scopo was shot.  It is apparent from their statements and their tone that the 911 callers were still "under the stress of excitement caused by the event[s]," Fed. R. Evid. 803(2), and the statements made during those calls clearly fall within the present sense impression and excited utterance exceptions.[1] Thus, the government respectfully submits that the 911 calls are admissible at trial.

## II. Statements Made by Co-Conspirator John "Sonny" Franzese Are Admissible

The government intends to introduce at trial statements by John "Sonny" Franzese, regarding his role and the role of

---

[1]    Admission of the statements made by the 911 callers is not prohibited by the Confrontation Clause of the Constitution because statements "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" are not testimonial.  Davis v. Washington, 547 U.S. 813, 822 (2006) (holding statements made by 911 caller to enable police assistance during an emergency were not testimonial because caller "was not acting as a witness" and "was not testifying").

Michael Persico in the Colombo family.  The government respectfully submits that Franzese's statements are admissible co-conspirator statements because they were made in order to further the Colombo enterprise.  In addition, they are necessary in order to place in context a recorded conversation among a cooperating witness ("CW1"), Franzese and Persico.  The recordings the government intends to introduce are included on the enclosed disc and labeled Exhibit B, and draft transcripts of those recordings are attached as Exhibit C.

First, on March 8, 2006, Franzese advised CW1 that he was the official underboss of the Colombo family.  In another recorded conversation on December 4, 2006, Franzese advised CW1 that he became close with the Persicos when he assisted them by destroying evidence.

Next, on January 11, 2006, Franzese advised CW1 that he wanted to introduce CW1 to Persico and wanted CW1 to make a good impression.  These conversations put into context a January 16, 2007 recorded conversation among Persico, Franzese and CW1.

During that conversation, the three discussed a dispute between Persico's brother-in-law and others at the Garden City Hotel that arose after Persico's brother-in-law was accused of stealing money from the hotel.  Persico advised that his brother-in-law had taken the money at the direction of his boss at the Garden City Hotel, and therefore sought CW1's assistance in

4

settling the matter.  Later in the same conversation, Franzese

asked Persico to tell Persico's father, Carmine Persico, the

incarcerated boss of the Colombo family, and his brother Alphonse

"Allie Boy" Persico, who was then slated to become the boss of

the Colombo family, that Franzese would always support them [the

Persicos] and had no plans to switch allegiances.  Specifically,

he states

> Tell Pops and Allie. . . .whatever.  Hey,
> listen, tell them whatever they need, uh, you
> know?  Otherwise. . . .I've been here from
> the first day and I and I'm never gonna leave
> until I die. . . . You know what I mean?  The
> only way they're gonna take me out of here is
> when I die.  What are you gonna do, you know.
> . . . Guys don't understand, where you were
> born, you stay. . . .Because when you start
> to go shopping around, that's when the -
> that's when the bullets start flying.

Subsequently, after CW1 and Franzese departed together,

CW1 and Franzese continued to discuss Colombo family affairs.

With respect to the hotel, Franzese advised CW1 that "we got the

hotel," and further advised CW1 that CW1 should remain loyal to

him and the Colombo family.  A little later in the discussion,

CW1 asks Franzese whether Persico is a "goodfella," meaning an

inducted member of the Colombo family.  Franzese explained,

"between me and you, he don't have to be a goodfella.  He's doing

a different kind of work.  One day I'll explain that to you. . .

.Sometimes there's even things I can't tell no-nobody.  You get

my point?"

A.   <u>The Statements Are Admissible Co-Conspirator Statements</u>

The government respectfully submits that Franzese's recorded statements are co-conspirator statements made in furtherance of the conspiracy, and thus, are admissible pursuant to Fed. R. Evid. 801(d)(2)(E).  The rule provides that a statement "offered against an opposing party" that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay.

Franzese's statements to CW1 are quintessential, admissible coconspirator statements.  First, he advised CW1 of his position in the family and his relationship to the leaders of the family - Carmine and Alphonse Persico - to ensure that CW1 understood the importance of heeding Franzese's advice.  Then, he advised CW1 that it was important for CW1 to meet Persico and for Persico to like him.  Next, he introduced CW1 to Persico for the purpose of handling a problem that arose at a Colombo-controlled entity, the Garden City Hotel, and affirmed his continued loyalty to the Persico family.  Finally, in order to be sure CW1 had an understanding of the nuances of the Colombo family hierarchy, Franzese advised CW1 that Persico, though not an inducted member of the Colombo family, nonetheless plays an important role in it.  Thus, in order to further the criminal enterprise and the Colombo family racketeering conspiracy - the enterprise alleged in the indictment against the defendants – Franzese was educating CW1 on

the Colombo family's operations as well as the Colombo family's
structure and the importance of the Persico to the Colombo
family.  Franzese's statements also put Persico's recorded
comments in context by clarifying that they relate to the
business of the Colombo crime family.

  B.   The Statements Are Admissible As Statements Against
       Franzese's Penal Interest

       Alternatively, Franzese's statements are admissible as
statements against penal interest made to a cooperating witness.
In United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004), the
Second Circuit considered the admissibility of statements made by
the defendant's co-conspirator to a confidential informant, in
which the co-conspirator relayed his and the defendant's
"gun-running practices, profits, and past exploits in a manner
that implicated both himself and [the defendant]."  Id. at 225.
The Second Circuit found that the "declarant's statements to a
confidential informant, whose true status is unknown to the
declarant, do not constitute testimony within the meaning of
Crawford . . . so long as the statements fall within a firmly
rooted hearsay exception or contain particularized guarantees of
trustworthiness."  Id.  Further analyzing the statements, the
Saget court found that such incriminating hearsay statements made
by an unavailable declarant (such as Franzese) would be
admissible "so long as the statements fall within a firmly rooted

hearsay exception or contain particularized guarantees of
trustworthiness."  Id. at 230.

Here, the applicable "firmly rooted hearsay exception"
is the statement against penal interest exception enumerated in
Rule 804(b)(3).  This rule is applicable because "a reasonable
person in the declarant's shoes would perceive the statement as
detrimental to his or her own penal interest."  Saget, 377 F.3d
at 231.  The statements at issue here are clearly self-
inculpatory.  For example, Franzese's admissions that he was
underboss of a crime family, that he helped destroy evidence, and
that he was privy to the inner-workings of the racketeering
enterprise, clearly implicate him in the racketeering conspiracy
and its criminal activities.

In addition to falling within the firmly rooted hearsay
exception of statements against penal interest, the statements at
issue here also "contain particularized guarantees of
trustworthiness" (Saget, 377 F.3d at 230), as interpreted in
United States v. Sasso, 59 F.3d 341 (2d Cir. 1995).  In Sasso,
the Second Circuit set forth several factors for district judges
to consider in determining whether a statement against penal
interest carries sufficient indicia of reliability so as to
warrant its admission into evidence, finding that such statements
are likely to be trustworthy where: (1) the declarant equally
inculpates himself along with the defendant and does not engage

in blame-shifting or role-minimizing; (2) there is no apparent self-interested motive for the declarant to inculpate the defendant; (3) there is no coercion present; and (4) there is no apparent attempt to curry favor with the authorities (i.e., the statement was made in a private setting and/or to a friend or ally).  Id. at 349-50; see also Saget, 377 F.3d at 230 (discussing Sasso and concluding that the tape-recorded statements made by a confidential informant were admissible against a third party implicated by the out-of-court declarant).  In this case, the recording the government seeks to admit bear all of the hallmarks of reliability identified in Sasso and Saget.

First, Franzese was speaking to a cooperating witness who he was attempting to educate in the ways of the Colombo family.  There is no evidence that Franzese is attempting to minimize his role or to shift blame for his criminal conduct.  To the contrary, he is openly admitting his high position and involvement in the criminal enterprise.  Moreover, the statements were made in casual, private conversations absent any pressure or duress that would have caused him to feel coerced.  It is also clear from the circumstances under which the recordings were intercepted that Franzese was not attempting to curry favor with law enforcement.  In addition, the government's other trial evidence will provide substantial corroboration for the

recordings.  Because the recording demonstrates particularized

guarantees of trustworthiness, they should be admitted at trial.

III. <u>Recorded Statements of Ralph DeLeo Are Admissible</u>

At least two cooperating witnesses ("CW2" and "CW3")

are expected to testify that Ralph DeLeo became the acting boss

of the Colombo family in approximately 2009.  The government

intends to introduce surveillance photographs of DeLeo with

Persico and two different occasions, once in Boston in February

2009 and again in New York in July 2009.

On February 3, 2009, a conversation between DeLeo and

his sister was intercepted pursuant to a court-authorized

wiretap.  An excerpt of that recorded conversation is contained

on the attached disc and labeled Exhibit D.  A draft transcript

of the excerpted conversation is attached as Exhibit E.  During

the conversation, DeLeo, who resides in Boston, described going

to New York for his first day "on the job."  He further explained

that "we had a couple of things going on that I had to preside

over."  He also referred to a ceremony he attended, explaining

that "we had to go in different groups and different cars and

make sure we weren't followed and all this type of stuff."

Shortly before this trip to New York, on February 11, 2009, DeLeo

was surveilled in Boston meeting with Michael Persico.

In light of the testimony from CW2 and CW3, DeLeo's

recorded statements describe his promotion to underboss of the

Colombo family and the meetings and ceremony he attended in New York for that promotion.  Thus, DeLeo's statements to his sister constitute statements against penal interest and put into context the two meetings that he had with Persico in February and July 2009.  For the same reasons discussed above in Section II(B), these statements are admissible at trial pursuant to <u>Saget</u> and Rule 804(b)(3) of the Federal Rules of Evidence.  The statements at issue here are clearly self-inculpatory.  For example, DeLeo's concern that he would be followed evidences that his activities in New York were in furtherance of the Colombo family racketeering conspiracy.

In addition to falling within the firmly rooted hearsay exception of statements against penal interest, the statements at issue here "contain particularized guarantees of trustworthiness" (<u>Saget</u>, 377 F.3d at 230; <u>Sasso</u>, 59 F.3d at 349-50).  First, DeLeo was speaking to his sister and it is apparent from the conversation that he maintained a close relationship of trust with her.  There is no evidence that DeLeo was attempting to minimize his role or to shift blame for his criminal conduct.  To the contrary, he was describing the treatment he received as a result of his promotion to underboss of a crime family.  Moreover, as discussed above, the statements were made in casual, private conversations absent any pressure or duress that would have caused him to feel coerced.  It is also clear from the

11

circumstances under which the recordings were intercepted that
DeLeo was not attempting to curry favor with law enforcement.  In
addition, the government's other trial evidence will provide
substantial corroboration for the recordings.  For example, a
cooperating witness will testify that DeLeo in fact presided over
an induction ceremony in early 2009.  Accordingly, because the
recording demonstrates particularized guarantees of
trustworthiness, they should be admitted at trial.

IV.  <u>Recorded Statements of Edward Garofalo Are Admissible</u>

In Racketeering Act Ten, Edward Garofalo ("Garofalo")
and Persico, Jr., are charged with witness tampering on November
15, 2004.  Although Garofalo is expected to plead guilty, the
government respectfully submits that statements he made to his
wife and co-defendant Alicia Dimichele, to his cousin Manny
Garofalo and to Anthony O'Donnell, an employee of Garofalo's
company and associate of the Gambino family, are admissible at
trial.

A cooperating witness ("CW4") is expected to testify
that he was present in the trucking yard where he, Garofalo and
Persico, Jr., worked, when Garofalo assaulted another truck
driver for repeatedly honking his horn.  Before assaulting the
victim, Garofalo advised Persico, Jr., that he would handle the
situation.  CW4 observed an ambulance arrive to treat the victim.
Garofalo and Persico, Jr., left the yard, and subsequently

12

advised CW4 that they met with the victim's employer, whom they knew, to ensure that the victim did not press charges. Garofalo and Persico, Jr., advised CW4 that, as planned, the employer had communicated a threat to the victim to ensure that he would not press charges.

On the day of the assault, Garofalo was intercepted pursuant to a court-authorized wiretap discussing the incident with his wife and co-defendant Alicia Dimichele, Anthony O'Donnell and Garofalo's cousin Manny Garofalo.  The recorded conversations are contained on the enclosed disc and labeled Exhibit F, and draft transcripts of those conversations are attached as Exhibit G. Garofalo advised O'Donnell that he had assaulted another truck driver and that an ambulance came to take the driver away.  He also described the incident to his wife, and advised her that the victim had called the police.  Finally, Garofalo discussed the incident with his cousin Manny Garofalo, and explained that he met with the victim's employer to ensure that the employer would prevent the victim from pressing charges.

A.   The Statements Are Admissible As Co-Conspirator
     Statements

As set forth above, the testimony of CW4 is expected to establish that Garofalo and Persico, Jr., conspired to obstruct justice by preventing the victim of the assault from reporting the crime.  Although Alicia Dimichele is not charged with racketeering conspiracy, CW4 is expected to testify that she was

13

involved in running the trucking company owned by Garofalo,
Persico, Jr., and CW4 for the benefit of members and associates
of the Colombo organized crime family.  Similarly, CW4 is
expected to testify that Anthony O'Donnell and Manny Garofalo
were associates of the Gambino family whose involvement in the
trucking business benefitted organized crime.  Thus, it was
important for Garofalo to keep these individuals apprised of the
incident to ensure that they would be in a position to protect
him and Persico, Jr., from any further law enforcement scrutiny
if necessary.  By keeping them informed, Garofalo ensured that
they would protect his interests and the interests of the company
that he ran with Persico, Jr., as part of the racketeering
conspiracy.

B.    The Statements Are Admissible As Statements
      Against Penal Interest

As set forth above, pursuant to United States v. Saget,
377 F.3d at 231, statements by a coconspirator are admissible at
trial of an accomplice if they are sufficiently reliable and fall
within a firmly rooted hearsay exception.  Like DeLeo's
statements, Garofalo's are reliable and, because they are
statements against penal interest, fall within a firmly rooted
hearsay exception.

It should be beyond dispute that the statements are
against Garofalo's penal interest, given the callous nature in
which he describes beating an individual who dared to honk his

14

horn at Garofalo and Persico, Jr.  Moreover, the statements are inherently reliable because they were made to individuals with whom Garofalo has a relationship of trust; Garofalo was clearly not minimizing his involvement in the crime; the statements were made in casual, private conversations absent any pressure or duress that would have caused him to feel coerced; and it is also clear from the circumstances under which the recordings were intercepted that Garofalo was not attempting to curry favor with law enforcement.  In addition, the government's other trial evidence, such as the testimony of CW4, will provide substantial corroboration for the recordings.  Therefore, the government respectfully submits that the recordings of Garofalo's statements relating to the assault and obstruction of justice are admissible at trial against Garofalo's co-conspirator, Persico, Jr.

V.   Reconsideration of the Court's Decision to Sever Sciaretta and Romeo is Appropriate

        The government respectfully requests that the Court reconsider its May 1, 2012 decision severing Sciaretta and Romeo from Guerra, Persico, Jr., and Persico, in light of new circumstances - the guilty plea and anticipated guilty pleas of three additional defendants - that have developed since the Court's decision.   These new circumstances eliminate the need for two trials.

A.   <u>Legal Standard</u>

The standard that applies to a Motion for Reconsideration Pursuant to Federal Rule of Civil Procedure 59(e) is set forth in Local Civil Rule 6.3.  See <u>Williams v. New York City Department of Corrections</u>, 219 F.R.D. 78, 83 (S.D.N.Y. 2003) ("several courts in the Southern District have concluded that 'the standards governing motions to alter or amend a judgment pursuant to Rule 59(e) and motions for reconsideration or reargument pursuant to Local Civil Rule 6.3 are the same.'" (citing <u>Graham v. Sullivan</u>, 2002 WL 31175181, at *2, n.2 (S.D.N.Y. Sept. 23, 2002); <u>Tran v. Tran</u>, 166 F. Supp. 2d 793, 797 (S.D.N.Y. 2001); <u>Word v. Croce</u>, 2001 WL 755394, at *2 (S.D.N.Y. July 5, 2001)).  According to Rule 6.3, the party moving for reconsideration "should inform the court of the matters or controlling decisions which counsel believes the court has overlooked."

The government is aware that the standard governing a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  <u>Shrader v. CSX Transportation, Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995); <u>United States v. All Right, Title and Present Interest in Real Property</u>

16

Known as 479 Tamarind Drive, Hallandale, Fla., 2007 WL 3118660,
at *2 (S.D.N.Y. 2007) ("A motion for reconsideration is not a
vehicle for litigants to make repetitive arguments that the court
has already considered and it cannot be used to fill in the gaps
of a losing argument.").  The government respectfully submits
that reconsideration is appropriate where, as here, the
circumstances of the case have changed substantially since the
Court's decision granting severance.

> B.   The Guilty Pleas of Additional Defendants Makes
>      Severance Unwarranted

Sciaretta and Romeo moved for severance in this case in
their March 1, 2011 pre-trial motions.  This Court rejected their
argument that a joint trial would prejudice their trial rights on
May 27, 2011, and in several subsequent status conferences,
including on August 25, 2011 and October 26, 2011.  While the
Court eventually severed Alicia Dimichele from the other
defendants in this case, in doing so, it specifically rejected
the argument that a joint trial with the other defendants would
result in spill-over prejudice to Dimichele.  Rather, the Court
held that severance was appropriate because her husband and co-
defendant, Edward Garofalo, submitted an affidavit stating that
he would testify on her behalf, but only at a severed trial.

In light of the Court's prior rulings, the Court's
recent severance of Romeo and Sciaretta appears to reflect a
determination that a trial of seven defendants could become

17

unwieldy.  Moreover, because two trials were scheduled -
Dimichele's trial and the trial of the other defendants -
Sciaretta and Romeo could be severed from Persico, Persico, Jr.,
and Guerra without increasing the number of trials before the
Court and without requiring the government to produce its
witnesses any more times than was already necessary.

However, since the Court's decision, Anthony Preza has
pled guilty, and the guilty pleas for Edward Garofalo and Alicia
Dimichele will be scheduled shortly.  Thus, a joint trial of all
remaining defendants would involve only five defendants.
Moreover, because Dimichele will have pled guilty, a joint trial
would permit the case to be resolved in one trial, thereby
preserving both judicial and governmental resources.

In contrast, two trials will require the government to
introduce identical proof twice.  Persico, Persico, Jr., Romeo
and Sciaretta, are all charged in Counts Thirteen and Fourteen
with wire fraud and wire fraud conspiracy relating to Testa
corporation, in violation of 18 U.S.C. § 1349 and 1343.  This
same conduct is the basis of Racketeering Act Seventeen, charging
Persico and Persico, Jr., with committing and/or agreeing to the
commission of wire fraud and commercial bribery as part of the
racketeering conspiracy.  These Counts and Racketeering Act
Seventeen are based on consensual recordings, trial testimony and
documentary evidence regarding the payments of kickbacks to
Sciaretta, a Testa employee.  In addition, the evidence regarding

18

the Colombo organized crime family, its involvement in the
demolition and carting industries and the racketeering conspiracy
will be relevant, even if Sciaretta and Romeo are tried
separately.  Thus, two trials will burden the Court with
duplicative trials and will require the government to present its
proof of these charges twice.  United States v. Lyles, 593 F.2d
182, 191 (2d Cir. 1979) (holding that the presumption in favor of
joint trials "conserves judicial resources, alleviates the burden
on citizens serving as jurors, and avoids the necessity of having
witnesses reiterate testimony in a series of trials." (quoting
United States v. Borelli, 435 F.2d 500, 502 (2d Cir. 1970));
Richardson v. Marsh, 481 U.S. 200, 209-10 (1987); United States
v. Rucker, 32 F. Supp. 2d 545, 547 (E.D.N.Y. 1999); United States
v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).  For these
reasons, the government respectfully submits that reconsideration
of the Court's decision to sever Romeo and Sciaretta is
appropriate in light of the guilty plea of Anthony Preza and
anticipated guilty pleas of Alicia Dimichele and Edward Garofalo.

<u>CONCLUSION</u>

For the reasons set forth above, the government's
motion in limine to admit (1) the 911 recordings from October 20,
1993 and (2) recorded statements of (a) John "Sonny" Franzese,
(b) Raph DeLeo and (c) Edward Garofalo should be granted.  In
addition, the government respectfully submits that the Court

should reconsider its decision to sever Sciaretta and Romeo, and should conduct one joint trial with all five remaining defendants.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

Nicole Argentieri
Rachel Nash
Allon Lifshitz
Assistant U.S. Attorneys
    (Of Counsel)

20