UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

        -against-

MICHAEL J. PERSICO,

              Defendant.
-------------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CR-147 (S-4) (SLT)

**TOWNES, United States District Judge:**

The fourth superceding indictment in this case (the "Instant Indictment") charges defendant Michael J. Persico ("Defendant") and several co-defendants with, among other offenses, a racketeering conspiracy (Count One), a Hobbs Act Extortion Conspiracy (Count Four) and Hobbs Act Extortion (Count Five). The racketeering conspiracy count alleges 25 racketeering acts, 10 of which allegedly involve Defendant and five of which – Racketeering Acts One, Two, Three, Five and Twelve – are relevant herein. Racketeering Acts One and Two charge Defendant with extortion-related crimes against a John Doe #1 between 1989 and 1991. Racketeering Act Three charges Defendant with conspiring to murder one Joseph Scopo and with aiding and abetting in the murder, which occurred on or about October 20, 1993. Racketeering Acts Five and Twelve charge Defendant with extortion-related crimes against a John Doe #2 in 1993-94 and 2007-09, respectively.

By motion filed March 26, 2012, Defendant now moves to dismiss Racketeering Acts One and Two, both on the ground of pre-indictment delay and on the ground that the acts are not sufficiently related to any other racketeering acts or to the charged enterprise. Defendant also moves to suppress (1) certain recordings made pursuant to court-authorized audio surveillance at a federal penitentiary in Lompoc, California; (2) recordings of telephone calls placed from prison

by Defendant's father and brother; and (3) evidence obtained during a search of Romantique Limousines at a time when the business was partly owned by Defendant. In addition, Defendant moves pursuant to Fed. R. Crim P. 7(f) for a bill of particulars concerning Counts Four and Five and the five racketeering acts discussed above, and moves pursuant to Fed. R. Crim P. 16 for disclosure of prison records relating to Defendant's father and three other individuals. For the reasons stated below, Defendant's motions to dismiss and for a bill of particulars are denied; the parties are directed to submit supplemental briefing with respect to Defendant's motion to suppress the recordings of telephone calls placed by Defendant's brother, Alphonse Persico; and all remaining motions are moot.

## I. Defendant's Motion to Dismiss

In Point I of his Memorandum of Law in Support of his Pretrial Motions ("Defendant's Memo"), Defendant moves to dismiss the first two racketeering acts alleged in Count One of the Instant Indictment. Racketeering Act One alleges that in or about and between 1989 and 1991, Defendant, together with others, either made one or more extortionate extensions of credit to John Doe #1 or participated in the use of extortionate means to attempt to collect and collect one or more extensions of credit from John Doe #1. Racketeering Act Two alleges that in or about and between 1990 and 1991, Defendant, together with others, either (1) conspired to make one or more extortionate extensions of credit to John Doe #1, (2) made one or more extortionate extensions of credit to John Doe #1, or (3) conspired to participate in the use of extortionate means to attempt to collect and collect one or more extensions of credit from John Doe #1. The government has advised Defendant that John Doe #1 is Kenneth Geller and that each racketeering act "refers to a distinct loan to Geller." Defendant's Memo at 4, 8.

At least one of the two acts involves a loan to Geller made by an individual by the name of Alfred Polizzotto. Defendant has a loan agreement (attached to Defendant's Memo as Ex. C) which documents a 30-day loan of $53,000 from Polizzotto to Geller. In addition, Defendant has recordings apparently relating to this transaction, including recordings of Geller (1) "discuss[ing] at length his alleged need to quickly obtain a short-term loan," (2) "thanking [Defendant] for introducing [him] to Polizzotto," and "repeatedly inquiring of [Defendant] his understanding regarding the manner in which Mr. Polizzotto structured the loan." *Id.*

Although Defendant concedes that Polizzotto was "a friend" of his, Defendant denies that this loan was an extortionate extension of credit. Defendant asserts that Polizzotto "has no affiliation with the Colombo family" and that there is "no indication that . . . the Geller loans were in any way related to the activities of the enterprise." *Id.* at 12. That assertion is substantiated by a recording in which Defendant responds to Geller's inquiry regarding the structure of the loan by saying "that he did not know precisely how Polizzotto had structured the loan and that it was his understanding that the loan was completely 'legitimate.'" *Id.* However, Polizzotto died in 2001 and is, therefore, no longer available to testify regarding this loan.

## A. Defendant's Due Process Argument

Asserting that Polizzotto is a critical witness, Defendant now moves to dismiss both Racketeering Acts One and Two, principally on the ground that the government's unjustified 20-year delay in bringing charges relating to the extortion-related offenses charged in these two racketeering acts violated his rights under the Due Process Clause of the Fifth Amendment of the United States Constitution. Defendant posits that testimony from Polizzotto would have been "critical to show that [Defendant] did not arrange for, conspire to or extend extortionate

3

extensions of credit to Geller." *Id.* at 10.  In addition, Defendant argues that the government

gathered the information regarding the Geller loans 20 years ago, and had "no legitimate reason"

to delay in bringing these charges against Defendant. *Id.* at 10.

In its response, the government argues that Defendant cannot establish the two elements

necessary to establish pre-indictment delay that violates the Fifth Amendment.  Characterizing

the first element as "substantial prejudice," the government notes that Defendant has "offer[ed]

no basis for the Court to find that [Polizzotto] . . . would have provided any testimony that would

exculpate [Defendant], let alone what that testimony might be." *Id.* at 23-24.  The government

argues that Defendant's proof of prejudice is, therefore, speculative rather than definite. *Id.* at 24

(citing *United States v. Birney*. 686 F.2d 102, 105-06 (2d Cir. 1982)).  In addition, the

government asserts that the prejudice would not be "substantial" if, as Defendant claims, the

recordings establish that Polizzotto set the terms of the loan. *Id.*

Characterizing the second element as requiring Defendant to produce evidence that "the

government caused a delay in order to obtain a tactical advantage," the government argues that

Defendant has not met this burden, but has merely attempted to shift this burden to the

government by asserting that the government can provide "no legitimate reason" for the pre-

indictment delay. *Id.*  The government further notes that Defendant does not assert that the

government knew Polizzotto would die if it delayed the indictment, and cannot argue that the

delay was in order to gain a tactical advantage.

In his reply papers, Defendant represents that Polizzotto "would undoubtedly have

exculpated [Defendant] by testifying that it was he . . . who set the terms of the loan to Geller and

that the loan was not extortionate" and that Polizzotto is "the only witness who could disprove

4

whatever claim Geller has made regarding the loan agreement between the two of them." Reply Memorandum in Further Support of Defendant's Motion ("Reply Memo") at 3, 4 (emphasis added). However, Defendant concedes in a footnote that it has recordings of conversations between Geller and Persico that support the position that Polizzotto set the terms of the agreement. *Id.* at 3. Moreover, Defendant has produced affidavits from Polizzotto's son and secretary, both of whom state that Polizzotto occasionally extended loans.

In his affidavit, Polizzotto's son expresses the belief that his father would have testified on Defendant's behalf and would have stated that he, not Defendant, "set the terms of any loans he extended and that he never extended an extortionate loan." Affidavit of Alfred Polizzotto, III (attached to Reply Memo as Ex. A) at ¶3. Polizzotto's son also states that because Polizzotto "ordinarily maintained files of all his activities," he could be "expected to have maintained a file" concerning the loan – a file which now cannot be located. *Id.* at ¶5. In addition, Polizzotto's son states that, due to the passage of time, he is "unable to determine where [his] father banked at the time or from what bank accounts [he] . . . might have extended such a loan," thus precluding Defendant's counsel from obtaining cancelled checks or other documentary evidence pertaining to the loan. *Id.* at ¶6.

Polizzotto's secretary's affidavit repeats many of the allegations made by Polizzotto's son. For example, Polizzotto's secretary states that she is "confident" that Polizzotto would have testified on Defendant's behalf and would have stated that he, not Defendant, "set the terms of any loans he extended and that he never extended an extortionate loan." Affidavit of Josephine Curcio (attached to Reply Memo as Ex. B) at ¶5. In addition, Polizzotto's secretary states that Polizzotto "was meticulous about keeping his files and . . . unquestionably would have

5

maintained documents on any loans he extended for a number of years." *Id.* at ¶3. In addition, Polizzotto's secretary speculates that she may have drafted the loan document at issue and been present for a discussion regarding the terms of the loan, but can no longer recall because it was so long ago. *Id.* at ¶4.

In response to the government's arguments regarding the second element of the pre-indictment delay test, Defendant implies that the government has the duty to provide justification for the 20-year delay. Citing to United States v. *Elsbury*, 602 F.2d 1054, 1059 (2d Cir. 1979), which requires a showing of "unjustifiable Government conduct" to establish a Fifth Amendment violation, Defendant opines that "given that the government has failed to provide any plausible explanation, let alone justification, for its extraordinary delay, the only logical conclusion is that the government intentionally decided not to bring charges in the years following the investigation." *Id.* at 10 (emphasis in original). Defendant further asserts that the government has attempted to characterizes the 20-year delay as "investigative," and asserts that this explanation is so "spurious" as to "smack[] of bad faith." *Id.* at 9.

### 1. The Law relating to Preindictment Delay

Discussions of the law regarding pre-indictment delay typically start with examination of two Supreme Court cases from the 1970's: *United States v. Marion*, 404 U.S. 307 (1971), and *United States v. Lovasco*, 431 U.S. 783 (1977). In *Marion*, the Supreme Court "considered the significance, for constitutional purposes, of a lengthy preindictment delay." *Lovasco*, 431 U.S. at 788. The Court concluded that only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections" of the Sixth Amendment, *Marion*, 404 U.S. at 320, and that statutes of limitations

6

"provide 'the primary guarantee, against bringing overly stale criminal charges.'" *Id.*, at 322

(quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966)). However, the *Marion* Court also

acknowledged that the Due Process Clause had "a limited role to play in protecting against

oppressive delay." *Lovasco*, 431 U.S. at 789.

The *Marion* Court did not "determine when and in what circumstances actual prejudice

resulting from preaccusation delays requires the dismissal of the prosecution" under the Fifth

Amendment. *Marion*, 404 U.S. at 324. Nonetheless, *Marion* made it "clear that proof of

prejudice is generally a necessary but not sufficient element of a due process claim, and that the

due process inquiry must consider the reasons for the delay as well as the prejudice to the

accused." *Lovasco*, 431 U.S. at 790. In addition, the Court noted:

> [T]he Government concedes that the Due Process Clause of the
> Fifth Amendment would require dismissal of the indictment if it
> were shown at trial that the pre-indictment delay in this case caused
> substantial prejudice to appellees' rights to a fair trial and that the
> delay was an intentional device to gain tactical advantage over the
> accused.

*Marion*, 404 U.S. at 324.

Six years later, in *Lovasco*, the Supreme Court again "consider[ed] the circumstances in

which the Constitution requires that an indictment be dismissed because of delay between the

commission of an offense and the initiation of prosecution." *Id.* at 784. In *Lovasco*, the district

court had dismissed an indictment brought more than 18 months after the crimes alleged in that

indictment were committed. The government not only made "no systematic effort" to excuse the

delay, *id.* at 786, but stipulated that "that little additional information concerning the crimes was

uncovered in the 17 months" prior to indictment. *Id.* at 785. The defendant claimed to have

been prejudiced by the pre-indictment delay, testifying that two material witnesses had died during that period. *Id.*

In analyzing this case, the *Lovasco* Court identified the relevant inquiry as "whether . . . compelling respondent to stand trial after the Government delayed indictment to investigate further violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Id.* (internal quotations and citations omitted). The Court answered this question in the negative, holding instead that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* The Court stated:

> [I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S., at 324 . . . precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," *Smith v. United States*, 360 U.S. 1, 10 . . . (1959). This the Due Process Clause does not require.

Id. at 795-96 (footnote omitted). Moreover, in a footnote, the Court stated:

> In Marion we noted with approval that the Government conceded that a "tactical" delay would violate the Due Process Clause. The Government renews that concession here . . . and expands it somewhat by stating: "A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense . . . ."

*Id.* at 795, n. 17.

Like the *Marion* Court, the *Lovasco* Court declined to "determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions." *Id.* at 796. Rather, the *Lovasco* Court left to lower courts "the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases." *Id.*

While the Supreme Court has not re-visited the issue of when preindictment delay constitutes a Due Process violation since 1977, the Court has mentioned *Marion* and *Lovasco* on several occasions. However, the Court's characterization of these two cases has varied. For example, in *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 563 (1983), the Court characterized *Lovasco* as articulating that Due Process claims "can prevail only upon a showing that the Government delayed seeking an indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant or in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges." In *United States v. Gouveia*, 467 U.S. 180, 192 (1984), the Court cited *Marion* and *Lovasco* for the proposition that "the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." Similarly, in *Doggett v. United States*, 505 U.S. 647, 666 (1992), the Court stated that *Marion* "explained" that the Due Process Clause "would require dismissal of [an] indictment if it were shown at trial that [a] delay . . . caused substantial prejudice to [a defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused."

9

The Courts of Appeals, too, have adopted various standards. As Justice White noted in his 1988 dissent from a decision to deny certiorari in a Second Circuit case addressing the correct test for determining if prosecutorial preindictment delay amounts to a violation of the Due Process Clause:

> The Second Circuit held that there was no due process violation because petitioner "made no showing of an improper prosecutorial motive." [*United States v. Hoo*,] 825 F.2d 667, 671 (1987). Other Circuits have similarly required a showing of prosecutorial misconduct designed to obtain a tactical advantage over the defendant or to advance some other impermissible purpose in order to establish a due process violation. *United States v. Ismaili*, 828 F.2d 153, 166 (CA3 1987); *United States v. Lebron-Gonzalez*, 816 F.2d 823, 831 (CA1), *cert. denied*, 484 U.S. 843, and 857 . . . (1987); *United States v. Caporale*, 806 F.2d 1487, 1514 (CA11 1986), *cert. denied*, 482 U.S. 917, and 483 U.S. 1021 . . . (1987); *United States v. Jenkins*, 701 F.2d 850, 854-855 (CA10 1983). Two Circuits, however, have concluded that intentional misconduct is not the *sine qua non* for a due process violation from prosecutorial preindictment delay, and instead they hold that the proper inquiry is to balance the prejudice to the defendant against the Government's justification for delay. *United States v. Valentine*, 783 F.2d 1413, 1416 (CA9 1986); *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 403-404 (CA4 1985). Exemplifying the significant disagreement in the lower courts over the proper test, panels in the Fifth and Seventh Circuits have acknowledged conflicts between decisions from their own Circuits on this issue. *Dickerson v. Louisiana*, 816 F.2d 220, 229, n. 16 (CA5), *cert. denied*, 484 U.S. 956 . . . (1987); *United States v. Hollins*, 811 F.2d 384, 387-388 (CA7 1987).

*Hoo v. United States*, 484 U.S. 1035, 1035-36 (1988).

In the Second Circuit, too, there has been some variation in the standards adopted by different panels. For example, while most panels have held that "actual prejudice" is one of the two elements necessary to make out a Due Process violation, *see, e.g., Bierenbaum v. Graham*, 607 F.3d 36, 51 (2d Cir. 2010); *Denis v. Upstate Correctional Facility*, 361 F.3d 759, 760 (2d

Cir. 2004), some panels have indicated that the prejudice must be "substantial." *See, e.g., United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (cited with approval in *United States v. Ray*, 578 F.3d 184, 199 (2d Cir. 2009)); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987). Still other panels have failed to qualify the degree of prejudice required. *See, e.g., United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990); *United States v. Birney*, 686 F.2d 102, 105 (2d Cir. 1982); *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979).

Similarly, while all panels agree that something more than prejudice is required, the panels do not entirely agree on this second element. Many panels have held that a defendant must show that "the delay was an intentional device to gain [a] tactical advantage over the accused." *See, e.g., Denis*, 361 F.3d at 760; *Cornielle*, 171 F.3d at 752. Other panels state that the defendant must show that the delay was "so unfair as to violate fundamental concepts of fair play and decency, such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage." *Scarpa*, 913 F.2d at 1014 (quoting *Rubin*, 609 F.2d at 66). Yet other panels have held that a defendant must show "unjustifiable government conduct," *United States v. Ruggiero*, 726 F.2d 913, 925 (2d Cir. 1984); *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979), and have implied that proving a "deliberate delay to achieve a substantial tactical advantage" is but one way of establishing such conduct. *Ruggiero*, 726 F.2d at 925. Another panel has indicated that a defendant must establish that "the prosecution's reasons for the delay were improper." *Bierenbaum*, 607 F.3d at 51 (citing *United States v. Langella*, 776 F.2d 1078, 1083 (2d Cir.1985)).

With all these different standards to choose from, the parties in the case have picked those standards most favorable to them. With respect to the first element, Defendant argues that he

11

need only establish actual prejudice, while the government argues that defendant must also prove

that the prejudice was substantial. With respect to the second element, Defendant argues that the

government had "no legitimate reason" to delay in bringing these charges against Defendant.

Defendant's Memo at 10. The government, in contrast, characterizes the second element as

requiring Defendant to produce evidence that "the government caused a delay in order to obtain a

tactical advantage" and argues that Defendant has not met this burden but has merely attempted

to shift this burden to the government by suggesting that the government can provide "no

legitimate reason" for the pre-indictment delay. Government Memo at 24. In his reply,

Defendant switches to a slightly different standard, arguing that the delay was unjustifiable.

Reply Memo at 6, 8.

### 2. *Prejudice*

This Court does not need to determine whether the first element requires proof of "actual"

or "substantial" prejudice, however, because Defendant has not adduced any proof of prejudice.

As the Second Circuit has observed:

> [P]roof of prejudice must be definite and not speculative . . . . To
> sustain her burden of proof, the defendant must demonstrate how
> (the loss of evidence) is prejudicial to her . . . . Without definite
> proof as to this essential element no due process claim has been
> stated.

*Birney*, 686 F.2d at 105-06 (internal quotation and citations omitted; parenthetical in original).

In this case, the scope and nature of the evidence which was allegedly lost as a result of

preindictment delay is uncertain and cannot be shown to have prejudiced Defendant.

Defendant's motion papers allude to three categories of evidence that were allegedly lost

as a result of the passage of time. First, Polizzotto has died, making it impossible for him to

12

testify on Defendant's behalf. Second, files and bank records maintained by Polizzotto and relating to the Geller loan have been lost or destroyed. Third, Polizzotto's secretary can no longer recall any conversations regarding the terms of the Geller loan.

Defendant can only speculate, however, regarding exactly what evidence was lost. First, while it is clear that Polizzotto can no longer testify, it is uncertain whether Polizzotto would have been willing to testify or what evidence he would have provided. Second, while both Polizzotto's son and secretary state that Polizzotto would have maintained a file relating to the Geller loan, they do not know what documents would be contained therein. Third, Polizzotto's secretary only speculates that she "*may* have drafted the loan document at issue and . . . *may* have been present for a discussion regarding the terms of the loan." Curcio Aff. at ¶4.

Even assuming that speculation were sufficient, Defendant could not establish that this evidence would not be merely cumulative. Defendant has recordings of Geller (1) "discuss[ing] at length his alleged need to quickly obtain a short-term loan," (2) "thanking [Defendant] for introducing [him] to Polizzotto," and "repeatedly inquiring of [Defendant] his understanding regarding the manner in which Mr. Polizzotto structured the loan." Defendant's Memo at 9. Moreover, Defendant has been recorded stating that the loan is "legitimate" and that he does not know Polizzotto structured the loan. In addition, Defendant has the loan agreement signed by Polizzotto and Geller, which purports to set forth the terms of the agreement.

To the extent that Defendant intends to argue that Polizzotto made the loan independently, without any involvement of the Colombo Family, this contemporaneous evidence is more than sufficient to make out that claim. Indeed, it is difficult to imagine what evidence from Polizzotto's files or what testimony Polizzotto or his secretary could offer that would add

much, if anything, to this argument.  Accordingly, this Court does not find that Defendant has –
or could – establish that the evidence lost as a result of the delay prejudiced him.

### 3. The Government's Conduct

With respect to the second element of the Due Process claim, this Court agrees with the
government that it is incumbent on Defendant to prove that the government either acted
deliberately to secure an advantage or recklessly in disregard of the probable prejudicial impact
of the delay upon the defendant's ability to defend against the charges.  Although some panels
have held that a defendant must show "unjustifiable government conduct," *Ruggiero*, 726 F.2d at
925; *Elsbery*, 602 F.2d at 1059, or that "the prosecution's reasons for the delay were improper,"
*Bierenbaum*, 607 F.3d at 51 (citing *Langella*, 776 F.2d at 1083), this Court does not interpret
these cases as implying that the government has a preliminary burden to justify the delay.
Rather, this Court notes that the Second Circuit has repeatedly referred to the "heavy burden" a
defendant faces in having to prove both elements.  *See, e.g.*, *Scarpa*, 913 F.2d at 1014 *Cornielle*,
171 F.3d at 752; *Hoo*, 825 F.2d at 671.

This Court finds that Defendant has not established this element.  Defendant does not
suggest an improper motive for the delay.  Rather, Defendant's Memo asserts that "[p]lainly,
prosecutors . . . recognized that they lacked sufficient evidence to charge [Defendant]" at the time
they first gathered the information regarding the Geller loans, and speculates that they may be
employing a "quantity trumps quality approach."  Defendant Memo at 5.  However, this
argument suggests a legitimate reason for delay:  that the government may have reassessed the
decision not to charge Defendant in connection with the Geller loans after obtaining evidence
that these acts fit into a pattern of racketeering activity.

14

Since this Court finds that Defendant has not proved either of the elements necessary to establish a Due Process violation, Defendant's motion to dismiss Racketeering Acts One and Two on the grounds of preindictment delay is denied. However, this denial is without prejudice to renewing this motion if facts adduced at trial provide Defendant with proof of prejudice and government misconduct.

### B. Defendant's Second Argument for Dismissal

Defendant also seeks to dismiss Racketeering Acts One and Two on the theory that they are not sufficiently related to the RICO enterprise or to the pattern of racketeering activity. Noting that he is only alleged to be an associate, rather than a member, of the Colombo Family and asserting that Polizzotto "has no affiliation with" the alleged racketeering enterprise, Defendant argues that "[t]here is no indication that [Defendant] was able to commit the predicate offenses solely by virtue of his position in the enterprise or that the Geller loans were in any way related to the activities of the enterprise." Defendant's Memo at 12 (internal quotations and citations omitted). Defendant further states that there is no evidence that Defendant "acted at the direction or for the benefit of anyone else in the enterprise" and "no allegation that the conduct was meant to advance the purposes of anyone but [Defendant]." Id.

To the extent that this argument seeks to challenge the sufficiency of the government's evidence, it is clearly premature. If the government fails to establish that these racketeering acts are related to the criminal enterprise or to the other racketeering acts, Defendant may renew this argument during or after the trial. To the extent that Defendant seeks to challenge the sufficiency of the indictment, this Court finds that the allegations set forth in Racketeering Acts One and Two are sufficient to meet the requirements of Rule 7(c) of the Federal Rules of Criminal

15

Procedure. This rule requires only that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Under this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975). The allegations in Racketeering Acts One and Two meet this minimal requirement.

## II. The Suppression Motions

Points II through V in Defendant's Memo seek to suppress various items of evidence. Points II and III seek to suppress recordings of visiting room conversations between Defendant and his father, Carmine Persico, which were made in early 1992, at a time when Defendant's father was incarcerated at a federal penitentiary in Lompoc, California. Point IV seeks to suppress recordings of "telephone calls placed by Alphonse Persico between October 1991 and January 1992 from the Federal Correctional Facility in Milan, Michigan, as well as recorded telephone calls placed by Carmine Persico from Lompoc in February 1991," alleging that these calls were intercepted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. Defendant's Memo at 30. Point V seeks to suppress any evidence recovered as a result of a search of Romantique Limousines in the "early 1990's," at which time the business was partly owned by Defendant, on the ground that the government has not yet produced a warrant authorizing the search, the affidavit supporting that application, or an inventory of the items seized.

In response to these points, the government states that it does not intend to introduce the recordings made in the Lompoc penitentiary or the recordings of telephone calls that Defendant's

16

father placed from that prison in February 1991. Government Memo at 43 & 44, n.15. In addition, the government states that it has now provided Defendant with a copy of the warrant authorizing the search of Romantique Limousines and the supporting affidavit. *See* Defendant's Memo at 43. Accordingly, the government argues that Points II and III are moot and should be "dismissed without prejudice," and that Point V is now baseless and should be "dismissed with prejudice." *Id.*

In his Reply Memo, Defendant agrees that Points II and III, as well as that portion of Point IV which seeks to suppress the recordings of telephone calls placed by Defendant's father, are all moot. Reply Memo at 1-2. However, Defendant states that, sometime after the filing of his motion papers, the government provided him with "additional prison communications of Alphonse Persico while he was incarcerated at FCI Milan and at FCI Fairton." Reply Memo at 11, n. 3. Implying that these are all telephonic communications, Defendant seeks to expand Point IV to cover these communications as well. *Id.* The Reply Memo does not expressly address Count V, but acknowledges receipt of the warrant authorizing the search of Romantique Limousines and the supporting affidavit (copies of which are attached to the Reply Memo as Ex. D).

Since the parties agree that Points II and III, and that portion of Point IV which seeks to suppress the recordings of telephone calls placed by Defendant's father are moot, these motions are denied. Similarly, since Point V was based on the government's failure to provide a valid search warrant and the underlying documentation, this Court finds that this point is also moot. Accordingly, this Court will only address that portion of Point IV which seeks to suppress recordings of telephone calls placed from prisons by Alphonse Persico.

17

Point IV incorporates two arguments.  First, Defendant asserts that the government violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, by intercepting these calls.  Second, Defendant alleges that the government's actions violated his rights under the First, Fourth, Fifth and Eighth Amendments of the United States Constitution.

### A. *Title III*

"Title III generally forbids the intentional interception of wire communications, such as telephone calls, when done without court-ordered authorization." *United States v. Workman*, 80 F.3d 688, 692 (2d Cir. 1996).  Title III "clearly applies to prison monitoring," *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987) (citing cases), and specifically provides that the contents of wire communications intercepted in violation of its prohibitions cannot be received in evidence at any trial.  *See* 18 U.S.C. § 2515.  However, Title III excludes from its coverage any communications intercepted through "any telephone or telegraph equipment or facility or any component thereof . . . being used by . . . an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a).  In addition, 18 U.S.C. §2511(2) establishes some exceptions to Title III's general prohibition, one of which provides that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception." 18 U.S.C. §2511(2)(c).

In *Amen*, the Second Circuit reviewed the legislative history of §2511(2)(c) and concluded that "Congress intended the consent requirement to be construed broadly." *Amen*, 831 F.2d at 378.  The *Amen* Court noted, *inter alia*, that the Senate Report had specifically stated in

relation to §2511(2)(c) that "Consent may be expressed or implied." *Id.* (quoting S. Rep. No.

1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Admin. News 2112, 2182).

Based on this history, the Second Circuit in *Amen* and subsequent cases has inferred an inmate's

consent to the interception of his calls on institutional telephones under circumstances in which

the inmate had notice that the calls might be intercepted.  *See, e.g., Workman*, 80 F.3d at 693;

*United States v. Willoughby*, 860 F.2d 15, 19-20 (2d Cir. 1988); *Amen*, 831 F.2d at 378-79.

Specifically, the Second Circuit has stated:

> In the prison setting, when the institution has advised inmates that
> their telephone calls will be monitored and has prominently posted
> a notice that their 'use of institutional telephones constitutes
> consent to this monitoring,' the inmates' use of those telephones
> constitutes implied consent to the monitoring within the meaning
> of Title III.

*Willoughby*, 860 F.2d 19-20 (citing *Amen*, 831 F.2d at 379).

In this case, the government is invoking the consent exception set forth in §2511(2)(c)

and attempting to show that the circumstances in FCI Milan at the time Alphonse Persico placed

his calls were nearly identical to the circumstances in *Workman, Willoughby* and *Amen*.  In *Amen*,

the defendants were "on notice of the prison's interception policy from at least four sources."

*Amen*, 831 F.2d at 379.  These sources were summarized in *Workman* as: "federal prison

regulations clearly indicating that inmate telephone calls were subject to monitoring, an

orientation lecture in which the monitoring and taping system was discussed, an informational

handbook received by every inmate describing the system, and signs near the telephones

notifying inmates of the monitoring." *Workman*, 80 F.3d at 693.

In *Willoughby*, the Court held that "a combination of notification at an orientation lecture and signs near the telephones explaining the policy was sufficient to justify the inference of consent by prisoners who used the phones." *Id.* (citing *Willoughby*, 860 F.2d at 20). In *Willoughby*, as in *Amen*, the notices were placed on or above each telephone and stated, in English and Spanish:

NOTICE

> The Bureau of Prisons reserves the authority to monitor conversations on this telephone.  Your use of institutional telephones constitutes consent to this monitoring.  A properly placed telephone call to any attorney is not monitored.

Similarly, in *Workman*, the combination of a sign placed near each telephone stating that "all inmate telephone conversations are subject to electronic monitoring," notice of the telephone monitoring program contained in an orientation handbook, and a state regulation providing "public notice that prisoner 'calls are subject to monitoring and may be tape recorded'" was held to provide adequate notice.

In its response to Defendant's motion, the government argues that Defendant was on notice of the telephone surveillance policy because of federal regulations, notices placed near telephones and information received at orientation.  First, the government notes that the federal regulations in effect in early 1992 provided:

> The Warden shall establish procedures that enable monitoring of telephone conversations on any telephone located within the institution, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.  The Warden must provide notice to the inmate of the potential for monitoring.

Government Memo at 45-46 (quoting 28 C.F.R. §540.101 (1991)).  Second, the government asserts:

20

> [T]he Bureau of Prisons has advised that during the relevant
> period, signs notifying prisoners that their calls were monitored
> were placed near telephones used by prisoners at FCI Milan. Those
> signs provided as follows:
>
> NOTICE
> Pursuant to Bureau of Prisons Inmate telephone regulations:
>
> <u>All conversations</u> on this telephone are subject to monitoring. Your
> use of this telephone constitutes consent to this monitoring. You
> must contact your unit team to request an unmonitored attorney
> call.

*Id.* at 46 (emphasis in original and in sign). Third, the government states that "the Bureau of Prisons has advised that during the relevant period, inmates in FCI Milan were advised in admission and orientation handbooks and during admission and orientation sessions that their calls were monitored." *Id.* at 46-47.

In his Reply Memo, Defendant advances both procedural and substantive arguments. First, Defendant notes that the government is relying on "unsworn claim[s]" from "some unidentified Bureau of Prisons source" to establish the factual predicates for its argument. Reply Memo at 11. Defendant also argues in a footnote that the government has provided no evidence regarding the "FCI Fairton communications," which were disclosed to Defendant sometime after Defendant filed his motion and, accordingly, not mentioned in Defendant's motion papers. *Id.* at 12, n. 4.

Defendant also advances some substantive arguments, claiming that "the government has failed entirely to prove, as it must, that A. Persico consented to any monitoring of his telephone calls." Reply Memo at 11. Defendant asserts that the government must produce "proof that A. Persico in particular saw such signs or was so advised." *Id.* at 12. In addition, Defendant

21

contends that, even if Alphonse Persico impliedly consented to some type of monitoring, the government must establish "exactly" what he consented to and the scope of that consent. *Id.* Referring to the federal regulation quoted by the government, Defendant contends that Alphonse Persico's consent was "limited to monitoring necessary to 'preserve the security and orderly management of the institution and to protect the public,'" and that "he did not remotely agree to wholesale recording – without probable cause, a warrant, or even individualized suspicion – to further a criminal investigation of [Defendant]." *Id.* at 12-13.

Defendant's substantive arguments reflect a misconception regarding the reasoning of *Workman, Willoughby* and *Amen.* None of these cases required the government to establish actual notice or express consent. Rather, after holding that implied consent was sufficient under §2511(2)(c), these cases "inferred consent from circumstances indicating that the prisoner used the telephone with awareness of the possible surveillance." *Workman*, 80 F.3d at 693. Accordingly, the analysis in these cases does not focus on what a specific inmate was told, understood, and agreed to, but rather what inference can be drawn from the circumstances presented. *See id.* (rejecting a defendant's argument that the notice he received was insufficient since nothing in *Willoughby* or *Amen* "turned on whether the prisoner was specifically told that use of the telephones constituted consent").

Moreover, the regulation quoted by the government is relevant only in that it provided the public – including inmates – with notice of the "potential for monitoring." 28 C.F.R. §540.101. That regulation did not imply that such monitoring was limited to that which was necessary to preserve the security and orderly management of the institution and to protect the public. Even if it did, the signs allegedly placed near the phones expressly notified inmates of the contrary,

22

stating that "[a]ll conversations on this telephone are subject to monitoring." Government Memo at 46.

Defendant's procedural arguments, in contrast, have some merit. The factual predicates on which the government's argument relies are largely based on unsworn hearsay, attributed to unnamed Bureau of Prisons sources. Without declarations or affidavits from these sources or any evidence to substantiate their claims, this Court cannot make the factual findings necessary to determine whether the circumstances from which consent could be inferred existed at FCI Milan in February 1992. Acceptance of this unattributed hearsay would effectively deprive Defendant of any opportunity to contest the veracity or sufficiency of the government's sources and render the Title III analysis perfunctory.

This Court does not doubt that the government can provide the evidence to establish the facts in which their implied consent argument rests. Since Defendant's Reply Memo raises a Title III claim regarding FCI Fairton to which the government has not yet had any opportunity to respond, this Court will afford the government the opportunity to provide this evidence as part of their response to the new Title III claim. The government shall file its supplemental response on or before May 18, 2012, and Defendant shall have until May 25, 2012, in which to reply.

### B. Defendant's Constitutional Arguments

Although Point IV is based primarily on Title III, it also incorporates some constitutional claims. First, Defendant suggests that unless the consent exception is construed as permitting only security-related surveillance, an inmate would face "the intolerable dilemma of surrendering one constitutional right – *i.e.,* his (admittedly reduced) Fourth Amendment privacy right – in order to assert another – *i.e.,* his First and Fifth Amendment rights to speak and associate with his

23

loved ones." Defendant's Memo at 36 (internal quotations and citations omitted). Defendant argues that this "Hobson's choice" would "not only unfairly burden prisoners' Fourth Amendment rights, but also amount to cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 37. Second, suggesting that Defendant is forced to rely on telephone calls as "his primary means of communicating" with his father and brother because they are incarcerated in remote locations, Defendant argues that "taxing those calls with investigative eavesdropping would, in effect, subject [Defendant] to custodial interrogation – requiring full-blown Miranda warnings – and/or compulsory self-incrimination in violation of the Fifth Amendment." *Id.*

These arguments do not require lengthy analysis. First, Defendant does not have standing to raise the constitutional claims on behalf of his incarcerated relatives. *See, e.g., Mitchell v. Cuomo*, 748 F.2d 804, 810 (2d Cir. 1984) (citing cases for the proposition that inmates do not have standing to assert their fellow inmate's rights). Second, the Court rejects the notion that, by incarcerating Defendant's relatives in remote locations, the government compelled Defendant to call his relatives. Moreover, the government's surveillance of the telephone calls cannot reasonably be characterized as "interrogation" and did not compel Defendant to make inculpatory statements. In addition, the Second Circuit has held that "the interception of calls from inmates to noninmates does not violate the privacy rights of the noninmates." *Willoughby,* 860 F.2d at 22. Accordingly, this Court concludes that Defendant's constitutional arguments are entirely without merit.[1]

---

[1]To the extent that Defendant is attempting to allege a First Amendment violation, this Court notes that the government is not preventing Defendant from associating with his incarcerated relatives.

24

### *III. Bill of Particulars*

Point VI of Defendant's Memo seeks a bill of particulars as to five of the racketeering acts alleged in Count One and with respect to Counts Four and Five, which charge Defendant with conspiring to commit, and committing, Hobbs Act Extortion with respect to a John Doe #2. However, Defendant's Reply Memo states that, sometime after the instant motion was filed, the government "provided additional particulars" concerning Counts Four and Five and one of the racketeering acts: Racketeering Act Twelve. Reply Memo at 14. Accordingly, Defendant now seeks a bill of particulars only as to the remaining racketeering acts: Racketeering Acts One, Two, Three and Five.

Rule 7(f) of the Federal Rules of Criminal Procedure provides that a "court may direct the government to file a bill of particulars." The rule itself provides no guidance as to when a bill of particulars should be granted. *United States v. Galestro*, No. 06-CR-285 (ARR), 2008 WL 2783360, at *8 (E.D.N.Y. July 15, 2008). However, the Second Circuit has held that "[a] bill is appropriate to permit a defendant 'to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)). The decision as to whether to grant a defendant's request for a bill of particulars rests "within the sound discretion of the district court." *Id.* (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)).

"The principles governing requests for a bill of particulars are well settled." *Id.* "To obtain a bill of particulars, the defendant must show that the charges of the indictment are so

25

general that they do not advise him of the specific acts of which he is accused." *United States v. Guerrero*, 669 F. Supp. 2d 417, 426 (S.D.N.Y. 2009) (citing *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)). "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574. "[A] defendant may not employ a bill of particulars as a general investigative tool," and a bill of particulars "will not be issued simply to force the Government to particularize all of its evidence." *Guerrero*, 669 F. Supp. 2d at 426 (internal quotations and citations omitted). Indeed, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *Id.* (quoting *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y.2001)).

In charging Racketeering Acts One, Two, Three and Five in Count One, the Instant Indictment does little more than track the language of the statute charged. However, Defendant has received considerable information concerning these alleged acts from other sources. This information is more than adequate to permit Defendant to identify with sufficient particularity the nature of the charge pending against him, to prepare for trial, to avoid surprise, and to determine whether to interpose a defense of double jeopardy. *See Davidoff*, 845 F.2d at 1154. Indeed, it is readily apparent from the very nature of Defendant's requests that he is seeking specifics to which he is not entitled.

### A. Racketeering Acts One and Two

This Court has already discussed Racketeering Acts One and Two, and the information which Defendant has regarding these charges, in great detail. Both of these racketeering acts allege extortion-related offenses against John Doe #1. Defendant admits that the government has

provided evidence relating to these acts. Specifically, Defendant states that "[t]he government has advised that John Doe #1 is Kenneth Geller" and that each racketeering act "refers to a distinct loan to Geller." Defendant's Memo at 4, 8. In addition, Defendant has a wealth of information regarding one of these loans – the loan issued by Polizzotto in December 1990 which is discussed in detail at pp. 2-3, *ante*. Defendant's Memo not only describes recordings relating to this loan, but attaches a copy of documentation relating to his loan. *Id.* at 9-10, Ex, C.

At the time Defendant filed his motion papers, he may not have had much information regarding the other loan. Defendant's Memo states that Defendant did not "know the nature of the second alleged loan [or] . . . which loan is referenced in which act." Defendant's Memo at 40. However, sometime before Defendant filed his Reply Memo, the government provided Defendant with the affidavit in support of the government's request for a warrant to search Romantique Limousines. Reply Memo, Ex. D. This affidavit, which contains information relating to a $100,000 loan which Defendant personally made to Geller in 1989, should answer the questions set forth above.

To be sure, this affidavit and the other information produced by the government may not provide all of the details Defendant might like. For example, there may be co-conspirators other than Polizzotto and the extortionate means allegedly used to collect from Geller may not have been expressly disclosed. However, Defendant is not entitled to this level of detail. *See Guerrero*, 669 F. Supp. 2d 417, 426; *Trippe*, 171 F. Supp. 2d at 240. Accordingly, Defendant's request for a bill of particulars with respect to Racketeering Acts One and Two is denied.

### B. Racketeering Act Three

Racketeering Act Three alleges that Defendant and two co-defendants – Theodore N. Persico, Jr., and Francis Guerra – conspired to commit, and committed, the murder of Joseph Scopo. In the course of bail litigation, Defendant learned some details regarding Defendant's alleged involvement in these crimes. Defendant's Memo states that the government revealed, *inter alia*, that Defendant told Guerra and Russo to murder Scopo and "arranged the firearms to be used in the . . . murder." Defendant's Memo at 40. However, Defendant nonetheless expresses uncertainty regarding Defendant's alleged role in these crimes and asks that the government "be required to provide additional information regarding its theory as to Mr. Persico's involvement in the murder." *Id.*

"[A] bill of particulars 'is not intended, as such, as a means of learning the government's evidence and theories.'" *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (citing Charles Alan Wright *et al.*, *Federal Practice and Procedure*, §129 (1982)). If a bill of particulars is "necessary to give the defendant enough information about the charge to prepare his defense, 'it will be required even if the effect is disclosure of evidence or of theories.'" *Id.* However, it is not required where, as here, the government has already provided the defendant with extensive additional information concerning his alleged involvement. *See id.*; *Bortnovsky*, 820 F.2d at 574. Accordingly, Defendant's request for a bill of particulars with respect to Racketeering Act Three is denied.

### C. Racketeering Act Five

Racketeering Act Five alleges that in or about and between January 1993 and December 1994, Defendant, together with others, committed one or more of the following offenses with

28

respect to John Doe #2: financing an extortionate extension of credit in violation of 18 U.S.C. §893, extortionate extension of credit in violation of 18 U.S.C. §892(a), and/or extortionate collection of credit in violation of 18 U.S.C. §894(a)(1). Defendant acknowledges that the government has identified John Doe #2 as Anthony Russo. However, Defendant requests additional details: the amounts allegedly advanced, the form in which they were advanced, the extortionate means the government claims was used to collect the loans, and whether any co-conspirators were allegedly involved in these crimes.

Defendant's request effectively seeks discovery. As noted above, these sorts of "demands for particular information" are routinely denied. *Guerrero*, 669 F. Supp. 2d at 426; *Trippe*, 171 F. Supp. 2d at 240. The indictment provides the approximate dates of the acts and the district in which the acts occurred, and the government has subsequently supplied the name of the alleged victim. Defendant cannot claim to be unfamiliar with Anthony Russo, who is alleged to be involved in the Scopo murder discussed above. Since this information is sufficient to enable Defendant to understand the nature of the charges alleged in Racketeering Act Five and to prepare a defense, this Court sees no need for a bill of particulars.

### IV. Motion to Compel Production of Bureau of Prisons Records

In Point VII, Defendant moves pursuant to Fed. R. Crim. P. 16 to compel the government to produce prison records relating to Alphonse Persico, John Monteleone, Sr., Anthony Russo and Joseph Russo. Defendant's Memo at 44. In response to this motion and to a discovery motion from a co-defendant seeking certain police records, the government represents that it has "provided the defendants with copies of the remaining materials in its possession from the NYPD homicide files related to the murders of Michael Devine and Joseph Scopo, as well as the

29

requested Bureau of Prisons' [*sic*] records." Government's Memo at 59-60. However, in a

footnote, the government states: "Additionally, with regard to [Defendant's] motion for Bureau

of Prisons records, the government notes that such records are equally available to the defendants

pursuant to a Rule 17(c) subpoena, should they believe that such materials are relevant." *Id.* at

60, n. 17.

In his Reply Memo, Defendant complains that the government has "produced only

limited Bureau of Prisons records, omitting from its production the most critical portion – the

visiting lists and visiting records of the aforementioned individuals." Reply Memo at 17.

Defendant requests that the Court order the government to "immediately produce all Bureau of

Prisons records in its possession, custody or control with respect to the individuals named herein,

including all of those persons' visiting records during 1993 and 1994." *Id.* In the alternative,

Defendant requests that this Court sign a Rule 17(c) subpoena, directing the Bureau of Prisons to

produce these records. *Id.*

Since this Court construes the Government's Memo as representing that it has already

produced all of the requested records that are in its possession, it would be futile to issue an order

compelling the government to produce these records. In addition, Defendant has not made the

showing necessary to meet the requirements for issuing a Rule 17(c) subpoena. Rule 17(c) is not

"a means of discovery in a criminal trial." *United States v. Nixon*, 418 U.S. 683, 698-99 (1974).

Moreover, Defendant must make a request for specific materials, and show how these are

relevant and admissible at trial. *Id.* at 700.

30

### V. Co-Defendant's Motions

Finally, Point VIII of Defendant's Memo seeks to "join[] in the motions of his co-defendants to the extent that they are applicable to him." Defendant's Memo at 46. However this argument consists only of a point heading, which is quoted verbatim above. This Court declines to speculate regarding the motions to which Defendant is referring. Accordingly, unless Defendant identifies the portions of his co-defendants' motions that are applicable to him, this application is not justiciable.

### CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss Racketeering Acts One and Two is denied without prejudice to renewing the Due Process argument if justified by events at trial. With respect to Defendant's suppression motions, Points II and III – both relating to recordings made at a federal penitentiary in Lompoc, California – and that portion of Point IV which seeks to suppress the recordings of telephone calls placed from prison by Defendant's father, Carmine Persico, are moot. Points V and VII – which request the production of documents which have since been provided by the government – are also moot. Defendant's request for a bill of particulars is denied.

This Court shall reserve decision on that portion of Point IV which seeks to suppress the recordings of telephone calls placed by Defendant's brother, Alphonse Persico, to permit both parties time to submit supplemental briefing with respect to the Title III claim. Defendant's Title III claim is deemed amended to seek suppression of recordings made while Alphonse Persico was at FCI Fairton. On or before May 18, 2012, the government shall file a supplemental response, not only addressing the Fairton claim but also providing evidence to substantiate their

31

argument regarding FCI Milan.  Defendant shall file a supplemental reply on or before May 25,

2012.  To the extent that Defendant seeks to join in his co-defendant's motions, he shall specify

those motions in his supplemental reply.  Defendant may also renew its motion for a Rule 17(c)

subpoena.

**SO ORDERED.**

s/ SLT

SANDRA L. TOWNES
United States District Judge

Dated: May *10* , 2012
       Brooklyn, New York

32