**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

UNITED STATES OF AMERICA

             -v-                                         S4 10 Cr. 147 (SLT)

MICHAEL PERSICO, et al.,

                    *Defendants*.

-------------------------------------------------------X

**DEFENDANT MICHAEL PERSICO'S OPPOSITION**
**TO THE ADMISSION OF OTHER ACTS EVIDENCE**

Sarita Kedia
Sarita Kedia Law Offices, P.C.
5 East 22nd Street, Suite 7B
New York, New York 10010
(212) 681-0202

Paul Shechtman
Zuckerman Spaeder LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 704-9600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA
        -v.-                              10 CR 147 (S-4) (SLT)

FRANCIS GUERRA, *et al.*,

                         *Defendants*.
------------------------------------------------------------------X

## DEFENDANT MICHAEL PERSICO'S OPPOSITION
## TO THE ADMISSION OF OTHER ACTS EVIDENCE

### STATEMENT

      In the guise of establishing a RICO enterprise, providing conspiratorial background and presenting legitimate Fed. R. Evid. 404(b) proof, the government seeks to impugn defendant Michael Persico's character with a wave of illicit propensity evidence – ranging from uncharged murders, loan sharking and drug trafficking to extortion, mob sitdowns and gambling – designed to arouse the jury's emotions and incite it to convict on an improper basis.

      Admitting these flimsy allegations will cause confusion, distraction and delay, fueling a string of minitrials and sideshows – needless detours into collateral issues – as the parties battle over their validity.   And more fundamentally, the allegations constitute irrelevant and unfounded innuendo whose prejudicial effect far outweighs any slim probative value they might have.

      For these reasons, the Court should reject the government's proffer and preclude it from airing the allegations at trial.   Were the Court to allow them, however, a continuance of at least 90 days would be necessary to investigate the uncharged crimes and prepare defenses.

**ARGUMENT**

**THE PROFFERED ALLEGATIONS ARE
INADMISSIBLE AND SHOULD BE EXCLUDED**

## I.   THE UNCHARGED MURDER ALLEGATIONS ARE INADMISSIBLE

The government begins with a flurry of uncorroborated assertions attributed to a person dubbed CW2, believed to be a crooked accountant named Kenneth Geller.   Geller has been a cooperating witness for more than two decades and testified in a 1992 trial against Victor Orena Sr.   Though Geller's accusations were apparently insufficient to indict Persico for the better part of 20 years, the government would now use him to prove not only two charged racketeering acts but a rash of uncharged crimes – including murders.

### A.   THE LALIMA MURDER ALLEGATION SHOULD BE EXCLUDED

The government first contends that Persico, following a purported business dispute with a man named Joseph Lalima, offered to sell Geller "one of Lalima's watches," supposedly saying he "would no longer need" it.   Govt. Mem. 19-20.   According to the government, Geller "is expected to testify that he never saw Lalima again and learned ... he was murdered."   *Id.* 20.

As a threshold matter, what Geller claims to have "learned" is patent hearsay, and the prosecutors do not identify the information's source, describe how Geller came to learn it or explain how they propose to get it in evidence.   But even beyond the hearsay problem, the government proffers no evidence showing who killed Lalima or suggesting that Persico had anything to do with the murder.   Indeed, so far as the proffer indicates, Geller himself has no idea who committed the crime – much less knowledge of Persico playing a part.

Instead, the government tries to insinuate Persico's involvement through a cryptic aside about buying a watch.   But at most, that stray remark – assuming it was actually made and taken at

face value – tends to imply that Persico might have known Lalima was going to be killed.   And it is elementary that mere knowledge – even coupled with presence, which is not alleged – does not give rise to criminal liability.   *E.g., U.S. v. Terrell*, 474 F.2d 872, 875 (2d Cir. 1973).

In view of these infirmities, the government's bid to tie the murder to Persico by an obscure, offhand watch reference amounts to pure speculation.   *A fortiori*, its proffer cannot support preponderant jury findings that the Colombo Family – and Persico in particular – had any role in Lalima's death.   It follows that the murder allegation fails Rule 104 scrutiny – reason enough to exclude it from evidence.   *Huddleston v. U.S.*, 485 U.S. 681, 689-91 (1988).

Punctuating this conclusion is that Persico adamantly denies involvement in the murder and will strenuously contest it at trial.   Proving his participation would thus spawn a "trial within a trial," wasting time, confusing the jury and stirring delay over issues with little or no bearing on the crimes charged in the indictment.   *See, e.g., U.S. v. Aboumoussallem*, 726 F.2d 906, 912 (2d Cir. 1984) (internal quotes omitted); *U.S. v. Pascarella*, 84 F.3d 61, 70 (2d Cir. 1996); *Ricketts v. City of Hartford*, 74 F.3d 1397, 1413-14 (2d Cir. 1996); Fed. R. Evid. 403.

This is especially true in light of the following factors:

1.   Persico is not accused of committing the charged crimes with Theodore Persico Sr. or Frank Sparaco, the other reputed participants in the meeting about the underlying business dispute.   Govt. Mem. 19.

2.   With Geller having cooperated for over 20 years, the government presumably would have prosecuted the murder long ago, or at least charged it now, if his claim were credible and the watch incident actually happened – points the defense will hammer home at trial if the allegation comes in.

3.   Indeed, despite his two decades of cooperation, it appears that Geller did not mention the Lalima watch story until 2010, when it first turns up in his debriefing reports – grist for a potent claim of recent fabrication.

Finally, beyond spurring a distracting and time-consuming minitrial, bootstrapping an uncharged murder that the government cannot prove legitimately – that is, sneaking it in through the backdoor – is the very essence of unfair prejudice.   This is yet another ground for exclusion under Rule 403.

The government's arguments for admission are unpersuasive.   First, it claims the Lalima murder is "probative of the Colombo [F]amily's commitment to generating money through criminal activities, including murder, and demonstrates the [Family's] existence and nature." Govt. Mem. 20 (citations and internal quotes omitted).   But Persico will not dispute the Colombo Family's nature or existence at trial, removing the issue from the case and eliminating the government's professed need to parade an uncharged murder before the jury.   *See, e.g., Huddleston*, 485 U.S. at 691-92; *U.S. v. Scott*, No. 10-3978-cr, __ F.3d __, 2012 WL 1143579, at *8-*9 (2d Cir. April 6, 2012); *U.S. v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011); *U.S. v. Figueroa*, 618 F.3d 934, 942 (2d Cir. 1980).   And more significantly, the government's supposition presumes evidence that the Colombos were responsible for the murder.   As noted, however, the government proffers none.

Second, and similarly, the government says the murder is "also probative of Persico's agreement to further the goals of the racketeering enterprise, and of the threat of continued criminal activity."   Govt. Mem. 20.   But those contentions likewise presume evidence that (1)

4

the charged enterprise was behind the murder and (2) Persico was involved in its commission. Again, both are absent from the government's proffer.

Third, the government asserts the murder is "admissible as background, because [Geller] is the victim of the extortionate extensions of credit alleged in Racketeering Acts One and Two, and [it] provided a reason for him to fear the consequences of not repaying th[em]."  *Id.*  This argument is multiply flawed.

      1.    By its terms, nothing in the government's proffer suggests that Persico played any role in the murder – let alone that his putative participation was ever communicated to Geller.

      2.    Regardless, the murder allegation is minimally probative and maximally prejudicial.  Indeed, the government charges that the loansharking began in 1989, long before it alleges the watch incident occurred.  Thus, it cannot claim that Geller's alleged fear arose as a result of the supposed watch incident.

      3.    An accused loan shark must create or instill the fear or take affirmative steps to exploit it, *cf. U.S. v. Abelis*, 146 F.3d 73, 83-84 (2d Cir. 1998); *U.S. v. Sears*, 544 F.2d 585, 588 (2d Cir. 1976), and nothing in the proffer, nor in the remaining evidence, indicates that Persico did either with respect to Geller.

Fourth, and last, the government urges that the proposed testimony concerning Lalima "reflects Persico's trust in [Geller] and his reliance on [Geller] to gather information about whether Lalima was ignoring his obligation to the Colombo [F]amily."  Govt. Mem. 20-21.  But the government can establish those propositions without eliciting the fact of Lalima's murder or intimating, *sans* record support, that Persico had a hand in it.  *Cf. Scott*, 2012 WL 1143579, at *9;

*U.S. v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999).   And the government undoubtedly has plenty of other evidence of the trust Persico ostensibly placed in Geller, rendering an uncharged murder allegation needlessly cumulative and unduly inflammatory.

For all these reasons, the Lalima homicide accusation should be excluded as unfounded, irrelevant and prejudicial hearsay, bound to sow confusion and invite delay.

**B.      THE BLACK MURDER CONSPIRACY ALLEGATION SHOULD BE EXCLUDED**

Again relying on uncorroborated assertions ascribed to Geller, the government seeks to elicit Persico's participation in an aborted plot to kill a shady investment promoter – Geller associate Bruce Black – to collect on an insurance policy Geller had taken against his life.   Govt. Mem. 21.

Contrary to the government's assumption, this putative conspiracy does *not* "establish that the participants in the racketeering conspiracy were willing to use murder to facilitate their monetary goals."   *Id.*   For the government proffers nothing connecting the purported murder plot to the charged Colombo Family enterprise – whose nature and existence are conceded regardless (*see supra* 5) – as opposed to it being an independent "personal matter[.]"   *U.S. v. Bruno*, 383 F.3d 65, 85-86 (2d Cir. 2004).   And even granting the requisite link, the incipient plan – if it really existed – reflects only a willingness to *discuss* murder rather than actually *use* it, apparently never progressing beyond casual talk.   These facts reduce any marginal probative value the allegation might have and enhance its obvious prejudicial effect.

Nor does the allegation provide legitimate – much less "critical" – "background" for the loan sharking charges in "Racketeering Acts One and Two."   Govt. Mem. 21.   Even if Geller's presumed "fear" were necessary or relevant to those charges, his affirmative overtures to Persico –

6

deliberately seeking him out and "soliciting [his] assistance" in killing Black – scarcely demonstrate it.  *Id.* 21-22.

Finally, Geller's debriefing reports reveal that he had his own animus against Black and abundant personal motives for wanting him dead.  Topping the list were failed investments, pending litigation and Black's then recent arrest in connection with a federal money laundering investigation targeting Geller.   The debriefing reports also show that Geller had discussed Black's murder with a number of other people.

Given this context, there is every reason to view the alleged plot with Persico as a blame-shifting fabrication designed to curry government favor.  Proving it actually existed thus raises the same *Huddleston*, Rule 104 and minitrial concerns as the Lalima accusation.  That is especially so because, according to Geller, Persico never trusted Black, advised Geller not to invest with him, refused to invest himself and would have nothing to do with Black – all as further documented in the debriefing reports.

For these reasons, the Court should preclude introduction of the Black murder conspiracy allegation.

### C.     THE PIAZZA MURDER ALLEGATION SHOULD BE EXCLUDED

Next, the government seeks to have Geller recount what he says Persico told him following the 1985 murder of Persico's brother-in-law, Steven Piazza.  Piazza was killed after supposedly cheating on his wife, Persico's sister.   In the wake of the murder, Persico purportedly told Geller, in substance, that's how "infidelity is punished in 'this life.'"   Govt. Mem. 22.

In the first instance, there is no reference to this uncorroborated, 27-year-old attribution in the extensive discovery produced by the government to date.  If Persico actually passed the

remark, Geller surely would have mentioned it sometime in the course of his 20-year cooperation. And even crediting Geller's story, the remark is equivocal at worst and innocuous at best, reading as nothing more than a benign observation about the nature of the life Persico was born into and grew up around.

In light of these frailties, the government's proffer cannot support preponderant jury findings that the statement was even made – let alone that it was meant to endorse "'this life'" – counseling exclusion under Rule 104 and *Huddleston*.   Alternatively, proving the comment was made and so meant will provoke confusion, distraction and delay, warranting preclusion under Rule 403 and *Aboumoussallem*.

Though the prosecutors deny any "inten[t] to introduce evidence that the defendants murdered Piazza," their proposed use of the attribution and rationale for offering it belie that disclaimer.   Govt. Mem. 22.   Considering the statement's facial ambiguity or neutrality, it would only "show Persico's commitment to 'this life,' *i.e.*, to the charged enterprise[,]" if he condoned Piazza's slaying or had something to do with it.   *Id.*   To the extent the government would urge that inference – obliquely tying Persico to an uncharged homicide when it admittedly has no proof of his involvement – the statement distills to consummate propensity or associational evidence. And the attending prejudice dwarfs any minuscule probative value it might have.

This is particularly true because (1) the attribution is outside the time frame of the charged RICO conspiracy, which is already stunningly broad, and (2) Persico is not charged with "the Devine murder alleged in Racketeering Act Four," for which the remark purportedly supplies "background" – itself an implausible stretch.   *Id.*   Surely the government does not need to augment a 25-year conspiracy with aged accusations predating its alleged formation.

The government does offer another justification for admitting the attribution,[1] but its thrust is unclear.  Perhaps the government means to renew its suggestion that the attribution helps establish Geller's fear for loan sharking purposes.  If so, that assertion is unconvincing for the reasons previously discussed.

Lastly, the government misconstrues basic evidence law in claiming the attribution is "not covered by Rule 404(b)" because it is a "party-opponent" admission under Rule 801(d)(2).   Govt. Mem. 22 n.4.   Both provisions apply and each must be satisfied; that a given piece of evidence escapes Article VIII's hearsay ban does not make it relevant or admissible under Article IV. Because the Piazza attribution is neither, the Court should order its exclusion.

### D. THE COLOMBO WAR MURDER CONSPIRACY ALLEGATIONS SHOULD BE EXCLUDED

The government also proffers consensual recordings made by another cooperating witness dubbed CW5, believed to be Steve Marcus.   Among them are conversations in which "P. Bombino discusses the involvement of the defendants and their co-conspirators in the Colombo [F]amily war," reportedly touching on "Persico" and "the Persicos."   *Id.* 25.

Made in 2009, at least 16 years after the war's conclusion, the statements at issue are classic narrative hearsay or "idle chatter," *e.g., U.S. v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980); *U.S. v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994), furthering no specific conspiracy between declarant P. Bombino and defendant Michael Persico – only a putative general conspiracy to associate with the mafia.   That is insufficient for admission under Rule 801(d)(2)(E).   *Compare U.S. v. Gigante*,

---

[1] *See* Govt. Mem. 22-23 ("[T]his evidence again demonstrates that Persico communicated with [Geller] about crimes in an effort to ensure that [he] understood the rules of the enterprise and the potential consequences of failing to obey them, which in this case meant educating [him] about how the Colombo [F]amily punished marital infidelity.").

9

166 F.3d 75, 82-83 (2d Cir. 1999), *with U.S. v. Russo*, 302 F.3d 37, 44-47 (2d Cir. 2002), *and U.S. v. Coppola*, 671 F.3d 220, 246-47 (2d Cir. 2012).

Nor are the proffered snippets admissible as declarations against interest. *See* Fed. R. Evid. 801(b)(3). The government fails to allege – much less establish – that the speaker, P. Bombino, is unavailable to testify, and it identifies no "corroborating circumstances that clearly indicate [the statements'] trustworthiness." Fed. R. Evid. 804(a), (b)(3)(B). To the contrary, the statements purport to implicate third parties – including "Persico" and "the Persicos" – as opposed to P. Bombino himself, making them blame-shifting rather than truly self-inculpatory. *See generally Williamson v. U.S.*, 512 U.S. 594 (1994); *accord, e.g., U.S. v. Ferguson*, 676 F.3d 260, 287-88 n.30 (2d Cir. 2011); *cf., e.g., U.S. v. Wexler*, 522 F.3d 194, 203 (2d Cir. 2008); *U.S. v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007).

More pointedly, the government articulates no theory of relevance for the excerpts mentioning "Persico" and "the Persicos" and we perceive no viable one. To the extent it even hints at an applicable relevance theory, Persico concedes the enterprise's "existence" (*id.* 25), as noted before. And *post hoc* perorations furnish no "background" – never mind "critical" background – for a murder occurring 16 years earlier. *Id.* 26.

This is especially so because P. Bombino was not involved in the Colombo war and lacks personal knowledge of its events and participants. In fact, the recordings reveal that he and his brother merely gossiped based on historical news accounts while gabbing with Marcus in an office for hours on end.

Finally, the government describes the proffered excerpts as "example[s]" of war-related "testimony and evidence" it may attempt to "introduce," without further elaboration. *Id.* 25. We

10

respectfully reserve the right to object to any such additional "testimony and evidence" regarding Persico.

## II.    THE UNCHARGED LOAN SHARKING ALLEGATIONS ARE INADMISSIBLE

The government also accuses Persico of uncharged loan sharking activity, vaguely alluding to "additional sums of money that [he] loaned, or arranged for others to loan, to individuals, including other Colombo [F]amily members and associates."   *Id.* 29.   But its proffer on this score is too scant and sketchy to permit an informed response.   *See, e.g., id.* 30 (referencing "collect[ion of] loansharking money owed to Persico and *others* from *other* associates of the Colombo family and *other* individuals") (emphasis supplied).

Who, for example, are the unnamed "individuals" and Colombo "members and associates" that supposedly borrowed from Persico?   What "sums" did he lend and when did he do it?   Which "others" allegedly served as intermediaries?   What was the nature of Persico's reported "involvement in the collection" of outstanding debts?   *Id.*   Who on earth are "Santo, Tony and Lenny"?   *Id.* 30.   And what does "CW2" – Geller – as distinct from "CW1" – believed to be Anthony Russo – have to say about all this?   *Id.*

Without these bare essentials, Persico cannot evaluate the admissibility of the uncharged loan sharking allegations or begin to lodge coherent objections – let alone prepare to combat the allegations at trial.   To avoid an unfair ambush, we respectfully request their preclusion. Alternatively, we request a more detailed proffer and, on receiving it, sufficient time to investigate the allegations, litigate their admissibility and ready any necessary trial defense.

That said, contrary to the government's claim, the allegations do not and cannot demonstrate "relationships of trust" among Persico, Russo and Guerra as the suspected killers of

11

Joseph Scopo (*id.* 29-30), because the murder preceded the loan sharking by a not inconsiderable period.   *Compare* Indictment ¶¶ 25-26 (Scopo killed Oct. 1993) *with* Govt. Mem. 30 (fixing some of the uncharged loan sharking activity in the "mid-1990s").

## III.   THE UNCHARGED DRUG ALLEGATIONS ARE INADMISSIBLE

The government next proffers an incident in which someone dubbed CW6 – believed to be Reynold Maragni – allegedly asked Persico for his father's permission to sell marijuana. According to the government, "Persico indicated that he was considering making the decision to grant or deny permission."   *Id.* 31-32.

First of all, there is no suggestion of Maragni's wanting or soliciting either Persico's or his father's permission to sell drugs anywhere in the hundreds of hours of recordings on which he was captured prior to his cooperation (during the very time frame on which Maragni claims such event occurred) or that he subsequently made while wearing a wire, seriously undermining his tale's veracity.

In any event, the claimed meeting with Persico actually dispels – not "demonstrates" – his "important role in[] the charged enterprise."   *Id.* 32.   For by the government's own account, Maragni would not have accepted or obeyed any decision Persico presumed to make, further disproving his ostensibly "important role."

Finally, Maragni's supposed "underst[anding]" that Persico was a "conduit" to his imprisoned father – unattributed hearsay at any rate – is an unfounded and irrelevant distraction unless Persico actually conveyed Maragni's request for permission.   *Id.*   Since the government proffers no evidence that Persico did so – indeed its proffer and the evidence suggests that he did not – the marijuana accusation should be excluded.

## IV.    THE UNCHARGED EXTORTION ALLEGATIONS ARE INADMISSIBLE

The government next seeks to elicit, through "[c]onsensual recordings" and testimony from Russo, that Persico and others "refused to reduce" a debt owed by an unidentified Russo associate – believed to be a bookmaker named Roger Califano – to the "Colombo [F]amily administration."  *Id.* 33-34.

This allegation is misleading, time-wasting and substantially more prejudicial than probative.  For as the recordings themselves conclusively establish, Persico had *no* "power and influence within the enterprise" and *no* authority to "reduce" the putative debt – notwithstanding the prosecutors' cursory assertions to the contrary.  *Id.*[2]  Consequently, the Court should preclude the government from pursuing the extortion claim at trial.

## V.    THE UNCHARGED SITDOWN ALLEGATIONS ARE INADMISSIBLE

The government also seeks to elicit Persico's participation in what it calls "'sit-downs'" aimed at settling organized crime disputes.  *Id.* 35.

One such dispute involved Anthony Preza and an employee "attempt[ing] to sue" him. *See id.* 35-36.  This episode is inadmissible because (A) Russo's narrative describing it contains multiple layers of hearsay for which the government identifies no applicable exceptions; (B) the employee has no proffered affiliation with organized crime; (C) Persico is not alleged to have attended any meeting; and (D) Russo's underlying debriefing report does not mention Persico's involvement in this incident at all, the conflict apparently having arisen after Persico's 2010 arrest in this case.  Proving his involvement and the situation's relationship to organized crime would

---

[2] Nor, parenthetically, could the purported extortion show a "trust" relationship between Russo and Theodore Persico Jr. with regard to a murder – again, that of Joseph Scopo – occurring 16 years earlier.   Govt. Mem. 34-35.

thus launch a long and confusing excursion into entirely extraneous territory – especially since Persico does not contest the "enterprise['s]" existence and "manner of operation." *Id.* 37.

Another proffered incident saw Persico settling a "physical altercation" between an individual dubbed CW7 – believed to be Christopher Prince – and the son of a Persico business partner. *Id.* 36. Nothing suggests the son or the altercation had any connection to organized crime. On the contrary, the pertinent debriefing report says the fight took place when Prince was just 18 or 19. And according to the government itself, Persico stepped in out of "friendship" with his uncle, *id.* – a New York City police officer with no apparent mob ties per the same report.

The only purported links between the meeting and the mob are the prosecutors' labeling Prince a "Genovese [F]amily associate" – an amorphous term that means whatever the government wants it to[3] – and the bald assertion that the Genovese Family was mentioned during the meeting, a claim conspicuously absent from the report. *Id.* 36-37. In the face of all these deficiencies, the fight and Persico's intervention have no discernible relevance to the charges in the indictment. And proving any would prompt still more digression and delay – particularly without proffered evidence that Prince was associated with the Genoveses at 18 or 19, when he slapped the son around.

We have yet to review any backup for a third allegation, concerning Persico allegedly helping Prince after he committed a robbery (*id.* 37), and therefore cannot address it at this time. Accordingly, as discussed at the conference earlier this week, we respectfully request appropriate

---

[3] *See, e.g., Weir v. U.S.*, 92 F.2d 634, 638 (7th Cir. 1937); *Rocha v. Twilleger*, No. 10-cv-00357-CMA-MEH, 2012 WL 573875, at *9 (D. Col. Jan. 3, 2012), *adopted*, 2012 WL 573849 (D. Col. Feb. 22, 2012); *U.S. v. O'Donnell*, No. CR 06-1227, 2008 WL 4601477, at *4 (D. Ariz. Oct. 16, 2008), *aff'd*, 405 Fed. Appx. 156 (9th Cir. 2010).

opportunity to investigate and challenge the accusation upon receipt.   Presuming we possess the necessary information, we will provide the Court with a response next week.

## VI.    THE UNCHARGED GAMBLING ALLEGATIONS ARE INADMISSIBLE

For its parting shot, the government asserts that, when they "came home from prison in the 2000s, Guerra told [Russo] that the money put in their commissary accounts originated from joker-poker machines ... controlled by Persico and ... placed in [Colombo-connected] businesses." *Id.* 39.

Contrary to the government's supposition, this contention does *not* demonstrate Persico's "commitment to the charged enterprise" – or the trio's continuing "relationship" based on joint "participation in the Scopo murder" – unless Persico either put the money in the accounts or at least knew about the deposits and their reputed source.   *Id.*   But again, the government proffers no such evidence.   Without this essential link, the gambling accusation should be excluded for what it is: confusing and irrelevant propensity proof, needlessly time-consuming and vastly more prejudicial than probative.

## CONCLUSION

For the reasons stated, the government's uncharged crime allegations should be excluded from evidence at trial.

Dated:      New York, NY
           May 25, 2012

Respectfully submitted,
/s/
Sarita Kedia
Sarita Kedia Law Offices, P.C.
5 East 22nd Street, Suite 7B
New York, New York   10010
(212) 681-0202

Paul Shechtman
Zuckerman Spaeder LLP
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
(212) 704-9600

16