EAG:NMA/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                       10 CR 147 (S-6) (DLI)

MICHAEL PERSICO,

            Defendant.

– – – – – – – – – – – – – – – –X

## MEMORANDUM OF LAW REGARDING
## EVIDENCE PRESENTED AT *FATICO* HEARING

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

DISCUSSION ........................................................................................................................... 1

I.   RACKETEERING .............................................................................................................. 1

    A.  The Testimony of Anthony Russo ............................................................................. 1

        1.  The Structure of Organized Crime Families ........................................................ 1

        2.  Russo's Role in the Colombo Family.................................................................... 2

        3.  The Defendant's Role in the Colombo Family ..................................................... 3

    B.  Additional Evidence .................................................................................................. 6

        1.  1993 Surveillance ................................................................................................. 6

        2.  1997 Surveillance ................................................................................................. 7

        3.  Telephone Evidence .............................................................................................. 8

II.  THE 1993 MURDER OF JOSPEH SCOPO .......................................................................... 8

    A.  The Testimony of Anthony Russo ............................................................................. 8

    B.  Additional Evidence ................................................................................................ 13

        1.  Crime Scene Photographs.................................................................................... 13

        2.  Funeral Records ................................................................................................... 15

        3.  Guilty Plea of Theodore Persico, Jr.................................................................... 15

        4.  Guilty Plea of Anthony Russo ............................................................................ 15

        5.  Docket Sheet for Alphonse Persico's Case ........................................................ 16

III. LOANSHARKING.............................................................................................................. 16

IV. EXTORTION..................................................................................................................... 19

    A.  The Testimony of Anthony Russo ........................................................................... 19

    B.  Additional Evidence ................................................................................................ 19

V. CONSPIRACY TO ACQUIRE AND SELL STOLEN VIDEO GAMES ....................... 20

    A. The Testimony of Anthony Russo ............................................................... 20

    B. Additional Evidence ................................................................................... 21

CONCLUSION ....................................................................................................... 23

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law regarding evidence presented at the <u>Fatico</u> hearing conducted on August 10 and 24, 2016.  For the reasons set forth below, the government respectfully submits that it has proven by a preponderance of the evidence that the defendant participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

<u>DISCUSSION</u>

I.      <u>RACKETEERING</u>

     A.      <u>The Testimony of Anthony Russo</u>

At the <u>Fatico</u> hearing, the government called cooperating witness Anthony Russo to testify.  Russo testified that he is a 55-year-old Brooklyn native who began committing crimes at age 16.  (Transcript of <u>Fatico</u> Hearing (attached as Ex. A) ("Tr.") at 11.)  He was involved in organized crime from that age until his arrest in 2011.  (<u>Id.</u> at 12.)  He has been involved with the Gambino and Colombo crime families, and has held the positions of associate, soldier and acting captain in organized crime.  (<u>Id.</u> at 12-13.)

     1.      <u>The Structure of Organized Crime Families</u>

Russo testified that there are five organized crimes families in New York City, namely, the Bonanno, Colombo, Gambino, Genovese and Luchese families.  (<u>Id.</u> at 13.)  They share a common structure, including the following positions, ranked from top to bottom:  boss, underboss, consigliere, captains, soldiers and associate.  (<u>Id.</u>)  Each position has specific responsibilities, and there is a formal process to becoming a "soldier," <u>i.e.</u>, an inducted member.  (<u>Id.</u> at 14-17.)  Money flows from the bottom of the structure to the top.

(Id. at 16.)  The rules of organized crime include prohibitions on narcotics trafficking,
murder (absent the boss's permission) and cooperation with law enforcement.  (Id. at 17.)

> 2.  Russo's Role in the Colombo Family

When Russo initially became involved with organized crime, he was
associated with the Gambino crime family.  (Id. at 17.)  After he was arrested in 1987 and
convicted of assault, he was incarcerated with Theodore Persico, Jr., also known as "Teddy
Boy."[1]  (Id. at 18-20.)  Persico, Jr. was an inducted member of the Colombo family and the
cousin of the defendant.  (Id. at 21.)  Russo and Persico, Jr. grew close, and Persico, Jr.
wanted Russo "around" him, meaning that Russo would be protected by Persico, Jr. and
would have to provide money to Persico, Jr.  (Id. at 21-22.)

When Russo was released from prison in late 1992, he became a Colombo
family associate; because Persico, Jr. was still incarcerated, Russo reported to Persico, Jr.'s
father, Theodore Persico, Sr., also known as "Uncle Teddy," who was a captain in the
Colombo family and the brother of Colombo family boss Carmine Persico.  (Id. at 23-24, 26-
28.)  At that time, other associates of Persico, Jr. also reported to Persico, Sr., including
Bobby Tarantola, Anthony Ferrara, Frank Sparaco and Frank Guerra, also known as "BF."
(Id. at 28.)

In early 2009, Russo was inducted into the Colombo family.  (Id. at 113.)  He
was assigned to report to Persico, Jr.  (Id.)  In or around 2010, Russo was promoted to acting
captain in the Colombo family.  (Id. at 114-15.)

---

[1] In this memorandum, the defendant Michael Persico is referred to as "the
defendant," his cousin Theodore Persico, Jr. is referred to as "Persico, Jr.," and Persico, Jr.'s
father, Theodore Persico, Sr., is referred to as "Persico, Sr."  Other members of the Persico
family are referred to using their full names.

3.      The Defendant's Role in the Colombo Family

The defendant is an associate in the Colombo family.  (Id. at 32.)  He is the

son of Carmine Persico, the boss of the Colombo family.  (Id. at 21.)  The defendant's

brother, Alphonse Persico, has been an inducted member, captain and acting boss within the

Colombo family.  (Id. at 25.)

As discussed in greater detail below, in or around 1993, Persico, Sr. and other

leaders of the Colombo family were arrested.  (Tr. at 31.)  As a result, Russo and his criminal

partner Frank Guerra reported to the defendant.  (Id. at 32.)  Although the defendant was an

associate, and it was not common for associates to report to another associate, Russo and

Guerra reported to the defendant because they were close with him and his father was the

boss.  (Id.)  In or around 1993, Russo and Guerra met with the defendant at locations

including Romantique Limousine, which was the defendant's limousine business and was

located at 11th Avenue and 67th Street in Brooklyn, New York, as well as at a bus company

the defendant had in Coney Island, restaurants, and other locations.  (Id. at 27, 33.)  At that

time, Russo discussed loansharking with the defendant – which, as explained below, Russo

committed using money provided by the defendant – and observed that Persico, Jr.'s other

associates, including Joe Baudanza, Guerra, Tarantola and Ferrara, met with the defendant

"all the time."  (Id. at 33-34.)  In approximately 1994, the defendant's brother Alphonse

Persico was released from jail, at which time Russo and Guerra were assigned to report to

him rather than the defendant.  (Id. at 69-70.)

In the late 1990s, Russo opened a liquor store in Staten Island.  (Id. at 85.)  He

obtained money to open the store from the defendant, the defendant's cousin Frank Persico,

and Colombo family member Anthony Stropoli.  (Id. at 85-86.)  The store was successful at

first, but then faltered.  (Id. at 86.)  Russo held on to it until he was arrested in late 1999 or

early 2000.[2]  (Id. at 86-87.)  After he was arrested, he discussed the store with the defendant.

(Id. at 87-88.)  The defendant gave Russo several suggestions, including giving the store to

the defendant, which Russo elected to do.  (Id. at 88.)  The defendant then arranged for

Colombo family associate Carl Panarella to work in the store, although it remained registered

to Russo's girlfriend's father.  (Id. at 89.)  The store was then sold, with no profit going to

Russo.  (Id.)

        In the late 1990s, Stropoli told Russo that Stropoli, Dino Calabro, "Andre" and

an associate from Boston were going to be inducted into the Colombo family, which

subsequently happened.  (Id. at 90-91.)  Russo became upset because he thought he and his

friends were more deserving, having ended the Colombo family war by murdering Joseph

Scopo – a sentiment he expressed to Guerra.  (Id. at 91.)  Guerra reported this to the

defendant, and word got back to Stropoli and Frank Persico.  (Id. at 91-92.)  They confronted

Russo for having provided the information to Guerra, and Russo, in turn, confronted Guerra

about having told the defendant that Russo was complaining.  (Id.)  Russo was concerned

that talking as he had could get him killed.  (Id. at 92.)

        In or around November or December 2008, after Russo completed a term of

supervised release, he talked to the defendant about possibly getting inducted into the

---

[2] Public records indicate that Russo was arrested in the Eastern District of New York
on or about January 27, 2000, that he was released on bail four days later, and that the case
was dismissed later that year.  See United States v. Russo, 99 CR 920 (CBA) (E.D.N.Y.).
On March 29, 2000, he was arrested in the Southern District of New York and ordered
released; on June 12, 2000, he pled guilty; and on September 15, 2000, he was sentenced to a
96-month term of imprisonment.  See United States v. Russo, 00 CR 26 (JSM) (S.D.N.Y.).
Notably, in both cases his co-defendant was Francis Guerra.

Colombo family.  (<u>Id.</u> at 109-10.)  The defendant told Russo that his brother, Alphonse

Persico, wanted Russo to be inducted.  (<u>Id.</u> at 110.)  The defendant also gave Russo advice

about how to act after he was inducted, suggesting that he calm down and "speak softer."

(<u>Id.</u>)

       In or around 2009, Russo and Guerra tried to open a legitimate business selling

car detailing products.  (<u>Id.</u> at 115.)  They asked the defendant for money to start the

business, and he directed them to ask Scott Reback, who gave them money.  (<u>Id.</u> at 115-16.)

In late 2009 or early 2010, Russo and Guerra opened the business in the defendant's garage

on 11th Avenue near 67th or 68th Street in Brooklyn, where the defendant formerly kept his

limousines.  (<u>Id.</u> at 116-17.)  The defendant provided this space after Guerra had asked him

for assistance.  (<u>Id.</u>)

       In addition, Russo and Guerra asked the defendant for help getting business

from Colombo family members John Staluppi and John Rosatti, who owned car dealerships.

(<u>Id.</u> at 117-18.)  The defendant agreed.  (<u>Id.</u> at 118.)  Russo and Guerra then got business

from Rosatti, but Russo was not satisfied with the amount they got from Staluppi.  (<u>Id.</u>)

Russo asked the defendant for additional help with Staluppi, but then decided not to bother

the defendant and instead asked Reback, who was Staluppi's son-in-law, to talk to Staluppi

for Russo.  (<u>Id.</u> at 118-19.)  Reback agreed, but instead reported the request to the defendant.

(<u>Id.</u> at 119-20.)  As a result, Russo and Guerra were summoned to meet Persico, Jr. and

Angelo Spata, who was the defendant's brother-in-law.  (<u>Id.</u> at 120.)  Persico, Jr., who was

upset, accused Russo of going behind the defendant's back, and told Russo that only the

defendant was allowed to reach out to Staluppi.  (<u>Id.</u> at 120-21.)  Spata told Russo that the

only people he should listen to were Carmine Persico, Alphonse Persico and the defendant; Russo responded that he listened to Persico, Jr.  (Id. at 121.)

        B.      <u>Additional Evidence</u>

           1.      <u>1993 Surveillance</u>

Government Exhibits 7003 and 208(a) show that the defendant met with Colombo family member Joseph Monteleone, Sr., in 1993.[3]  Government Exhibit 7003 is a surveillance log prepared by FBI Special Agent Kevin O'Rourke about a surveillance he conducted on March 9, 1993.   As indicated in an entry made on the log at 12:48 p.m., the surveillance was instituted at 6701 11th Avenue in Brooklyn, New York, and is associated with "color roll # 6192."  Entries made beginning at 1:02 p.m. indicate that the agent observed Joseph Monteleone, Sr. exiting that location and entering a car.  An entry made at 1:33 p.m. indicates that the agent saw Monteleone ("JMS") with an unknown white male ("UWM") on a bridge at Cropsey Avenue; the entry also indicates that color photos numbered 15 through 21 depict the two men at that location.

Government Exhibit 208(a) is one of the photographs taken during the surveillance.  The back of the exhibit is labeled with the roll number 6192, photograph number 21, and the agent's initials.  The photograph depicts two men.  As the agent observed in his log, one of the men is Joseph Monteleone, Sr.   The government respectfully submits that the unknown man – the younger of the two, whom the agent identified as "UWM" – is the defendant.  In particular, his appearance in this exhibit is the same as his appearance in the 1997 surveillance discussed below, in which he was positively identified.

---

[3] Numbered exhibits cited herein are enclosed within Exhibit D.

2.      1997 Surveillance

By way of background, Russo testified that in 1996 or 1997, he was on parole, and was not allowed to meet with Alphonse Persico – a condition that he violated.  (Tr. at 69-71.)  The defendant's cousin Frankie Persico told Russo that there existed a videotape depicting Russo meeting with the defendant and Alphonse Persico.  (Id. at 71-72.)  Russo's parole officer subsequently showed him the videotape, which Russo testified indeed depicted him meeting with the defendant and Alphonse Persico.  (Id. at 72.)

Government Exhibits 7004 and 228 indicate that the defendant in fact met with Anthony Russo and Alphonse Persico in and around the location of Romantique Limousine in Brooklyn, New York in 1997.  Government Exhibit 7004 is the trial testimony of New York City Police Department ("NYPD") Detective Fred Santoro.  As indicated in the testimony, Detective Santoro conducted a surveillance of Russo in or around August 1997 on 11th Avenue between 67th and 68th streets in Brooklyn, New York, where Romantique Limousines was located.  (GX 7004 at 1891-92.)  His surveillance depicted Russo meeting with Alphonse Persico and the defendant.  (Id.)  Government Exhibit 228 is a copy of the video surveillance.  Consistent with Detective Santoro's testimony, the video footage from the beginning to 0:09 depicts Alphonse Persico and Russo together; from 2:00 to 2:15 depicts Russo and the defendant walking out of Romantique together; and from 2:15 to 3:30 depicts the defendant meeting with Alphonse Persico and Russo across the street from Romantique.[4]

---

[4] The video may be viewed by opening the folder named "VIDEO_TS" withing Government Exhibit 228 and then opening the file named "VIDEO_TS.IFO."  If a video-player application opens and depicts a series of bars, click on the top bar.

3.      Telephone Evidence

Government Exhibits 7001 and 1013(b) indicate that the defendant's

limousine business (Romantique) had telephone contacts with members and associates of the

Colombo family, including Anthony Russo, Frank Guerra and Joseph Monteleone, Sr.

Exhibit 7001 is the trial testimony of FBI Intelligence Analyst Maria Kinigopoulos, who

testified that she reviewed telephone records and prepared a summary chart showing contacts

among certain telephones.  Exhibit 1013(b) is a summary chart that the witness prepared

based on those records, which was admitted into evidence in the Guerra trial.  (GX 7001 at

2101-02.)

II.     THE 1993 MURDER OF JOSPEH SCOPO

A.      The Testimony of Anthony Russo

Russo testified that when he was released from prison in 1992, the Colombo

family was split into two warring factions.  (Tr. at 30.)  One faction was loyal to the

defendant's father, official boss Carmine Persico, and the other was loyal to the acting boss,

Vic Orena, who was attempting to take over the crime family.[5]  (Id. at 30-31.)  The leaders of

the Persico faction included Chucky Russo (no relation to Anthony Russo), Jo Jo Russo (also

no relation to Anthony Russo), Persico, Sr., Joseph Monteleone, Sr. (whom Russo knew as

"Joe Monte") and Thomas Gioeli.  (Id.)  The leaders of the Orena faction included Joe Scopo

and William Cutolo, also known as "Wild Bill."  (Id. at 31.)

---

[5] Russo explained that in organized crime, a member is "officially" in a position if he
is appointed to it permanently; alternatively, a member can be appointed to an "acting"
position if the person who officially holds it is incarcerated.  (Tr. at 14.)

Russo became involved in the Colombo family war immediately upon his release from prison in 1992. (Id. at 34.) Notably, in or around 1993, Persico faction leaders Persico Sr., Chucky Russo, Jo Jo Russo and Joseph Monteleone, Sr. were arrested, along with Persico faction associate Frank Sparaco. (Id.)

At some point in 1992 or 1993, Russo and Colombo family associates Guerra, Tarantola, Danny Persico (the defendant's cousin and Persico, Jr.'s brother), Anthony Ferrara and Eric Curcio developed a plan to murder Cutolo. (Id. at 34-35.) Russo and Guerra apprised the defendant of their plan, including by telling the defendant they had almost killed Cutolo on two occasions. (Id. at 35.)

After Russo began plotting to murder Cutolo, the defendant asked him to meet Curcio, who "had a line" on Scopo, which Russo understood to mean that Curcio knew where Scopo was and that Russo and others should "do what we had to do" to murder Scopo. (Id. at 36.) Curcio was a Colombo family associate who claimed to be related to Joseph Monteleone, Sr. (Id. at 36-37.) Russo agreed to meet Curcio, and Russo wanted to murder Scopo to help the Persicos maintain control of the crime family as well as to advance within the crime family himself. (Id. at 37-38.)

Curcio told Russo and Guerra that he knew where Scopo was, and asked if they were willing to put together a crew to murder Scopo. (Id. at 38.) Russo and Guerra agreed. (Id.) Originally, the crew included Russo, Guerra, Tarantola, Curcio and Ferrara. (Id.) Subsequently, Curcio brought John Sparacino into the crew. (Id. at 38-39.)

After Russo and Guerra met with Curcio, they told the defendant their plans and told him that they needed weapons. (Id. at 40.) The defendant told them, "No problem. We have plenty." (Id.) The defendant then pointed at a Colombo family associate known as

9

"Smiley" and said to Guerra, "You got Smiley's number.  Smiley will bring you a bag."
(Id.)  Later that day, Guerra brought a duffle bag to Russo's house.  (Id. at 40-41.)  It
contained a Mac 10 with a silencer and two pistols.  (Id. at 41.)  Guerra said he had just
received the firearms from "Smiley."  (Id.)

Persico, Jr. remained incarcerated during the planning of the Scopo murder.
(Id. at 41.)  Guerra told Russo that he visited Persico, Jr. and told him about the planning,
and that Persico, Jr. said to make sure they got it done.  (Id. at 42.)  At some point, Russo and
others met with Persico, Sr. at a funeral parlor, after Persico, Jr.'s grandmother died.[6]  (Id. at
44-45.)  The funeral parlor was Scarpaci's on 86th Street and 14th Avenue in Brooklyn, New
York.  (Id.)  Russo understood that although Persico, Jr. was still incarcerated at that time, he
was allowed to attend because a close relative had died.  (Id.)  At the funeral home, Persico,
Jr. discussed the Scopo murder with Russo, Guerra and Tarantola, and Persico, Jr. told them,
"You got to get it done and I want my guys to do it."  (Id. at 45-46.)  Russo understood "my
guys" to refer to himself, Guerra and Tarantola.  (Id. at 46.)  Notably, at or around this time,
the Scopo murder crew consisted of Russo, Guerra, Curcio, Sparacino and John Pappa,
whom Curcio had recruited into the crew.  (Id. at 46-47.)

After the funeral, the crew made an unsuccessful attempt to murder Scopo:
they saw Scopo taking out the garbage outside his home in Brooklyn, but they did not shoot
him because by the time they identified him, he was too close to his front door.  (Id. at 47-

---

[6] Russo recalled that the meeting at the funeral parlor took place in the summer of
1994.  Because Scopo was murdered in October 1993, and records discussed below indicate
the funeral took place in August 1993, the government submits that Russo misspoke or was
mistaken about the precise year, and that the meeting with Persico, Jr. occurred in August
1993, not 1994.

48.)  Russo reported this unsuccessful attempt to the defendant.  (Id. at 48-49.)  The

defendant responded, "You got to get this thing done before my brother goes to trial."  (Id. at

49.)  At the time, his brother Alphonse Persico was in jail, awaiting trial for his role in the

Colombo family war, and Russo understood that murdering Scopo soon would allow

Alphonse Persico to assert his incarceration as an alibi.  (Id. at 49-50.)  On another occasion,

the crew located Scopo outside his social club[7], but Russo did not shoot because Scopo was

near a woman and two children.  (Id. at 50-52.)

       The crew eventually succeeding in murdering Scopo.  Russo recalled that the

murder occurred in late 1993 in the Ozone Park neighborhood, in the vicinity of 110th Street

and 109th Avenue, where Scopo's house was then located.  (Id. at 52.)  The plan – which

was largely carried out – called for Russo to drive a car in which Sparacino and Pappa were

passengers; Sparacino was to sit in the back seat with the Mac 10, and was to be the shooter;

and Pappa was the "backup" shooter.  (Id. at 52-53.)  Curcio and Guerra were assigned to

drive separate "crash cars,"[8] for a total of three cars.  (Id.)  During the murder, Russo indeed

drove Sparacino and Pappa, and he recalled that his car was a four-door, brown or beige

Chevrolet.  (Id. at 53-54.)  It had been stolen, and he started it with a screwdriver.  (Id. at 54.)

       The night that the murder was carried out, the crew members set up on a

corner near Scopo's home.  (Id. at 54.)  Sparacino wore a ski mask.  (Id. at 55.)  Curcio

spotted Scopo, and the crew members got in their assigned cars.  (Id. at 54.)  Russo told

---

[7] A "social club" is a place where members of organized crime meet.  (Tr. at 50.)

[8] A "crash car" is used to block law enforcement from accessing a street.  (Tr. at 48.)

Sparacino he was going to pull in front of Scopo's car, at which point Sparacino should kick his door open and fire.  (Id.)

Scopo approached his home in a car that Russo recalled was a small, light-colored Nissan Altima.  (Id. at 54.)  Scopo was in the passenger seat.  (Id. at 55.)  As Scopo's car parked, Russo pulled up next to it, aligning his own back door with Scopo's front bumper so that Sparacino could open the door and shoot.  (Id.)  Sparacino did so, emptying the Mac 10 at Scopo's car.  (Id. at 55-56.)  This was the Mac 10 that the defendant had previously provided through "Smiley," and it contained thirty rounds.  (Id. at 57.)

As Sparacino fired, a bullet came through the back window of Russo's car.  (Id. at 56.)  Pappa exited Russo's car and ran into some bushes, carrying an automatic pistol.  (Id.)  Sparacino screamed at Russo to go, and Russo drove off; as he did, he saw Pappa, who was still on the street, beginning to shoot.  (Id.)  Russo drove to a prearranged spot about two blocks away and parked.  (Id. at 57.)  He and Sparacino exited their car, leaving the Mac 10 in it, which the defendant had instructed Russo to do, and left Sparacino's ski mask and Russo's gloves in a bush.  (Id. at 57-58.)  Guerra pulled up to the corner, with Pappa now in his car.  (Id. at 58.)  Russo and Sparacino got in the backseat of Guerra's car, and Guerra drove off.  (Id.)  Scopo died as a result of the defendant and the crew's actions.  (Id.)

After the Scopo murder, then-Colombo family associate Dino Calabro and Luchese family associate Michael DeRosa separately approached Russo and commented on his participation in the murder.  (Id. at 58-60.)  Russo told each of them that he did not know what they were talking about, because Russo understood that talking about a murder could get him killed.  (Id. at 59-60.)  Russo and Guerra complained to the defendant that Curcio was telling others what they had done, and the defendant instructed them to talk to Curcio.

(Id. at 60-61.)  They did; Curcio denied it and said that, because of the murder, the crew members would get inducted into the crime family and would become captains.[9]  (Id. at 61.)

    B.    Additional Evidence

        1.    Crime Scene Photographs

Exhibit 7000 is the trial testimony of NYPD Detective John DeGiulio. Detective DeGiulio testified that on October 20, 1993, he responded to the Joseph Scopo murder scene and took the photographs admitted into evidence at the Guerra trial as Government Exhibits 17(c), 18(a), 18(c), 19(a) and 19(b).  (GX 7000 at 1037, 1039-41, 1049-52.)  Initially, he responded to 110th Street between 107th and 109th Avenues in Queens, New York.  (GX 7000 at 1034-35.)  He later responded to 106th Street, where there was a vehicle that was believed to be involved in the crime.  (Id. at 1035.)   The photographs he took depict the following:

- GX 17(c):  A large, brown, four-door Buick with a shattered back windshield and other damage, as it was found on 106th Street.  (GX 7000 at 1039.)

- GX 18(a) and 18(c):  A white Nissan Altima found in front of 107-43 and 107-45 110th Street, with shattered windows and ballistics damage. (GX 7000 at 1040-42.)

- GX 19(a):  The rear passenger area of the Buick, which contained a semiautomatic weapon with a silencer and a wool hat.  (GX 7000 at 1049-50.)

- GX 19(b):  The semiautomatic weapon and silencer that had been in the Buick.  (GX 7000 at 1049, 1051-52.)

---

[9] Subsequently, Pappa killed Sparacino, and Russo helped mutilate and dispose of the body.  (Tr. at 63-66.)  Curcio also got killed, and Russo believes Pappa was involved in murdering him.  (Id. at 66-68.)

These exhibits corroborate Russo's testimony that he drove a four-door, brown or beige car to murder Scopo (though he recalled it was a Chevrolet), that Scopo arrived in a small, light-colored Nissan Altima, that the murder crew used a semiautomatic weapon with a silencer, that Sparacino had a ski cap (the wool hat), and that bullets were fired both at Scopo in the Nissan and in return at Russo in the brown car, shattering his rear windshield.

Exhibit 7007 is the trial testimony of NYPD Detective Jeffrey Young. Detective Young testified that on October 21, 1993, he took photographs of the Buick and Nissan after they were secured in a garage.  (GX 7007 at 1847-50.)  He took the photographs admitted into evidence at the <u>Guerra</u> trial as Government Exhibits 20(c), 20(d), 20(f), 20(g), 21(e) and 21(i).  (GX 7007 at 1852-54, 1856-57.)  The photographs he took depict the following:

- <u>GX 20(c)</u>:  The Buick, with a shattered rear windshield and other damage.  (GX 7007 at 1852.)

- <u>GX 20(d)</u>:  The interior driver's area of the Buick, including a broken steering wheel column, which is consistent with car theft, and a screwdriver between the seats.  (GX 7007 at 1852-53.)

- <u>GX 20(f)</u>:  The backseat of the Buick, including broken glass and the wool cap.  (GX 7007 at 1853.)

- <u>GX 20(g)</u>:  The backseat of the Buick, including discharged shells.  (GX 7007 at 1854.)

- <u>GX 21(e)</u>:  The exterior of the rear passenger side of the Nissan, including broken glass.  (GX 7007 at 1856-57.)

- <u>GX 21(i)</u>:  The interior of the rear of the Nissan, including shattered glass and bullet fragments.  (GX 7007 at 1856-57.)

These exhibits corroborate Russo's testimony about the types of cars involved, the ski mask, the fact that bullets were fired in both directions, and the fact that the brown car he drove had been stolen and was then started with a screwdriver.

2.     Funeral Records

Records corroborate Russo's testimony about meeting with Persico, Jr. during the planning of the Scopo murder even though Persico, Jr. was incarcerated.  Government Exhibit 861 is a death certificate for Elenor Avena indicating a date of death of August 17, 1993.  The government proffers that Ms. Avena was the grandmother of Teddy Persico, Jr. Government Exhibit 862 is a business record from a funeral home dated August 17, 1993. (GX 862 at 1.)  It shows that Ms. Avena's place of service was "Scarpaci FH."  (GX 862 at 5.)  Government Exhibit 863 is a state prison record dated August 18, 1993, indicating that an inmate named Persico was transported on a "BKLYN funeral trip."  (GX 863 at 1.)

3.     Guilty Plea of Theodore Persico, Jr.

Persico, Jr. was a co-defendant in the present case.  On June 8, 2012, he pled guilty to conspiring to murder Joseph Scopo in aid of racketeering.  (Docket Entry Nos. 562, 563.)  This corroborates Russo's testimony that Persico, Jr. was involved in ordering and planning the murder.

4.     Guilty Plea of Anthony Russo

Russo's own guilty plea also corroborates his testimony.  He pled guilty to racketeering conspiracy, including the Scopo murder, which subjected him to a maximum sentence of life imprisonment.  (Tr. at 125-26; see also GX 3500-AR-9(b) (indictment in United States v. Russo, 11 CR 30 (KAM)) ¶¶ 17-21; GX 3500-AR-9(c) (Russo's plea allocution) at 22.)

15

5.     Docket Sheet for Alphonse Persico's Case

The docket for <u>United States v. Alphonse Persico</u>, 92 CR 351 (DGT)

(E.D.N.Y.), which is attached as Exhibit B, corroborates Russo's testimony that Alphonse

Persico was incarcerated during the planning of the Scopo murder, which motivated the

defendant to order that the murder occur soon, and that Alphonse Persico was released from

incarceration in 1994, at which time Russo and Guerra began reporting to Alphonse Persico

rather than the defendant.  (Tr. at 49-50, 69-70.)  In particular, the docket sheet indicates that

an arrest warrant was issued as to Alphonse Persico on May 14, 1993 (Ex. B at 7), that he

was ordered temporarily detained on June 9, 1993 (<u>id.</u> at 8), that he moved for bail on

September 10, 1993 (<u>id.</u> at 11), that on September 29, 1993 Judge Sifton requested that he

remain in his facility through November 1993 (<u>id.</u>), that the defendant's motion for bail was

argued on October 12, 18, 19 and 20, 1993, and was denied on October 20, 1993 (<u>id.</u> at 11-

13), that another bail motion was denied on April 7, 1994 (<u>id.</u> at 22), and that he was

acquitted following trial – and was "discharged" – on August 8, 1994 (<u>id.</u> at 32-33).[10]

III.    LOANSHARKING

Russo testified that in the mid-1990s, he and Guerra made money by

loansharking.  (Tr. at 72-73.)  Loansharking involves extending loans in exchange for interest

payments that do not reduce the principal.  (<u>Id.</u> at 72.)  It is generally committed by members

and associates of organized crime.  (<u>Id.</u> at 72-73.)  Russo and Guerra borrowed their

loansharking money from the defendant.  (<u>Id.</u> at 73.)  They borrowed from him at the rate of

---

[10] Alphonse Persico's co-defendants included others identified by Russo as leaders of
the Persico faction, including Joseph Russo, Anthony Russo, Joseph Monteleone, Sr., and
Theodore Persico, Sr.  (<u>See</u>, <u>e.g.</u>, Ex. B at 7-8.)

one "point," or one percent interest, per week, and they then extended loans to others at the

rate of two-and-a-half to three points per week.  (Id. at 73-74.)  This arrangement with the

defendant lasted from approximately 1993 to approximately 1996 or 1997.  (Id. at 74.)  In

total, Russo recalled that he and Guerra borrowed about $150,000 or $200,000 in

loansharking money from the defendant.[11]  (Id.)

      At first, Russo and Guerra had no trouble repaying the defendant.  (Id. at 75.)

After a year-and-a-half or two years, however, they had trouble collecting from their own

customers and repaying the defendant.  (Id.)  The defendant initially did not make demands,

but after a while, he said to them, "Listen, youse got to bring my money back."  (Id. at 75-

76.)  After hearing that, Russo assaulted a series of loansharking customers.  (Id. at 76-80.)

After Russo assaulted a customer known as "Fat Lenny," who owed about $30,000, the

defendant told Russo that Gambino family member Tony Anastasio "was going to take care

of" the loan.  (Id. at 76-77.)

      In a separate incident, after Russo assaulted a customer named Tony who

owed $7,000 or $8,000, a Genovese family member known as "Joe C" urged Russo and

Guerra to settle for $2,000 or $3,000.  (Id. at 77.)  Russo declined because the money

belonged to the defendant, not Russo.  (Id. at 77-78.)  Russo reported this to the defendant's

brother, Alphonse Persico, who then told Russo – in front of "Joe C" – to continue assaulting

Tony.  (Id. at 78.)  Subsequently, Gambino family members known as "Big Louie" and

"Huck" discussed the debt with Alphonse Persico, who told Russo not to worry about the

---

[11] In addition, the defendant told Russo that he was owed money with interest by
Colombo family associate Bobby Tarantola, although Russo did not know what the money
was for, and Colombo family associate Anthony Ferrara said he had borrowed money from
the defendant to buy a car.  (Tr. at 80-81.)

debt and that he (Alphonse Persico) would get the money and give it to the defendant.[12] (Id. at 78-79.)

>        While they owed money to the defendant, Russo and Guerra became involved in a dispute in which Tarantola was owed $100,000 by a stockbroker. (Id. at 98-99.) Russo and Guerra got permission from Alphonse Persico to help Tarantola collect the money. (Id. at 99.) They then assaulted the stockbroker. (Id.) Afterward, a Gambino family member known as "Ronnie One Arm" approached Russo on behalf of the stockbroker. (Id. at 99-100.) Russo agreed to leave the stockbroker alone, and, about two weeks later, "Ronnie One Arm" told Russo that the stockbroker would repay the money in two installments of $50,000. (Id. at 100.) When they received the first installment, Russo took $5,000. (Id. at 101.) Alphonse Persico told Russo he should not have taken any money until Alphonse Persico gave him permission. (Id. at 101-02.) Russo offered the $5,000 to Alphonse Persico, who responded that Russo should give it to the defendant because he owed the defendant money. (Id. at 102.) Russo did in fact owe loansharking money to the defendant at that time. (Id.)

>        After Russo and Guerra were arrested in or around 2000, Russo was out on bail. (Id. at 102-03.) While he was out on bail, Russo discussed money with the defendant. (Id. at 103.) Russo recalled that he then owed the defendant about $60,000 or $70,000. (Id. at 103-04.) The defendant told Russo to forget about that money. (Id. at 104.) Russo understood that the defendant said that because Russo was involved in murdering Scopo, and the defendant did not want Russo to inform on him. (Id.) Subsequently, after Russo was sentenced and became unable to put money into his commissary account, he obtained money

---

[12] During this period, Russo also assaulted a loansharking customer named Santos, who owed $3,000 or $4,000.

from Colombo family associate Scott Reback, in the amount of approximately $250 or $300

per month.  (Id. at 104-05.)  After Russo was released, Reback told him to thank the

defendant for the money.  (Id. at 106.)

IV.   EXTORTION

    A.   The Testimony of Anthony Russo

       Russo testified that in 2009 or 2010, he and Colombo family member Anthony

Stropoli wanted to start a valet parking business in New Jersey together.  (Tr. at 121-23.)

The choice of business and location was based on the fact that Stropoli already operated a

wholesale seafood business selling to restaurants in New Jersey.  (Id. at 122.)  Russo

contacted an individual he knew as "Anthony," who operated a valet business on Staten

Island, to get advice.  (Id.)  When Russo went to meet "Anthony," the defendant was there.

(Id. at 122-23.)  The defendant asked Russo how he and Stropoli would like it if the

defendant opened a seafood business.  (Id. at 123.)  The defendant further told Russo to make

his life easier by "giv[ing] us the valet" and putting "our" (the defendant's and "Anthony's")

valet business in the restaurants that Russo intended to approach, while "you guys" (Russo

and Stropoli) "sit back and collect a check."  (Id. at 124.)  Russo then obtained valet business

for "Anthony" and the defendant from an Italian restaurant in Red Bank, New Jersey.  (Id. at

124.)  Russo and Stropoli never opened their own valet business because they did not want

"problems" from the defendant.  (Id. at 124-25.)

    B.   Additional Evidence

       Exhibit 7002 is an FBI report of an interview of a man who operated an Italian

restaurant in Red Bank, New Jersey, who advised that a man named Anthony, possibly with

the last name Russo, referred him to a valet business, which he used in or around 2011 for

approximately six months.  Exhibits 838(a) and 838(b) are business records that the restaurant subsequently provided to the FBI, indicating that the restaurant paid Park Plus Valet Service and another company with the same address on various dates between June 2009 and February 2011.[13]  The government proffers that Park Plus Valet Service was operated by Anthony Preza, a co-defendant in this case and an associate of the defendant.

V.     CONSPIRACY TO ACQUIRE AND SELL STOLEN VIDEO GAMES

      A.     The Testimony of Anthony Russo

      Russo testified that in the mid-1990s, he was involved in a scheme to acquire and sell stolen video games.  (Tr. at 81.)  It began when Russo's father told him about someone who wanted to sell the games.  (Id.)  Russo met the seller, known as "Spider," who asked for $75,000 for a tractor-trailer load of the games.  (Id. at 81-82.)  Russo then told the defendant about the scheme, and the defendant referred him to a friend who would provide the money to buy the games.  (Id. at 82.)  Russo and Guerra met the friend, who gave them $70,000 or $75,000.  (Id. at 82, 85)  Russo had his father rent a Ryder truck, and planned to take the games in two loads, each time paying "Spider" $35,000.  (Id. at 82-83.)  He further planned to put the games in the garage of a bus company in Coney Island, which was owned by the defendant, and which the defendant made available for that purpose.  (Id. at 83.)

      The plan came to include additional Colombo family associates.  (Id.) "Spider" brought Russo one load of games in the truck that Russo's father had rented.  (Id. at 84.)  However, after "Spider" showed Russo the load, Russo spotted what he believed to be

---

[13] Because Government Exhibits 838(a), 838(b) and 7002 identify the restaurant and certain affiliated individual, the government will seek permission to file them under seal, with copies to the defense, under separate cover.

law enforcement agents photographing him.  (Id.)  Russo took "Spider" into a car service,

searched him for a wire, found none, and told him to get rid of the truck and the games.  (Id.)

Russo held on to the money provided by the defendant's friend.  (Id. at 85.)  About two days

later, the defendant asked Russo if he was ever going to return the money, and Russo agreed

to do so.  (Id.)

      B.    <u>Additional Evidence</u>

        Russo's testimony is corroborated by the trial testimony of two FBI agents and

related exhibits.  Government Exhibit 7006 is the trial testimony of FBI Special Agent Kevin

Wevadau, and Government Exhibit 7005 is a surveillance log reflecting a surveillance that

Agent Wevadau conducted on October 26, 1994.  Pursuant to Rule 803(5) of the Federal

Rules of Evidence, Agent Wevodau read out loud from the log at trial, and it indicated that

he took photographs of an unidentified white male that day in the vicinity of 3rd Avenue

between 30th and 31st streets in Brooklyn, New York.   He further testified that Exhibits

212(a), 212(b) and 212(c) were those photographs.  The government respectfully submits

that those photographs depict Russo and that Russo was looking directly at the camera in

Exhibit 212(b).

        Government Exhibit 7008 is the trial testimony of FBI Special Agent Matthew

Tormey, and Government Exhibits 7009, 7010 and 7011 are reports he prepared in October

1994.  Referring to those reports, Agent Tormey testified that on October 27, 1994, he

conducted surveillance at 7th Avenue and 23rd Street in Brooklyn, New York.  (GX 7008 at

1005.)  He observed two individuals remove boxes from a U-Haul truck.  (Id.)  He then

looked in the truck and found a load of hand-held video games and a lease agreement for the

truck.  (Id.)  Government Exhibit 864 is the lease agreement, and Government Exhibits

21

865(a)-(e) are photographs of the truck and its contents.  (Id. at 1006-07.)  The agreement was signed by "Anthony Russo," whom Agent Tormey later determined was born in 1939.[14] (Id. at 1007, GX 864.)  The photographs depict boxes of video games.  (GX 7008 at 1007-08; GX 865(a)-(e).)  Agent Tormey determined that the "Anthony Russo" who rented the truck had reported it stolen.  (GX 7008 at 1008.)

*      *      *

The government respectfully submits that Russo's testimony was credible and was corroborated.  The Court observed him testify in a straightforward manner on both direct and cross-examination, and is familiar with his motivations and incentives.  Based on the totality of his testimony and the extensive corroboration described above, Russo's testimony should be credited.

In addition to the corroborative evidence described above, the government notes that Russo has been found credible by Judge Townes, who presided over the trial of Guerra and resolved numerous significant issues prior to sentencing Guerra.  In particular, Judge Townes observed that, with respect to the Scopo murder:

> [T]he testimony of Mr. Russo showed by a preponderance of the evidence that [Guerra] as well as he, Mr. Russo, helped plan it; that they got guns that [Guerra] came bringing in a gym bag; and that the defendant went to prison to discuss murder plans with Ted Persico; and that the group of them started to look for Mr. Scopo.  He, [Guerra], along with Russo and others, met with Theodore Persico, Jr. at his grandmother's funeral and received the okay or order to commit this murder.

(Transcript of Guerra Sentencing dated September 9, 2013 (attached in relevant part as Ex. C) at 21.)  Although Judge Townes did not need to determine at Guerra's sentencing whether

---

[14] Russo's father was born in or around 1939.

or to what extent the defendant Michael Persico participated in the Scopo murder, her statement about Russo's testimony indicates that she credited Russo's account of how the murder was planned and carried out.

CONCLUSION

For the reasons set forth above, the government respectfully submits that it has proven by a preponderance of the evidence that the defendant Michael Persico participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

Dated:      Brooklyn, New York
            September 21, 2016

                                Respectfully submitted,

                                ROBERT L. CAPERS
                                UNITED STATES ATTORNEY
                                Eastern District of New York
                                271 Cadman Plaza East
                                Brooklyn, New York 11201

                        By:     /s/ Allon Lifshitz
                                Nicole M. Argentieri
                                Allon Lifshitz
                                Assistant U.S. Attorneys
                                (718) 254-6232/6164

cc:     Clerk of Court (DLI) (by ECF)
        Defense Counsel (by ECF)
        U.S. Probation Officer Mary Ann Betts (by email)