

GOVERNMENT
EXHIBIT
**17(C)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943    10/21/93
Pct 106    Photo #  19
Investigator DET. DEGUILIU

Initials



GOVERNMENT
EXHIBIT
**18(a)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943        10/21/93
Pct 106              Photo #    5
Investigator DET. DEGUILIO

Initials



GOVERNMENT
EXHIBIT
**18(c)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943          10/21/93
Pct 106
Investigator DET. DEGUILIO     Photo #     9
Initials



**GOVERNMENT EXHIBIT**
**19(a)**
**10 CR 147 (DLI)**



CRIME SCENE UNIT
Run # 93/2943
Pct 106
Investigator DEI.
10/21/93
Photo #
DEGUILIO 22



GOVERNMENT
EXHIBIT
**19(b)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943          10/21/93
Pct 106                Photo #   27
Investigator DET. DEGUILIO

Initials



**GOVERNMENT
EXHIBIT
20(c)**
**10 CR 147 (DLI)**

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106                Photo #    6
Investigator DET. YOUNG #2387 (1)

Initials



**GOVERNMENT EXHIBIT**
**20(d)**
**10 CR 147 (DLI)**

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #    8
Investigator DET. YOUNG #2387 (2)

Initials *9Y*

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #    8
Investigator DET. YOUNG #2387

Initials *9Y 4/4/93*



GOVERNMENT
EXHIBIT
**20(f)**
10 CR 147 (DLI)

CRIME SCENE UNIT
Run # 93/2943A          10/21/93
Pct 106                 Photo #   10
Investigator DET. YOUNG #2387 (1)

Initials



**GOVERNMENT EXHIBIT**
**20(g)**
**10 CR 147 (DLI)**

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #   12
Investigator DET. YOUNG #2387 (2)

Initials

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #   35
Investigator DET. YOUNG #2387

Initials 4/8/99



**GOVERNMENT
EXHIBIT
21(e)
10 CR 147 (DLI)**

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #  18
Investigator DET. YOUNG #2387 (1)

Initials

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106              Photo #  18
Investigator DET. YOUNG #2387

Initials



**GOVERNMENT
EXHIBIT
21(i)
10 CR 147 (DLI)**

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106                    Photo #   23
Investigator DET. YOUNG #2387 (1)

Initials *Jy*

CRIME SCENE UNIT
Run # 93/2943A        10/21/93
Pct 106                    Photo #   23
Investigator DET. YOUNG #2387

Initials *Jy 4/8/98*



**GOVERNMENT EXHIBIT**

**208(a)**

**10 CR 147 (DLI)**

281-214955

6192

71

Klü



SO-2 AGENT:  K. WEVODAU  DATE:102694
CASE AGENT:  FERRANDINO  SQUAD: C-31
FILE #: 87G-NY-228482    ROLL#:4183
PHOTOGRAPHS ARE IN SEQUENTIAL ORDER

15B-NK-85650-1A6

GOVERNMENT
EXHIBIT
**212(a)**
10 CR 147 (DLI)



**GOVERNMENT
EXHIBIT
212(b)
10 CR 147 (DLI)**

```
SO-2 AGENT:   K. WEVODAU  DATE:102694
CASE AGENT:   FERRANDINO  SQUAD: C-31
FILE #: 87G-NY-228482     ROLL#:4183
PHOTOGRAPHS ARE IN SEQUENTIAL ORDER
```

15B-NK-85650-1A6



SO-2 AGENT:   K. WEVODAU  DATE:102694
CASE AGENT:   FERRANDINO  SQUAD: C-31
FILE #: 87G-NY-228482    ROLL#:4183
PHOTOGRAPHS ARE IN SEQUENTIAL ORDER

15B-NK-85650 - 1A6

GOVERNMENT
EXHIBIT
**212(c)**
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
**861**
10 CR 147 (DLI)

# THE CITY OF NEW YORK
## VITAL RECORDS CERTIFICATE

VITAL RECORDS
DEPARTMENT OF HEALTH
DATED BOROUGH OF MANHATTAN

AUG 18  11 21 PM '95.

**CERTIFICATE OF DEATH**   1563 93-046759
Certificate No.

**1. NAME OF DECEASED**   Eleanor — Avena
(Type or Print)   (First Name)   (Middle Name)   (Last Name)

---

### MEDICAL CERTIFICATE OF DEATH (To be filled in by the Physician)

| 2. PLACE OF DEATH | NEW YORK CITY | 2b. Name of hospital or other facility if not facility, street address | 2c. If in Hospital or Other Facility (Check) | 2d. If Inpatient, date of current admission |
|---|---|---|---|---|
| | 2a. BOROUGH Brooklyn | Lutheran Medical Center | 1 □ DOA  3 □ Outpatient  2 □ Emerg.  4 ☒ Inpatient | Month 6  Day 24  Year 93 |

| 3a. Date and Hour (Month) | (Day) | (Year) | 3b. HOUR | ☒ AM  □ PM | 4. SEX F | 5. APPROXIMATE AGE 78 |
|---|---|---|---|---|---|---|
| August | 17 | 1993 | 5:45 | | | |

**6. I HEREBY CERTIFY THAT: (Check One)**

□ I attended the deceased    ☒ A staff physician of this institution attended the deceased

□ Dr. _____ attended the deceased

from June 24 19 93 to August 17 19 93 and last saw h er alive at 1:00 AM

on August 17 19 93 . I further certify that traumatic injury or poisoning DID NOT play any part in causing death, and that death did not occur in any unusual manner and was due entirely to NATURAL CAUSES.

*See first instruction on reverse of certificate.

Witness my hand this 17 day of August 19 93   Signature _____ D.O. M.D.

Name of Physician Lawrence Faraud (Type or Print)   Address Lutheran Medical Center

---

### PERSONAL PARTICULARS (To be filled in by Funeral Director)

| 7. Usual Residence a. State N.Y. | 7b. County KINGS | 7c. City, Town, or Location NEW YORK | 7d. Street & House No. | Zip | Apt. No. | 7e. Inside City Limits of 7c ☒ Yes □ No |
|---|---|---|---|---|---|---|

| 8. Served in U.S. Armed Forces No ☒  Yes □  Specify years From ___ To ___ | 9. Marital Status (Check One) 1 □ Never Married  2 ☒ Widowed  3 □ Married or separated  4 □ Divorced | 10. Name of Surviving Spouse (If wife, give maiden name) |
|---|---|---|

| 11. Date of birth (Month) (Day) (Year) | 12. Age at last birthday 78 | If under 1 Year: mos. ___ days ___ | If less than 1 Day: hours ___ min. ___ | 13. Social Security No. |
|---|---|---|---|---|

| 14a. Usual Occupation (Kind of work done during most of working lifetime, do not enter retired) FACTORY WORKER | 14b. Kind of Business KING RESEARCH |
|---|---|

| 15. Birthplace (City & State or Foreign Country) BROOKLYN | 16. Education (Check only one) 0-11 □1  12 ☒2  13-15 □3  16 □4  17+ □5 | 17. Other name(s) by which decedent was known |
|---|---|---|

| 18. NAME OF FATHER OF DECEDENT CARL JOHNSON | 19. MAIDEN NAME OF MOTHER OF DECEDENT JEANETTE FOX |
|---|---|

| 20a. NAME OF INFORMANT PATTY AVENA | 20b. RELATIONSHIP TO DECEASED DAUGHTER | 20c. ADDRESS | (City) | (State) | (Zip) |
|---|---|---|---|---|---|

| 21a. NAME OF CEMETERY OR CREMATORY SILVERMOUNT CEMETERY | 21b. LOCATION (City, Town, State and Country) STATEN ISLAND N.Y. | 21c. DATE OF BURIAL OR CREMATION AUGUST 20 1993 |
|---|---|---|

| 22a. FUNERAL DIRECTOR BLAIR MAZZARELLA FUNERAL HOME | 22b. ADDRESS 723 CONEY ISLAND AVE BKLYN N.Y |
|---|---|

**VITAL RECORDS**   **DEPARTMENT OF HEALTH**   **THE CITY OF NEW YORK**

VR 15 (1/88)



This is to certify that the foregoing is a true copy of a record on file in the Department of Health and Mental Hygiene. The Department of Health and Mental Hygiene does not certify to the truth of the statements made thereon, as no inquiry as to the facts has been provided by law.

Do not accept this transcript unless it bears the security features listed on the back. Reproduction or alteration of this transcript is prohibited by §3.19(b) of the New York City Health Code if the purpose is the evasion or violation of any provision of the Health Code or any other fact.

DATE ISSUED   May 13, 2011

Steven P. Schwartz, Ph.D., City Registrar


Q 0 0 5 5 8 7 1 6

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

GOVERNMENT
EXHIBIT
**862**
10 CR 147 (DLI)

723 CONEY ISLAND AVENUE
BROOKLYN, NY  11218

DATE
March 1, 1994

NUMBER

Patty Avena

TERMS:

PLEASE DETACH AND RETURN WITH YOUR REMITTANCE     $

| DATE | CHARGES AND CREDITS | BALANCE |
|------|---------------------|---------|
|      | BALANCE FORWARD ⇨ |         |
|      | FUNERAL OF ELEANOR AVENA | $ 2,621 | 00 |
|      | FUNERAL OF: |         |

BLAIR · MAZZARELLA FUNERAL HOME  *Thank You*   PAY LAST AMOUNT
IN THIS COLUMN

723 CONEY ISLAND AVENUE
BROOKLYN, NY  11218

DATE
April 6,1994

NUMBER

PATTY AVENA

TERMS:

PLEASE DETACH AND RETURN WITH YOUR REMITTANCE    $ _____

| DATE | CHARGES AND CREDITS | BALANCE |
|------|---------------------|---------|
|      | BALANCE FORWARD ⇨ |         |
|      | FUERRAL OF ELEANOR AVENA | $ 2,621.00 |
|      | PLEASE REMIT PAYMENT! |  |

FUNERAL OF:

BLAIR - MAZZARELLA FUNERAL HOME  *Thank You*   PAY LAST AMOUNT IN THIS COLUMN

# BLAIR MAZZARELLA FUNERAL HOME

723 CONEY ISLAND AVENUE

BROOKLYN, N.Y. 11218

718-282-1164

Number _6 7_

Date _3/17/93_

Name of Deceased _Eleanor Hvena_

Date of Death _____ Place of Death _Cathveen Hosp_

## ITEMIZATION OF FUNERAL SERVICES AND MERCHANDISE SELECTED

The following are the charges for the services, merchandise, and livery you have selected. You will not be charged for any item you do not choose unless it is necessary because of other selections you have made. Any such charges are explained below.

**I. FUNERAL HOME CHARGES**
(Indicate N/A for items of service and/or merchandise that are not provided.)

A. Alternative Services
1. Direct Cremation............................ $ _N/A_
2. Direct Burial ............................... $ _N/A_

B. Transfer of remains to the funeral establishment including personnel, equipment and vehicle............ $ _175_

C. Preparation of Remains

1. Embalming (including use of preparation room)........ $ _395_

If you select a funeral for which this firm requires embalming such as a funeral with viewing, you may have to pay for embalming. You do not have to pay for embalming you do not approve if you select arrangements such as direct cremation or direct burial. If we charge for embalming, we will explain why below.

2. Other Preparation (including use of preparation room but excluding embalming)

a. Topical Disinfection...................... $ _N/A_
b. Custodial Care.......................... $ _N/A_
c. Dressing/Casketing ...................... $ _N/R_
d. Cosmetology............................ $ _N/A_
e. Restoration............................. $ _N/A_
f. Other (specify)_____ $ _N/A_

D. Arrangements
Basic arrangements: including funeral director, other staff, equipment and facilities to respond to initial request for service, the arrangement conference, securing of necessary authorizations and coordination of service plans with parties involved in the final disposition of the deceased. $ _395_

E. Supervision (funeral director and staff)

1. Supervision for visitation ...................... $ _50_
2. Supervision for funeral service................. $ _N/A_
3. Other supervision (specify)_____ $ _N/A_

F. Use of the facilities
1. Use of the facilities for visitation................. $ _N/A_
2. Use of facilities for funeral service............. $ _700_
3. Other use of facilities (specify)_____ $ _N/A_
_____

G. Livery
1. a. Hearse or........................... $ _225_
   b. Alternative vehicle .................. $ _N/A_
   (Specify type:_____)
2. Flower vehicle .............................. $ _N/A_
3. Limousine(s)............................... $ _N/A_
   (Specify number: _____ @ $_____/limousine)
4. Passenger car(s) .......................... $ _N/A_
   (Specify number: _____ @ $_____/car)

H. Merchandise
1. Casket or alternative container ................ $ _3290_
   a. Supplier _Batesville_
   b. Model name or number _Pine Rose_
   c. Material: Species of wood_____
      or kind of metal _Metal_ weight or gauge. _N/A_
      or alternative container (describe)_____
      _____
   d. Interior _Crepe_

2. Outer Interment Receptacle ................... $ _850_
   a. Supplier_____
   b. Model name or number_____
   c. Material _Concrete_

I. Additional Services and Merchandise Selected (Describe and show price)
1. Memorial Cards ............................ $ _____
2. Acknowledgement Cards.................... $ _____
3. Casket Plate.............................. $ _18_
4. Crucifix/Cross............................ $ _____
5. Hairdressing............................. $ _N/A_
6. Flowers ................................. $ _N/A_
7. Clothing or Burial Garments ............... $ _175_
8. Register Book............................ $ _N/A_
9. Death Notices............................ $ _N/A_
10. ....................................... $ _____
11. ....................................... $ _____
12. ....................................... $ _____

J. Limited Services
1. Forwarding remains to_____ $ _N/A_
2. Receiving remains from_____ $ _N/A_

TOTAL OF FUNERAL HOME CHARGES $ _5945_

## II. CASH ADVANCES

These are estimated charges for items to be paid to others. We will charge you no more for these items than is actually paid the third parties. (Describe and show estimated charges.)

| | |
|---|---|
| 1. Cemetery or Crematory | $ 423 |
| 2. Clergy Honoraria | $ |
| 3. Death Certificate Transcripts | $ 45 |
| 4. Livery | $ |
| 5. Pallbearers | $ 168 |
| 6. Public Transportation | $ |
| 7. Gratuities | $ 40 |
| 8. Bridge & Road Tolls | $ |
| 9. Telephone & Telegraph Charges | $ |
| 10. | $ |
| 11. | $ |
| 12. | $ |

ESTIMATED TOTAL OF CASH ADVANCES ... $ 926

### III. SUMMARY OF CHARGES
1. Funeral Home Charges ... $ 59745
2. Cash Advances ... $ 926

TOTAL FUNERAL CHARGES ... $ 6571

### IV. EXPLANATION OF CHARGES

Explain charges for embalming and for any items that are not required by law but may be necessary because of cemetery requirements, crematory requirements or other selections made.

_____

_____

Signature of Licensed Funeral Director          Date  8-17-93

Lynda Dicce / Cringder 5627
Printed or Typed Name of Funeral Director

### ACKNOWLEDGEMENT OF RECEIPT

I have received this itemization of funeral services and merchandise selected.

Patricia Evena          8-17-93
Signature          Date

### PUBLIC NOTICE

The New York State Department of Health is responsible for licensing and regulating New York State funeral directing under the Public Health Law. You may contact the Department at:

Bureau of Funeral Directing
New York State Department of Health
Corning Tower, Empire State Plaza
Albany, New York 12237

EXCLUSION OF WARRANTY. The only warranties, express or implied, granted in connection with the goods sold with this funeral service are the express written warranties, if any, extended by the manufacturers thereof. No other warranties and no warranties of merchantability or fitness for a particular purpose are extended by the funeral director.

---

## STATEMENT OF GOODS AND SERVICES SELECTED

INVOICE TO _____

The undersigned hereby authorizes the above funeral establishment or its representatives to obtain custody of the remains of

Eleanor Avena

Initial and state your relation to deceased ___ daughter

The undersigned hereby authorizes the above funeral establishment or its representatives ☒ to embalm ☐ not to embalm the remains of

Eleanor Avena

Initial and state your relation to deceased ___ daughter

Other Authorization by _____

"Charges are only for those items that are used. If we are required by law to use any items, we will explain the reasons in writing below."

TOTAL FUNERAL CHARGES ... $ 6571

Date ........................... 19 .........

The foregoing statement has been read by (to) me and I hereby acknowledge receipt of a copy of same and agree to pay the above funeral account and for such additional services and materials as are ordered by

me, on or before........................ 19 ......... In the event that this account is not paid in accordance with the terms of this agreement, the undersigned hereby agrees to pay any and all costs and attorney's fees incurred in connection with the collection of this account.

Prior to the discussion of these funeral arrangements, I was presented with a copy of this funeral firm's "General Price List" for which I hereby acknowledge receipt, and have had an opportunity to review the firm's Casket Price List and Outer Interment Receptacle Price List.

TERMS: This account becomes due_____. If bill remains unpaid beyond_____ a late charge of_____% per month

(annual rate_____%) may be added to the unpaid portion of the balance due. The liability hereby assumed is in addition to the liability imposed by law upon the estate and others, and shall not constitute a release thereof.

Signature _____

Relation to Deceased _____

Signature _____

Relation to Deceased _____

By _____
Print Name of Licensed Funeral Director

ADDITIONS OR ALTERATIONS OF SERVICES AND MERCHANDISE SELECTED. The following changes represent items of service and/or merchandise ordered or altered subsequent to the original funeral agreement.

AUTHORIZATION INITIAL

Total Adjustments to Funeral Charges .................. $ _____

ADJUSTED TOTAL ............................. $ _____

Credit ........................................ $ _____

BALANCE DUE .............................. $ _____

Viewing: Wed. Thr.
2-5 : 7-930

Regina Haas B.C.
236-0909 . fr.

DAY 8/20

PLACE OF SERVICE Scarpaci F.H. 331-5000          TIME OF SERVICE 900

| NAME: | FIRST | | MIDDLE | LAST | | SEX | DATE OF DEATH | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | MONTH | DAY | YEAR |
| | Eleanor | | Avena | | | F | 8 | 17 | 93 |

| PLACE OF DEATH | | | CITY OR VILLAGE | | TOWN | COUNTY | STATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Lutheran Hosp. | | | Brooklyn | | | Kings | N.Y. |

LENGTH OF STAY

| LEGAL RESIDENCE | | CITY OR VILLAGE | TOWN | COUNTY | STATE |
| --- | --- | --- | --- | --- | --- |
| | | | | Kings | N.Y. |

LENGTH OF STAY

| DATE OF BIRTH | | AGE | PLACE OF BIRTH | CITIZEN OF | VETERAN? | DATES OR WHICH WAR |
| --- | --- | --- | --- | --- | --- | --- |
| MONTH | DAY YEAR | | | | | |
| July 15 15 | | 78 | Brooklyn | U.S.A | no | |

| MARITAL STATUS | SURVIVING SPOUSE MADEN NAME, IF WIFE | WAS DECEASED KNOWN BY ANY OTHER NAME? |
| --- | --- | --- |
| Widow. | | |

EDUCATION INDICATE HIGHEST GRADE COMPLETED ONLY
ELEMENTARY        HIGH SCHOOL    COLLEGE
0  1  2  3  4  5  6  7  8    1  2  3  4    1  2  3  4  5+
□ □ □ □ □ □ □ □ □    □ □ □ □    □ □ □ □ □

| USUAL OCCUPATION | BUSINESS OR INDUSTRY | SOCIAL SECURITY NUMBER |
| --- | --- | --- |
| factory Worker. | King Research NAME & LOCATION OF FIRM OR CO. | |

| FATHER'S NAME | MOTHER'S MAIDEN NAME |
| --- | --- |
| Carl Johnson | Jeanette Fox |

| NEXT OF KIN | RELATIONSHIP |
| --- | --- |
| Patty Avena. | Daughter |

| ADDRESS | TELEPHONE |
| --- | --- |
| | |

| INFORMANTS NAME | RELATIONSHIP |
| --- | --- |
| Dan | grandson |

| ADDRESS | TELEPHONE |
| --- | --- |
| | |

| MAIL BILL TO:  NAME | ADDRESS |
| --- | --- |
| | |

Loose ok 12:00 wed.

E. Gallagher
Thr. 9:30 a.m.

Certificate................Permit No. ................
Removal ................Medical Exam. ...........
Embalmer................Lady Attend. ....Time.......
Priest Line ................Ctsgnd. ................
Church .................Am't: .................Time .........
Cemetery .................Am't: .................Time .........
Cloister................Insc. Form ................
Military ................Flag ................
Firing Squad ................Vet. Forms ................
Transcripts................Soc. Sec................
Prayer Cards.................Am't ................Type .........
Ack. Card .................Am't: ................Type .........
Memorial Pack # ................
Name Plate.................Door Badge ................
Clothing................Us.............Family .......
Casket: .................Mfg. .........Desc. .......
Del. ................Stock................
Outer Case: .........Mfg. .......Type ......Size.......
Livery ................Limousines ................
Priest at Cemetery.........Viewing Time ................
Newspapers: ................
................
................
Verified................

727-7020  # 10 (ok)
Priest at cemetery

Portars - Scarpaci ok

Hearse (c)
Limu) family
Limu (cg)
Hearse Car
1  Scarpaci(c)
2
3
4

GOVERNMENT
EXHIBIT
863
10 CR 147 (DLI)

## TRANSPORTATION INFORMATION

BUS # 1152 VAN # _____ ARRIVED S.F.C. _____ DATE 8/19/93 TIME 754 am

# OF INMATES ON BUS 4     Co 5 px + 105

# OF INMATES RECEIVED 0

# OF INMATES TRAILED 5

TOTAL INMATES ON BUS 9     Returned w/ 5 355/p.m

DEPARTING T.M. 84

DESTINATION Wallkill     ETA _____

NOTIFIED FACILITY _____

EMPLOYEE NOTIFIED _____ TIME _____

NOTIFIED CCC _____ TIME _____

Does Not Require reporting — Medical Hud

SULLIVAN C. F. TRANSPORTATION INFORMATION

DESTINATION Shawangunk PURPOSE Medical

ESCORTING OFFICERS     TIMES 1

1) Co Taylor   LEFT 901 Am E.T.A. 1 Hr

2) Co St Heid   ARRIVED 1030 Am

3) _____ LEFT 116 PM E.T.A. 1 Hr

RETURNED 227 pm

INMATES TRANSPORTED, (list below) LIST IF C.M.C.

9126141 GURGANEOUS

SULLIVAN C. F. TRANSPORTATION INFORMATION

DESTINATION B'Klyn NY PURPOSE Funeral

ESCORTING OFFICERS     TIMES 1

1) Hill   LEFT 1010 Am E.T.A. 1:15

2) Huebsch   ARRIVED 1457 p

3) BIVINS   LEFT 312 E.T.A. 715

RETURNED 613/p

INMATES TRANSPORTED, (list below) LIST IF C.M.C.

Persico 88A6463

1210 Pm   Count Clear 728

Send CMC & Notification to CCC on inmate Spradley 91AXX3
message #616981

100 pm B'Klyn Funeral trip Stuck in Traffic
won't make 100 P.m Viewing — were told to
proceed to Destination — may make services.

1:49 Relieved Joy — St. R Beste

315 PM Relieved by Lt Henley &amp; Sr M Guuf

6³⁰ W.C. on rounds
9⁰⁰ C.O. Huebsch and Ramos return w/ 2 inmates from St. Clares.
LE 6⁰⁰ One on one watch in M.H.U. has been lifted per O.M.H.
11⁰⁰ Count correct; In 720   Out 8   Tlh 728
Relieved by Lt. Frisbie
Lt. Healy
11¹⁰ Lt. Frisbie reviewed log.

DAY: Wed   DATE: 8/18/93   TIME SHIFT STARTS: 11¹⁵ pm   TIME SHIFT ENDS: 7³⁰ am
WEATHER: Rain   TEMPERATURE: 62°   FIRE CHIEF: Berthold
WATCH COMMANDER: Frisbie   OFFICER OF THE DAY: OSA Capuano
SENIOR NURSE ON DUTY: Upulant   INMATES OUT:
ANNEX COUNT BEGINNING OF SHIFT: 185   END OF SHIFT: 185
MAIN COUNT - BEGINNING OF SHIFT: 543/728   END OF SHIFT: 543/728
VISITING COUNT - MAIN BUILDING: N/A   VISITING COUNT - ANNEX: N/A

Sgt.
C. Aurok - Main
Miller - annex

11¹² C.O. Brooks called from Harris Hosp., inmate moved from I.C.U. to 5-E-11.
11¹⁵ Line up & briefing.
12¹⁰am Count Correct; total 728
1⁰⁰am C.O. Brooks; all secure at Harris Hosp.
2³⁰am Count Correct; total 728
3⁰⁰am C.O. Brooks; all secure at Harris Hosp.
4⁰⁰am Count Correct; total 728
6⁰⁰am C.O. Brooks; all secure at Harris Hosp.
6⁴⁵am Count Correct; total 728.
7:15AM Log Review - Lt. Frisbie

DAY: Wed   DATE: 8/18/93   TIME SHIFT STARTS:   TIME SHIFT ENDS: 3³⁰ pm
WEATHER: P/cloudy overcast   TEMPERATURE: 60°   FIRE CHIEF: Fletcher
WATCH COMMANDER: Dunn/Suf   OFFICER OF THE DAY: D/SA Capuano
SENIOR NURSE ON DUTY: Nutley   INMATES OUT:
ANNEX COUNT BEGINNING OF SHIFT: 185   END OF SHIFT:
MAIN COUNT - BEGINNING OF SHIFT: 543   END OF SHIFT:
VISITING COUNT - MAIN BUILDING:   VISITING COUNT - ANNEX:

8388

Sgts.
Leone I/S
Katz   Annex
Coleman F/S
Audomsky S/N
Ferrie H
Dunn HA
Baker GC
DeJohn H/A

7:15AM Lineup & Briefing
8:04AM Mr. Davis Plant Supt Reviewed Log
8:30AM Sgt Coleman FDS Reviewed Log

GOVERNMENT
EXHIBIT
864
10 CR 147 (DLI)



14042

10/26/94  01:48pm                    RENTAL CONTRACT              00193687
                                      LOCAL OUT
WE SLOPE U-HAUL         803-59
52 & TH STREET
BROOKLYN        NY  11215
(718) 237-2894

J.IORT: RUSSO ANTHONY                 DR. LIC.                       DATE       TIME
       2131 84ST                      PHONE NO.
       BROOKLYN         NY  11214                           OUT: 10/26/94    01:48pm

                                                           DUE: 10/26/94    07:00pm

                              EQUIPMENT RENTED

QTY.    EQUIPMENT NO.              DESCRIPTION               LOCAL RATES        ESTIMATED AMOUNT

  00006H        7225P     GREAT HAULER TRUCK-24                 39.95              39.95
    VF08922       PA      RATE PER MI/KM:           0.99
                          MILEAGE OUT:          78,168.7
                          ESTIMATED MILES:          50.0                            49.50
                          SAFEMOVE PROTECTION           10.00                       10.00

                                                    SALES TAX:                       7.38
                                           ESTIMATED RENTAL TOTAL:                  106.83

                                           TODAY'S RENTAL DEPOSIT:                  200.00
                                                    TOTAL DEPOSIT:                  200.00
                                           TOTAL COLLECTED TODAY:                   200.00
                                                            CASH:                   200.00

_____ (CUSTOMER INITIALS)    I HAVE RECEIVED:    X CONTRACT HOLDER    X USERS GUIDE(S)

BY SIGNING BELOW, I HAVE RECEIVED AND UNDERSTAND THE TERMS AND CONDITIONS PRINTED ON THE CONTRACT HOLDER.  I AGREE TO PAY FOR ALL
FUEL AND RETURN THE TRUCK FULL OF FUEL OR PAY A MINIMUM $2 PER GALLON FOR ESTIMATED FUEL USED PLUS AN ADDITIONAL $20 SERVICE FEE.
I UNDERSTAND THAT ANY REFUND DUE WILL NOT BE PAID UNLESS I RETURN WITH ALL EQUIPMENT RENTED AND RENTAL CONTRACT.

_____              10/26/97              _____
CUSTOMER SIGNATURE                     DATE                 EMPLOYEE SIGNATURE 0171A

Safemove is in effect when payment for coverage is received and noted on the contract. As a Safemove customer, you are relieved of responsibility for most damage, yet we still must determine how the damage occurred. You need to file an Accident/Damage Report for your protection against further claims and so we can recover damage costs from responsible third party (parties). Additionally, if you hit an object or other personal property, a completed Accident/Damage Report is required in case of potential liability claim(s) made against U-Haul.

• Off-road use of the vehicle.

• Incorrect fuel.

• Cut, blown or damaged tires.

• Damage caused from low oil level.

• Damage caused while the driver or passengers were using any controlled substance (drugs) or alcohol, etc.

• Damage to the truck bed (box), rear doors or cab that resulted from overloading, improper loading or failure to secure the load.

• Mechanical damage resulting from overloading or topping of the vehicle while towing or pulling a trailer.

• Damage that results from the vehicle being used in the commission of a crime.

• Other damage resulting from willful abuse and serious negligence.

• Damage that results from the failure to comply with the terms of the rental contract.

GOVERNMENT
EXHIBIT
**865(a)**
10 CR 147 (DLI)



GOVERNMENT EXHIBIT

**865(b)**

10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
865(c)
10 CT 147 (DLI)



GOVERNMENT
EXHIBIT
**865(d)**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
**865(e)**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT

**1013(b)**

**10 CR 147 (DLI)**

## SUMMARY CHART
## PHONE RECORDS

| From | | To | | Date Range | Number of Contacts |
|------|------|------|------|------|------|
| Phone Number | Subscriber/User | Phone Number | Subscriber/User | | |
| 917-567-8741 | Michael Persico (Romantique) | 917-757-2359 | Francis Guerra | June 2, 2008 - April 20, 2009 | 33 |
| 917- 757-2359 | Francis Guerra | 917-567-8741 | Michael Persico (Romantique) | June 2, 2008 - April 20, 2009 | 81 |
| 917-567-8741 | Michael Persico (Romantique) | 347-288-9628 | Anthony Russo (Maritza Medina) | January 6, 2009 - April 16, 2009 | 3 |
| 347-288-9628 | Anthony Russo (Maritza Medina) | 917-567-8741 | Michael Persico (Romantique) | January 6, 2009 - April 16, 2009 | 11 |
| 917-567-8741 | Michael Persico (Romantique) | 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | January 29, 2009 - April 14, 2009 | 8 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 917-567-8741 | Michael Persico (Romantique) | January 29, 2009 - April 14, 2009 | 7 |

1

| From | | To | | Date Range | Number of Contacts |
|---|---|---|---|---|---|
| Phone Number | Subscriber/User | Phone Number | Subscriber/User | | |
| 917-757-2359 | Francis Guerra | 347-288-9628 | Anthony Russo (Maritza Medina) | August 20, 2009 – July 26, 2010 | 1339 |
| 347-288-9628 | Anthony Russo (Maritza Medina) | 917-757-2359 | Francis Guerra | August 20, 2009 – July 26, 2010 | 2317 |
| 917-757-2359 | Francis Guerra | 347-231-5175 | Anthony Russo (Maritza Medina) | July 21, 2010 - August 30, 2010 | 142 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 917-757-2359 | Francis Guerra | August 21, 2009 - January 20, 2011 | 94 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 347-288-9628 | Anthony Russo (Maritza Medina) | September 10, 2009 - July 19, 2010 | 242 |
| 732-673-4274 | Anthony Stropoli (Ultimate Seafood Inc.) | 347-231-5175 | Anthony Russo (Maritza Medina) | July 21, 2010 - September 2, 2010 | 69 |
| 914-246-9726 | Michael Persico | 718-996-8358 | Joseph Monteleone (Anna Sottile) | December 31, 1991 - May 17, 1992 | 6 |

2

| From | | To | | Date Range | Number of Contacts |
|------|------|------|------|------|------|
| Phone Number | Subscriber/User | Phone Number | Subscriber/User | | |
| 718-875-3955 | Eric Curcio | 718-745-8345 | Joyce Persico (Alphonse Persico's Mother) | August 18, 1994 | 1 |
| 718-356-0208 | Michael Sessa | 914-246-9726 | Michael Persico | February 29, 1992 – June 10, 1992 | 3 |
| 917-757-2359 | Francis Guerra | 718-312-9032 | Michael Sessa (Smily) | September 25, 2009- December 22, 2010 | 10 |
| 718-312-9032 | Michael Sessa (Smily) | 917-757-2359 | Francis Guerra | September 25, 2009- December 22, 2010 | 28 |
| 917-757-2359 | Francis Guerra | 646-400-9696 | Ambrose | September 10, 2009- February 9, 2011 | 217 |
| 646-400-9696 | Ambrose | 917-757-2359 | Francis Guerra | September 10, 2009- February 9, 2011 | 150 |
| 917-757-2359 | Francis Guerra | 718-234-5580 | Patty Avena | June 9, 2010- December 6, 2010 | 4 |
| 917-757-2359 | Francis Guerra | 917-538-1365 | Scott Reback (Jew) | August 20, 2009- January 6, 2011 | 176 |
| 917-538-1365 | Scott Reback (Jew) | 917-757-2359 | Francis Guerra | August 20, 2009- January 6, 2011 | 137 |

3

| From | | To | | Date Range | Number of Contacts |
|------|---|------|---|------------|--------|
| **Phone Number** | **Subscriber/User** | **Phone Number** | **Subscriber/User** | | |
| 917-757-2359 | Francis Guerra | 917-567-0028 | Suzzie Girl | August 20, 2009- December 17, 2009 | 8 |
| 917-757-2359 | Francis Guerra | 718-680-5072 | Suzzie Girl | August 20, 2009-September 22, 2009 | 8 |
| 718-680-5072 | Suzzie Girl | 917-757-2359 | Francis Guerra | August 20, 2009-September 22, 2009 | 5 |
| 718-219-4572 | Susie Girl Little | 917-757-2359 | Francis Guerra | January 20, 2011 | 2 |
| 917-757-2359 | Francis Guerra | 718-708-0923 | Suzzie Girl | August 27, 2009- December 18, 2009 | 19 |
| 718-708-0923 | Suzzie Girl | 917-757-2359 | Francis Guerra | August 27, 2009- December 18, 2009 | 92 |

4

GOVERNMENT
EXHIBIT

**7000**

10 CR 147 (DLI)

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA      :
 3                  PLAINTIFF,      :    10CR147
                                    :
 4        versus                    :    United States Courthouse
                                    :    225 Cadman Plaza East
 5                                  :    Brooklyn, N.Y.  11201
     FRANK GUERRA,                  :
 6                                  :    June 19, 2012
                  DEFENDANT.        :    9:30 A.M.
 7   ------------------------------x

 8
                        TRANSCRIPT OF JURY TRIAL
 9          BEFORE THE HONORABLE SANDRA L. TOWNES
               UNITED STATES DISTRICT COURT JUDGE
10

11   A P P E A R A N C E S:
     For the Government:
12
     LORETTA LYNCH
13   United States Attorney
     BY: NICOLE ARGENTIERI, ESQ.
14   RACHEL NASH, ESQ.
     ALLON LIFSHITZ, ESQ.
15   Assistant United States Attorney
     271 Cadman Plaza East
16   Brooklyn, New York  11201

17

18   For the Defendant:

19   GERALD J. MCMAHON, ESQ.
     MATHEW J. MARI, ESQ.
20   Court Reporter:
     Charisse Kitt, CRI, CSR, RPR, FCRR
21   225 Cadman Plaza East Rm N357
     Brooklyn, New York  11201
22   Tel: (718) 613-2606
     Fax: (718) 613-2696
23

24

25   Proceedings recorded by mechanical stenography, transcription
     by computer-aided transcription.
```

Quarantello – Direct/Lifshitz

1

9                    **JOHN DEGUILIO,**

10  called as a witness, having been duly sworn, was examined and

11  testified as follows:

12        THE COURT:  Please be seated.  Tell us your full

13  name and spell it.

14        THE WITNESS:  John, J-o-h-n, Deguilio,

15  D-e-g-u-i-l-i-o.

16        MR. LIFSHITZ:  May I inquire, Your Honor?

17  DIRECT EXAMINATION

18  BY MR. LIFSHITZ:

19  Q    Good morning, sir.

20  A    Good morning.

21  Q    Where did you work in 1993?

22  A    The New York City Police Department, crime scene unit.

23  Q    And when did you work for the police department?

24  A    From 1984 to 2004.

25  Q    Are you retired now?

Deguilio – Direct/Lifshitz

1   A     Yes.

2   Q     And you mentioned the crime scene unit; is that also

3   known as the CSU?

4   A     Yes.

5   Q     Approximately what years did you work in the CSU?

6   A     Early '93 to around September of 2000.

7   Q     And generally speaking, what were your responsibilities

8   when you worked in the CSU?

9   A     I responded to crime scenes and we photographed,

10  sketched, and documented and collected any evidence that was

11  present.

12  Q     Directing your attention to October 20, 1993, did you

13  work that day?

14  A     Yes.

15  Q     What shift?

16  A     I started at 2 p.m. on October 20th, and my shift ended

17  at 8 a.m. on October 21st.

18  Q     Directing your attention to the late evening of the 20th,

19  did you get a call to respond to a crime scene?

20  A     Yes, I did.

21  Q     Where, if anywhere, did you go as a result of getting

22  that call?

23  A     We responded to –– within the 106th Precinct, which was

24  in Queens County, respond to 110th Street between 107th and

25  109th.

Deguilio – Direct/Lifshitz

1   Q    107th and 109th Avenue?

2   A    Correction, 107th.

3   Q    When you arrived what did you see?

4   A    There was police vehicles present and there was yellow

5   tape sectioning off an area within that block.

6   Q    What kind of street was it?

7   A    It was residential.

8   Q    What did you do when you first arrived?

9   A    I conferred with one of the detectives that was at the

10  scene, he advised us what he needed to have done at that

11  location, and then I proceeded to -- I sketched the scene.

12  Q    Scene of 110th Street?

13  A    Yes.

14  Q    What else did you do, if anything, at 110th Street?

15  A    Once I had sketched the scene, I photographed the scene

16  and collected evidence that was located there.

17  Q    Other than 110th Street, where else, if anywhere, did you

18  go in connection with this particular crime scene?

19  A    It was, as I recall, a few blocks away; I believe it was

20  106th Street.  It was a vehicle located that was running and

21  was noted to us that it may have been involved with the prior

22  crime scene that we were working on.

23  Q    The scene at 110th Street?

24  A    Correct.

25       MR. LIFSHITZ:  May I approach, Your Honor?

                    Deguilio – Direct/Lifshitz

1          THE COURT:  Yes.

2    Q    I'll hand the witness a series of photographs that have

3    been marked Government Exhibits 17A, –B, and –C; 18A, –B, –C,

4    –D, and –E; 18–1A, –B, and –C?

5          THE COURT:  Don't –– wait.  Don't talk so fast.

6    18–1?

7          MR. LIFSHITZ:  18–1A, –B, and –C; and 19A and –B.

8    Q    Please look at these exhibits and tell us if you

9    recognize them.

10          (Handing.)

11          (Witness perusing.)

12   A    These are the photographs that I had taken of the crime

13   scene.

14   Q    Do they fairly and accurately depict items and scenes you

15   observed that night?

16   A    Yes.

17   Q    October 20, 1993?

18   A    Yes, they do.

19          MR. LIFSHITZ:  Your Honor, the government moves to

20   admit the exhibits that was just handed to the witness.  I can

21   read off the numbers again, if it would help.

22          THE COURT:  Mr. McMahon.

23          MR. McMAHON:  No objection.

24          THE COURT:  All right, no objection.  I will

25   receive, and I will read off the numbers.  Tell me if I've

                   CHARISSE KITT, CRI, CSR, RPR, FCRR
                        Official Court Reporter

Deguilio - Direct/Lifshitz

1   missed anything.

2           MR. LIFSHITZ:  Sure.

3           THE COURT:  17A, 17B, and 17C, 18A, -B, -C, -D,

4   and -- E; 18-1A, -B, and -C; and 19A and -B.

5           MR. LIFSHITZ:  Yes, that's everything.  Thank you,

6   your Honor.

7           THE COURT:  Received.

8           (Government's Exhibits 17A, 17B, 17C, 18A, 18B, 18C,

9   18D, 18E, 18-1A, 18-1B, 18-1C, 19A and 19B received in

10  evidence.)

11          MR. LIFSHITZ:  May I approach again?

12          THE COURT:  Yes.

13          MR. LIFSHITZ:  I will show the witness a board that

14  we've marked as Government Exhibit 17.

15  Q    Does this exhibit consist of enlarged versions of the

16  photographs at Government Exhibits 17A, -B, and -C?

17  A    Yes, they do.

18          MR. LIFSHITZ:  Your Honor, the government would move

19  to admit Exhibit 17.

20          THE COURT:  Mister --

21          MR. McMAHON:  No objection.

22          THE COURT:  I'll receive Government Exhibit 17.

23          (Government's Exhibit 17 received in evidence.)

24          MR. LIFSHITZ:  Your Honor, may I display it on the

25  easel and ask the witness to stand down?

Deguilio - Direct/Lifshitz

1    THE COURT:  Yes, you may.

2    MR. LIFSHITZ:  Thank you.

3  Q    Please explain to the jury what's depicted in the picture

4  on the top left of this board which corresponds to

5  Exhibit 17A?

6  A    This is glass fractures that are on the street opposite

7  107-45 110th Street.

8  Q    What -- is there a car depicted in that picture?

9  A    Yes, a white Cadillac.

10  Q    Is the glass from the Cadillac?

11  A    No, it wasn't.

12  Q    What's depicted in the picture on the bottom left of this

13  board which corresponds to Exhibit 17B?

14  A    If you were standing in front of 107-44 on 110th Street,

15  right in front of the home, this what the photo is showing a

16  Nissan Altima.

17  Q    Does the Cadillac in the top left picture appear in the

18  bottom?

19  A    Yes, it does, on the opposite side of the street.

20  Q    So within that particular picture is the top most car on

21  the right?

22  A    Yes.

23  Q    And is there any damage to the Nissan that's in the

24  foreground of the picture?

25  A    On this photo you can see that the rear window is

                    Deguilio - Direct/Lifshitz

1   shattered.

2   Q    Take a look at the picture on the right of the board,

3   which corresponds to Government Exhibit 17C.

4            What's depicted in that picture?

5   A    This is the Buick that has a fractured rear window and a

6   blown out rear driver's side passenger door window on 106th

7   Street.

8   Q    And is that how it appeared when you found it on

9   106th Street?

10  A    Yes.  The vehicle was running, actually.

11  Q    Thank you.

12           MR. LIFSHITZ:  Your Honor, I'd like to next show the

13  witness a board marked Government Exhibit 18.

14           If you grab the folder containing the 18 series.

15           Does this board contain enlarged versions of 18A,

16  -B, and -C?

17  A    Yes, it does.

18           MR. LIFSHITZ:  Your Honor, I would move to admit

19  Government Exhibit 18.

20           THE COURT:  Any objection.

21           MR. McMAHON:  No, Judge.

22           MR. LIFSHITZ:  And may I place it on the easel.

23           THE COURT:  Exhibit 18 is received.

24           (Government's Exhibit 18 received in evidence.)

25           THE COURT:  Yes, you may.

Deguilio – Direct/Lifshitz

1    MR. LIFSHITZ:  Thank you.

2  Q    Now looking at Exhibit 18, the board that's in front of

3  you, can you please explain what's depicted in the top left

4  picture, which corresponds to 18A?

5  A    This is the Nissan Altima that's in front of 107-43 and

6  107-45 on 110th Street.

7  Q    Is this the opposite prospective of what was on the

8  previous board, the board marked 17?

9  A    Yes.  I was standing in front of the home as it was shot

10  of the passenger side out.  This is the opposite facing.

11  Q    And what can you see in this picture?

12  A    You could also see where the shattered glass –– this

13  window here is blown out, the driver's side door.

14  Q    The front driver's side door?

15  A    That's correct.  And two bullet impact marks on this

16  vehicle.  And you can see that rear window is shattered.

17  Q    Does glass appear in that picture?

18  A    If you stepped out of the vehicle right below it.

19  Q    Under the driver's door?

20  A    Yes.

21  Q    What's depicted in the picture on the top right of this

22  board, which I believe corresponds to 18B?

23  A    This is the same vehicle in this photograph on the left,

24  just another view of it.  And it's showing that the rear

25  window –– you see how it's completely blown out.

Deguilio – Direct/Lifshitz

1  Q    You're pointing to the vehicle on the right side of the
2  picture that has open doors?
3  A    Yes.  The vehicle was never moved from where it was at
4  that time.
5  Q    And you may have said this, but can you see any damage to
6  the vehicle in this picture?
7  A    Yes.  The rear view shattered window and glass along the
8  front driver's side door.
9  Q    And finally, the bottom 18C.  Can you explain what's in
10  that picture?
11  A    Also the Nissan Altima, closer photograph of it, where
12  you could see where the two bullet impact marks are on the
13  vehicle.  You see the rear window shattered.  You can see that
14  this window here is blown out.  And you can also see on the
15  ground below here the shattered glass.
16  Q    And that's below the drivers window?
17  A    Yes.
18  Q    I think you mentioned ballistics damage just now.  Can
19  you just point it out and describe in your own words where it
20  appears?
21  A    These are bullet impact marks; one is on the driver's
22  side rear door towards the rear.  I will refer to it as the
23  post, between the rear window and door.  There's one right
24  here.
25  Q    Above that door?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

                    Deguilio – Direct/Lifshitz

1    A    Yes.

2    Q    Above the rear driver's side door?

3    A    This is where the bullet impact mark was.

4    Q    Thank you.  You can have a seat.

5            (Witness complies.)

6    Q    I'll show you what's in evidence as

7    Government Exhibit 18E.  I'll just put it up on the Elmo.

8            Can you explain what this picture depicts?

9    A    Yes.  This is the front entryway to 104-35 -- excuse me.

10   Could I refer to paperwork in regards --

11   Q    Yes.  Is there anything that might refresh your

12   recollection?

13   A    Yes, my crime scene report.

14            MR. LIFSHITZ:  For the record, this is 3500JD3.

15   A    Yes, this is 107-43 110th Street.

16   Q    Is there any ballistics damage on this picture?

17   A    Yes.  Between the window and the front door there's an

18   exterior light.  There's a bullet hole just below the light.

19   Q    If you could touch the screen, maybe immediately next to

20   the bullet holes?

21   A    That didn't come out where it was supposed to go.

22   Q    Try again.

23   A    It's still not in the right place.

24   Q    Is this one of the bullet holes?

25   A    Yes.

1043

Deguilio – Direct/Lifshitz

1    Q    Just below the light around the middle of the picture?

2    A    That's correct.

3    Q    And where did you say the other one was?

4    A    Above the light there's a decorative piece on top of the

5    light, just to the left of it.

6    Q    Partially blocked --

7    A    By the light, yes.

8            THE COURT:  Wait.  Please don't talk at the same

9    time.  Don't talk at the same time.  She can't take both of

10   you.

11           MR. LIFSHITZ:  Yes, Your Honor.

12   Q    Is the second bullet hole partially blocked by the light

13   fixture?

14   A    Yes.

15   Q    I show you what's in evidence as 18D.  What does this

16   picture depict?

17   A    This is 107-45 110th Street.  This is showing -- this is

18   a porch that would stick out from the home.  This is the north

19   side of the front of that building.

20   Q    Are there any bullet holes visible in this picture?

21   A    Yes.

22   Q    And where are they?

23   A    One is to the window that's facing in the aluminum frame

24   and then there's an additional bullet --

25   Q    The window on the right or the left?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Deguilio - Direct/Lifshitz

1   A    The window to the left, in the -- to the left of the

2   aluminum frame, there's a bullet hole on the other side.

3   Right there, over here.  No --

4   Q    Right above that?

5   A    No, to the left of that, towards the corner of that --

6   Q    Is that -- is that bullet hole easier to see from an

7   anterior view?

8   A    Yes, it is.

9   Q    Okay, we'll get to that.

10          Where is the other bullet hole?

11  A    The other bullet hole is right here.  It would be the

12  window -- first window to the right of the main window.  You

13  can see in this photograph there's a bullet hole.  That's

14  where it would be; correct.

15          And then there's an additional bullet hole further

16  up in the window that would be closer to -- where you see most

17  of this black framework to the right of the photograph.

18  Q    Okay.  Is that bullet hole visible in this picture?

19  A    Yes, further up.  It's a little difficult to see, but

20  it's there.

21  Q    Can you press down on the screen where it is?

22  A    That's not marking it in the correct location.

23          THE COURT:  Is it the glass or around --

24          THE WITNESS:  Yes, the glass.  This is marking it in

25  the wrong location.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Deguilio – Direct/Lifshitz

1   THE COURT:  All right.

2   MR. LIFSHITZ:  Your Honor, can I ask the witness to

3   step down briefly?

4   THE COURT:  Yes.

5   Q    Can you step down to the board that's Exhibit 18.

6   (Witness complies.)

7   Q    On the top left-hand picture, can you indicate where the

8   two houses are that we just saw closeup photographs of.

9   A    Yes, this is 107-43.

10  Q    The gray house in the middle.

11  A    And this is the white house with the black trim, 107-45.

12  Q    On the right side of that picture?

13  A    That's correct.  And this is the house that you were just

14  showing me a photograph of.

15  Q    Okay.

16  THE COURT:  He's pointing to what on the --

17  MR. LIFSHITZ:  He's pointing to the top left picture

18  on the board.  And he first pointed to the middle house in

19  that picture and then he --

20  Q    What's the address of the middle house, just for clarity?

21  A    107-43.

22  Q    And the right-end house on that picture?

23  A    107-45.

24  Q    Okay, thank you.

25  MR. LIFSHITZ:  May I approach again, Your Honor.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Deguilio - Direct/Lifshitz

1      THE COURT:  Yes.

2      MR. LIFSHITZ:  You can sit down for a second.

3   Q    I'm going to show the witness the board marked 18-1 and

4   I'll ask you to refer to Government Exhibits 18-A, -B, and -C.

5      (Handing.)

6   Q    Does Government Exhibit 18 contain enlarged versions of

7   18A through -C?

8   A    Yes.

9      MR. LIFSHITZ:  Your Honor, I move to admit

10  Government Exhibit 18-1, the board?

11     THE COURT:  Any objection?

12     MR. McMAHON:  No objection.

13     THE COURT:  I'll receive Government's Exhibit 18-1.

14     MR. LIFSHITZ:  And may I place it on the easel?

15     THE COURT:  Yes.

16     MR. LIFSHITZ:  And have the witness step down.

17  Q    What house do these pictures depict on board 18-1?

18  A    Photograph to the left is 107-45 110th Street, that's an

19  anterior photograph.  This first photo is showing the bullet

20  hole that came through the, the window frame.

21  Q    And where are you pointing on that picture on the left?

22  A    This will be right here to -- it will be the left.  If

23  you're looking from outside, it would be on your left, but

24  this is on your right looking out.

25  Q    And is that the bullet hole you explained was harder to

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Deguilio – Direct/Lifshitz

1   see from the exterior than the anterior?

2   A    Yes, this bullet hole faces 110th Street.

3   Q    And what's depicted in the middle picture?

4   A    This is the anterior door of the same location, 107–45

5   110th Street, depicting a coat rack.  And also there's a

6   bullet hole in this glass pane, and this glass pane.

7   Q    And the first bullet hole you pointed to, is that toward

8   the top of the picture in the middle glass pane?

9   A    Yeah, closer to the curtain.

10  Q    And the second bullet hole you pointed to, is that to the

11  left side of the middle row panes?

12  A    That's correct, closer to where these jackets are.

13  Q    And finally the right hand picture, some what does that

14  depict?

15  A    This is three porch windows that face 110th Street.

16  Q    Is this an exterior view or anterior view?

17  A    That is facing the location.

18  Q    Sorry, was this taken outside the house or inside?

19  A    Yes, I was outside the house when this picture was taken.

20  Q    Does it show any bullet holes?

21  A    There's one in the left window here.

22  Q    A little less than halfway, a little less than the

23  halfway point of that window?

24  A    Right below the multi–panes there's another additional

25  bullet hole here.

Deguilio – Direct/Lifshitz

1  Q    In the middle window?

2  A    It would be another bullet hole here which is the center

3  window of the three windows.

4  Q    Now, are you pointing to a spot a little bit below the

5  middle of that window?

6  A    Yes.  Also below these multi-pane windows and lower

7  window.

8  Q    Thank you.  You may have a seat.

9        (Witness complies.)

10 Q    Now, you mentioned 106th Street before.  Did there come a

11 time on this night where you went to 106th Street?

12 A    Yes, I did.

13 Q    Can you tell us why you went there?

14 A    We were advised there was a vehicle that may have been

15 connected to this crime scene.

16 Q    What did you do at 106th Street?

17 A    I photographed a Buick that was parked on the road.  I

18 noticed a weapon in the vehicle.  And I photographed that

19 weapon also, and eventually I recovered the weapon.

20       (Continued on the next page.)

21

22

23

24

25

Deguilio – Direct/Lifshitz

1   MR. LIFSHITZ:

2   Q    What color was the Buick?

3   A    It was brown and gold.

4        MR. LIFSHITZ:  May I approach, your Honor.

5        THE COURT:  Yes, you may.

6        (Approaching the witness.)

7   Q    Briefly showing him Government's 17 which is already in

8   evidence.

9        Does the right-hand picture on this border depict

10  the Buick?

11  A    Yes, it is.

12  Q    And is that how it was recovered on 106th Street?

13  A    Yes.

14  Q    Now, I'd like to show the witness what's not yet in

15  evidence a board 19, Exhibit 19.

16       Do you have the photographs 19-A and B in front of

17  you?

18  A    Yes I do.

19  Q    Does this board, Exhibit 19, contain enlarged versions of

20  19-A and B?

21  A    Yes, they are.

22       MR. LIFSHITZ:  I move to admit Exhibit 19, your

23  Honor.

24       THE COURT:  Any objection?

25       MR. McMAHON:  No, Judge.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

1050

Deguilio – Direct/Lifshitz

1      THE COURT:  I'll receive Exhibit 19.

2      (Government's Exhibit 19 was received in evidence as

3  of this date.)

4      MR. LIFSHITZ:  May I publish it on the easel?

5      THE COURT:  Yes.

6      MR. LIFSHITZ:  And ask the witness to stand down.

7      (Witness leaves the witness stand.)

8  Q    Looking at Government Exhibit 19, the board in front of

9  you.

10     What does the picture on the left hand depict?

11  A    This photograph depicts the rear sitting area of the 1984

12  Buick which is showing a semiautomatic weapon with a

13  suppressor, which is more commonly known as a silencer.

14     There's also a wool hat sitting on the seat and

15  there were cartridges also sitting on the seat which would be

16  on the rear passenger side.

17  Q    Just so the record is clear.  The firearm you refer to,

18  is that leaning against the back seat and also on the floor?

19  A    Yes, it is.  The suppressor, the silencer, is against the

20  floor and the weapon itself is up against the seat.

21  Q    And is the wool cap you referred near the middle of the

22  back seat area?

23  A    More towards behind the driver's area, but it's in the

24  center.  Toward the center, also.

25  Q    And you referred so some other evidence toward the top of

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio – Direct/Lifshitz

1    the picture.  What are those items?

2    A    These are cartridges.

3    Q    What is a cartridge?

4    A    Being an unfired bullet.

5    Q    Again, so the record is clear, are those items on the

6    rear passenger side seat?

7    A    Yes, they are.  Right here.

8    Q    Is there any glass in this picture?

9    A    Yes, glass on the seat and also on the floor of the

10   vehicle.

11   Q    What does the picture on the right depict?

12   A    This photograph here is this weapon that's in the

13   previous photograph.

14   Q    And where was the picture on the right taken?

15   A    This is taken in the 106th Precinct Detective Squad.  I

16   had removed the magazine to make the weapon safe, then I

17   processed it for latent fingerprints.

18   Q    Other than having removed the magazine, does that picture

19   accurately depict the weapon as you found it?

20   A    Yes, it does.

21   Q    Can you point out the magazine, the silencer, and the

22   firearm, please?

23   A    This would be a silencer so it has white metal finish;

24   this is the weapon; and this is the magazine that would insert

25   in this position into the weapon.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio – Direct/Lifshitz

1    Q    So, the magazine is on the bottom of the picture?

2    A    That's correct.

3    Q    And the silencer is still attached to the gun in this

4    picture?

5    A    Yes, it is.

6    Q    By the way, what, if anything, did you first observe

7    about the Buick that we've been discussing when you first

8    found it on 106th Street?

9    A    It was still running.

10          MR. LIFSHITZ:  Thank you.  You may have a seat.

11          (Witness takes the witness stand.)

12          MR. LIFSHITZ:  Your Honor, may I approach.

13          THE COURT:  Yes, you may.

14          MR. LIFSHITZ:  I will show the witness 12–B–2 which

15   is a brown envelope and ask you to open that up and take a

16   look at what's inside.

17          THE WITNESS:  (Complying).

18   Q    Are there two envelopes in there?

19   A    Yes.

20   Q    Do you recognize those envelopes that were inside the

21   larger envelope?

22   A    Yes, I do.

23   Q    How are you able to recognize them?

24   A    They have the crime scene sticker number that I applied

25   to them.  The run number, my name, my shield number, the date,

Deguilio - Direct/Lifshitz

1   the precinct, and each one is marked D-2 and one is marked

2   D-3.

3   Q    Do you recognize what is inside those envelopes, D-2 and

4   D-3?

5   A    D-2 is a deformed copper jacketed lead.

6   Q    Are you able to recognize it?

7   A    Yes.  This is still marked as I had marked it then.

8   Q    How?

9   A    D-2.

10  Q    How did you mark it?

11  A    With a metal describer.

12  Q    You marked D-2 on it?

13  A    Yes, I did.

14  Q    And what about D-3?  Take a look at what's inside the

15  envelope marked D-3?

16  A    (Complying).

17  Q    Do you recognize that item?

18  A    Yes, I do.

19  Q    How do you recognize it?

20  A    This is marked D-3.

21  Q    Did you mark it?

22  A    Yes, I did.

23  Q    Okay.  And, for the record, what are D-2 and D-3?

24  A    D-2 is a piece of deformed copper jacketed lead and D-3

25  is also a piece of deformed copper jacketed lead.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio – Direct/Lifshitz

1        MR. LIFSHITZ:  Your Honor, the Government would move

2   to admit Exhibit 12-B-2.

3        THE COURT:  Any objection.

4        MR. McMAHON:  No, Judge.

5        THE COURT:  I will receive Government's

6   Exhibit 12-B-2.

7        (Government's Exhibit 12-B-2 was received in

8   evidence as of this date.)

9   Q    Are the items in there which are in envelopes marked D-2

10  and D-2 items you recovered at the crime scene you visit on

11  the note night of October 20, 1993?

12  A    Yes, they are.

13  Q    Where did you recover each those items?

14  A    D-2 and D-3 were recovered in the roadway behind the

15  vehicle which I noted was the Nissan Altima.

16  Q    On the street closer to the street or closer to the

17  houses?

18  A    It would be within the street.  It would be more or less

19  on the driver's rear driver's side of that vehicle.

20  Q    By the way, is there a voucher number associated with

21  this Exhibit 12-B-2?

22  A    Yes.

23  Q    What is it?

24  A    F195469.

25  Q    When you say "Frank" is that an F?

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio - Direct/Lifshitz

1   A    F for Frank.

2   Q    Okay.

3        MR. LIFSHITZ:  May the witness stand down briefly

4   and I'll show him the board that's in evidence as 18.

5   Government Exhibit 18.

6        (Witness leaves the witness stand.)

7   Q    Can you please point out on this board on the top left

8   picture where you found the items that are contained in

9   12-B-1?

10  A    This general area right here.

11  Q    Are you pointing out the Nissan and closer to the street

12  side?

13  A    In the roadway, yes.

14  Q    Thank you.

15       (Witness takes the witness stand.)

16  Q    Now, I'll show you another envelope this one is marked

17  Government's Exhibit 12-B-1.

18  A    (Complying).

19  Q    You can open that up and take a look at the envelopes

20  inside it.

21       Are those envelopes marked D-1, D-4, D-5, and D-6?

22  A    Yes, they are.

23  Q    Do you recognize the envelopes?

24  A    Yes.  I prepared these myself and they contain the run

25  number, my name and shield number, and the D-1, 4, 5, and 6.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio – Direct/Lifshitz

1   Q    Can you please look inside each envelope and tell us what

2   you recognize is inside of it and how you recognize it?

3   A    D-1 is a discharged shell.  I scribed it inside the

4   shell.  D-4 is a piece of copper jacketed lead which also has

5   the scribe number of D-4 I placed on it.  D-5 is a piece of

6   deformed metal which also has what I inscribed on it which is

7   D-5.  And D-6 is a piece of deformed lead which I also

8   inscribed D-6 on.

9               MR. LIFSHITZ:  Your Honor, can the witness stand

10  down again so he may refer to Exhibit 18-1 of the boards.

11              THE COURT:  Yes.

12              MR. LIFSHITZ:  You can bring your report if it helps

13  refresh your recollection.

14              (Witness leaves the witness stand.)

15  Q    I would like you to tell the jury and, if possible, point

16  out on that board where you recovered items D-1 and D-4?

17  A    D-1 was recovered right near where this shattered glass

18  is.

19  Q    You're pointing at the top left picture?

20  A    The top left picture is the near where the driver's side

21  door is opened.

22  Q    Yes.

23  A    D-4, if I may refer to my paperwork.

24  Q    To refresh your memory, yes.

25  A    (Complying).  Are you referring to D-4?

Deguilio – Direct/Lifshitz

1   Q    Yes.

2   A    D-4 was actually recovered inside this location which is

3   107-45.

4   Q    Are you pointing to the top left picture?

5   A    Yes, the home that's white with the black trim.

6   Q    The home on the right of that picture?

7   A    Yes.

8   Q    And where within the home was that found?

9   A    There's an organ.

10  Q    I apologize.  Did you say it was outside the house or

11  inside the house?

12  A    No, D-4 was on the interior.

13  Q    Where was it?

14  A    After you walked through this small porch area, there's a

15  secondary door and there was an organ to the right near the

16  coat rack and it was laying on top of the organ.

17  Q    Did you take handwritten notes as you walked through the

18  crime scene?

19  A    Yes.

20  Q    Would those handwritten notes help refresh your

21  recollection?

22  A    Yes.

23  Q    I will show him what's mark as 3500-JD-4?

24       THE COURT:  All right.

25  Q    Does this document refresh your recollection about where

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio - Direct/Lifshitz

1  item D-4 was found?

2  A    D-4, according to my handwritten notes, what I had

3  written at the scene was six feet north of building line which

4  would have made it outside the location.

5  Q    Which location?

6  A    107-45 110th Street.

7  Q    The house in the top-left picture on the right side of

8  that picture?

9  A    The white house with the black trim.

10        MR. LIFSHITZ:  Your Honor, for the record, I don't

11  believe I move to admit Exhibit 12-B-1 which contains the

12  items.

13        THE COURT:  You're not moving?

14        MR. LIFSHITZ:  I have not, but I now am.  It was an

15  oversight on my part.

16        THE COURT:  Any objection?

17        MR. McMAHON:  No objection.

18        MR. LIFSHITZ:  Thank you.

19        THE COURT:  I will receive Exhibit 12-B-1.

20        MR. LIFSHITZ:  Thank you.

21        (Government's Exhibit 12-B-1 was received in

22  evidence as of this date.)

23  Q    And now let me show you again the board marked as

24  Government Exhibit 18-1.

25        Can you please explain to the jury and point out on

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio – Direct/Lifshitz

1    this board where you recovered items D-5 and D-6 which are

2    contained within Exhibit 12-B-1?

3    A    You can't see this photograph, but D-5.

4    Q    Which photograph are you pointing at?

5    A    The middle photograph.

6    Q    Okay.

7    A    The organ was in this area here where D-5 was recovered.

8    Q    On top of an or began?

9    A    Yes.

10   Q    And D-6?

11   A    D-6 was recovered within this jacket that was hanging.

12   Q    Pointing at the same picture?

13   A    Yes.

14   Q    And the jacket that's toward the top of a coat rack?

15   A    Yes.

16   Q    You can return to your seat.

17              (Witness takes the witness stand.)

18   Q    Is there a voucher number associated with

19   Government Exhibit 12-B-1?

20   A    F, as in Frank, 195469.

21              MR. LIFSHITZ:  Your Honor, may I approach again.

22              THE COURT:  Yes.

23              MR. LIFSHITZ:  I will show the witness Government's

24   Exhibits 13-A, B, and C.

25              THE COURT:  13-A?

Deguilio – Direct/Lifshitz

1          MR. LIFSHITZ:  A, B, and C, yes.

2   Q     Here you go, sir.

3          Can you please tell us if you recognize these items?

4   A     Yes, I do.

5   Q     How are you able to recognize them?

6   A     These are –– this is the weapon that I recovered from the

7   1984 Buick.  The silencer which is no longer attached to the

8   weapon is marked JD-1.

9   Q     Did you make it JD-1?

10  A     Yes, I did.

11  Q     And the firearm itself?

12  A     The firearm also is marked JD-1.

13  Q     On the handle?

14  A     On the handle with black marker.

15         THE COURT:  And your exhibit numbers?

16         MR. LIFSHITZ:  The firearm is 13-A; the silencer is

17  13-B; and the magazine is 13-C, but, for the record, they're

18  all contained in one sealed bag.

19         THE COURT:  Yes.  And 13-D is.

20         MR. LIFSHITZ:  Is a magazine.

21         THE COURT:  Thank you.

22

23  EXAMINATION BY

24  MR. LIFSHITZ:

25  (Continuing.)

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Deguilio − Direct/Lifshitz

1    Q    Do you recognize the magazine?

2    A    Yes, I do because it has the markings that I etched in

3    JD−1.

4    Q    And just to be clear what are these items?

5    A    Semiautomatic .9 millimeter handgun, a magazine that was

6    removed from it, and this is the suppressor, the silencer,

7    that was attached to the gun when I recovered it.

8    Q    Where did you recover the items?

9    A    The rear seat, driver's side passenger area of the 1984

10   Buick On 106th Street.

11   Q    On October 20, 1993?

12   A    Correct.

13           MR. LIFSHITZ:  Your Honor, the Government would move

14   to admit Exhibits 13−A, B, and C.

15           MR. McMAHON:  No objection.

16           THE COURT:  Received.

17           (Government's Exhibits 13−A, B, C was received in

18   evidence as of this date.)

19   Q    What voucher number is associated with this evidence?

20   A    R195469.

21           MR. LIFSHITZ:  Your Honor, no further questions at

22   this time.

23           MR. McMAHON:  No cross, your Honor.

24           THE COURT:  Thank you.  You may step town.

25           THE WITNESS:  Have a nice day.

ANTHONY FRISOLONE, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

1

2048

GOVERNMENT
EXHIBIT
**7001**
10 CR 147 (DLI)

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - X
4   UNITED STATES OF AMERICA,   :

                                    10-CR-147
5

             -against-              United States Courthouse
6
                               :    Brooklyn, New York
7
    FRANCIS GUERRA,
8
             Defendant.
9                              :    June 27, 2012
                                    9:30 o'clock a.m.
10   - - - - - - - - - - - - - X
11   TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE SANDRA L. TOWNES
12   UNITED STATES DISTRICT JUDGE, and a jury
13   ATTORNEYS FOR GOVERNMENT:
     LORETTA E. LYNCH
14   UNITED STATES ATTORNEY
     BY:  NICOLE ARGENTIERI
15        ALLON LIFSHITZ
          RACHEL NASH
16   Assistant United States Attorney
     271 Cadman Plaza East
17   Brooklyn, New York 11201
18   ATTORNEY FOR DEFENDANT:
     GERALD McMAHON, ESQ.
19   MATHEW J. MARI, ESQ
20
     Court Reporter:
21   Marsha Diamond
     225 Cadman Plaza East
22   Brooklyn, New York
     TEL: (718) 613-2489
23   FAX: (718) 613-2369
24       Proceedings recorded by mechanical stenography,
     transcript produced by CAT.
25
                    MARSHA DIAMOND, CSR, RPR
                    OFFICIAL COURT REPORTER

      06 27 2012 trial chance adam russ castrogiovanni scott curtis

2096

6              THE WITNESS:  First name is Maria, M A R I A; last

7    name is Kinigopoulos, K I N I G O P O U L O S.

8              MS. NASH:  May I inquire, judge?

9              THE COURT:  Yes.

10             MS. NASH:  Thank you.

11   DIRECT EXAMINATION

12   BY MS. NASH:

13   Q    Are you currently employed?

14   A    I am.

15   Q    Where do you work?

16   A    I am an intelligence analyst with the Federal Bureau of

17   Investigation.

18   Q    How long have you been with the FBI?

19   A    Since 2003; and I have been an intel analyst since 2007.

20   Q    Since 2000-what?

21   A    Seven.

22   Q    What do you do as an intelligence analyst with the FBI?

23   A    Some of my duties include reviewing phone records,

24   analyzing them, running background checks, disseminating

25   intelligence to law enforcement.

               GR      OCR      CM      CRR      CSR

2097

1    Q    I am going to show you several items, Government

2    Exhibit 6002, which is a stipulation in evidence, as well as

3    the underlying exhibits in that stipulation, which are

4    Government Exhibits 1000, 1001, 1001-A, 1002, 1003, 1004,

5    1007-A and 1007-B, 1011, and 1012.

6              MS. NASH:  May I approach, Judge?

7              THE COURT:  Yes.

8    Q    Can you look at Government Exhibit 1000, 1001 and 1001-A,

9    1002, 1003, 1004, 1007-A and B, 1010 and 1012 -- I'm

10   sorry -- 1011 and 1012 and tell us whether you have seen and

11   reviewed those records before?

12   A    I have.

13             And they are all telephone records, which include

14   actual telephone bills with call details itemized and also,

15   generally speaking, any calls made with these phone numbers,

16   incoming, outgoing, subscriber information.

17   Q    Just explain what you mean when you say incoming,

18   outgoing?

19   A    Basically, any contact that the telephone number has,

20   phones made out or telephone calls received.

21   Q    Okay.  Does each exhibit contain the telephone calls that

22   came in or were placed by the particular telephone number in

23   each exhibit?

24   A    Yes, incoming and outgoing calls, basically date, time,

25   duration.

                    GR      OCR      CM      CRR      CSR

2098

1    Q    I will leave those with you in case you need to refer to

2    them.

3    A    Okay.

4    Q    In conjunction with your analysis of the phone records

5    contained in the exhibits before you, did you review other

6    documents as well and other information?

7    A    Yes.

8         I reviewed telephone bills, trial testimony and all

9    sorts of prison emails sent and phone records.

10   Q    Showing you Government Exhibit 1009-A in evidence.

11        Can you see that?

12   A    Yes.

13   Q    Are these records that you reviewed in conjunction with

14   your analysis of the phone records?

15   A    Yes.

16        This is actually -- this was taken from a cellphone

17   that was seized after an arrest and this was all the

18   information contained on the memory card of the cellular phone

19   in the phone's address book.

20        THE COURT:  Let me stop you.

21        1009-A is not part of Exhibit 6002, correct?

22        MS. NASH:  Correct, Judge.

23        But this was an exhibit that was introduced in

24   evidence through Agent Adam and it is the contents of the

25   cellular phone address book of Anthony Russo.

                    GR      OCR      CM      CRR      CSR

2099

1          THE COURT:  No.  I just want to know, is it part

2     of --

3          MS. NASH:  I'm sorry.

4          THE COURT:  I don't have it on my list as part of

5     this list of exhibits.

6          MS. NASH:  Correct

7     EXAMINATION CONTINUES

8     BY MS. NASH:

9     Q    Is this information something you reviewed in conjunction

10    with the exhibits that contain phone records that are the

11    subject of Government Exhibit -- of government stipulation

12    6002?

13    A    Yes, it is.

14    Q    Just once again, to be clear, what type of information is

15    contained in 1009-A?

16    A    These are contacts, name and phone numbers, that were

17    stored in a cellular phone address book that was seized after

18    an arrest.

19    Q    I'm sorry.  Whose cellular phonebook was it?

20    A    Anthony Russo slash Maritza Medina.

21    Q    Did you also review what's in evidence as Government

22    Exhibit 1010-A in conjunction with your analysis of the phone

23    records that are referenced in government stipulation 6002?

24    A    I did.

25          And this is the same thing.  This was a telephone

                   GR      OCR     CM     CRR     CSR

2100

1    that was seized from Francis Guerra and it was all the

2    contacts in his cellular phone address book.

3    Q    Showing you the second to last page of Government

4    Exhibit -- I'm sorry -- the last page of Government

5    Exhibit 912, which are in evidence as prison visitor records

6    for Joseph Monteleone.

7         Are these also records that you reviewed in

8    conjunction with your analysis of phone records?

9    A    Yes, they are.

10   Q    Showing you Government Exhibit 907, which are in evidence

11   as prison records for Alphonse Persico.

12        Did you review these records as well in conjunction

13   with your analysis of phone records?

14   A    Yes, I did.

15        MS. NASH:  Just one moment.

16        (Pause.)

17   Q    Showing you Government Exhibit 906 and specifically an

18   email from October 30, 2009.

19        These are in evidence as the emails between John

20   Pappa and Francis Guerra obtained by the Bureau of Prisons, or

21   maintained by the Bureau of Prisons, I should say.

22        Did you review these as well in conjunction with

23   your analysis of phone records?

24   A    Yes, I did.

25        MS. NASH:  May I approach, Judge?
                 GR      OCR      CM      CRR      CSR

2101

1            THE COURT:  Yes, you may.

2    Q    Actually, well, yes.

3            Showing you Government Exhibit 1013-B.

4            Do you recognize that?

5    A    I do.

6    Q    What is Government Exhibit 1013-B?

7    A    It is a chart I created showing phone contacts between

8    various phone numbers, number of calls, call direction and the

9    date range those calls took place.

10   Q    What do you mean by call direction?

11   A    Who made the call and who received the call.

12   Q    Is the information contained in that chart based in part

13   on the exhibits that are contained in government stipulation

14   6002?

15   A    They are.

16   Q    In addition, is the information contained in that chart

17   based in part on the other documents and information that you

18   have testified about before?

19   A    They are.

20   Q    Does the information contained in this chart accurately

21   reflect the -- and accurately summarize the information

22   contained in the exhibits in stipulation 6002, as well as the

23   other exhibits and information that we have discussed?

24   A    Yes.

25            MS. NASH:  Judge, the government moves to admit
               GR        OCR       CM      CRR       CSR

2102

1   Exhibit 1013-B as a summary chart pursuant to Rule 1006.

2              MR. McMAHON:  No objection.

3              THE COURT:  Received.

4              (Marked.)

5   Q    Just before I publish this chart, if I could show you

6   page five of Government Exhibit 907, which is already in

7   evidence as Alphonse Persico's prison records.

8              Let me ask you this.

9              I am having trouble finding the page number.

10             Did you review a prison, an application for -- to

11  visit Alphonse Persico in Government Exhibit 907?

12  A    Yes.

13  Q    Who was that application made by?

14  A    I would have to see it to recall.

15  Q    Okay.  Do you recall -- well --

16  A    I know I reviewed it but I'd have to see it.

17  Q    Give me one moment.  I'm sorry.

18  A    Yes.

19             (Pause.)

20             MS. NASH:  I apologize.

21             (Pause continues.)

22  Q    Showing you Exhibit 57.  I apologize for that.

23             THE COURT:  57?

24             MS. NASH:  Yes.  It is Exhibit 907, page 57.

25             THE COURT:  All right.
                    GR     OCR     CM     CRR     CSR

2103

1   Q     Did you review this document in conjunction with

2   preparing your chart, Exhibit 1013-B?

3   A     I did.

4   Q     Is this an application to visit Alphonse Persico?

5   A     It is.

6   Q     Who filled out this application?

7   A     Michael Persico.

8   Q     What phone number did he list?

9   A     (917) 567-8741.

10  Q     Showing you Exhibit 1010-A, the report of the address

11  book contained in the phone seized from Francis Guerra.

12          Can you tell us what the phone number was?

13  A     Sure.

14          It's (917) 757-2359.

15          MS. NASH:  May I now publish the chart, Judge, or at

16  least a part of it?

17          THE COURT:  Yes.

18  Q     Showing you now the first two lines of Government

19  Exhibit 1013-B.

20          Can you explain the information that is reflected in

21  the first two rows of your chart?

22  A     Sure.

23          The first row is contact between a number known to

24  belong to Michael Persico and Francis Guerra for the date

25  range of June 2, 2008 through April 20, 2009, and there were

               GR      OCR      CM      CRR      CSR

2104

1    33 calls from Michael Persico to Francis Guerra.

2           And the second line is telephone calls from Francis

3    Guerra to Michael Persico for the same time period,

4    June 2, 2008, through April 20, 2009, and there were 81

5    contacts.

6    Q     Before I move on to another portion of your chart, can

7    you please just look at Government Exhibit 1002 and 1003 that

8    you have before you?

9    A     Sure.

10   Q     Just tell us what, generally speaking, those records

11   contain, or those exhibits contain?

12   A     Sure.

13          1002 are telephone records for telephone number

14   (347) 231-5175 subscribed to by Maritza Medina for the time

15   period of August 16, 2010 through October 4, 2010.

16          And Government Exhibit 1003 are call record details,

17   phone calls for the time period of August 20, 2009 through

18   July 20, 2010 for telephone number (347) 288-9628 subscribed

19   to by Maritza Medina.

20          (Continued on next page.)

21

22

23

24

25

                    GR       OCR      CM      CRR      CSR

2105

```
1              THE COURT:  May I stop you and have counsel approach

2     the bench?

3              (Side bar.)
```

GR      OCR      CM      CRR      CSR

2106

```
 1              (In open court.)

 2    EXAMINATION CONTINUES

 3    BY  MS. NASH:

 4    Q    Can you explain in greater detail the methodology you

 5    used to prepare this chart?

 6    A    Sure.

 7              I reviewed telephone records and then I ran various

 8    reports showing contacts between certain telephone numbers.  I

 9    reviewed --

10              THE COURT:  No.  Let's talk about the lines that you

11    have already testified to.

12              THE WITNESS:  Okay.

13              So I reviewed telephone records belonging to

14    (917) 567-8741, which is subscribed to Romantique and used by

15    Michael Persico.  I did the same thing for (917) 757-2359.

16              THE COURT:  Where did you get the information?

17              THE WITNESS:  The information came through various

18    means.  It was actual phone records.  It was through pen

19    register data.

20              THE COURT:  What do you mean by actual phone

21    records?

22              THE WITNESS:  We had some actual printouts the phone

23    company sent us.  We had them uploaded electronically to our

24    system.  I reviewed them that way.  And then I actually

25    reviewed them sent from the phone company to make sure that
                   GR     OCR     CM     CRR     CSR
```

2107

1    that information sent to us belonged to those phone numbers.

2    Q    To be clear, with respect to the phone number for

3    Romantique, did the -- or subscribed to by Romantique, did

4    the -- through a subpoena, did you obtain phone records for

5    that phone number indicating incoming and outgoing calls for

6    (917) 567-8741?

7    A    No.

8         I believe that one was from prison visitor logs.

9    That's how we attributed that phone number to Michael Persico.

10   Q    I understand.

11        But with -- so you are saying that with respect to

12   the phone number itself, the way you determined the user was

13   to look at the prison record and the individual who listed

14   that phone number on the prison record.

15        Do I have that right?

16   A    Right.

17        We know that phone number is subscribed to by

18   Romantique as the actual subscriber.  We know that Michael

19   Persico used it through the prison log.

20   Q    Through the prison log?

21   A    Through the prison records that he filled out, right.

22   Q    With respect to the subscriber information, did you

23   obtain that through information provided to you by -- provided

24   to the FBI by the phone company?

25   A    Yes.

                    GR     OCR     CM     CRR     CSR

[6/27/2012] 06 27 2012 trial chance adam russ castrogiovanni s...

2108

1    Q    The information provided by the phone company, is it

2    that -- is it that information that contained incoming and

3    outgoing phone calls for telephone number (917) 567-8741?

4    A    I believe so, yes.

5    Q    Similarly, for telephone number (917) 757-2359, were you

6    able to determine who used that phone number?

7    A    Yes.

8    Q    Showing you Exhibit 1010, is that one of the ways in

9    which you were able to determine who used phone number

10   (917) 757-2359?

11   A    Yes.

12   Q    Just for the record, remind us, Government Exhibit 1010-A

13   is what?

14   A    That is a printout of the contact information on that

15   phone number that was seized after the arrest of Francis

16   Guerra.  The telephone was in his possession at the time of

17   his arrest.

18   Q    Other than the telephone and the contents of his address

19   book, did the FBI obtain through the phone company incoming

20   and outgoing calls that were placed or received by phone

21   number (917) 757-2359?

22   A    Yes.

23   Q    So now once you reviewed the records that you obtained

24   from the phone company containing incoming and outgoing calls,

25   and reviewed documents such as the prison records or the

                    GR      OCR      CM      CRR      CSR

2109

1  address book, what did you do in order to create the chart

2  that reflects the number of contacts between two phone

3  numbers?

4  A    I simply ran a report.  I just inputted the two phone

5  numbers I was interested in and ran a report and it gave me

6  the printout.  Then I just double-checked to make sure that

7  the information was correct.

8  Q    When you say run a report, what happens in the process of

9  running that report?

10         What information is distilled at the end of that

11  process?

12  A    Well, it is just a database that I use and I input the

13  telephone number and it just prints you out a sheet of paper

14  that shows you the contacts, the date, duration, incoming,

15  outgoing calls, how long the call lasted and the number of

16  contacts.

17  Q    So the report that is generated through that process

18  would show for the phone numbers the number of times within a

19  particular time period that they were in contact?

20  A    Exactly.

21         (Continued on next page.)

22

23

24

25

        GR      OCR      CM      CRR      CSR

2110

1    BY MS. NASH:

2

3    Q    And how were you able to determine the direction of the

4    phone number, whether or not the Michael Persico subscribed to

5    by Romantique called to Francis Guerra and vice versa?

6    A    If it's an incoming call to the first number, it will

7    say "in" before the phone number, and that's how I know it's

8    an incoming call.

9    Q    With respect to the first line now  --

10   A    Yes.

11   Q     -- what information does that reflect?

12   A    It reflects  --

13   Q    To be clear, it's the first line of Exhibit 1013-B.

14   A    So, the first phone number is 917-567-8741, which is

15   Romantique/Michael Persico.  That telephone number called and

16   made an outgoing call to 917-757-2359, Francis Guerra,

17   thirty-three times for the time period of June 2, 2008 through

18   April 20, 2009.

19        And the second line shows the same two contacts in

20   different directions.  So, the second line is calls made from

21   917-757-2359 to 917-567-8741 for the same time period, and

22   there were eighty-one calls in that direction.

23   Q    Did you perform that similar process for the various

24   phone numbers contained in the exhibits referenced in

25   Government's Exhibit Stipulation 6002?
              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2111

1    A    Yes.

2    Q    I'll take you through that process for the remainder of

3    the chart?

4         If you'd look at the next two lines, first with

5    respect to Exhibits 1002 and 1003, which are referenced in

6    Stipulation 6002.  What do Exhibits 1002 and 1003 contain.

7    A    1002 reflects call records for 347-231-5175, subscribed

8    to by Maritza Medina for the time period August 6, 2010

9    through October 4, 2010.

10        And Government's Exhibit 1003 provides also call

11   details for time period of August 20, 2009 through July 20,

12   2010 for Telephone Number 347  --

13        THE COURT:  Don't talk so fast.

14        THE WITNESS:  Sorry.

15   A    -- for Telephone Number 347-288-9628 subscribed to by

16   Maritza Medina.

17   Q    To back you up for a second, now.   Do those two

18   exhibits, 1003 and 1003, contain phone records obtained by the

19   FBI from the telephone company?

20   A    Yes.

21   Q    And do they contain incoming and outgoing calls placed by

22   and received by those two numbers in the manner that you have

23   previously described?

24   A    Yes, they do.

25   Q    Who is Maritza Medina?
            ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2112

1   A    She, I believe, is Anthony Russo's wife or common-law

2   wife.

3   Q    In conjunction with your analysis, in order to determine

4   who is using the phone numbers, did you review portions of

5   Exhibit 906, which are e-mails between John Pappa and Francis

6   Guerra?

7   A    I did.

8   Q    I'm showing you, before we proceed with the chart, an

9   e-mail dated October 30, 2009 at 2:06 p.m. from Government's

10  Exhibit 906.  Can you identify the phone number associated

11  with the individual listed as Moos in this e-mail?

12  A    347-288-9628.

13  Q    Now, going back to your Chart 1013-B.  Can you explain

14  the information contained in the second two lines of your

15  chart?

16  A    It's the same thing.  It's showing contact between

17  917-567-8741 to Telephone Number 347-288-9628.  So, the first

18  telephone number listed on the left made the telephone calls

19  to the second phone number, and there were three calls for the

20  date range of January 6, 2009 through April 16, 2009.

21         And then the line under that shows contact for the

22  same two phone numbers, except on the left, you have the  --

23  the telephone number making the call is 347-288-9628, and it's

24  making the call to Telephone Number 917-567-8741, and there

25  were eleven calls from January 6, 2009 through April 16, 2009.
            ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2113

1    Q    And if you could look now at Exhibit 1004, which you have

2    as one of the underlying exhibits in the Stipulation 6002?

3    A    Yes.

4    Q    What does Exhibit 1004 contain?

5    A    It's a call detail record, telephone records for

6    Telephone Number 732-673-4274, subscribed to by Ultimate

7    Seafood Service, Inc., and that's for the time period of

8    September 10, 2009 through December 24, 2010.

9    Q    Who owns Ultimate Seafood Service, Inc.?

10   A    Anthony Stropoli.

11   Q    Again, when we're talking about the phone records in

12   Exhibit 1004, are these incoming and outgoing phone calls that

13   the FBI received from the phone company?

14   A    Yes.

15   Q    With respect to that phone number, did you perform the

16   same type of analysis when you compared to it certain of the

17   other phone numbers in the exhibits contained in 6002?

18   A    Yes.

19   Q    If you look at the bottom two lines of your chart, can

20   you explain the information contained in those last two lines?

21   A    Sure.  On the left, you have calls made from Telephone

22   Number 567-8741, which is Romantique/Michael Persico to

23   Telephone Number 732-673-4274, belonging to Ultimate Seafood,

24   Inc., Anthony Stropoli.  And there were eight calls during the

25   time period of January 29, 2009 through April 14, 2009.

              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2114

1          And then the line under that shows telephone calls

2    made from 732-673-4274, which is Ultimate Seafood,

3    Inc./Anthony Stropoli to Michael Persico at 917-567-8741.  And

4    there were seven calls for the time period of January 29, 2009

5    through April 14, 2009.

6    Q    And if we look now at the first three lines of your chart

7    -- excuse me.  I have turned now to page two of Government's

8    Exhibit 1013-B, and if we look at the first three lines of

9    your chart, are these phone numbers that we have previously

10   discussed and identified with respect to the exhibits in

11   Stipulation 6002?

12   A    Yes.

13   Q    And, again, are these phone records obtained by the FBI

14   that show incoming and outgoing phone calls for these

15   telephone numbers?

16   A    Yes.

17   Q    Did you perform the same analysis for each of these

18   telephone numbers in terms of determining the contacts between

19   them?

20   A    Yes.

21   Q    Can you explain the information contained in the first

22   -- I guess we can start with the first three rows?

23   A    Okay.  So, the first line shows contact between Telephone

24   Number 917-757-2359 to 347-288-9628 for the time period of

25   August 20, 2009 through July 26, 2010.  And there were 1339
                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2115

1    calls made from the telephone number on the left to the

2    telephone number on the right.

3            And the second line shows calls made from

4    347-288-9628 to 917-757-2359 for the time period of August 20,

5    2009 through July 26, 2010.  And there were 2317 calls.

6            The third line, phone calls made from Telephone

7    Number 917-757-2359 to Telephone Number 347-231-5175 for the

8    time period of July 21, 2010 through August 30, 2010.  And

9    there were 142 calls made in that direction.

10   Q    Just to refresh everyone's recollection:  The telephone

11   number that you indicated as used by Francis Guerra is the

12   telephone number listed on Exhibit 1010-A as the phone number

13   associated with the phone seized from him at the time of his

14   arrest?

15   A    Correct.

16   Q    If you look now at the fourth, fifth and sixth lines.  Is

17   that the same telephone number we previously reviewed for

18   Ultimate Seafood, Inc. owned by Anthony Stropoli?

19   A    Yes, it is.

20   Q    Did you perform an analysis with respect to that number

21   and the phone number subscribed to by Maritza Medina, Anthony

22   Russo's wife?

23   A    I did.

24   Q    Can you just briefly summarize the information contained

25   in the second  -- I'm sorry  -- on the fourth, fifth and sixth

                 ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    lines of your chart?

2    A    Sure.   It's how many calls were made from the phone

3    number on the left, which is 732-673-4274, it's Ultimate

4    Seafood, Inc., Anthony Stropoli, to 917-757-2359, which is

5    Francis Guerra.   And there were 94 calls made in that

6    direction for the time period of August 21, 2009 through

7    January 20, 2011.

8           And then the line under that shows call direction

9    from 732-673-4274, once again Ultimate Seafood, Inc., Anthony

10   Stropoli, to 347-288-9628, which is Anthony Russo/Maritza

11   Medina for the time period of September 10, 2009 through

12   July 19, 2010.   And there were 242 calls made in that

13   direction.

14          The line under that shows calls made from, once

15   again, Ultimate Seafood, Inc., Anthony Stropoli, at

16   732-673-4274 to Anthony Russo, Maritza Medina at 347-231-5175.

17   And it was 69 calls made between July 21, 2010 and September

18   2, 2010.

19   Q    Before we review now the last line of page two of Exhibit

20   1013-B, can you look at Government's Exhibit 1012 that you

21   have  --

22   A    Yes.

23   Q    -- and just explain for the jury what information is

24   contained in Exhibit 1012?

25   A    Sure.   This is an actual phone bill for Telephone Number
                 ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

2117

1    914-246-9726, and the telephone bill covers the dates of

2    May 16, 1991 to July 31, 1992, and it is subscribed to by

3    Michael Persico.

4    Q    In addition to the bill, do you have records reflecting

5    incoming and outgoing telephone calls for Telephone Number

6    914-246-9727?

7    A    Yes, I do.  That's also in here.

8    Q    Is that also in Exhibit 1012?

9    A    Yes.

10   Q    I'm sorry if you said this already, but who is the

11   subscriber or who is the bill to for Phone Number

12   914-246-9726?

13   A    Michael Persico.

14   Q    Did you take the incoming and outgoing phone calls

15   reflected in the records contained in Exhibit 1012 and compare

16   them to other phone numbers that you have incoming and

17   outgoing phone call information for?

18   A    Yes, I did.

19   Q    Let me show you again Government's Exhibit 912 in

20   evidence, which is the prison records or the visiting records

21   for Joseph Monteleone.  And can you indicate the phone number

22   that is listed for Anna Sottile?

23   A    Sure.  It's 718-996-8358.

24        THE COURT:  And that is exhibit number?

25        MS. NASH:  This is 912.

         ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

[6/27/2012] 06 27 2012 trial chance adam russ castrogiovanni s...

2118

1        THE COURT:  912.  Thank you.

2   Q    Can you also look at Government's Exhibit 1011, and tell

3   us what Government's Exhibit 1011 contains?

4   A    It's a telephone bill with call detail billed to Anna

5   Sottile.

6   Q    For what phone number?

7   A    718-996-8358.

8   Q    What time period do the telephone records cover for

9   Exhibit 1011?

10  A    February 3, 1992 through March 30, 1992.

11  Q    So, looking at the last line of your chart, can you

12  explain the information contained in that row.  And to be

13  clear for the record, we're still on page two of Exhibit

14  1013-B.

15  A    Can you move it up a little bit?

16  Q    I'm sorry.

17  A    That's okay.

18  Q    There you go.

19  A    That is telephone calls made from 914-246-9726, belonging

20  to Michael Persico, to Telephone Number 718-996-8358, which is

21  listed as Anna Sottile/Joseph Monteleone.  And there were six

22  calls made, Michael Persico to that phone number, for the time

23  period of December 31, 1991 to May 17, 1992.

24  Q    Can you look now at Government's Exhibit 1007-A and B,

25  and describe for the jury the information contained in those

            ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2119

1    exhibits?

2    A    Sure.  They are call telephone records, including billing

3    records and subscriber information, for Telephone Number

4    718-875-3955, which is subscribed to by Elite Auto Body and

5    Eric Curcio, and that's for the time period of November 4,

6    1993 through April 21, 1995.

7    Q    And I'm showing you a copy of Exhibit 1007-B.

8         Is that the billing record that you were just

9    referring to  --

10   A    Yes.

11   Q    -- listed to Elite Auto Body, Inc., Eric Curcio?

12   A    Correct.

13   Q    And 1007-A, what information does that contain?

14   A    That is the actual printout, showing call direction and

15   telephone calls made to that phone number.

16   Q    So, 1007-A are the incoming and outgoing phone calls for

17   the phone number registered to Eric Curcio?

18   A    Correct.

19   Q    And once again, that phone number is what?  The phone

20   number for Eric Curcio or Elite Auto Body is what?

21   A    718-875-3955.

22   Q    I'm going to show you page three of Government's Exhibit

23   907, once again the prison records for Alphonse Persico.

24        Did you review this document among others in

25   preparing this telephone chart.
          ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    A    I did.

2    Q    And can you indicate who is listed as the person applying

3    to visit Alphonse Persico?

4    A    Joyce Persico.

5    Q    What phone number does she list?

6    A    718-745-8345.

7    Q    Referring back now to your chart, 1013-B, the first line

8    of page three.  Can you just indicate the information that is

9    provided there?

10    A    Sure.  It just shows that the telephone number subscribed

11    to by Eric Curcio made one phone call to Joyce Persico at

12    718-745-8345 on August 18, 1994.

13    Q    Now, I'm moving to the second line of page three of

14    Government's Exhibit 1013.  Before I have you explain the

15    information there, if I can direct your attention to

16    Government's Exhibit 907, Alphonse Persico's prison records,

17    pages 24 and 25.  Are these records that you reviewed in

18    conjunction with the preparation of this chart?

19    A    Yes.

20    Q    Who is listed on page 24 of Government's Exhibit 907 as

21    applying to visit Alphonse Persico?

22    A    Michael Sessa.

23    Q    And turning now to page 25 of Government's Exhibit 907.

24    What telephone number did Michael Sessa list?

25    A    718-356-0208.
          ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2121

1    Q    Can you now indicate the information that is contained in

2    the second row of page three of your summary chart, Exhibit

3    1013-B?

4    A    Sure.  That shows three telephone calls were made from

5    Michael Sessa at 718-357-0208 to Michael Persico at Telephone

6    Number 914-246-9726 between February 29, 1992 and June 10,

7    1992.  There were three calls.

8    Q    I'm going to direct your attention now to Government's

9    Exhibit 1010-A.  Again, it is the report of the address book

10   contained in Francis Guerra's phone?

11   A    Yes.

12   Q    Turning now to page 17.  Can you please read the entry at

13   line 202?

14   A    Sure.  It listed as Smiley, and the telephone number is

15   1-718-312-9032.

16   Q    Did you compare that number or perform an analysis with

17   respect to that number and the incoming and outgoing telephone

18   calls that you have for Francis Guerra's phone, 917-757-2359?

19   A    Yes, I did.

20   Q    Can you indicate, in the second two lines of your chart,

21   page three, Exhibit 1013-B, what information is reflected in

22   those rows?

23   A    Sure.  It shows the number of telephone calls made from

24   Francis Guerra to Michael Sessa for the time period of

25   September 25, 2009 through December 22, 2010.  There were ten

           ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2122

1    calls made in that direction.

2              The line under that shows calls made from Michael

3    Sessa to Francis Guerra for the same time period.  And there

4    were 28 calls in that direction.

5    Q    Going back now to Exhibit 1010-A, the report containing

6    the information in Francis Guerra's cell phone address book.

7    I'm going to direct your attention to page two of that

8    exhibit.  Can you please indicate who is listed at line nine

9    of page two of Exhibit 1010-A?

10   A    Ambrose.  And the telephone number is 1-646-400-9696.

11   Q    Did you perform an analysis with respect to that phone

12   number and the phone number used by Francis Guerra?

13   A    Yes.

14   Q    Looking at page three of Exhibit 1013-B, your summary

15   chart.  Can you explain what information is reflected in the

16   fifth and sixth rows?

17   A    Sure.  It's contact made from Francis Guerra to Ambrose

18   for the time period of September 10, 2009 through February 9,

19   2011.  There were 217 calls in that direction.

20             The following line shows calls made from

21   646-400-9696, which is Ambrose, to Francis Guerra for the time

22   period of September 10, 2009 through February 9, 2011.  And

23   there were 150 telephone calls made in that direction.

24   Q    Before we proceed to the next rows of your chart, I'm

25   going to direct your attention now to Exhibit 1009-A.  Is that

                     ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2123

1    the report of the address book contained in Anthony Russo's

2    phones?

3    A    Yes.

4    Q    And directing your attention to page fourteen of Exhibit

5    1009-A -- sorry -- page five, line 26 of 1009-A.

6    A    I'm sorry.  What line did you say?

7    Q    Page five -- I'm sorry.  I have not done it yet?

8         Line 26 of page five of 1009-A.  Can you indicate

9    who is listed in the address book of Anthony Russo's phone.

10   A    It's listed as  "Jew," and the Mobile Telephone Number is

11   917-538-1365.

12   Q    If you go to the bottom two rows of your chart of page

13   three; again, Exhibit 1013-A.  Can you indicate what

14   information is provided in that  -- in those rows?

15   A    Can you move it up a little?

16   Q    Sorry.

17   A    There you go.

18        The first line shows calls made from Francis Guerra

19   to Scott Reback,  "Jew," for the time period of August 20,

20   2009 through January 6, 2011.  There were 176 telephone calls.

21        The line under that shows telephone calls made from

22   917-538-1365, which is Scott Reback/Jew to Francis Guerra for

23   the same time period.  And there were 137 phone calls.

24   Q    Again, for the record:  In order to determine the number

25   of calls between these two phone numbers, did you review the

                 ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2124

1    incoming and outgoing calls that you have for Francis Guerra's

2    phone number, 917-757-2359?

3    A    Yes.

4    Q    And did you analyze how many incoming and outgoing calls

5    he had to and from the number 917-538-1365?

6    A    Yes.

7    Q    Going back to Exhibit 1010-A, which is the address book

8    in Francis Guerra's cell phone.  I'm going to direct your

9    attention to page fourteen.  Can you identify who is listed at

10   line 170 of page fourteen of Exhibit 1010-A?

11   A    Pat Avena, with the home telephone number list of

12   1-718-234-5580.

13   Q    Now, if you look at your chart, the third row from the

14   bottom.  Can you indicate the information that is contained in

15   that row?  And again, we're on page three of 1013-B.

16   A    It shows that four telephone calls were made from

17   917-757-2359, which is Francis Guerra, to 718-234-5580, which

18   is Pat Avena, for the time period of June 9, 2010 through

19   December 6, 2010.

20   Q    Going back now to Exhibit 1010-A.  Once again, the report

21   for the address books in Francis Guerra's cell phones.  I'm

22   going to direct your attention to page 11.  Can you indicate

23   who is listed at entry line 121?

24   A    Suzzie Girl Litle, and it's Telephone Number

25   718-219-4572.

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2125

 1    Q    I'm also going to direct your attention, in the same

 2    Exhibit 1010-A, to page 17.  Can you please identify who is

 3    listed at line 210 on page 17 of Exhibit 1010-A?

 4    A    Suzzie Girl, and there are three telephone numbers

 5    listed.  The first one is a mobile listed at 1-917-567-0028,

 6    followed by a home telephone number listed as 718-680-5172,

 7    followed by a work number, which is 718-708-0923.

 8    Q    Looking at page four, the last page of your chart,

 9    Exhibit 1013-B.  Can you summarize the information that is

10    provided here?

11    A    The first line shows calls made from Francis Guerra to

12    Suzzie Girl for the time period of August 20, 2009 through

13    December 17, 2009.  There were eight telephone calls.

14         Second line shows calls made from Francis Guerra to

15    another one of Suzzie Girl's telephone numbers, which was

16    718-680-5072, for the time period of August 20, 2009 through

17    September 22, 2009.

18    Q    To be clear:  I'm sorry to stop you, but these phone

19    numbers that you have listed here for Suzzie Girl are the

20    phone numbers listed in Government's Exhibit 1010-A; is that

21    correct?

22    A    Yes.

23         And there were eight telephone calls for that second

24    line.

25         The third line shows calls made from 718-680-5072,

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

2126

1   which is Suzzie Girl, to Francis Guerra.  Five calls were made

2   for the time period of August 20, 2009 through September 22,

3   2009.

4           Following line shows calls made from 718-219-4572,

5   which is listed in the address book as Suzzie Girl Little to

6   Francis Guerra.  There were two calls made on January 20,

7   2011.

8           Line under that shows calls made from Francis Guerra

9   to Suzzie Girl at 718-708-0923.  There were 19 telephone calls

10  from August 27, 2009 through December 18, 2009.

11          And the last line shows calls made from Suzzie Girl,

12  718-708-0923, to Francis Guerra for the time period of

13  August 27, 2009 through December 18, 2009.  There were 92

14  calls in that direction.

15          MS. NASH:  Thank you.  Just a moment.

16          (Pause.)

17          MS. NASH:  Nothing further from the government, your

18  Honor.

19          THE COURT:  Cross-examination.

20          MR. McMAHON:  Yes, your Honor.

21  CROSS-EXAMINATION

22  BY MR. McMAHON:

23  Q    Ma'am, are you an agent?

24  A    I am not.

25  Q    So, you are a civilian employee of the FBI?
             ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    A    Correct.

2    Q    What is your educational background?

3    A    I have a bachelor's degree in criminal justice from John

4    Jay College.

5    Q    Did you go from John Jay to the FBI?

6    A    I did.

7    Q    What sort of training have you had in intelligence

8    analysis?

9    A    I had about thirteen weeks in Quantico, Virginia, various

10   types of training.

11   Q    Now, the information that's on this report, the summary

12   report, which is 1013-B, I think you said you gathered some

13   data and you put it into a computer, and out spits the report?

14   That's the long and short of it?

15   A    No.   Some of the telephone numbers we had pen registers

16   up on.  So, that number is in our database.  I don't input

17   anything.  I just run reports with what's in there already.

18            MR. McMAHON:  Can I see the stipulation?

19   Q    Do you have the stipulation in front of you?  I think

20   it's 6002.

21   A    6002?

22   Q    Yes.  Let me take a look at it for a second?

23            (Pause.)

24            MR. McMAHON:  Is this in evidence?

25            MS. NASH:  Yes.
            ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2128

1    Q    Would you please show me on that document where it says

2    that you used pen register information?

3    A    It doesn't.  I just know I used pen register information

4    for some of it, not for all of it.

5              MR. McMAHON:  Judge, can we approach sidebar?

6              THE COURT:  Yes.

7

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

2151

1

2

3

4

5

6

7

8

9

10

11   CROSS-EXAMINATION CONTINUED

12   BY MR. McMAHON:

13   Q    So, ma'am, your chart also includes -- it also includes

14   pen register data; is that correct?

15   A    Yes.

16   Q    Now, when you say on this chart contacts, what do you do

17   mean?

18   A    Telephone calls that were made from each phone number.

19   Q    Okay.  Now, if there was a call was a one second call or

20   a voicemail or something like that, that would also be listed?

21   A    It would only be listed if the call was answered.

22   Q    So if it was answered by voicemail it would be listed?

23   A    I believe so, yes.

24   Q    And this chart you have done -- you have a subscriber

25   user.  The subscriber information, I guess, comes from the

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

1    phone company?

2    A    Correct.

3    Q    In terms of user, that you would gather from other data,

4    such as the prisons records and stuff you talked about?

5    A    Yes.

6    Q    But you don't know as to these particular calls who the

7    user was at any given call; is that correct?

8    A    Right.

9    Q    You are saying that with respect to this phone, that

10   there is some evidence that the user was the person that you

11   listed?

12   A    Exactly.

13   Q    That's where the user is different from the subscriber?

14   A    Correct.

15   Q    Okay. Now -- and I see that there are some other things

16   in here that have to have come from agent information, such as

17   on page four -- I think it's page three, I'm sorry, Scott

18   Rheback (ph) Jew, do you see that line?

19   A    Correct.

20   Q    One hundred seventy-six calls from Frank Guerra to him?

21   A    Yes.

22   Q    Where do you get the Jew from; is that in the phone book

23   or something?

24   A    That's how it was saved in the telephone book that -- the

25   phone that we seized for the phone of Frank Guerra.

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

1    Q    Okay. Now, you said that was seized from Frank Guerra?

2    A    Correct, at the time of his arrest. That is the 917

3    757-2359 telephone.

4    Q    Were you at his apartment when he was arrested?

5    A    I was not.

6    Q    So I gather somebody told you that this phone came from

7    Frank Guerra when he was arrested?

8    A    Yes, it was entered into evidence and then I received the

9    printout from --

10   Q    From the evidence log?

11   A    From whatever was printed out. Whoever --

12   Q    The report?

13   A    Correct.

14   Q    Now, on this Scott Rhebock, you know, he is the owner of

15   the Nissan dealership where Frank worked, is that the

16   subscriber?

17        Do you know who the subscriber was?

18        Do you remember as you sit here today who that Scott

19   Rheback is?

20   A    I believe Anthony Russo testified that he was known as

21   the Jew.

22   Q    What I am asking is do you know that Scott Rheback is the

23   owner of the Nissan dealership where Frank worked?

24   A    No, I don't know that.

25   Q    You don't know what the subscriber specifically -- what

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

2154

1    the subscriber information for that 917 538-1365, you don't

2    know if that was paid by Nissan, by the dealership or by him?

3    A    I have no way of knowing that, correct.

4    Q    Oh, and lastly, it wasn't clear to me.  On the number of

5    contacts did you actually count or did some machine count?

6    A    It was -- a report was printed out that lists the number

7    of calls, with the exception of the older calls that I counted

8    myself from the phone records that went back to the 90s. Those

9    we do not have electronically.

10   Q    All right. That's gone a little bit over my head here.

11   A    Okay.

12   Q    This 1013 B is this chart in evidence?

13   A    Yes.

14   Q    And the last column on the right is the number of

15   contacts?

16   A    Yes.

17   Q    And this deals with a certain timeframe in two phone

18   numbers?

19   A    Yes.

20   Q    And the number is 33; is that correct?

21   A    Yes.

22   Q    Now, my question is this actual document, it's a four

23   page -- this four page document, did some computer generate

24   this document or did you put -- withdrawn.

25              Did a computer generate this document?

                    MARSHA DIAMOND, CSR

                    OFFICIAL COURT REPORTER

1    A    No, I made this document from information that came from

2    a computer or from hard physical paper copy.

3    Q    So if the phone records were old you actually counted the

4    contacts?

5    A    Yes.

6    Q    And you would have counted them, what, in the call detail

7    section?

8    A    Yes.

9    Q    So you would have counted each one?

10   A    Only the old -- the two or three old phone bills that are

11   here, yes.

12   Q    So the vast majority of the data has been generated by

13   the some database?

14   A    After I entered the information that I was interested in

15   finding, yes.

16   Q    Okay. So, for example, on 2009 information.  Let's go to

17   a different -- the second line there.  Now, the 81 calls

18   between Francis Guerra and Roman T/Michael Persico, that

19   number of 81 you didn't personally count --

20   A    -- no --

21   Q    A computer database told you there were 81 contacts?

22   A    Correct.

23   Q    And whose database is that that told you that

24   information?

25   A    It's an outside database that we call, Penlink.

                    MARSHA DIAMOND, CSR

                    OFFICIAL COURT REPORTER

1    Q    P-E-N-L-I-N-K?

2    A    Correct.

3    Q    So somebody put some information into the Penlink and

4    Penlink sent you back a report with that number 81 on it?

5    A    No. I take the information that is in our estimate, FBI

6    system, for this phone number. Let' say, 917 757-2359.  That

7    gets downloaded to my computer, and then uploaded into the

8    Penlink database and then you can run all sorts of reports and

9    would have given you that number.

10   Q    Okay. But when you say that you downloaded the number, I

11   understand when you say the phone number, but what information

12   do you convey to Penlink from which that computer comes up

13   with the number 81?

14   A    Every, every, every, all the information --incoming,

15   outgoing call, date, time, duration, anything that we have

16   captured from the phone company.

17        THE COURT: One moment.  You put that in Penlink?

18        THE WITNESS:  In our system, yes, but it goes into

19   our system, not by me, through the phone company, or however

20   else they are -- depending on where they get it from.

21   Q    This is a little hard to understand for us old timers.

22   A    I understand.

23   Q    You got the phone bills -- withdrawn.

24        You have pen register data.  Somehow you have a list

25   of all calls that were made in the timeframe.  For example, on

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

2157

```
1    line two, June 2 of 08 to April 20 of 09, you have a computer
2    that captures the number of every call in that timeframe made
3    between those two numbers.
4    A    If there's a pen register.    If you have a pen register
5    on a phone number, whoever authorizes -- whatever the company
6    -- Nextel or Sprint or whatever it is, they give that
7    information to someone else at the FBI.   Whoever handles that,
8    not me, and it gets entered into our internal system.   That is
9    a live feed, FBI.   Live feed.   Pen register is live.   You get
10   calls as they happen.   Maybe there's like a 12-hour delay.
11   Okay.  Then I take that information and dump it into Penlink,
12   download it into Penlink and then I run my reports.
13   Q    Got it, but meanwhile -- so all of the data that is here
14   is part of a vast array of numbers and calls and contacts, if
15   it is pen register gathered that is sitting in an FBI
16   computer?
17   A    Originating from the telephone company, yes.
18   Q    Yes.  Made from the phone company pursuant to some pen
19   register application and then it's stored in the FBI computer?
20   A    Yes.
21   Q    Okay. And then you ask the computer to generate some of
22   that and you send it to Penlink or you send it all to Penlink?
23   A    I send everything to Penlink, or you can also send
24   certain dates but normally we send everything.
25   Q    And then the computer -- you tell them what kind of
```

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

2158

1    report you want and then they will send it back to you in this

2    format or the data will come back?

3    A    It just comes on the screen and you can just print it out

4    instantly.

5    Q    So you will ask it for this date, these two numbers, how

6    many contacts?

7    A    Correct.

8    Q    Is that the terminology used:  contacts or completed

9    calls, or what is it?

10   A    I think contacts is fair.

11   Q    It has to be more than a minute, more than ten seconds,

12   anything like that or is it just contacts?

13   A    Well, the call would have had to have been answered so --

14   Q    Okay. All right. So then basically the data that is on

15   this chart is taken from this Penlink's computer which dealt

16   with the material that it got previously from the FBI computer

17   which it got from the phone company, correct?

18   A    With the exception of the older records, yes.

19   Q    Okay. Now, when they send this back to you, for example,

20   I don't know, maybe 15 your 20 columns here that you've asked

21   for, is there a specific report that comes from Penlink which

22   you then turn into this document which is in evidence?

23            In other words, is the 81 -- withdrawn.

24            Penlinks didn't do this four page document when they

25   gave you the data?

MARSHA DIAMOND, CSR

OFFICIAL COURT REPORTER

2159

1    A    No.

2    Q    When they gave you the data did you print it out?

3    A    Sometimes I did, sometimes I didn't.

4    Q    Did you do the data for this chart and do you have that

5    in your office?

6    A    Somewhere I probably do, yes.

7              MR. McMAHON: Nothing further, Judge.

8              THE COURT:  All right.  Any questions for this

9    witness?

10             MS. NASH:  No Judge.

11             THE COURT:  You may step down. Thank you.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    MARSHA DIAMOND, CSR

                  OFFICIAL COURT REPORTER

GOVERNMENT
EXHIBIT
7003
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
3500-KO-7
10 CR 147 (SLT)

DATE, 3-09-93

DAY Tuesday

WEATHER Clear - Cool

A PHYSICAL _____ PHOTO ✓ SURVEILLANCE WAS CONDUCTED IN THE

VICINITY OF 6701 11TH Ave Brooklyn N.Y.

AT WHICH TIME THE FOLLOWING OBSERVATIONS WERE NOTED:

| TIME | INITIALS | OBSERVATIONS |
|------|----------|--------------|
| 12:48P | [init] | Photographic surveillance instituted at the above address with cola roll # 6192 |
| 12:50 P | [init] | Cola photo's 1, 2 & 3 depict HTV-790 N.Y. (an Oldsmobile Bravada) parked in front of 6701 11TH Ave Brooklyn N.Y. |
| 12:51 P | [init] | Cola photo #4 depicts 6701, 11TH Ave Luncheonette. |
| 12:?P | [init] | Cola photo's 5, 6 & 7 depict Joseph Monteleone Sr. (further noted as JMS) exiting 6701 11TH Ave walking towards HTV-790 N.Y. |
| 1:02 P | [init] | Cola photo's 8 & 9 depict JMS entering HTV-790 N.Y. |
| 1:15 P | [init] | Cola photo's 10, 11, 12 & 13 depict JMS talking w/a UWM on the sidewalk in front of 2002 W 6TH St Brooklyn. |
| 1:33 P | [init] | Cola photo #14 depicts JMS exiting 196 Ave "S" Brooklyn N.Y. |
| | | Cola photo's 15, 16, 17, 18, 19, 20, & 21 depict JMS talking w/ UWM while standing on the Bridge on Cropsey Ave that crosses the Coney Island Creek. |
| 2:24 P | [init] | Cola photo #22 depicts UWM standing in the doorway of 196 Ave "S" Brooklyn. |
| 2:25 P | [init] | Cola photo's 23 & 24 depict 2 UWM's in front of 196 Ave "S" Brooklyn. |
| 2:26 P | [init] | Photographic surveillance terminated with cola |

PAGE 1 OF 2

CONTINUATION PAGE                          DATE  3-09-93

| TIME | INITIALS | OBSERVATIONS |
|------|----------|--------------|
|      |          | call # 6192 |
|      | KMO      | Kevin M. O'Rourke, SA, FBI, NY, N.Y.  4-01-93 |

PAGE ___2___ OF ___2___

1

1871

GOVERNMENT
EXHIBIT
**7004**
10 CR 147 (DLI)

```
 1    UNITED STATES DISTRICT COURT
 2    EASTERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - X
 4   UNITED STATES OF AMERICA,  :

                                        10-CR-147
 5
            -against-             United States Courthouse
 6
                              :  Brooklyn, New York
 7
     FRANCIS GUERRA,
 8
             Defendant.
 9                            :  June 26, 2012
                                 9:30 o'clock a.m.
10    - - - - - - - - - - - - - - X
11    TRANSCRIPT OF TRIAL
      BEFORE THE HONORABLE SANDRA L. TOWNES
12    UNITED STATES DISTRICT JUDGE, and a jury
13    ATTORNEYS FOR GOVERNMENT:
      LORETTA E. LYNCH
14    UNITED STATES ATTORNEY
      BY:  NICOLE ARGENTIERI
15         ALLON LIFSHITZ
           RACHEL NASH
16    Assistant United States Attorney
      271 Cadman Plaza East
17    Brooklyn, New York 11201
18    ATTORNEY FOR DEFENDANT:
      GERALD McMAHON, ESQ.
19    MATHEW J. MARI, ESQ
20
      Court Reporter:
21    Marsha Diamond
      225 Cadman Plaza East
22    Brooklyn, New York
      TEL: (718) 613-2489
23    FAX: (718) 613-2369
24       Proceedings recorded by mechanical stenography,
      transcript produced by CAT.
25
                    MARSHA DIAMOND, CSR
                  OFFICIAL COURT REPORTER
```

1889

1    F R E D   S A N T O R O                , having been first

2    duly sworn/affirmed, testified as follows:

3              THE COURT:  Tell us your full name and spell it.

4              THE WITNESS:  My name is Fred Santoro F-R-E-D

5    S-A-N-T-O-R-O.

6    DIRECT EXAMINATION

7    BY MS. ARGENTIERI:

8    Q    Are you currently employed?

9    A    No ma'am.

10   Q    Directing your attention to the 1997, where did you work?

11   A    I was a detective in the Brooklyn South Narcotics Major

12   Case Unit.

13   Q    And is that a part of the New York City Police

14   Department?

15   A    Yes, it is.

16   Q    When did you join the New York City Police Department?

17                    MARSHA DIAMOND, CSR, RPR

18                    OFFICIAL COURT REPORTER

1    A    July 16, 1984.

2    Q    You said that in 1997 your assignment was to the major

3    case unit?

4    A    Yes, it was.

5    Q    Can you explain to the jury, generally, what that is?

6    A    Yes. We did long-term investigations into upper echalance

7    drug dealers and we also did traditional organized crime which

8    involved physial surveillance, electronic surveillance which

9    was wiretap, and undercover work.

10   Q    In the course of your work for the Brooklyn Major Case

11   Unit, did you perform video surveillance of Anthony Russo?

12   A    Yes, ma'am.

13   Q    When, approximately, did you conduct that surveillance?

14   A    Approximately 1997 in August.

15         MS. ARGENTIERI: Judge, may I approach?

16         THE COURT: Yes.

17         MS. ARGENTIERI: I am showing the witness Government

18   Exhibit 228 previously shown to the defense counsel (handing

19   to the witness).

20   Q    Do you recognize that?

21   A    Yes.

22   Q    Have you reviewed it prior to today?

23   A    Yes.

24   Q    What is it?

25   A    Copy of the video, the surveillance, that I conducted in

                    MARSHA DIAMOND, CSR, RPR

                    OFFICIAL COURT REPORTER

1   1997.

2   Q    And how do you know that's what it is?

3   A    Because my initials are on it.

4           MS. ARGENTIERI: Government moves to admit

5   Government Exhibit 228.

6           MR. McMAHON: No objection.

7           THE COURT: Received.

8           (Exhibit 228  so marked).

9           MS. ARGENTIERI:  May I publish it to the jury,

10  Judge?

11          THE COURT:  Yes, you may.

12  Q    Sir, before I start the video, where were you physically

13  located when you shot this video?

14  A    I was in the back of a surveillance van on 11th Avenue

15  approximately between 67th and 68th Street in the County of

16  Kings, Brooklyn, New York.

17  Q    And what was at that location?

18  A    Romantique Limousines.

19  Q    Sir, stopping the video for the record at eight seconds,

20  what's in this shot?

21  A    You got Allie Boy Persico and Anthony Russo.

22  Q    And there are two individuals in the photo, can you

23  identify the individual on the left?

24  A    Yes. The individual on the left is Anthony Russo.  He's

25  in a black jogging outfit with white and red stripes, and the

                    MARSHA DIAMOND, CSR, RPR

                    OFFICIAL COURT REPORTER

1892

1    person in front of him is Allie Boy Persico who is wearing a

2    white T-shirt with a logo on the back and sunglasses.

3    Q    And to the right there looks like a neon sign, what is

4    that neon sign say?

5    A    That says Romantique Limousine.

6    Q    And was that the storefront?

7    A    Yes.

8    Q    So where was your car parked in relation to that

9    storefront?

10   A    I was, approximately, I'd say maybe 20 feet parked on the

11   street.

12              MS. AREGNTIERI: If you can just play the video.

13              (Video playing).

14   Q    Where do you see Allie Boy Persico and Anthony Russo go?

15   A    They start to enter the location Romantique Limousine.

16   Q    Approximately 35 seconds into the video what happens?

17   A    Alley Boy Persico entered into the location.

18   Q    To just -- we are moving just to before two minutes.

19   Right there, who did you see exit?

20   A    Anthony Russo.

21   Q    And then the individual in the doorway, do you recognize

22   that person?

23   A    Yes, ma'am.

24   Q    Who is that?

25   A    Michael Persico. (Continued on next page)

                         MARSHA DIAMOND, CSR, RPR

                         OFFICIAL COURT REPORTER

1893

1     (Tape continues to play.)

2     EXAMINATION CONTINUES

3     BY  MS. ARGENTIERI:

4     Q     Are you are moving the camera here?

5     A     Yes.

6     Q     What were you able to observe?

7     A     I observed all three individuals cross the street and

8     start to meet up across the street by a parking meter.

9     Q     We are stopping the video at 2:31.

10          Do you see anyone that you recognize in the shot?

11    A     Yes.

12    Q     Who?

13    A     Allie Boy Persico.

14    Q     Can you indicate where for the jury you see Allie Boy

15    Persico?

16    A     He's opposite where I'm sitting, he's opposite across the

17    street, and he's facing me.

18    Q     Is he wearing a white T-shirt?

19    A     Yes, he is.

20    Q     All the way to the right?

21    A     Yes.

22          (Tape plays.)

23    Q     In this shot it looks like how many individuals -- well

24    just wait for it to clear up.

25          (Pause.)

                    GR       OCR       CM       CRR       CSR

1894

1    Looking at this video at around three minutes, who

2    is there?

3    A    Well, now the same three individuals, they hook back up.

4    It's Allie Boy Persico, Michael Persico and Anthony Russo.

5    Q    Did you observe them?

6    A    Yes, ma'am.

7    Q    What did they appear to be doing?

8    A    They appear to be having a conversation, or a

9    walk-and-talk, what we used to call it, from across the street

10   from where I'm sitting.

11       (Tape plays.)

12   Q    Did they meet there for a couple of minutes?

13   A    Yes, they did.

14   Q    I am just going to fast forward from four minutes to

15   six minutes.

16       Are they still meeting across the street?

17   A    Yes.

18       (Tape continues to play.)

19   Q    I am going to fast forward to eight minutes.

20       What is the group still doing?

21   A    They are still talking.

22   Q    I am fast forwarding to approximately 9 minutes

23   30 seconds.

24       (Tape continues to play.)

25       At this point did they move on?

                    GR      OCR      CM      CRR      CSR

1895

```
 1    A     Yes, ma'am.

 2           (Tape plays.)

 3    Q     At approximately 10 minutes 30 seconds,  what did you

 4    observe them doing?

 5    A     I observed Anthony Russo get into a passenger seat of a

 6    vehicle.  Michael Russo got into -- actually, Anthony got into

 7    the driver's seat, Michael got into the passenger seat, and

 8    they drove off towards the higher numbers.  Allie Boy has a

 9    brief conversation with them and then he comes back across the

10    street.

11           At this point I believe they know that I'm out there

12    because Allie Boy starts to put on like a little show for the

13    camera.  He starts skipping and laughing.

14           (Tape plays.)

15    Q     Is that what you are talking about there?

16    A     Yes.

17    Q     That's approximately 11 minutes 20 seconds.

18           Where did Allie Boy go just there?

19    A     He went back inside of Romantique Limousines.

20    Q     At some point did he reappear?

21    A     Yes, shortly thereafter.

22    Q     I am just going to fast forward to shortly before

23    19 minutes.

24           (Tape continues.)

25           What does he appear he's doing right there at 19:20?
```

          GR        OCR       CM        CRR       CSR

1896

1    A    He just stuck his head out.  I think he was looking to

2    see if I was still out there.

3                (Tape continues.)

4    Q    Later that day, did Anthony Russo and Michael Persico

5    return?

6    A    I don't recall if they returned.  I was out there for a

7    while.  I don't recall if they came back.

8    Q    I am fast forwarding to 34 minutes.

9                (Tape continues.)

10               Who is that in the frame?

11   A    That's Anthony Russo and Michael Persico.

12               (Tape continues.)

13   Q    Approximately how long was your entire surveillance?

14   A    I stood out there approximately three to four hours.  I

15   believe the reason why they pulled away on the first time was

16   because they wanted to see if I was going to follow them but I

17   remained at the location.

18               MS. ARGENTIERI:  I have no further questions, Judge.

19               MR. McMAHON:  No cross, Judge.

20               THE COURT:  You may step down.

21               Thank you.

22               THE WITNESS:  Have a nice day.  Have a nice day.

23               (Witness excused.)

24

25

             GR        OCR       CM       CRR       CSR

GOVERNMENT
EXHIBIT
**7005**
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
**3500-KW-1**
10 CR 147 (SLT)

DATE 10/26/94

DAY Wednesday

WEATHER Cloudy

A PHYSICAL _____ PHOTO ✓ SURVEILLANCE WAS CONDUCTED IN THE

VICINITY OF Gowanus Parking Field C 3 Ave. between 30 + 31 Sts,

AT WHICH TIME THE FOLLOWING OBSERVATIONS WERE NOTED: Brooklyn, N.Y.

| TIME | INITIALS | OBSERVATIONS |
|------|----------|--------------|
| 430P | KW | Surveillance was initiated at the above location. |
| 502P | KW | Photos #1 #2 #3 depict (KW) unk W/M #3 walking on E. 10th St from Bay Parkway (towards the U-Haul) |
| 900P | KW | Surveillance terminated. |
| | KW | Kevin G. Wevodau SA FBI NY, NY 11/23/94 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |



1

1452

GOVERNMENT
EXHIBIT

**7006**

10 CR 147 (DLI)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 10-CR-00147(SLT)
                                   :
                                   :
        -against-                  : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
                                   : Thursday, June 21, 2012
FRANCIS GUERRA,                    : 9:30 a.m.
                                   :
            Defendant.             :
                                   :

- - - - - - - - - - - - - X

        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE SANDRA L. TOWNES
              UNITED STATES DISTRICT JUDGE

                A P P E A R A N C E S:

    For the Government: LORETTA E. LYNCH, ESQ.
                        United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                    BY:  NICOLE M. ARGENTIERI, ESQ.
                        RACHEL NASH, ESQ.
                        ALLON LIFSHITZ, ESQ.
                        Assistant United States Attorneys

    For the Defendant:   LAW OFFICE OF GERALD J. MCMAHON
                        67 Wall Street
                        New York, New York 10005
                    BY:GERALD J. MCMAHON, ESQ.


                    Victoria A. Torres Butler, CRR
                        Official Court Reporter

*C. Wertenberger - Cross / McMahon*                    1546

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16    K E V I N   L.   W E V O D A U,
17              called by the Government, having been
18              first duly sworn, was examined and testified
19              as follows:
20
21              THE COURT:  Please, be seated.  Tell us your full
22    name and spell it.
23              THE WITNESS:  My name is Kevin L. Wevodau,
24    W-E-V-O-D-A-U.
25              THE COURT:  D-A-U?

*K. L. Wevodau - Direct / Argentieri*　　1547

1　　　　THE WITNESS:  Yes.

2　　　　THE COURT:  Thank you.

3　　　　MS. ARGENTIERI:  May I enquire?

4　　　　THE COURT:  Yes, you may.

5　DIRECT EXAMINATION

6　BY MS. ARGENTIERI:

7　Q    Sir, where are you employed?

8　A    I'm a supervisory senior resident agent for the Federal

9　Bureau of Investigation in the Philadelphia division assigned

10　to the Scranton and resident agency.

11　Q    And how long have you been a special agent with the

12　Federal Bureau of Investigation?

13　A    Little over 28 years.

14　Q    Directing your attention to October of 1994, what FBI

15　office were you assigned to?

16　A    I was assigned to the special operations group within the

17　New York division.

18　Q    That's the New York office?

19　A    Yes.

20　Q    And what squad specifically were you assigned to?

21　A    S02.

22　Q    And what were your responsibilities as a special agent

23　assigned to S02?

24　A    Tasks would be submitted by case agents to the special

25　agent -- to the special operations branch.  Assignments would

*K. L. Wevodau - Direct / Argentieri*                    1548

1   be meted out from there by the coordinators tours to the

2   various squads.  And our task as surveillance agents would be

3   to complete those missions, be they physical surveillance or

4   photographic surveillance.

5   Q    And when you conducted a visual surveillance or

6   photographic surveillance, how -- did you have a practice with

7   regard to documenting it?

8   A    We would be required to complete logs.

9   Q    And when you created those logs, were you careful to be

10  fair and accurate?

11  A    Yes.

12  Q    As you sit here today, do you recall if you conducted a

13  surveillance on October 26th, 1994?

14  A    Not specifically, no.

15          MS. ARGENTIERI:  May I approach?

16          THE COURT:  Yes.

17          MS. ARGENTIERI:  Showing the witness what's marked

18  for identification as 3500 KW-1.

19          (Handing.)

20  Q    Sir, do you recognize that document?

21  A    Yes, this would be a surveillance log, a photographic

22  surveillance log that I would have completed.

23  Q    And on what date did you complete it?

24  A    The log itself was completed on November 23, 1994, for a

25  surveillance done on October 26th, 1994.

*K. L. Wevodau - Direct / Argentieri*          1549

1  Q    And at the time that you created this, were you careful
2  to be fair and accurate?
3  A    Yes.
4          MS. ARGENTIERI:  Judge, the Government moves to have
5  this witness refer to this log pursuant to 8035 during his
6  testimony.
7          THE COURT:  Any objection?
8          MR. McMAHON:  No, Judge.
9          THE COURT:  All right.  That request is granted.
10         MS. ARGENTIERI:  I'm also going to show the witness
11 for identification Government's Exhibit s 212-A, B, and C.
12         (Handing.)
13 Q    Sir, do you recognize those photographs?
14 A    These would be the three photographs that were taken as
15 depicted in my surveillance log from that date.
16 Q    And how do you know that those are photographs you
17 specifically took?
18 A    On the back I completed the indications that were SO2
19 agent Kevin Wevodau, the date and the case agent that assigned
20 us to the matter and the file number for which they were
21 taken.
22         MS. ARGENTIERI:  The Government moves to admit
23 212-A, B, and C.
24         MR. McMAHON:  May I see them, Judge?
25         THE COURT:  Yes.

*K. L. Wevodau - Direct / Argentieri*                    1550

1         (Handing.)

2         MR. McMAHON:   No objection, Your Honor.

3         THE COURT:   All right, I will receive Government's

4    Exhibits 212-A, B, and C.

5         (Government's Exhibits 212-A, B, and C were received

6    in evidence.)

7         (The above-referred to Exhibit was published to the

8    jury.)

9    Q    Sir, on October 26th, 1994, where were you conducting

10   surveillance?

11   A    The Gowanus Parking Field C, Third Avenue, between 30th

12   and 31st Street, in Brooklyn, New York.

13   Q    And at what time did you initiate your surveillance that

14   day?

15   A    4:30 p.m.

16   Q    And where were you when you initiated the surveillance?

17   A    At the Gowanus Parking Field C, Third Avenue.

18   Q    And did you take photographs that day?

19   A    Yes.

20   Q    At approximately what time did you take photographs?

21   A    5:02 p.m. on that date.

22   Q    And did you describe what you observed as you took the

23   photographs in your log?

24   A    Yes.

25   Q    What did you observe at 5:02 p.m.?

*K. L. Wevodau - Direct / Argentieri*          1551

1   A     An unknown white male walking west on 10th Street from

2   Bay Parkway and then I put in parentheses, "towards the

3   U-Haul."

4   Q     And what time did you terminate surveillance that day?

5   A     9:00 o'clock p.m.

6              MS. ARGENTIERI:   Judge, may I publish 212-A, B, and

7   C to the jury?

8              THE COURT:   Yes.

9              MS. ARGENTIERI:   Showing you first 212-A.

10             (The above-referred to Exhibit was published to the

11  jury.)

12  Q     Is this one of the photographs you took that day?

13  A     Yes.

14  Q     And what does that photo show?

15  A     That was the unknown white male.

16             MS. ARGENTIERI:   Showing 212-B.

17             (The above-referred to Exhibit was published to the

18  jury.)

19  Q     What does that show?

20  A     It's another picture of the same unknown white male.

21  Q     And in that photo what does the unidentified male appear

22  to be doing?

23  A     Looking back at me.

24             MS. ARGENTIERI:   Showing you Government's

25  Exhibit 212-C.

*K. L. Wevodau - Direct / Argentieri*          1552

1          (The above-referred to Exhibit was published to the
2   jury.)
3   Q    Is that the same unidentified male?
4   A    Yes.
5   Q    And these are the three photos you took that day?
6   A    Yes.
7          MS. ARGENTIERI:  No further questions.
8          THE COURT:  Any cross, Mr. McMahon?
9          MR. McMAHON:  No, Your Honor.
10         THE COURT:  You may step down, thank you.
11         THE WITNESS:  Thank you.
12         (Witness excused.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1

1646

**GOVERNMENT EXHIBIT**
**7007**
**10 CR 147 (DLI)**

1   UNITED STATES DISTRICT COURT
2   EASTERN DISTRICT OF NEW YORK
3   - - - - - - - - - - - - - X
4   UNITED STATES OF AMERICA,  :

                                    10-CR-147

5

        -against-                United States Courthouse

6

                            :    Brooklyn, New York

7

    FRANCIS GUERRA,

8

            Defendant.

9                           :    June 25, 2012
                                 9:30 o'clock a.m.

10  - - - - - - - - - - - - - X
11  TRANSCRIPT OF TRIAL
    BEFORE THE HONORABLE SANDRA L. TOWNES
12  UNITED STATES DISTRICT JUDGE, and a jury
13  ATTORNEYS FOR GOVERNMENT:
    LORETTA E. LYNCH
14  UNITED STATES ATTORNEY
    BY:  NICOLE ARGENTIERI
15       ALLON LIFSHITZ
         RACHEL NASH
16  Assistant United States Attorney
    271 Cadman Plaza East
17  Brooklyn, New York 11201
18  ATTORNEY FOR DEFENDANT:
    GERALD McMAHON, ESQ.
19  MATHEW J. MARI, ESQ
20
21  Court Reporter:
    Marsha Diamond
22  225 Cadman Plaza East
    Brooklyn, New York
23  TEL: (718) 613-2489
    FAX: (718) 613-2369
24
        Proceedings recorded by mechanical stenography,
25  transcript produced by CAT.
                        MARSHA DIAMOND, CSR
                        OFFICIAL COURT REPORTER

1846

```
 1
 2
 3
 4
 5
 6
 7
 8
 9              THE WITNESS:  Jeffrey Young, J E F F R E Y,
10     Y O U N G.
11              THE COURT:  Thank you.
12     DIRECT EXAMINATION
13     BY MS. ARGENTIERI:
14     Q    Sir, what do you do for a living?
15     A    I'm a retired New York City detective.
16     Q    Prior to your current job, where were you employed?
17     A    Prior to my -- I was employed by the New York City Police
18     Department.
19     Q    What year did you join the New York City Police
20     Department?
21     A    In 1981.
22     Q    And what was your first assignment with the NYPD?
23     A    My first assignment was patrolman with the 77th Precinct.
24     Q    At some point, did you join the Crime Scene Unit?
25     A    Yes.
```

1847

1    Q    When was that?

2    A    That was in 1992.

3    Q    What were your duties and responsibilities as an officer

4    assigned to the Crime Scene Unit?

5    A    As a crime scene officer, I responded to homicides,

6    burglaries.  We would assist the detectives who needed the

7    crime scene to be processed.  By process, I mean taking

8    photographs, making sketches, if necessary, reflecting any

9    physical or ballistic evidence at the scene.

10   Q    Directing your attention to October 21st of 1993.

11        What was your assignment that day?

12   A    We were assigned -- my partner and I were assigned to

13   the -- to 106th Precinct garage to process two vehicles that

14   were involved in a homicide.

15   Q    As you sit here today, do you recall each and every

16   detail of the crime scene you processed on that day?

17   A    No.

18   Q    At the time that you processed the two vehicles, did you

19   document what you did?

20   A    Yes.

21   Q    In notes and for a report?

22   A    Yes, that's right.

23   Q    Were you careful to be fair and accurate?

24   A    Yes.

25            MS. ARGENTIERI:  Judge, may I approach?

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1848

```
 1              THE COURT:  Yes.
 2    Q    I am showing the witness what's been marked as
 3    3500 JY one, two and three.
 4              What are those things, sir?
 5    A    This is the crime scene report that I prepared along with
 6    a document -- I'm sorry -- a diagram of the vehicles that were
 7    involved.
 8              THE COURT:  What exhibit is that?
 9              THE WITNESS:  This is JY one, is the crime scene
10    report.
11              THE COURT:  Thank you.
12    Q    And your notes and the diagrams you did are marked as
13    what?
14    A    JY three.
15              MS. ARGENTIERI:  The government asks that the
16    witness be able to refer to these documents during his
17    testimony pursuant to 803(5).
18              THE COURT:  Any objection?
19              MR. McMAHON:  No, Judge.
20              THE COURT:  Your request is granted.
21    Q    Sir, do those documents indicate what the Crime Scene
22    Unit run number was?
23    A    Yes.
24    Q    What was it?
25    A    93-2943-A.
```

                   Victoria A. Torres Butler, CRR

                        Official Court Reporter

1849

1    Q    What were the two vehicles that you processed that day?

2    A    The two vehicles were a 1993 Nissan and a 1984 Buick.

3    Q    With regard to the Buick, what was the license plate

4    number?

5    A    Let's see.  The license plate number on the Buick was

6    RDW 146.

7    Q    Do you recall what color it was?

8    A    I believe it was brown.

9    Q    With regard to the Nissan, what was the license plate

10   number?

11   A    The license is X6W 283.

12   Q    What color was it, if you recall?

13   A    I believe that was a tan.

14   Q    When you arrived -- first of all, where did you process

15   the vehicles, can you describe the location to the jury?

16   A    It was in the garage of the 106th Precinct.

17   Q    When you arrived at the garage of the 106th Precinct,

18   what did you do first?

19   A    We verified the vehicle VIN numbers and license plate

20   numbers and then we proceeded to photograph the vehicles.

21   Q    On this day, did you -- were you able to match the VIN

22   numbers to the paperwork you received?

23   A    Yes.

24   Q    What did you do next?

25   A    Next I photographed the vehicles.

Victoria A. Torres Butler, CRR

Official Court Reporter

1850

1    Q     Prior to -- when you arrived, were the vehicles secured

2    in any way?

3    A     They were secured in the garage.

4              MS. ARGENTIERI:  Judge, may I approach?

5              THE COURT:  Yes.

6    Q     I am showing the witness what was previously provided to

7    defense counsel and marked for identification as

8    20-A through I.

9              Can you just look through those, sir?

10             (Pause.)

11             What are those?

12   A     Those are photographs of the Buick.

13   Q     Are they photographs you took?

14   A     Yes.

15   Q     How do you know that?

16   A     I have my stamp and initial on the back of the

17   photographs.

18             MS. ARGENTIERI:  The government moves to admit

19   20-A through I.

20             MR. McMAHON:  No objection.

21             THE COURT:  I will receive Government's 20-A

22   through I.

23             (Marked.)

24   Q     Now showing the witness 21-A through I for

25   identification.

                  Victoria A. Torres Butler, CRR

                       Official Court Reporter

1851

```
1              Can you look at those, sir?

2    A    Sure.

3              (Pause.)

4    Q    What are those?

5    A    Those are photographs of -- I took of the Nissan.

6    Q    How do you know they are photographs you took?

7    A    Also stamped on the back with my initials.

8              MS. ARGENTIERI:  The government moves to admit 21-A

9    through I.

10             MR. McMAHON:  No objection.

11             THE COURT:  All right.  Received.

12             (Marked.)

13             MS. ARGENTIERI:  Judge, may I publish certain of

14   these photos to the jury?

15             THE COURT:  Yes.

16   Q    Showing you 20-A in evidence.

17             What is that a photo of?

18   A    That's the photo of the Buick.

19   Q    And it is a front view?

20   A    Yes, front view.

21   Q    What if any damage can you see on the car in this photo?

22   A    There is damage to the driver's side rear window,

23   passenger -- I would say driver's side passenger rear window.

24   Q    To the driver's side window where I am indicating here?

25   A    That's correct.
```

Victoria A. Torres Butler, CRR

Official Court Reporter

1852

1    Q    And looking at Government Exhibit 20-B, does there appear

2    to be any damage to this side of the car?

3    A    No.

4    Q    I'm sorry.  I should just indicate I meant the passenger

5    side.

6              Government Exhibit 20-C in evidence, what does this

7    photo show?

8    A    This shows the back windshield of the Buick with damage

9    to the windshield.

10   Q    At the center of the photo?

11   A    That's correct.

12   Q    What if anything can you see about the rear driver's side

13   window?

14   A    The rear driver's side window is also broken.

15   Q    Showing you Government Exhibit 20-D in evidence.

16              What is this a view of?

17   A    This is a view of the driver's side interior of the

18   Buick.

19   Q    And what is this object in the middle between the seats?

20   A    That's a screwdriver.

21   Q    Looking at the side panel of the steering wheel, what

22   damage did you observe there?

23   A    The collar of the steering wheel is broken.

24   Q    What is that consistent with?

25   A    That's consistent most times with someone who wants to

Victoria A. Torres Butler, CRR

Official Court Reporter

1853

1    steal the vehicle.

2    Q    Just looking at the seat, was there anything unusual

3    about the seat?

4    A    Aside from the broken glass, the seat was pulled back as

5    far as it could go.

6    Q    The driver's seat?

7    A    The driver's seat.

8    Q    Showing you Government Exhibit 20-E.

9            Is that a view of the driver's seat?

10   A    That's correct.

11   Q    And what were you and your partner measuring here?

12   A    We were measuring the distance from the dash to the back

13   of the seat.

14   Q    Showing you Government Exhibit 20-F in evidence.

15           What is that a view of?

16   A    That's a view of the rear seat of the Buick.

17   Q    And what is this in the seat?

18   A    That's a broken glass CORRECTION.

19   Q    Did you also recover a quantity of ballistics evidence in

20   this car?

21   A    Yes, that's correct.

22           (Continued on next page.)

23

24

25

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1854

1    BY MS. ARGENTIERI:   (Continued)

2    Q    And do you recall what type of ballistics evidence you

3    recovered from the car?

4    A    They were discharged shells.

5    Q    And have you reviewed a report recently?

6    A    Yes.

7    Q    Do you recall where those shell casings were recovered in

8    the car?

9    A    A number of the shells were recovered on the seat and on

10   the back panel of the windshield.

11   Q    That would be somewhere like up here (indicating)?

12   A    Yes.

13          MS. ARGENTIERI:   Showing you Government's

14   Exhibit 20-G in evidence.

15          (The above-referred to Exhibit was published to the

16   jury.)

17   Q    Is that some of the shells?

18   A    Yes, that's correct.

19          MS. ARGENTIERI:   Showing you Government's

20   Exhibit 20-H in evidence.

21          (The above-referred to Exhibit was published to the

22   jury.)

23   Q    Does that show the floor?

24   A    Yes.

25   Q    And what can you see in that picture?

                    Victoria A. Torres Butler, CRR

                       Official Court Reporter

1855

1       THE COURT:  And what part of the floor?

2    Q    What part of the vehicle's floor?

3    A    That's the passenger side rear floor of the vehicle.

4       THE COURT:  Thank you.

5    Q    And I'm sorry, what can you see in that photo?

6    A    Broken glass and ballistics evidence, discharged shells.

7    Q    Those are all photos of the Buick; is that correct?

8    A    Yes, that's correct.

9       MS. ARGENTIERI:  Showing you Government's

10   Exhibit 21-A in evidence.

11       (The above-referred to Exhibit was published to the

12   jury.)

13   Q    What is that a photo of?

14   A    That's a photo front view of the Nissan.

15       MS. ARGENTIERI:  Showing you Government's

16   Exhibit 21-B.

17       (The above-referred to Exhibit was published to the

18   jury.)

19   Q    What does this photo show?

20   A    That's showing the front view of the windshield of the

21   Nissan.

22   Q    And is there damage indicated in this photo?

23   A    Yes, ballistics damage to the windshield.

24   Q    Are you referring to these bullet holes here

25   (indicating)?

Victoria A. Torres Butler, CRR

Official Court Reporter

06 25 2012   maragni direct cross obondo miller lewis young

1856

1    A      Yes.

2    Q      And what ballistics evidence did you recover, generally,

3    in the Nissan?

4    A      Recovered, I would say, fragmented bullets and copper

5    jacketing.

6              MS. ARGENTIERI:  Showing you Government's

7    Exhibit 21-C.

8              (The above-referred to Exhibit was published to the

9    jury.)

10   Q      What does that show?

11   A      That's the driver's side window.  And it's broken.

12             MS. ARGENTIERI:  Showing you Government's

13   Exhibit 21-D.

14             (The above-referred to Exhibit was published to the

15   jury.)

16   Q      Can you see any ballistics damage in this photo?

17   A      Yes, there's ballistics damage around the door jamb of

18   the driver's side of the vehicle.

19   Q      Is that here, the top of the door (indicating)?

20   A      Yes.

21   Q      And then also over here (indicating)?

22   A      Yes, that's correct.

23             MS. ARGENTIERI:  Showing you Government's

24   Exhibit 21-E in evidence.

25             (The above-referred to Exhibit was published to the

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1857

1    jury.)

2    Q    What view of the Nissan is that?

3    A    That's the passenger side and rear view, rear of the

4    vehicle.

5    Q    And what ballistics damage, if any, did you observe?

6    A    That's broken glass, and the back windshield is broken.

7           MS. ARGENTIERI:  Showing you Government's

8    Exhibit 21-I.

9           (The above-referred to Exhibit was published to the

10   jury.)

11   Q    What is that a view of?

12   A    That's the rear seat of the Nissan.

13   Q    And what can you see in this photo?

14   A    There's broken glass on the seat.

15   Q    And does it look like there are other items back there as

16   well?

17   A    There are fragments of ballistics evidence on the seat.

18   Q    You said bullet fragments?

19   A    Yes.

20   Q    Did you collect any ballistics evidence from either of

21   these two vehicles?

22   A    Yes.

23           MS. ARGENTIERI:  Showing you Government's

24   Exhibit 12-C in evidence, which con stains a series of

25   envelopes marked Y-1 through Y-6.

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter

1858

1      (The above-referred to Exhibit was published to the

2  jury.)

3  Q    Who filled out these envelopes, sir?

4  A    I did.

5  Q    And how do you know that?

6  A    My name and the Y-1 through Y-6 on the envelopes.

7  Q    And what does that Y stand for?

8  A    Y is the last letter -- I'm sorry, first letter in my

9  last name, Young.

10  Q    And is this your handwriting, sir?

11  A    Yes.

12  Q    And where did you recover this evidence; can you tell

13  from the markings on the outside of the envelope?

14  A    This evidence was recovered from the Nissan.

15  Q    And looking first, for example, at Y-1.  What did you

16  indicate Y-1 contained?

17  A    The deformed copper-jacketed bullet.

18  Q    And where did you indicate within the Nissan you

19  recovered this?

20  A    That would be BHE-14.

21  Q    Does that stand for bullet hole entry?

22  A    That's correct.

23  Q    And in your report, did you document where on the Nissan

24  that was, for example?

25  A    Yes.

Victoria A. Torres Butler, CRR

Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1859

```
 1   Q     And where was that location?
 2              THE WITNESS:  Can I look at my notes, Your Honor?
 3              THE COURT:  Yes, if you need to refer to your
 4   report, you may.
 5              THE WITNESS:  Thank you.
 6              (Pause in the proceedings.)
 7   A     14 was on the top of the door jamb, on the driver's side.
 8   Q     And just as an example, is this what the item looked
 9   like (showing) --
10   A     Yes.
11   Q     -- that you recovered?
12   A     Yes.
13   Q     And how did you extract it from the door?
14   A     With pliers.
15   Q     And the rest of this evidence was also recovered from the
16   Nissan?
17   A     That's correct.
18   Q     And looking at it, does it all appear to be bullets or
19   bullet fragments?
20   A     Yes, that's correct.
21   Q     And you testified that you also recovered some ballistics
22   evidence from the Buick?
23   A     Yes.
24              MS. ARGENTIERI:  Looking at 14-A-1 in evidence,
25   which contains envelopes marked 22, 23, 24, 25, 26, 28, and
```

1    29.

2              (The above-referred to Exhibit was published to the

3    jury.)

4    Q    Are those envelopes you prepared, sir?

5    A    Yes, that's correct.

6    Q    And where does it indicate that these, that this

7    ballistics evidence was found?

8    A    This is recovered from the Buick.

9    Q    And just looking at it, your description of the evidence

10   contained in these envelopes is what?

11   A    .9-millimeter discharged shells.

12   Q    And just opening the envelope marked Y-23, is that what

13   it looked like (showing)?

14   A    Yes, that's correct.

15   Q    And can you tell from where in the Buick Y-22 through

16   Y-26 were recovered, based on your report?

17   A    Based on my report, the -- I'm sorry, the numbers again?

18   Q    Y-22 through Y-26.

19   A    That was recovered from the top of the rear deck of the

20   car, the back seat.

21   Q    When you say top of the rear deck of the car, can you

22   just describe to the jury what you're talking about?

23   A    Just the area of the back windshield where the speakers

24   might be.

25              MS. ARGENTIERI:  Showing you next 14-A-2 in

                        Victoria A. Torres Butler, CRR

                            Official Court Reporter

1861

1    evidence.  This contains items marked Y-7 through Y-12, and

2    Y-27.

3              (The above-referred to Exhibits were published to

4    the jury.)

5    Q    Are those, again, envelopes you filled out?

6    A    Yes, that's correct.

7    Q    And where was this ballistics evidence recovered from?

8    Which car?

9    A    This was also recovered from the Buick.

10   Q    And again, what type of evidence was this, generally?

11   A    These are discharged shells, .9-millimeter discharged

12   shells.

13   Q    And with regard to the envelopes marked Y-7 through Y-12,

14   looking at your report, can you determine from what part of

15   the Buick you recovered these items?

16   A    Yes, this was recovered in a bunch or cluster in the

17   right rear seat.

18   Q    And with regard to Y-27?

19   A    Y-27 was also recovered on the top deck of the back, near

20   the back windshield.

21             MS. ARGENTIERI:  This is 14-A-3 in evidence.  It

22   contains envelopes Y 13 through 21.

23             (The above-referred to Exhibit was published to the

24   jury.)

25   Q    Are those, again, envelopes that you filled out?

                  Victoria A. Torres Butler, CRR

                     Official Court Reporter

06 25 2012  maragni direct cross obondo miller lewis young

1862

```
1    A     Yes.

2    Q     And again, what category of evidence was recovered in

3    these envelopes?

4    A     These were .9-millimeter discharged shells from the

5    Buick.

6    Q     And with regard to 13 through 15, where were these

7    recovered from within the Buick?

8    A     These were also recovered on top of the right rear seat.

9    Q     And what about 16 and 17?

10   A     16 and 17 were also on the left rear seat, top of left

11   rear seat.

12   Q     And then, with regard to 18 through 21, where were they

13   recovered in the Buick?

14   A     They were recovered on the left rear passenger floor.

15   Q     So, where was the majority of the ballistics evidence

16   recovered from in the Buick?

17   A     On, in the rear, rear seat and rear floor.

18         MS. ARGENTIERI:  I'm sorry, there's just one more

19   envelope.  Government's Exhibit 14-B in evidence.  There are

20   envelopes marked Y 30, 31, and 32.

21         (The above-referred to Exhibits were published to

22   the jury.)

23   Q     Are those envelopes that you filled out?

24   A     Yes, that's correct.

25   Q     And where were they recovered from?
```

Victoria A. Torres Butler, CRR

Official Court Reporter

1863

1   A     They were recovered from the Buick.

2   Q     And what type of evidence was this?

3   A     This was also discharged shells.   .9-millimeter

4   discharged shells.

5   Q     Do you recall vouchering any other evidence on the Buick?

6   A     There was also a ski mask recovered.

7               MS. ARGENTIERI:   Judge, may I approach?

8               THE COURT:   Yes, you may.

9               MS. ARGENTIERI:   I'm showing the witness what's

10   marked as Government's Exhibit 15 for identification.

11               (Handing.)

12   Q     What is that?

13   A     This is the ski mask that was recovered.

14               May I take it out?

15   Q     Yes.   How do you know it's the key mask you recovered?

16   A     My initials are on the bottom.

17               MS. ARGENTIERI:   I move to admit Government's

18   Exhibit 15.

19               THE COURT:   Any objection?

20               MR. McMAHON:   No objection.

21               THE COURT:   Received.

22               (Government's Exhibit 15 was received in evidence.)

23               (The above-referred to Exhibit was published to the

24   jury.)

25               MS. ARGENTIERI:   Can I ask the witness just to hold

                           Victoria A. Torres Butler, CRR

                              Official Court Reporter

        06 25 2012   maragni direct cross obondo miller lewis young

1864

1    it up for the jury, Judge.

2              THE COURT:  Yes.  And this is 15?

3              MS. ARGENTIERI:  Yes, 15.

4              (Showing.)

5    Q    And where was that recovered in the Buick?

6    A    That was recovered on top of the left rear seat of the

7    Buick.

8              MS. ARGENTIERI:  Nothing further, Judge.

9              THE COURT:  Cross-examination?

10             MR. McMAHON:  Nothing, Judge.

11             THE COURT:  You may step down, thank you.

12             THE WITNESS:  Thank you.

13             (Witness excused.)

14

15

16

17

18

19

20

21

22

23

24

25

                    Victoria A. Torres Butler, CRR

                        Official Court Reporter


        06 25 2012  maragni direct cross obondo miller lewis young

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK

2  ------------------------------x

   UNITED STATES OF AMERICA    :

3               PLAINTIFF,     :    10CR147
                               :

4        versus                :    United States Courthouse
                               :    225 Cadman Plaza East

5                              :    Brooklyn, N.Y.  11201

   FRANK GUERRA,               :

6                              :    June 19, 2012
               DEFENDANT.      :    9:30 A.M.

7  ------------------------------x

8

                    TRANSCRIPT OF JURY TRIAL

9        BEFORE THE HONORABLE SANDRA L. TOWNES
            UNITED STATES DISTRICT COURT JUDGE

10

11 A P P E A R A N C E S:
   For the Government:

12

   LORETTA LYNCH

13 United States Attorney
   BY: NICOLE ARGENTIERI, ESQ.

14 RACHEL NASH, ESQ.
   ALLON LIFSHITZ, ESQ.

15 Assistant United States Attorney
   271 Cadman Plaza East

16 Brooklyn, New York  11201

17

18 For the Defendant:

19 GERALD J. MCMAHON, ESQ.
   MATHEW J. MARI, ESQ.

20 Court Reporter:
   Charisse Kitt, CRI, CSR, RPR, FCRR

21 225 Cadman Plaza East Rm N357
   Brooklyn, New York  11201

22 Tel: (718) 613-2606
   Fax: (718) 613-2696

23

24

25 Proceedings recorded by mechanical stenography, transcription
   by computer-aided transcription.

GOVERNMENT EXHIBIT
7008
10 CR 147 (DLI)

Proceedings

1

5                      **MATTHEW TORMEY,**

6   called as a witness, having been duly sworn, was examined and

7   testified as follows:

8              THE CLERK:  Please state and spell your name for the

9   record.

10             THE WITNESS:  Matthew Tormey.  M-a-t-t-h-e-w,

11  T-o-r-m-e-y.

12             MS. NASH:  May I inquire, Judge?

13             THE COURT:  Yes, you may.

14  DIRECT EXAMINATION

15  BY MS. NASH:

16  Q    Good morning.  Were you previously employed by the

17  Federal Bureau of Investigations?

18  A    Yes, I was.

19  Q    How long did you work for the FBI?

20  A    From 1991 through 1999.

21  Q    What was your title at the FBI?

22  A    Special agent.

23  Q    What squad did you work on when you first joined the FBI?

24  A    I did background investigations.

25  Q    Where did you go from there?

                          Tormey - Direct/Nash

 1    A      I went to a squad called C31 which was in the violent

 2    crimes program.

 3    Q      During what time period were you on Squad C31?

 4    A      Approximately 1993 through 1999.

 5    Q      What types of crimes did C31 investigate?

 6    A      We investigated a variety of violent crimes, including

 7    murder, drugs, truck highjackings, robberies.

 8    Q      Drawing your attention to the time period between 1995

 9    and 1999, what specifically are some of the crimes and

10    individuals you were investigating?

11    A      I was investigating a group of individuals that consisted

12    of an individual named John Pappa, Calvin Hennigar,

13    Frank Guerra, Anthony Russo, and others, relating to the

14    murder of -- the murders of --

15             MR. McMAHON:  Objection.

16             THE COURT:  Basis?

17             MR. McMAHON:  Judge, what his -- what his

18    investigatory process was is not relevant to the proceeding.

19             THE COURT:  No.  Overruled.

20    A      We were investigating the murder of -- murders --

21    murders, drug dealing, bank robberies, among some other

22    things.

23    Q      What were some of the murders you were investigating

24    during that time period?

25    A      Eric Curcio, Joseph Scopo, Rolando Rivera.

                     CHARISSE KITT, CRI, CSR, RPR, FCRR
                          Official Court Reporter

Tormey – Direct/Nash

1  Q    Did your duties while you were on C31 include conducting

2  surveillance?

3  A    Yes.

4  Q    Directing your attention to April 24th of 1998, were you

5  conducting surveillance that day?

6  A    Yes.

7  Q    Have you testified on previous occasions about

8  surveillance that you conducted on that day?

9  A    Yes.

10  Q    Have you reviewed that testimony to help refresh your

11  recollection about the surveillance you conducted?

12  A    Yes, I did.

13  Q    Did it, in fact, help refresh your recollection as to

14  what you observed on April 24th of 1998?

15  A    Yes, it did.

16  Q    In what area were you conducting surveillance on that

17  day?

18  A    Eleventh Avenue in Brooklyn.

19  Q    What is located at 11th Avenue in Brooklyn in 1998?

20  A    Romantique Limousines.

21       MS. NASH:  May I approach, Your Honor?

22       THE COURT:  Yes, you may.

23  Q    First I'm showing you Government Exhibit 214A and 214B.

24       Do you recognize those photographs?

25  A    Yes, I do.

Tormey – Direct/Nash

1   Q    Do they accurately depict your observations on April 24,

2   1998?

3   A    Yes, they do.

4            MS. NASH:  Government moves to admit 214A and B.

5            MR. McMAHON:  Judge, may I see them?

6            THE COURT:  Yes.

7            MR. McMAHON:  No objection.

8            THE COURT:  All right, I will receive Government

9   Exhibits 214A and 214B.

10           (Government's Exhibits 214A and 214B received in

11  evidence.)

12  Q    I'm showing you now Government Exhibit 214.  Are those

13  fair and accurate enlargements of Government Exhibits 214A and

14  -B?

15  A    Yes, they are.

16           MS. NASH:  The government moves to admit 214.

17           MR. McMAHON:  No objection.

18           THE COURT:  Received, 214.

19           (Government's Exhibit 214 received in evidence.)

20           MS. NASH:  May the witness step down, Your Honor?

21           THE COURT:  Yes.

22           MS. NASH:  Can you step down, sir.

23           (Witness complies.)

24  Q    Starting with the picture on the left-hand side of the

25  board, can you indicate the individuals in the picture?

Tormey – Direct/Nash

1        THE COURT:  Wait.  The picture on the left-hand side

2   of the board is what?

3        MS. NASH:  That is an enlargement of Exhibit 214A.

4        THE COURT:  Thank you.

5   A    The individual in the light colored shirt with the light

6   colored cup to his mouth is Allie Boy; and the individual next

7   to him in the darker -- it looks like a blue jean jacket and

8   hat is BF.

9   Q    What are the full names of those individuals?

10  A    Alphonse Persico and Frank Guerra.

11  Q    Could you put a sticker underneath the individual who you

12  identified as Alphonse Persico or Allie Boy.

13        (Witness complies.)

14  Q    And can you also put a sticker indicating the individual

15  you identified as BF Frank Guerra.

16        (Witness complies.)

17  Q    And similarly looking at the right-hand side picture,

18  which is Government Exhibit 214B or I should say an

19  enlargement of Government Exhibit 214B, can you identify the

20  individuals in the picture for the jury.

21  A    The individual with the light colored shirt is Allie Boy

22  and the individual in the jean jacket is BF.

23  Q    And once again, could you put a sticker indicating the

24  individual who is Alphonse Persico or Allie Boy.

25        (Continued on the next page.)

Tormey – Direct/Nash

1    Q    And can you do the same for Frank Guerra.

2            (Witness complies.)

3    Q    Thanks.  You can take your seat.

4            (Witness complies.)

5    Q    Directing your attention now to October 27, 1994; were

6    you working that day?

7    A    Yes.

8    Q    And in connection -- On that day were you also conducting

9    surveillance?

10   A    Yes, I was.

11   Q    In connection -- in connection with your observations on

12   October 27, 1994, did you prepare reports?

13   A    Yes, I did.

14   Q    Would those reports help refresh your recollection as to

15   what you observed and what you did?

16   A    Yes.

17            MS. NASH:  May I approach?

18            THE COURT:  Yes, you may.

19   Q    I'm showing you 3500MT28, 29, and 30.  Can you look at

20   those and tell me if those are the reports that you prepared

21   in connection with your work on October 27, 1994.

22            (Witness perusing.)

23   A    Yes, October 27th, 28th, and 31st [sic] of 1994.

24            THE COURT:  That's 28, 29, and 30?

25            THE WITNESS:  I'm sorry, October 27th --

                          Tormey — Direct/Nash

1            THE COURT:  No, the exhibit.

2            THE WITNESS:  Yes, 28, 29, and 30.

3            THE COURT:  Thank you.

4    Q    On October 27, 1994, where were you conducting

5    surveillance?

6    A    Seventh Avenue and 23rd Street in Brooklyn.

7    Q    What did you observe that day?

8    A    We were sitting on a U—Haul truck and we observed two

9    individuals go to the back of the truck remove a box, take it

10   to an apartment, return to the truck, take two more boxes out,

11   and then we approached them.

12   Q    What happened after that?

13   A    With regard —— What did we do after that?

14   Q    What, if anything, did you do with regard to the U—Haul

15   truck?

16   A    We looked in the rear of the U—Haul truck to see what the

17   contents of the truck were.  We also looked in the cabin to

18   see the contents of the cabin.

19   Q    What did you find in the U—Haul truck?

20   A    There was a load of hand—held games.

21   Q    What do you mean by load?

22   A    The truck was full with hand—held video games.

23   Q    What, if anything, else did you find in the truck?

24   A    We found a lease agreement for the rental of the truck.

25            MS. NASH:  May I approach, Your Honor?

                    CHARISSE KITT, CRI, CSR, RPR, FCRR
                         Official Court Reporter

Tormey − Direct/Nash

1    THE COURT:  Yes.

2  Q    Showing you first Exhibit 864.  Do you recognize that

3  document?

4  A    Yes, I do.

5  Q    What is that?

6  A    This is the copy of the lease agreement that was found in

7  the truck.

8  Q    The government moves to admit 864?

9    MR. McMAHON:  No objection.

10    THE COURT:  Received.

11    (Government's Exhibit 864 received in evidence.)

12  Q    I'm showing you now a series of photographs marked 865.

13  Do you recognize those?

14    THE COURT:  The series is marked 865?

15    MS. NASH:  Yes, Judge.  I can mark them 865A through

16  −E, if you'd prefer?

17    THE COURT:  Yes, I would.

18  A    Yes, I do.

19  Q    Are those −− what are they?  What are those photographs?

20  A    The first one which depicts −−

21  Q    Just describe it, yes, since I haven't moved them in.

22  A    The first one is a picture looking into the rear of the

23  truck and it depicts the boxes in the back of the truck.

24  Q    Are the remaining pictures accurate photographs of what

25  you observed inside the truck?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey — Direct/Nash

1   A    And inside the boxes, correct.

2           MS. NASH:  Government moves to admit 865A through

3   —E.

4           MR. McMAHON:  No objection.

5           THE COURT:  All right, I'll receive 865A, —B, —C,

6   —D, and —E.

7           (Government's Exhibits 865A through 865E received in

8   evidence.)

9   Q    Showing you first Government Exhibit 864; can you see

10  that on your screen?

11  A    Yes, I can.

12  Q    Can you indicate the name in which this agreement is in?

13  A    Anthony Russo.

14  Q    And can you indicate the date of the agreement?

15  A    October 26, 1994.

16  Q    In connection with this investigation, did you interview

17  Anthony Russo?

18  A    I did.

19  Q    What year was he born in?

20  A    It was 1939.  I don't see it on here.

21  Q    I'm showing you Exhibit 865, which we will mark as 865A;

22  it's the first page of the photographs you reviewed.

23          What does that depict?

24  A    That's a view into the back of the truck that we were

25  surveilling that morning.

Tormey – Direct/Nash

1  Q    Continuation of 865 which we will mark 865B.

2  A    This is a close --

3  Q    What does that depict?

4  A    This is a closeup of some of the boxes that were in the

5  truck.

6  Q    And can you read the names of the -- or what is indicated

7  on the boxes?

8  A    Mortal Combat, The Lion King, Mighty Morphin Power

9  Rangers.

10  Q   Third page of 865 through label 865C.

11  A   That's a picture of a Mortal Combat game.

12  Q   865D?

13  A   Picture of the Power Rangers game.

14  Q   And 865E?

15  A   Picture of Lion King Game.

16  Q   Do you know approximately how many cases of video games

17  were in this U-Haul truck?

18  A   Approximately 570.

19  Q   About how many games are in each case?

20  A   Twenty-four.

21  Q   What, if anything, did you discover about the U-Haul

22  truck?

23  A   It had been reported stolen by Mr. Russo.

24  Q   In connection with the investigation that you were

25  conducting between 1995 and 1999, that you have testified

Tormey – Direct/Nash

1  about earlier, what, if any, court orders did you obtain in

2  1998?

3  A    We obtained a court order for blood samples from some of

4  the -- from some of the individuals we were investigating.

5  Q    Who are some of the individuals that you obtained a court

6  order for blood samples for?

7  A    John Pappa, Anthony Russo, Frank Guerra.

8            MS. NASH:  Thank you.  May I have a moment?

9            THE COURT:  Yes.

10           (Pause.)

11           MS. NASH:  No further questions.  Thank you.

12           THE COURT:  Cross-examination.

13           MR. McMAHON:  Yes.

14  CROSS-EXAMINATION

15  BY MR. McMAHON:

16  Q    Former Agent Tormey, what do you do now for a living?

17  A    I'm a compliance officer.

18  Q    What company?

19  A    Pardon me?

20  Q    For a corporation?

21  A    Yes, correct.

22  Q    Now, you said that part of your job was doing

23  surveillances.  Is that correct, sir?

24  A    Correct.

25  Q    And when you do a surveillance, is it generally a two-man

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey - Cross/McMahon

1  team? one-man team? how did you do that?

2  A    It varies.  There are teams; usually at least two people.

3  It could be a team of multiple people.

4  Q    And one person would likely have a camera and the other

5  one would be making notes.  Is that correct, sir?

6  A    Possibly.

7  Q    Now, C31 investigated, I guess, activities of some

8  organized crime, Colombo family.  Was that part of C31's

9  jurisdiction, shall we say?

10  A    It -- it could.  It wasn't technically.  We investigated

11  violent crimes.

12  Q    Okay.

13       Now, Johnny Pappa was pretty much a homicidal

14  maniac?

15       MS. NASH:  Objection.

16       THE COURT:  Yes, sustained.

17  Q    Was John Pappa the focus of your investigation for many

18  years?

19  A    Yes.

20  Q    He killed a lot of people?

21  A    He killed people.

22  Q    More than five?

23  A    He was convicted of --

24  Q    I didn't ask what he was convicted of.  You told us who

25  you investigated and everything.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey – Cross/McMahon

 1  A    Right.

 2  Q    Did he kill more than five people?

 3  A    We were investigating multiple homicides.  I don't recall

 4  the specific number.

 5  Q    Okay.

 6       Now, you did a lot of surveillances in your career

 7  as an agent?

 8  A    Yes.

 9  Q    And you took a lot of pictures?

10  A    Again, I'm not sure what you mean by "a lot."  I took

11  pictures on my surveillances, yes.

12  Q    Well, I'm talking about your surveillances.  Did you take

13  pictures?

14  A    I took pictures during surveillances, yes.

15  Q    Do you have a problem with the word "lot"?

16       MS. NASH:  Objection.

17  Q    I want to know how many pictures did you take in your

18  career.  Did you take more than 50 pictures in your career?

19  A    I don't recall specifically.

20  Q    As you sit here today you don't know if you took

21  thousands or 2,000 pictures?

22       MS. NASH:  Objection.

23       THE COURT:  No, overruled.

24  A    Correct.

25  Q    But you took lots of pictures?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey – Cross/McMahon

1   A    I took lots of pictures during surveillances yes.

2   Q    And these were the only two that you could find

3   Frank Guerra in?

4            MS. NASH:  Objection.

5            THE COURT:  No, overruled.

6   A    I didn't look for pictures.

7   Q    So you were just basically handed these to identify?

8   A    Correct.

9   Q    Now, do you know whether or not you did a surveillance

10  leading to these pictures.  Is that correct, sir?

11  A    Correct.

12  Q    Now, did you continue surveillance and follow them to

13  Allie Boy Persico's boat?

14  A    No.

15  Q    Where did they go after this picture?

16  A    They headed into Staten Island.

17  Q    Okay.

18           Now, did you see whether or not on one of these

19  occasions they were researching or checking out locations for

20  a bagel store on Staten Island?

21  A    I don't have any idea.

22  Q    Did you see them go into locations at strip malls that

23  had stores in them?

24  A    We followed them from Romantique until they went over the

25  Verrazano Bridge and they were gone.

1013
Tormey - Cross/McMahon

1   Q    Now, you said on direct examination that you were

2   investigating John Pappa, Calvin Hennigar, Frank Guerra, and

3   Anthony Russo.  Is that who you said you were investigating

4   between 9 '5 and '99?

5   A    Among others, correct.

6   Q    Among others were Dino Basciano?

7   A    Dino Basciano had been arrested prior to that.

8   Q    Okay.  Frank Iborti?

9   A    Who?

10  Q    Frank -- Joseph Iborti?

11  A    He had been arrested prior to that.

12  Q    Well, he was arrested in December of '94?

13  A    Correct.

14  Q    And you spent a lot of time with Joseph Iborti?

15  A    I spent time with Joseph Iborti, yes.

16  Q    And you investigated crimes that Joseph Iborti committed,

17  did you not?

18  A    I didn't investigate Joseph Iborti.

19  Q    Did you investigate crimes -- some of the crimes he

20  committed?

21  A    Joseph Iborti provided --

22  Q    It's a yes or no answer, sir.

23       Did you investigate some of the crimes that Joseph

24  Iborti committed?

25  A    Yes.

1014

Tormey – Cross/McMahon

1  Q   Now, you were also investigating John Sparacino?

2  A   Correct.

3  Q   Sal Sparacino?

4  A   Correct.

5  Q   Eric Curcio?

6  A   Correct.

7  Q   Rolando Rivera?

8  A   Murder of Rolando Rivera.

9  Q   So is there some reason –– well, withdrawn.

10       Now, you took –– you got a court order for DNA and

11 blood samples of Mr. Guerra in 1998.  Is that correct, sir?

12 A   Correct.

13 Q   And he voluntarily complied with your request and

14 provided that information?

15 A   To my recollection, yes.

16 Q   And he was not arrested as a result of providing that

17 scientific evidence?

18 A   Correct.

19 Q   Now, you testified in the grand jury that Curcio and

20 Pappa shot Joe Scopo.  Is that correct, sir?

21       MS. NASH:  Objection:  Outside the scope.

22       THE COURT:  Overruled.

23 A   John Pappa shot Joe Scopo, is what I recall.

24 Q   All right.

25       Directing your attention to 3500MT23, page 19.  If I

Tormey - Cross/McMahon

 1    may approach.

 2            (Handing.)

 3    Q    Take a look at page 19 of that testimony and see if that

 4    refreshes your recollection.

 5            (Witness perusing.)

 6    A    Okay.

 7    Q    Does that refresh your recollection, sir, that you

 8    testified under oath in the grand jury that Johnny Pappa and

 9    Eric Curcio got out of the car and shot Joe Scopo on

10    October 23, 1993?

11    A    That's not accurate.

12    Q    I didn't ask you if that's accurate.  I asked you did you

13    testify under oath in the grand jury on that day?

14    A    I testified under oath in the grand jury that day that

15    Pappa and Curcio got out of the vehicle and Scopo was shot and

16    killed.

17    Q    And did you certainly mean to suggest to the grand jury

18    that day that Curcio and Pappa shot Scopo?

19    A    No, Pappa shot Scopo.

20    Q    But standing next to him getting out of the car with him

21    was Eric Curcio.  Is that correct, sir?

22    A    Correct.

23    Q    Not John Sparacino?

24    A    I'm not sure what you're asking me.

25    Q    Okay.

Tormey - Cross/McMAHON

1           But that was your testimony in October, what was

2   that, 1996, or '4?

3   A     That is a piece of my testimony.

4   Q     Well, you have the first page of your testimony.  Does

5   that refresh your recollection as to the date of your

6   testimony?

7   A     I'm sorry.  When I say it was a piece of my testimony, it

8   was several hours of testimony.  This is a page of the

9   testimony, correct.

10  Q     I understand.  But you do try to be truthful on each and

11  every sentence you say in the grand jury?

12  A     Absolutely.

13  Q     You don't just sort of give several hours and then maybe

14  have a sentence or two?

15          MS. NASH:  Objection.

16          THE COURT:  Yes.  You know, there are -- first of

17  all, there isn't any indication that he lied.

18          MR. McMAHON:  I'm not saying he lying, Judge.  What

19  I'm saying is maybe he's mistaken; maybe he's truthful.

20  Q     Did you testify under oath in the grand jury that

21  Eric Curcio and John Pappa got out and Pappa shot Scopo?

22  A     I testified that, yes, Pappa and Curcio got out of the

23  car and Scopo was shot.

24  Q     Okay.

25          Now, when you go into the grand jury to testify,

Tormey – Cross/McMahon

1  it's like anywhere from 15 to 23 people that are there.  Is

2  that correct, sir?

3  A     Yes.

4  Q     Civilian people?

5  A     Yes.

6  Q     You raised your right hand swear to tell the truth?

7  A     Yes.

8  Q     And you were absolutely truthful to the best of your

9  recollection, to the best of your knowledge.  Is that correct,

10 sir?

11 A     Yes.

12 Q     That's what you said in the grand jury on October --

13 October 10, 1996.  Is that correct, sir?

14 A     If that's the date there, yes.

15 Q     Okay.

16        Now, you also told the grand jury that the order to

17 kill Scopo came from Jo Jo Russo and Joe Monte.  Is that

18 correct, sir?

19 A     I don't specifically recall.

20 Q     Let me refresh your recollection.

21        3500MT25, this would be pages 20 and 21.

22        MR. McMAHON:  May I approach the witness, Your

23 Honor?

24        THE COURT:  Yes, you may.

25 Q     Bottom of page 20, top of page 21.

Tormey – Cross/McMahon

1    (Witness perusing.)

2    Q    Does that refresh your recollection, sir, that you

3    testified in the grand jury on that occasion under oath that

4    the order to kill Scopo came from Jo Jo Russo and Joe Monte?

5    A    I testified that I was told by a cooperator that another

6    individual had received the authorization from Joe Monte and

7    Jo Jo Russo, correct.

8    Q    And the person they were talking about killing was

9    Joe Scopo.  Is that correct, sir?

10   A    Correct.

11   Q    Now, on that same grand jury appearance, sir, and I would

12   refresh your recollection perhaps to December 9, 1997, did you

13   also make it clear at that grand jury appearance that they --

14   that they, Pappa and Curcio, killed -- they shot Scopo

15   referring to Pappa and Curcio?

16   A    I don't recall.

17   Q    All right.

18        MR. McMAHON:  If I may approach, Your Honor.

19   Q    Page 19, and I'll hand you the cover page so you can see

20   the date.

21        (Witness perusing.)

22   A    I testified that --

23   Q    Yes or no, sir?

24   A    What's the question?

25   Q    You're an attorney, are you not, Mr. Tormey?

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey - Cross/McMahon

1        MS. NASH:  Objection.

2        THE COURT:  Yes, sustained.  What's the question?

3   Do you want it --

4   Q    Does that refresh your recollection that you testified in

5   the grand jury under oath that they, referring to Pappa and

6   Curcio, shot Scopo.  Yes or no?

7   A    No.

8   Q    All right.  Line --

9        MR. McMAHON:  If I may read the question and answer

10  to him, Your Honor?

11       THE COURT:  Yes.

12  Q    "QUESTION: -- at line 14 -- and again, I would ask you to

13  describe for the grand jury, in substance, what you learned

14  from Mr. Iborti?

15       "ANSWER:  Pappa told Iborti that he, Curcio,

16  Sparacino, Anthony Russo, and Frank Guerra were responsible

17  for killing Joe Scopo.  He stated that he was the one who

18  actually -- that he and Curcio got out of the car and he was

19  the one that actually killed Scopo.  And after they shot

20  Scopo, Sparacino had taken off in the car and they were forced

21  to run three blocks to get to a getaway car.

22       Did you give those answers -- that answer to that

23  question?

24  A    That's correct.

25  Q    Now, when you said they shot Scopo, who was the "they"

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey - Cross/McMahon

1    that you were referring to in that sentence?

2    A    What it says is that --

3    Q    Who is the "they"?

4    A    Pappa told --

5    Q    Who were you referring to?

6    A    Pappa told Iborti that I --

7    Q    Sir, who is the "they?"  Those are your words.  Who is

8    the "they" that shot Scopo?  In your words, who were you

9    referring to with that pronoun?

10   A    I think it's clear that Pappa -- Iborti told Pappa or

11   Pappa told Iborti.

12   Q    Sir, sir, just answer my question.  I just read to you

13   what you said.

14        MS. NASH:  Objection.

15   Q    Who is the "they"?

16   A    I'm trying to answer your question.

17   Q    Can you associate -- can you put names to "they"?

18   A    The individuals that were present when Scopo was shot.

19   Q    No, no, sir.  I didn't ask you -- the question was that

20   after they shot Scopo, this is Matt Tormey in the grand jury

21   on November -- on December 9, 1997, under oath?

22   A    Correct.

23   Q    When you told that to the grand jury, when you said they

24   shot Scopo, were you referring to Curcio and Pappa?

25   A    I was referring to whoever was named there.

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey - Cross/McMahon

```
1    Q    Now, are you a lawyer, sir?
2              MS. NASH:  Objection.
3              THE COURT:  Well, you're a lawyer.  He can answer
4    the question.
5    A    Yes, not practicing lawyer.
6    Q    Well, that's okay.  It's a noble profession.
7              And this was based on information from Iborti?
8    A    Correct.
9    Q    And he had told you that Sparacino took off in the car
10   and Pappa and Curcio had to run three blocks to the get-away
11   car?
12   A    I believe that's correct.
13   Q    And the get-away car was Eric Curcio's Green Honda?
14   A    I don't recall.
15             MR. McMAHON:  Nothing further, Judge.
16             THE COURT:  Any redirect?
17             MS. NASH:  Yes, Judge, briefly.
18   REDIRECT EXAMINATION
19   BY MS. NASH:
20   Q    At the time that you provided grand jury testimony, was
21   anyone who was directly involved in the Scopo murder was
22   present at the time of the Scopo murder cooperating with the
23   government?
24   A    Anyone who was present at the scene of the murder?
25   Q    Correct.
```

CHARISSE KITT, CRI, CSR, RPR, FCRR
Official Court Reporter

Tormey – Redirect/Nash

1    A    No.

2          THE PLAINTIFF:  No further questions.

3    RECROSS-EXAMINATION

4    BY MR. McMAHON:

5    Q    Agent -- Mr. Tormey, are you suggesting that

6    Anthony Russo is being truthful and Mr. Iborti and Pappa lied?

7          MS. NASH:  Objection.

8          THE COURT:  Yes, objection is sustained.  Improper

9    question.

10   Q    Well, when you told the grand jury what cooperating

11   witnesses tell you, you have every reason to believe that the

12   information you're being given is truthful.  Is that correct,

13   sir?

14   A    Correct.

15   Q    You would not be telling grand jurors, who are deciding

16   whether or not to indict somebody, information that you think

17   is sketchy or a little fuzzy, would you, sir?

18   A    Correct.

19   Q    And you did not in anyway suggest to the grand jury that

20   per this evidence on these days, that you thought that the

21   information maybe wasn't true, did you?

22   A    No.

23          MR. McMAHON:  Nothing further.

24          THE COURT:  All right.

25          MS. NASH:  Nothing further.

FD-302 (Rev. 3-10-82)

GOVERNMENT
EXHIBIT
**7009**
10 CR 147 (DLI)

GOVERNMENT
EXHIBIT
**3500-MT-28**
10 CR 147 (SLT)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription        10/28/94

        At approximately 6:00am, surveillance was initiated in
the vicinity of 7th Avenue and 23rd Street in Brooklyn, New York.
Parked on 23rd Street, between 6th and 7th Avenues, was a Uhaul
straight truck, orange and white in color, bearing Pennsylvania
license "YF 08922" (Hereinafter, "the Uhaul").

        At approximately 11:20am, two male whites (Unsub #1 and
Unsub #2) were observed approaching the rear of the Uhaul and
opening the back door. They removed one box, closed the door, and
carried the box into an apartment across the street. Unsubs #1
and #2 thereafter returned to the truck, again opened the back
door, and began removing boxes and placing them on the sidewalk.

        Special Agents Matthew F. Tormey and George Wright
approached Unsub #1 and Unsub #2, identified themselves as
Special Agents of the FBI, and temporarily detained Unsubs #1 and
#2. The individuals were identified as ▮▮▮▮▮▮▮▮ and
▮▮▮▮▮. They stated that they did not rent the truck nor did
they know who rented the truck. They saw the truck park there the
previous night, October 26, 1994, and observed the driver get out
of the truck and run into the graveyard. The driver never came
back and they wanted to know what the truck contained. They
stated that they had no intention of stealing the entire truck.
Thereafter, they were turned over to the custody of the local
Police.

        A silver "Guard Security" lock was found at the rear of
the Uhaul and in the cab of the Uhaul was a rental agreement in
the name of ANTHONY RUSSO, ▮▮▮▮▮▮▮▮ Brooklyn, New York,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The
Uhaul contained 570 cases of assorted Tri-Action Video games.

Investigation on    10/27/94    at   BROOKLYN, NEW YORK    File # ▮▮▮▮▮▮▮

by   SA's  MATTHEW F. TORMEY and GEORGE WRIGHT  Date dictated    10/28/94

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)

███████████████

Continuation of FD-302 of _____ , On  10/27/94 , Page   2

### The following identifying information was obtained:

UNSUB #1:
    NAME:                            ██████████
    RACE:                            WHITE
    SEX:                             MALE
    DOB:                             ████████
    ADDRESS:                     ████████████████████

    TELEPHONE:                  ████

_____ #2:
    NAME:                            ███████████
    RACE:                            WHITE
    SEX:                             MALE
    DOB:                             ████████████
    ADDRESS:                     ████████████████████

    TELEPHONE:                  ████████████████████

Case 1:10-cr-00147-DLI   Document 846-4   Filed 09/21/16   Page 190 of 206 PageID #:GOVERNMENT

FD-302 (Rev. 3-10-82)

GOVERNMENT
EXHIBIT
**7010**
10 CR 147 (DLI)



GOVERNMENT
EXHIBIT
**3500-MT-29**
10 CR 147 (SLT)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___10/28/94___

     Photographs were taken of an orange and white Uhaul truck, Pennsylvania license "YF 08922", and the contents which consisted of 570 cases of assorted hand held video games including "Lion King", "Mortal Kombat", and "Power Rangers".

     An inventory of the passenger section of the truck revealed the following items:

     (1) one package of "KOOL" cigarettes (on front seat); and
     (2) one package of "Marlboro" cigarettes (on floor of passenger side).

     The truck was dusted for fingerprints and one lift was taken from the driver's side view mirror and two were taken from the outside of the passenger door, below the door handle.

     The odometer read 78,190.7 and the gas needle was between Empty and 1/8 of a tank.

---

Investigation on ___10/28/94___ at ___BROOKLYN, NEW YORK___ File # ▇▇▇▇▇▇▇

by ___SA MATTHEW F. TORMEY___ Date dictated ___10/28/94___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 3-10-82)

GOVERNMENT
EXHIBIT
**7011**
10 CR 147 (DLI)



- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____10/31/94_____

       Photographs were taken of the following items which constitute samples of items found in a Uhaul truck Pennsylvania license "YF 08922" which was recovered on October 27, 1994:

    1) ONE CARTON "LION KING" HAND HELD VIDEO GAMES;

    2) ONE CARTON "MORTAL KOMBAT" HAND HELD VIDEO GAMES; and

    3) ONE CARTON "POWER RANGERS" HAND HELD VIDEO GAMES.

       There were twenty-four games in each carton. The labels had been removed from the outside boxes.

       These items are being maintained for evidentiary purposes.

---

Investigation on ___10/31/94___ at ___QUEENS, NEW YORK___ File # ▓▓▓▓▓▓

by ___SA MATTHEW F. TORMEY___ Date dictated ___10/31/94___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GOVERNMENT
EXHIBIT
**3500-AR-9(b)**
10 CR 147 (DLI)

TM:EAG
F.#2010R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

                            I N D I C T M E N T

ANDREW RUSSO,
    also known as "Mush,"
RALPH ARPAIO,
JOHN AZZARELLI,
    also known as "Johnny Cash,"
DANIEL BOGAN,
ANTHONY CALABRO,
    also known as "Nooch,"
ROGER CALIFANO,
DANIEL CAPALDO,
JOSEPH CARNA,
    also known as "Junior
    Lollipops,"
MICHAEL CASTELLANO,
    also known as "Big Mike,"
BENJAMIN CASTELLAZZO,
    also known as "Benji,"
    "The Claw" and "the Fang,"
DENNIS DELUCIA,
    also known as "Fat Dennis,"
    "Little Dennis" and "the
    Beard,"
GIUSEPPE DESTEFANO,
    also known as "Pooch,"
JOSEPH DIMARCO,
JOHN DUNN,
    also known as "Johnny Five,"
ANTHONY DURSO,
    also known as "Baby Fat
    Larry" and "BFL,"
SCOTT FAPPIANO,
EMANUELE FAVUZZA,
    also known as "Manny,"
VINCENT FEBBRARO,
    also known as "Jimmy Gooch,"
RICHARD FUSCO,
    also known as "Richie,"

Cr. No. _____
(T. 18, U.S.C., §§ 371,
892(a), 893, 894(a)(1),
922(g)(1), 924(a)(2),
924(c)(1)(A)(i),
924(c)(1)(A)(ii), 924(d),
981(a)(1)(C), 982,
982(a)(2)(A), 1343, 1349,
1951(a), 1952(a)(3)(A),
1955(a), 1955(d), 1956(h),
1962(d), 1963, 1963(a),
1963(m), 2342(a), 2344(a),
2 and 3551 et seq.; T. 21,
U.S.C., §§ 841(a)(1),
841(b)(1)(D), 846, 853(a),
853(p); T. 28, U.S.C.,
§ 2461(c))

GAETANO GALLO,
     also known as "Tommy,"
GIOVANNI GALLUZZO,
     also known as "John,"
ALI JUSEINOSKI,
JOHN MAGGIO,
REYNOLD MARAGNI,
     also known as "Ren" and
     "Reynolds,"
HECTOR PAGAN,
     also known as "Junior,"
THEODORE PERSICO, JR.,
     also known as "Teddy" and "the
     kid,"
FRANK PONTILLO,
     also known as "Frankie Steel,"
NICKY RIZZO,
JACK RIZZOCASCIO,
     also known as "Jack the Whack,"
JOHN ROSSANO,
ANTHONY RUSSO,
     also known as "Big Anthony,"
JOSEPH SAVARESE,
RALPH SCOPO, JR.,
FRANK SENATORE,
     also known as "Buzz,"
ILARIO SESSA,
     also known as "Larry," "Fat
     Larry" and "FL,"
ANGELO SPATA,
     also known as "Little Angelo,"
LOUIS VENTURELLI,
     also known as "Louie Ices,"
JOSEPH VIRZI and
VITO VIZZI,

             Defendants.

- - - - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

## INTRODUCTION TO ALL COUNTS

      At all times relevant to this Indictment, unless otherwise indicated:

2

The Enterprise

1.    The members and associates of the Colombo
organized crime family of La Cosa Nostra constituted an
"enterprise," as defined in Title 18, United States Code, Section
1961(4), that is, a group of individuals associated in fact
(hereinafter, the "Colombo crime family" and the "enterprise").
The enterprise constituted an ongoing organization whose members
functioned as a continuing unit for a common purpose of achieving
the objectives of the enterprise.  The Colombo crime family
engaged in, and its activities affected, interstate and foreign
commerce.  The Colombo crime family was an organized criminal
group that operated in the Eastern District of New York and
elsewhere.

2.    La Cosa Nostra operated through organized crime
families.  Five of these crime families - the Bonanno, Colombo,
Gambino, Genovese and Luchese crime families - were headquartered
in New York City and supervised criminal activity in New York, in
other areas of the United States and, in some instances, in other
countries.  Another crime family, the Decavalcante crime family,
operated principally in New Jersey, but from time to time also in
New York City.

3.    The ruling body of La Cosa Nostra, known as the
"Commission," consisted of leaders from each of the crime
families.  The Commission convened from time to time to decide

3

certain issues affecting all of the crime families, such as rules
governing crime family membership.

        4.    The Colombo crime family had a hierarchy and
structure.  The head of the Colombo crime family was known as the
"boss."  The Colombo crime family boss was assisted by an
"underboss" and a counselor known as a "consigliere."  Together,
the boss, underboss and consigliere were the crime family's
"administration."  With the assistance of the underboss and
consigliere, the boss was responsible for, among other things,
setting policy and resolving disputes within and between La Cosa
Nostra crime families and other criminal groups.  The
administration further supervised, supported, protected and
disciplined the lower-ranking participants in the crime family.
In return for their supervision and protection, the
administration received part of the illegal earnings generated by
the crime family.  Members of the Colombo crime family served in
an "acting" rather than "official" capacity in the administration
on occasion due to another administration member's incarceration
or ill health, or for the purpose of seeking to insulate another
administration member from law enforcement scrutiny.  Further, on
occasion, the Colombo crime family was overseen by a "panel" of
crime family members that did not include the boss, underboss
and/or consigliere.

                            4

5.    Below the administration of the Colombo crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

6.    Only members of the Colombo crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been "straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who nonetheless engaged in criminal activity for, and under the protection of, the crime family.

7.    Many requirements existed before an associate could become a member of the Colombo crime family. The Commission of La Cosa Nostra from time to time limited the number of new members that could be added to a crime family. An associate was also required to be proposed for membership by an existing crime family member. When the crime family's administration considered the associate worthy of membership, the administration then circulated the proposed associate's name on a

5

list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

### Methods and Means of the Enterprise

8. The principal purpose of the Colombo crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

9. Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the

6

members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

10. The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities. That conduct included a commitment to murdering persons, particularly members or associates of the crime families, who were perceived as potential witnesses against members and associates of the enterprise.

11. Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

## The Defendants

12. At various times relevant to this Indictment, the defendant ANDREW RUSSO, also known as "Mush," was a street boss, captain, soldier and associate within the Colombo crime family.

13. At various times relevant to this Indictment, the defendant BENJAMIN CASTELLAZZO, also known as "Benji," "the Claw" and "the Fang," was an underboss, captain, soldier and associate within the Colombo crime family.

7

14.   At various times relevant to this Indictment, the defendants JOSEPH CARNA, also known as "Junior Lollipops," DENNIS DELUCIA, also known as "Fat Dennis," "Little Dennis" and "the Beard," REYNOLD MARAGNI, also known as "Ren" and "Reynolds," and ANTHONY RUSSO, also known as "Big Anthony," were captains, soldiers and associates within the Colombo crime family.

15.   At various times relevant to this Indictment, the defendants EMANUELE FAVUZZA, also known as "Manny," VINCENT FEBBRARO, also known as "Jimmy Gooch," NICKY RIZZO, JOSEPH SAVARESE and RALPH SCOPO, JR. were soldiers and associates within the Colombo crime family.

16.   At various times relevant to this Indictment, the defendants DANIEL BOGAN, ANTHONY CALABRO, also known as "Nooch," ROGER CALIFANO, MICHAEL CASTELLANO, also known as "Big Mike," GIUSEPPE DESTEFANO, also known as "Pooch," SCOTT FAPPIANO, ALI JUSEINOSKI, JACK RIZZOCASCIO, also known as "Jack the Whack," FRANK SENATORE, also known as "Buzz," ILARIO SESSA, also known as "Larry," "Fat Larry" and "FL," and ANGELO SPATA, also known as "Little Angelo," were associates within the Colombo crime family.

## COUNT ONE
### (Racketeering Conspiracy)

17.   The allegations contained in paragraphs 1 through 16 are realleged and incorporated as if fully set forth in this paragraph.

8

18. In or about and between June 1991 and January 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DANIEL BOGAN, ANTHONY CALABRO, also known as "Nooch," ROGER CALIFANO, JOSEPH CARNA, also known as "Junior Lollipops," MICHAEL CASTELLANO, also known as "Big Mike," BENJAMIN CASTELLAZZO, also known as "Benji," "the Claw" and "the Fang," GIUSEPPE DESTEFANO, also known as "Pooch," SCOTT FAPPIANO, EMANUELE FAVUZZA, also known as "Manny," VINCENT FEBBRARO, also known as "Jimmy Gooch," ALI JUSEINOSKI, NICKY RIZZO, JACK RIZZOCASCIO, also known as "Jack the Whack," ANTHONY RUSSO, also known as "Big Anthony," FRANK SENATORE, also known as "Buzz," and ANGELO SPATA, also known as "Little Angelo," together with others, being persons employed by and associated with the Colombo crime family, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of the racketeering acts set forth below. Each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

9

RACKETEERING ACT ONE
(Murder/Murder Conspiracy - Joseph Scopo)

19.    The defendant named below agreed to the commission
of the following acts, either one of which alone constitutes
Racketeering Act One:

A.    Conspiracy to Murder Joseph Scopo

20.    On or about and between June 20, 1991 and October
20, 1993, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendant ANTHONY
RUSSO, together with others, did knowingly and intentionally
conspire to cause the death of Joseph Scopo, contrary to New York
Penal Law Sections 125.25(1) and 105.15.

B.    Murder of Joseph Scopo

21.    On or about October 20, 1993, within the Eastern
District of New York, the defendant ANTHONY RUSSO, together with
others, with intent to cause the death of Joseph Scopo, did cause
his death, contrary to New York Penal Law Sections 125.25(1) and
20.00.

RACKETEERING ACT TWO
(Receipt of Stolen Property - Video Games)

22.    On or about and between October 20, 1994 and
October 27, 1994, both dates being approximate and inclusive,
within the Eastern District of New York and elsewhere, the
defendant ANTHONY RUSSO, together with others, did knowingly and
intentionally receive, possess, conceal, store, barter, sell and

10

dispose of goods, wares and merchandise, to wit: video games of a value of $5,000 or more, which goods, wares and merchandise had crossed a State boundary after being stolen, unlawfully converted and taken, knowing the same to have been stolen, unlawfully converted and taken, contrary to Title 18, United States Code, Sections 2315 and 2.

### RACKETEERING ACT THREE
(Wire Fraud - Personal Loans)

23. In or about and between 1995 and 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANTHONY CALABRO, MICHAEL CASTELLANO and FRANK SENATORE, together with others, did knowingly and intentionally devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: telephone calls in which the conspirators made false promises to fund personal loans and faxes of confirmation letters, contrary to Title 18, United States Code, Sections 1343 and 2.

24. It was a part of the scheme that the defendant MICHAEL CASTELLANO, together with others, placed advertisements in newspapers, falsely promising to loan money to individuals

11

GOVERNMENT
EXHIBIT
**3500-AR-9(c)**
10 CR 147 (DLI)

1
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - X

3  UNITED STATES OF AMERICA,    :
                                :
4                  Plaintiff,   :    11-CR-30
                                :
5        -against-              :    United States Courthouse
                                :
6                               :    Brooklyn, New York
                                :
7  JOHN DOE,                    :
                                :
8                  defendant.   :
                                :    May 6, 2011
                                :    3:00 p.m.
9  - - - - - - - - - - - - - X

10
                            SEALED
11                   TRANSCRIPT OF PLEADING
             BEFORE THE HONORABLE KIYO MATSUMOTO
12               UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Plaintiff:      LORETTA E. LYNCH, ESQ.
                            United States Attorney
15                          BY:  ALLON LIFSHITZ, ESQ.
                                 JAMES GATTA, ESQ.
16                          Assistant United States Attorneys

17  For the Defendant:      ALEXANDER EISEMANN, ESQ.
                            GEOFFREY S. STEWART, ESQ.
18

19

20
    Court Reporter:         FREDERICK R. GUERINO, C.S.R.
21                          225 Cadman Plaza East
                            Brooklyn, New York
22                          718-224-7686

23

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by CAT.

                FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

4

1          THE COURT:  Criminal cause for pleading, 11-CR-30,

2   United States of America v. Anthony Russo.

3          Would the parties state their appearances.

4          MR. LIFSHITZ:  Allon Lifshitz and James Gatta with

5   the United States.  With us joined at counsel table is

6   Special Agent Scott Curtis of the F.B.I.

7          Good afternoon.

8          THE COURT:  Good afternoon.

9          MR. EISEMANN:  Alex Eisemann for Mr. Russo.

10          Good afternoon.

11          THE COURT:  Good afternoon.

12          Good afternoon.  Mr. Russo.  How are you, sir?

13          Do you speak and understand English?

14          THE DEFENDANT:  Yes, I do.

15          (The defendant is sworn in at this time.)

16          THE COURT:  Mr. Russo, before deciding whether or

17   not to accept your guilty plea, there are a number of

18   questions that I must ask you in order to assure myself that

19   your plea is valid.  If you do not understand one of my

20   questions, please let me know and I will be glad to clarify.

21   All right, sir?

22          THE DEFENDANT:  Thank you.

23          THE COURT:  Do you understand that having been sworn

24   your answers to my questions will be subject to the penalty

25   of perjury or making false statements if you do not answer

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

1          THE COURT:  At this time, Mr. Russo, let's start

2     with Count One.  I would like you to tell me in your own

3     words what you did in connection with the acts set forth in

4     Count One of the indictment.

5          THE DEFENDANT:  Between the time of my release from

6     New York State custody, in or around the fall of '92 until

7     February 2011, I was associated with and was a member of the

8     Colombo Crime Family.

9          During that period, I committed a number of crimes,

10    including murder, murder conspiracy, narcotic trafficking,

11    extortion, loansharking, in furtherance of the Colombo Crime

12    Family.  I will describe six of those crimes.

13          In or about 1993, in Brooklyn, I agreed to help

14    other people kill Joey Scarpo, who was a member of the

15    Colombo Crime Family.

16          In or about October 20, 1993, I participated in the

17    murder with other people by driving them to the scene,

18    knowing their intent when they arrived was to kill Scarpo.

19          Between October 20 and October 27, 1994, in

20    Brooklyn, I agreed to purchase video games that had been

21    stolen in New Jersey, and I then attempted to complete that

22    purchase in a location here in Brooklyn.  At that time I

23    received a sample of the stolen property.  I attempted to

24    take possession of the rest of the stolen items.  I thought I

25    saw law enforcement personnel watching me, so I abandoned the

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

```
 1    items which were worth more than $5,000.
 2              THE COURT:  They were worth more than five thousand?
 3              THE DEFENDANT:  Yes.
 4              In or about September 2009, in the Eastern District
 5    of New York, I instructed other people to try to collect
 6    money owed by another individual.  When I gave these
 7    instructions, everyone involved understood that the efforts
 8    to collect the money would be backed up by intimidation and
 9    threats of violence.  That's how the Colombo family routinely
10    handles these types of clashes.
11              THE COURT:  Take your time, sir.
12              THE DEFENDANT:  In 2010, associates of another
13    organized crime organization stabbed an associate of the
14    Colombo Crime Family.  Between May 2010 and August 2010, I
15    arranged a series of meetings with members of that other
16    organization to seek monetary compensation for that stabbing.
17    In the meetings which took place in Brooklyn and in Staten
18    Island, the members of the other organization agreed to
19    compensate the stabbing victim.  It was clearly understood by
20    everyone involved that if these people didn't come through
21    with the compensation, in the future they would be subject to
22    violence.
23              In September of 2010, in Brooklyn, I sent an
24    individual to collect a debt from someone who was supposed to
25    obtain money for the wife of a member of the Colombo Crime
```

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER