UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA

      -v-

                                            10 CR 147 (DLI)

MICHAEL PERSICO,

        *Defendant*.

--------------------------------------------------------X

**DEFENDANT MICHAEL PERSICO'S
FATICO HEARING BRIEF**

| | | |
|---|---|---|
| Marc Fernich | Maurice Sercarz | Sarita Kedia |
| Law Office of Marc Fernich | Sercarz & Riopelle | Sarita Kedia Law Offices |
| 810 Seventh Avenue | 810 Seventh Avenue | 5 East 22nd Street |
| Suite 620 | Suite 620 | Suite 7B |
| New York, NY  10019 | New York, NY  10019 | New York, NY  10010 |
| (212) 446-2346 | (212) 586-4900 | (212) 681-0202 |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

LEGAL STANDARD...............................................................................................1

DISCUSSION .........................................................................................................2

  I. RUSSO'S RECORDED PRE-COOPERATION STATEMENTS
     UNDERMINE HIS HEARING TESTIMONY ..................................................3

    A.  Michael is "truly legitimate" and "has nothing to do with anything"...........................4

    B.  Russo would never "report" to Michael...................................................7

    C.  Russo has substantial motive to implicate Michael ......................................8

    D.  Russo knows how to make a deal with the government ...................................9

  II. RUSSO'S POST-COOPERATION CONTENTIONS .......................................10

    A.  THE OCTOBER 20, 1993 SCOPO HOMICIDE .......................................10

      1.  Russo's Concocted Testimony Regarding Michael .................................10

        a.  Michael tells Russo to see Curcio because he has a "line on Joey."................10

        b.  Russo tells Michael: "We need weapons." ......................................12

        c.  "Get this thing done before my brother goes to trial."...........................13

        d.  "Leave the gun in the car." ......................................................14

      2.  Russo's Additional Fabrications and Inconsistencies............................15

      3.  Additional Evidence Regarding the Scopo Homicide and
        Michael Persico's Lack of Involvement in the Colombo War .............................19

    B.  THE LOAN SHARKING ALLEGATIONS...............................................22

    C.  STOLEN VIDEO GAMES .............................................................24

    D.  THE ALLEGED EXTORTION..........................................................24

CONCLUSION........................................................................................25

## PRELIMINARY STATEMENT

We respectfully submit this brief in opposition to the government's application for the Court to consider certain unconvicted conduct in sentencing Michael Persico. Based on representations that the government could prove certain unconvicted conduct against Mr. Persico by a preponderance of the evidence, the Court ordered a *Fatico* hearing.  *See* Transcript of Proceedings dated 6/3/16.  The government called only one witness, Anthony Russo, who began cooperating after his January 2011 arrest for murder and other serious crimes. Each party is submitting additional evidence it asks the Court to consider in determining whether the government has met its burden of proof, as well as argument on its position.  For the following reasons, we respectfully submit that the government's evidence falls far short of preponderant proof.

## LEGAL STANDARD

For sentencing purposes, the government bears the burden of proving "disputed factual allegations" by a "preponderance of evidence." *U.S. v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003) (internal citation omitted).[1]  Although "meeting the preponderance-of-the-evidence standard is not an exacting exercise, [ ] it is also not a meaningless one."  *U.S. v. Assorted Jewelry Approximately Valued of $44,328.00*, No. 14-1175, 2016 WL 4205866 (1st Cir. Aug. 10, 2016).  It is a significantly "heighten[ed] [ ] standard of proof from the less-burdensome probable cause standard" applied to secure an indictment. *Id.  See also U.S. v. Hussain*, No. 14 Cr. 4425, 2016 WL 4536516 (2d Cir. Aug. 31, 2016) (preponderance standard considerably stricter than reasonable suspicion or probable cause).

In determining whether to consider disputed allegations, "a district court's findings must be grounded in the evidence and not derive from mere speculation." *U.S. v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) (citation omitted).  Rather, the evidence must bear "sufficient indicia of

---

[1] While recognizing that the Second Circuit currently applies the preponderance standard, we maintain that unconvicted conduct should not be considered at sentencing.  *See Jones v. U.S.*, 135 S. Ct. 8, 8 (2014) (Scalia, Thomas and Ginsburg, JJ., dissenting from certiorari denial).

reliability to support its probable accuracy." *U.S. v. Cruz*, 586 Fed. Appx. 36, 38 (2d Cir. 2014) (summary order) (quoting U.S.S.G. § 6A1.3 & cmt.).

Further, "the preponderance standard is no more than a ***threshold*** basis for adjustments and departures, and the weight of the evidence … should be considered." *U.S. v. Gigante,* 94 F.3d 53, 56 (2d Cir. 1996) (emphasis in original). Indeed, although "the applicable standard of proof for enhancements is preponderance of the evidence, [ ] a downward departure [or variance] may be warranted, depending on the extent of the sentence increase resulting from such enhancements and the probative force of the evidence supporting them." *U.S. v. Norris*, 281 F.3d 357, 359 (2d Cir. 2002).

## DISCUSSION

In attempting to prove unconvicted conduct, the government relies exclusively on unsubstantiated testimony from Russo, a career criminal who has spent his entire life lying and deceiving law enforcement officials.  By his own admission, Russo is incapable of "change" (Audio Rec. and Tr., Ex. A and A(T))[2] and his testimony regarding Mr. Persico is wholly unworthy of belief.  Indeed, despite a 20-year investigation of Mr. Persico's activities due to his last name and blood relations, the government has no proof – direct or circumstantial – to corroborate Russo's claims.  This is true even though the government has had 25 years' access to dozens of cooperating witnesses – from the early 1990s to date – who were Colombo members and associates during the war period.  In fact, its cooperators made thousands of hours of recordings detailing years of criminal activity by the Colombo family.  To boot, the government tried to substantiate Russo's claims even after he began cooperating, blanketing virtually every contact of Mr. Persico's with subpoenas demanding information "from 1990 to the present."  *See, e.g.*, Grand Jury Subpoena, Ex. G. Still, the government turned up no evidence to support Russo's contentions.

---

[2] The audio files are being provided on compact disk.  In the Court's hard copy of exhibits, recording transcripts can be found under the exhibit letter matching the audio file.

2

But that is just the beginning.  ***After Russo started cooperating, he destroyed the only piece of corroboration he would have possessed if he were telling the truth about Mr. Persico***. The only rational inference is that the evidence would have vitiated – not validated – his claims.

## I.   RUSSO'S RECORDED PRE-COOPERATION STATEMENTS UNDERMINE HIS HEARING TESTIMONY

Tellingly, Russo's ***pre-cooperation*** statements – recorded by trusted criminal cohorts to Russo's complete shock (FH 144-45[3]) – utterly belie his ***post-cooperation*** claims.  Indeed, his own recorded statements make plain that (1) Mr. Persico never committed crimes with Russo; (2) Russo had no knowledge of Mr. Persico's involvement in crimes; (3) Russo, knowing that Mr. Persico's name made him an opportune target, had particular motive to implicate Mr. Persico when he began cooperating; and (4) Russo understood precisely how cooperators go about falsely implicating someone.

In January 2011, Russo was indicted for the murder of Joseph Scopo and a wave of other violent crimes.  *See U.S. v. Russo*, 11 CR 30, Indictment (Ex. H) and Excerpt from Govt. Summary Chart (Ex. I).  The underlying evidence came primarily from recordings made by Peter Tagliavia and Thomas McLaughlin – men secretly cooperating with the government and aggressively pursuing information against Russo and others affiliated with the Colombo family.  *See* Govt. Letter in *U.S. v. Russo*, 11 CR 30 (Ex. J), at pp. 23-44, listing recording dates and those intercepted.[4]  Notably, both Tagliavia and McLaughlin were Persico loyalists during the Colombo war, in the crew of Gregory Scarpa Sr.  *See* Ind. in *U.S. v. Scarpa*, 94 Cr. 1119, Ex. K, at 23-24. Equally significant, none of the recordings capture Mr. Persico.

Tagliavia and McLaughlin, whom Russo viewed as veteran Colombo associates now reporting to him, recorded Russo more than 100 times from 2009 until his early 2011 arrest.  (FH 144-45)  He freely discussed his own criminal activity and that of many others – including the Scopo murder.  Once, while assaying the guns he and others should use in a robbery, Russo

---

[3] Numbers preceded by "FH" refer to Russo's *Fatico* testimony.

[4] The letter refers to Tagliavia and McLaughlin, respectively, as "CW-4" and "CW-5."

recounted in detail his role in the killing. Audio Rec. and Tr. dated 4/10/10, Ex. L and L(T).  As the government stressed when seeking to detain Russo, he similarly implicated himself and others in the Scopo murder in multiple recordings. *See* Govt's Detention Mem. in *U.S. v. Russo*, 11 CR 30 (Ex. M) at 7-8. ***Never once was Michael Persico's name mentioned in connection with this crime.***

The recordings also caught Russo describing other crimes he committed, including: (1) attending – and using a gun provided by an inductee at – a Colombo family induction ceremony (*id.* at 4-6); (2) carrying out a violent home invasion robbery (*id.* at 8-9); (3) conspiring to extort members of the Gambino family (*id.* at 9-10); (4) extorting and assaulting a gambling club operator (*id.* at 13); and (5) loan sharking. *Id.* at 14-16.  On various occasions, Russo said that he was carrying "a pistol"; that he was going to hit a debtor in the head with a "pipe"; and that he wanted to "chop [the] head off" a "rat."  *Id.* at 32-33.  Before one assault, Russo volunteered, "I don't care if we have to hunt him all night…. Crack him in the fucking mouth and give him a beat down." *Id.* at 13.  Anticipating subsequent retaliation, Russo instructed: "Get everybody loaded up. They come in, we shoot the shit out of them." *Id.*

### A.  Michael is "truly legitimate" and "has nothing to do with anything"

Though evidence of Russo's ruthlessness pervades the tapes, proof of Mr. Persico's involvement in crime is nonexistent.  And while often speaking about possessing or buying guns, Russo never remotely suggests that Mr. Persico provided them – for the Scopo murder or otherwise.  Quite the opposite.  Asked why the government charged Michael, Russo responds that he is "***truly legitimate***" but "***got wrapped up in this because people just drop his name***":

> [The feds] know Michael's like … he did this, he did that ... they ***think***…. He's ***truly legitimate*** – the kid's a legitimate kid…. he took money and made money with it. That's all he did. ***Legitimately***. And they think he's doing – he's into other things, he's the last Persico, he runs – you know, he's, he's not a made man, but … the father's the boss…. ***The guy has nothing to do with anything. He fucking legitimately tries to open up legitimate businesses and minds his business.***

4

Audio Rec. and Tr. dated 9/25/10, Ex. E and E(T).  Strikingly, Russo made this declaration fewer than four months before he began cooperating.

Though Russo tried to shrug off this candid confession, he could only surmise that he would not divulge Michael's crimes to a mere "driver." (FH 282) But that excuse is belied by dozens of recordings where Russo details his own offenses and those of numerous others – *including other Persicos and Colombo administration members* – to both Tagliavia and McLaughlin, brothers-in-law. (FH 287) Indeed, Russo felt completely comfortable with these Persico loyalists (*see* Ex. K) who appeared to maintain allegiance to the Colombo family.

For example, one particularly graphic recording finds Russo beating someone with a bat, repeatedly yelling, "Kill him."  *See* Audio Rec. and Tr. dated 10/29/10, Ex. N and N(T).[5] Another sees him confiding that he badly assaulted two Irish guys and "left them for dead in the street." Audio Rec. and Tr. dated 9/23/10, Ex. O and O(T).  In a third, Russo suggests getting masks or front-men for a Staten Island robbery as cameras are everywhere. Audio Rec. and Tr. dated 6/20/10, Ex. P and P(T).  In a fourth, Russo demands weekly payments from a gambling racket or he'll "kill" the operator and "put [him] in a fucking box." Audio Rec. and Tr. dated 7/17/10, Ex. Q and Q(T). Russo also tells Tagliavia that he brought "a pistol" to a meeting (Audio Rec. and Tr. dated 9/7/10, Ex. R and R(T)) and threatens to "pipe" a debtor "half to death."  Audio Rec. and Tr. dated 12/23/10, Ex. S and S(T).

In still other recordings, Russo shares close confidences with Tagliavia and McLaughlin. Indeed, beyond rehearsing  the  crimes just discussed – including the Scopo murder (*see supra* at 4; Ex. L and L(T)) -- Russo  reveals that (1) people are calling him "the new street boss" (Audio Rec. and Tr. dated 8/25/10, Ex. T and T(T)); (2) Anthony Stropoli is "acting" as captain for Teddy Persico Jr. (Audio Rec. and Tr. dated 8/8/09, Ex. U and U(T)); (3) Andrew Russo, the family's

---

[5] Tagliavia and McLaughlin were each present during this episode and recorded it separately. Tagliavia's recording accompanies this submission.  Similarly, both were present for and separately recorded the conversations on 8/21/10 and 1/7/11, discussed *infra*.

alleged Street Boss (*see* Ex. K at 4), "knocked [Stropoli] down" from "skipper" [6] and promoted Anthony Russo to replace him as Teddy's acting captain (Audio Rec. and Tr. dated 7/6/10, Ex. V and V(T)); (4) Teddy Persico Jr. placed an associate in Joey Savarese's crew so the associate must stay there (Audio Rec. and Tr. dated 5/21/10, Ex. W and W(T)); (5) an illegal gambling establishment is a "Colombo stronghold" (*id.*); (6) the Colombo family has a "chain of command" (Audio Rec. and Tr. dated 7/17/10, Ex. Q and Q(T)); and (7) Russo wants his son inducted so he can get things "done immediately." Audio Rec. and Tr. dated 9/29/10, Ex. X and X(T).

To be sure, several recordings reveal the degree to which Russo trusts Tagliavia.  For example, when Russo believes his phone is tapped or that "a rat [is] real close" to him because "[the feds] know too much" (Audio Rec. and Tr. dated 12/21/10, Ex. Y and Y(T)), he calls on Tagliavia to get him a "throw away" phone and appoints him as an envoy to other conspirators. Audio Rec. and Tr. dated 8/25/10, Ex. T and T(T) and 9/4/10, Ex. Z and Z(T).  And just two weeks before describing Michael as "truly legitimate," Russo met in Tagliavia's presence with Benjamin Castellazzo, an alleged Acting Colombo Underboss (*see* Ex. M at 4), also recounting the details of a meeting with alleged Street Boss Andrew Russo (*id.*). Audio Rec. and Tr. dated 9/9/10, Ex. AA and AA(T) ("[T]his is between me and you and don't ever repeat this."); *see also* FBI Reports re Audio Rec. dated 9/9/10, Ex. BB and CC.[7]  Russo further explained to Tagliavia "protocol" within the Colombo Family, including "who has access, who is allowed to direct activities and the process for getting approval to do things within the Family." Ex. CC at 2.

For the kicker, the day after the conversation about Michael's lawfulness, Russo disclosed to Tagliavia particulars about the murder of an individual he and others believed to be a cooperator. *See* FBI Report on Recordings dated 9/25/10 and 9/26/10, Ex. DD, at 2-3.  And just two days

---

[6] As Russo explained at the Guerra trial, "skipper" is another name for the "captain" of a crew. *See* Russo's Testimony at Guerra Trial ("GT"), 3500-AR-63, Ex. C, at 156-57.

[7] Because parts of the recordings are hard to hear or contextualize, we have included FBI reports describing certain meetings. *See* Exs. BB, CC, DD, YY, JJJ and KKK.  We are not filing these exhibits electronically unless directed to do so because a protective order currently prohibits their public dissemination. (Docket Entry No. 298)

before the legitimacy conversation, Russo told Tagliavia how his own son is a "bad kid" who will "shoot you in the head [ ] in a heartbeat." Audio Rec. and Tr. dated 9/23/10, Ex. EE and EE(T). He described an incident where his son came home with "blood all over the place" after "put[ting] an axe over [another guy's] head," forcing Russo to "burn" his clothes and "dump[ ]" them. *Id.*

On top of all that, ***the same day Russo told Tagliavia that Michael "ha[d] nothing to do with anything" in the Colombo family*** (Ex. E and E(T)), he confided that he told the powers that be to promote Joseph ("Joey") Savarese to "skipper," adding that they would have "somethin' nice going on" once that happened.  Audio Rec. and Tr. dated 9/25/10, Ex. FF and FF(T).  Russo also allowed that he was authorized to "shel[ve]" people. *Id.*  He and Tagliavia additionally discussed how Larry Sessa had been "straightened out" –  inducted into the family (FH 16-17) – but that Sessa could not then be "introduced" because the family wanted to keep things "quiet."  Ex. FF and FF(T).  Russo also schooled Tagliavia on protocol when someone gets proposed for mob membership – specifically, the name goes to all five families and people start treating him "differently."  *Id.*; *see also* Ex. DD at 2.

These recordings conclusively demonstrate that Tagliavia and McLaughlin were trusted Colombo associates and Russo confidants and that he did not call Michael "truly legitimate" merely to hide criminal activity.

### B.  Russo would never "report" to Michael

Other recordings flatly contradict Russo's testimony regarding Michael, including the claim that he "report[ed] to Michael" – an admittedly "unusual" arrangement since Michael was not a Colombo family member. (GT 204) By contrast, multiple recordings capture Russo conceding that he would only report to "Allie" or "Teddy" Persico,[8] answering solely to "Tommy" Gioeli[9] in their absence:

---

[8]  "Allie" is Alphonse Persico, Michael's life-imprisoned brother who has been incarcerated continuously since October 1999. "Teddy" is Theodore Persico Jr., Michael's cousin.

[9]  "Tommy" is Thomas Gioeli, identified by Russo as a Persico loyalist who was "on the street" upon Russo's 1992 prison release.  (FH 31)

> 'Cause Allie asked me one time, me and BF, when he was going
> away before … he says, "Yous got to answer to somebody. I'm
> asking you who yous want to answer to?" I said, "Well, I'm going
> to tell you right now, *I only answer to a Persico. That's either
> Teddy or you. And you're not here. And Teddy's not here. There's
> only one other person I'll answer to, and I ain't answering to
> nobody else, and that's Tommy. Me and BF will answer to Tommy,
> and that's it. I won't answer to nobody else.*

Audio Rec. and Tr. dated 8/8/09, Ex. GG and GG(T), and 11/4/09, Ex. HH and HH (T) (Russo

reiterating that he would "answer" solely to "Allie" or his "cousin" Teddy and only one other

person – "Tommy" Gioeli -- if they were unavailable).

Similarly, while now tarring Michael with violence, Russo proclaimed on pre-cooperation

tapes that he actually shuns it: "[Michael's] always been like that, he's like a fucking broad"

(Audio Rec. and Tr. dated 12/5/10, Ex. II and II(T)); "when people needed to get beat up, [Michael]

stopped it," "calm[ing] [others] down." Audio Rec. and Tr. dated 8/21/10, Ex. JJ and JJ(T).

### C.  Russo has substantial motive to implicate Michael

Myriad recordings establish Russo's motive to falsely inculpate Michael, manifesting his

belief upon cooperating that Michael was a prime government target.  To this end, Russo opined

that the feds are "going after Michael" and "anybody they think" is "close to him" (Audio Rec. and

Tr. dated 2/12/10, Ex. KK and KK(T)) because they "think" Michael must be involved in crime

since "his father's the boss." Ex. E and E(T).

Russo offered numerous anecdotes fueling this perception.  He recalled how, as far back

as 1999 or 2000, FBI agents visited Frank Sparaco, with whom he had been incarcerated.[10]

According to Russo, Sparaco told him that the agents wanted information about Michael Persico:

"[The agents] said, 'You know Russo's a well of information…. *If you can get anything out of*

---

[10]  Sparaco, a confidential informant since the 1980s, pled guilty in 1993 to multiple murders and
received a 24-year sentence. He kept feeding the government false information throughout the
1990s and 2000s, hoping to reduce his sentence.  Though leaking to the press in 2010 that Sparaco
had flipped, the government has since confirmed that it never offered him a cooperation agreement,
presumably deeming him incredible, unhelpful or both.

*him or you can tell us about Michael, we'll have you out of here by the weekend*."'  Audio Rec. and Tr. dated 1/21/10, Ex. B and B(T); *see also* Audio Rec. and Tr. dated 9/1/10, Ex. LL and LL(T) ("***The[] [agents] want Michael.***").

In yet another recording, Russo related that agents asked Theodore Persico Jr. to cooperate against his cousin Michael: "[Agents] told [Teddy] – They said, 'What do you want to do.... What do you got? You got a Mercedes. You got a little house now upstate they gave you. What do you got? ***Your cousin's got everything. You got nothing. Why don't you join us? We'll make life a lot easier for you***."'  Audio Rec. and Tr. dated 5/12/10, Ex. MM and MM(T).  Within two weeks of his arrest, Russo described a visit he received from an FBI agent who professed "hate" for "the Persicos" and pushed Russo to cooperate.  Audio Rec. and Tr. dated 1/7/11, Ex. NN and NN(T). McLaughlin informed Russo that the agent likewise told him: "Don't be the fall guy for the Persicos." Audio Rec. and Tr. dated 1/7/11, Ex. OO and OO(T).  During the same conversation, Russo also discussed his belief that the government had made plea offers to Michael and others, but that Michael was not "taking a day" because he "didn't do nothing."  Audio Rec. and Tr. dated 1/7/11, Ex. PP and PP(T).

### D.  Russo knows how to make a deal with the government

Russo also chatted about making deals with the government by framing "innocent[s]":

> The fucking feds, they're characters, man. They don't give a fuck who they jam up. They don't care if you're innocent. They don't care. All they know – all they're taught is this: "If you help us out, we'll let you go. If you help us out, we can do something for you." "Help yous out? I don't know nothing." "Ah, you're fucked."

Audio Rec. and Tr. dated 9/25/10, Ex. E and E(T).

Continuing in this vein, Russo declared that cooperators "lie all day long just to save themselves" (Audio Rec. and Tr. dated 9/1/10, Ex. QQ and QQ(T)), but the government will embrace even a lying "psycho" who says what it wants to hear: ***"[The feds] piece it all together. Then they tell him what to say and how to say it…. I know that. If he wants to go tell them that I told him something that I never did, there's nothing I can do about that."*** Audio Rec. and Tr. dated 1/22/10, Ex. RR and RR(T). Russo also expressed his view that "agents aren't going to take

you" unless you tell them certain things. *Id.* And again within two weeks of cooperating, he discussed how agents broadcast their belief that Teddy ordered a murder from prison with Michael conveying the order (Audio Rec. and Tr. dated 1/7/11, Ex. SS and SS(T)) – a textbook example of Russo learning "what to say and how to say it." Ex. RR and RR(T).

Likewise, Russo showed that he knew how one might implicate another in his own conspiracy:

> All of a sudden, I'm caught up in a conspiracy 'cause you're talking to somebody, and that guy's wired, and you're mentioning my name, yeah I was talking to Anthony and … I told him I wanted to pipe him. You know, thank God I was talking to Anthony, he calmed me down, told me to handle it like this. All of a sudden, I'm part of this conspiracy…. I don't even fucking bother with you but you're telling the guy, yeah, you know my friend Anthony…. Well, he told me to fuckin' do it like this just to get the guy nervous because you're mentioning my name. And I know nothing about it, but I'm still caught up in the fucking conspiracy.

Audio Rec. and Tr. dated 9/25/10, Ex. E & E(T).

In short, Russo's unguarded pre-cooperation confidences – shared with ostensible compatriots when he had no idea he was being taped – reveal that Russo fabricated his post-cooperation allegations against Michael in hopes of cutting his own sentence. And his hopes were realized in spades; Russo served under three years after pleading to participating in the Scopo murder and a rash of other violent crimes.

## II.   RUSSO'S POST-COOPERATION CONTENTIONS

### A.  THE OCTOBER 20, 1993 SCOPO HOMICIDE

#### 1.  Russo's Concocted Testimony Regarding Michael

Apart from changing his tune after cooperating, Russo's assertions about conversations with Michael concerning the Scopo murder are suspect on their face.

##### a.  Michael tells Russo to see Curcio because he has a "line on Joey."

Russo testified that the day he left jail – August 26, 1992 – he met Danny Persico and Teddy Persico Sr., the brother and father of Teddy Persico Jr., with whom Russo had been

incarcerated from mid-1988 to mid-1989.  (FH 166-68)   Within a few days, he met Eric Curcio –

a participant in the Scopo murder – and they started committing crimes together, including selling

cocaine and stolen credit cards.  (FH 171-72)

Russo's claims regarding his "involvement" in the Colombo War – an intra-family conflict

between the Orena and Persico factions (FH 30-31) – are impugned by his own testimony, at both

the *Fatico* hearing and the *Guerra* trial.  Indeed, though asserting at the *Fatico* hearing that he

entered the war "the minute [he] got home in 1992" (FH 34), Russo testified in *Guerra* that he

joined "sometime in 1993." (GT 204) More pointedly, Russo testified at the *Fatico* hearing that he

"***first***" got involved in the war by planning to murder "Wild Bill" Cutolo, an Orena captain. (FH

34, 182-83) In *Guerra*, however, Russo maintained that he "***first***" got involved when "Michael

told [Russo] to go see Eric [Curcio] one day" because "Eric got the lead on Joey [Scopo]."  (GT

204)

And contrary to his *Fatico* claim of enlisting in the war "the minute [he] got home in 1992"

(FH 34), Russo testified in *Guerra* that Sparaco, Guerra and Danny Persico told him the ***war was***

***at a "standstill" when he got out of prison.***  (GT 190, 578) Russo further acknowledged that, as

he understood it, ***a "cease fire" existed from his 1992 release until the day of Scopo's death***.  (GT

578-59) Indeed, Russo insisted in *Guerra* that he ***did not carry a gun*** upon his release because of

the cease fire. (GT 578)[11]  And despite hearing that participants would hide in safehouses when

the war was active (FH 178), Russo placed attempts on Cutolo's and Scopo's lives ***at their own***

***homes and other spots they were known to frequent*** – Cutolo's barber shop and Scopo's club.

(GT 212, 217, 219; FH 44, 48, 51, 183, 185-86)[12]

---

[11]  Other evidence confirms that hostilities prevailed from late 1991 to mid-1992. *See, e.g.,* Govt's
Timeline of War-Related Crimes introduced at the 1994 trial of *U.S. v. Alphonse Persico*, 92 Cr.
351, Ex. TT.  By mid-1992, several participants from both sides had been indicted and were
awaiting trial, including Victor Orena – the Orena faction head – who was arrested and detained
in April.  *See U.S. v. Orena*, 986 F.2d 628, 629 (2d Cir. 1993).

[12]  Several cooperators reported that warriors hid in safehouses containing heavy artillery,
ammunition and the like.  *See, e.g.*, Alan Quattrache Testimony in *U.S. v. Persico*, 92 Cr. 351 (Ex.

Russo alleged at the *Fatico* hearing that he began looking to kill Cutolo in early 1993 – Russo's first involvement in the war – with Curcio, BF[13] and others. (FH 34, 182-83) Yet he disclaimed any memory of how he and his cohorts decided to take Cutolo's life. (FH 182-83) Russo testified to murder attempts near Cutolo's hair salon with Curcio, BF, Sparacino and others. (GT 212, FH 183) He described one incident where he and others sought to kill Cutolo outside his Brooklyn home, with Russo and Pappa as prospective shooters.  (FH 44, 185-86)

Russo testified that "*after*" he and others tried to kill Cutolo, they "***next***" intended to murder Scopo, whereupon attempts on Cutolo "stopped." (FH 34-35, 44, 182-83, 215) The Scopo plot began, Russo claimed, when Michael Persico directed him and BF to see Curcio because Curcio had "a line" on Scopo. (FH 36) But with Russo and Curcio already involved in multiple attempts to assassinate Cutolo (FH 34), why would Michael need to refer Russo to Curcio because he had a line on a different Orena loyalist? The notion is fanciful.

Equally anomalous, Russo admitted that, from Alphonse Persico's August 1994 prison release until Curcio's own death,[14] Curcio "harass[ed]" Russo and BF to introduce him to Alphonse.  (FH 255) Had Alphonse's brother Michael actually connected Russo with Curcio to murder Scopo, Curcio wouldn't have needed to hound third parties for an introduction.

**b.  Russo tells Michael: "We need weapons."**

Russo testified that, directly after meeting Michael, he and BF went to see Curcio, who asked if they were willing to kill Scopo. (FH 38) Russo and BF then allegedly saw Michael again, telling him in the presence of "Smiley": "We need[ ] weapons." (FH 40) The same day BF ostensibly brought Russo a black gym bag containing "[t]he Mac-10" and "a couple of pistols," purportedly obtained from Smiley. (FH 40-41) Russo later conceded that the only relevant gun

---

UU) at 1387, 1395-96, 1586-87; FBI Debriefing Report of Joseph Ambrosino, Ex. WW; *see also* FBI Agent Robert Neuendorf Testimony in *U.S. v. Guerra*, 10 CR 147, Ex. XX, at 1113.

[13] During his testimony, Russo alternately referred to Frank Guerra as "BF" and "Frankie."

[14]  According to government records, Curcio died on October 4, 1994.  *See* 3500-AR-22, Ex. YY, at p. 87.

was "the Mac-10" as they "didn't bother with" the others. (FH 231) Yet Russo previously testified that **BF was not with him** during the alleged conversations with Michael and Curcio about the Scopo murder (GT 206-07, 694) – a discrepancy he could not explain. (FH 212-14)

Russo testified that, **after receiving** the gun-filled bag, they **stopped going after Cutolo and started hunting Scopo**. (FH 43-44, 215) Critically, though, Russo said **he already had the Mac-10** – ostensibly conveyed in the gym bag following a conversation with Michael – during attempts on **Cutolo's** life. (FH 186, GT 212) Specifically, Russo testified in *Guerra* that he had "**_the_ Mac-10**" and "a couple of pistols" during attempts to kill Cutolo by his barber shop. (GT 212) Russo likewise testified at the *Fatico* hearing that he, BF and Pappa once almost killed Cutolo by his house (FH 44, 185-86), when Russo carried a .38 and Pappa had "**_the_ Mac-10**," which he got from Russo.  (FH 186) Indeed, Russo's *Fatico* and *Guerra* testimony both referenced only a single machine gun – **the Mac-10 that BF sourced to Smiley and allegedly gave Russo in a gym bag**.

### c.   "Get this thing done before my brother goes to trial."

Russo's next conversation with Michael allegedly followed an attempt to kill Scopo at his Brooklyn home, which in turn took place after Russo saw Teddy Persico Jr. at a funeral where he received the murder order. (FH 45-49) Russo said he told Michael about the incident, and Michael purportedly replied: "You got to get this thing done before my brother goes to trial." (FH 49) Russo understood this to mean that the hit "was supposed to be done before" the approaching trial of Michael's brother Alphonse so "at least [Alphonse] would have an alibi." (FH 49-50) Given Russo's testimony, this conversation would have occurred – if at all – between August 18, 1993, when Teddy Persico Jr. attended his grandmother's wake (*see* Ex. ZZ), and September 15, 1993, when Scopo sold his Brooklyn home and moved to Queens.  *See* Property Deed, Ex. AAA.

To begin, it is highly implausible that Alphonse or Michael Persico would want Scopo killed at this time.  Alphonse had been incarcerated from 1986 to 1993, serving an eight-year sentence on another case.  *See* Bureau of Prisons Records, Ex. BBB at 4-5.  In May 1993, while serving the prior sentence, he was indicted again.  *See* Arrest Warrant dated May 13, 1993, and Indictment in *U.S. v. Persico*, 92 CR 351, Ex. CCC.  Though **imprisoned throughout the Colombo**

13

*war*, Alphonse was charged with five war murders, one attempted war murder, and conspiring to murder members of the Orena faction. *See id.*, Counts 1-7.

In this light, an incarceration alibi would scarcely absolve Alphonse Persico of Scopo's murder. Instead, Alphonse or anyone concerned for him would have worried that if Scopo or another Orena loyalist were killed, Alphonse would be charged with that crime too. And in any event, as even Anthony Russo had to concede, Alphonse did not go trial until the summer of 1994 and was acquitted on August 8 – long after the Scopo murder. *See* FH 218; *see also* 8/8/94 Transcript in *U.S. v. Persico*, 92 CR 351, at 3158, Ex. DDD.

To boot, Michael's uncle, Theodore Persico Sr. – whom Russo ostensibly reported to before Theodore's arrest (FH 24) – was also indicted by May 1993. *See* Ind. 92 CR 351, Ex. CCC. When Scopo died, Theodore Sr. was out on bail (*see* GT 673-76) awaiting trial for conspiring to kill Orena faction members. *See* Ex. CCC, Count 7. If anything, then, Michael, Alphonse and Theodore Sr. had to fear Theodore Sr.'s remand if more Orena loyalists expired during his release.

### d. "Leave the gun in the car."

Russo also testified at the *Fatico* hearing that he told Sparacino "to leave the gun in the car" at Michael's direction. (FT 57-58). The purported instruction strains credulity. First, Russo has never made this claim before – in *Guerra* or any debriefing session. To the contrary, Russo was specifically asked in *Guerra* why the gun was left in the car, and this exchange ensued:

> Q   Had you left the MAC 10 machine gun and Sparacino's ski mask in the stolen car?
> A   I didn't leave a ski mask in the car. **I told him to leave the machine gun in the car.**
> Q   You were sort of running this hit?
> A   **He said, what should I do?   I said, leave the machine gun and get out of the car.**
> Q   You weren't running this hit?
> A   No.
>              * * *
> Q   **You gave instructions, did you not?**
> A   **He asked me a question, I answered it.**

GT 735-36.

14

Yet despite his *Guerra* testimony – that Russo told Sparacino to leave the gun only after Sparacino asked him what to do – Russo reversed himself at the *Fatico* hearing:

> Q　　And you told John Sparacino to leave the MAC-10 in the car.
> A　　Yes, I did.
> Q　　**Did he ask you what he should do or did you just**...
> A　　**I just told him to leave it in the car.**
> Q　　**And when did you tell him that, before the murder had taken place? Was it the plan that you had in effect or was this something that you just did at that moment?**
> A　　**I don't remember exactly when I told him. I know when we got out of the car, I said leave the gun in the car. I can't remember if I told him before that moment**.

FH 246.

Russo's *Fatico* testimony does not merely clash with what he said in *Guerra*. Rather, the testimony in both proceedings dispels his claim that Michael Persico had previously instructed Russo and the hit team to leave the gun in the car. Indeed, Russo could not recall if the gun was even discussed before the actual murder. (FH 245-46) And nothing suggests that Michael knew the hit team had stolen a car – a prerequisite for giving the instruction. In fact, the car was stolen only a night or a week before the murder (*compare* Govt. Chart at *Pappa* trial, Ex. EEE,[15] *with* Chesney Testimony in *U.S. v. Guerra*, Ex. FFF, at 1073), while the last conversation Russo recalled having with Michael Persico was weeks earlier – sometime prior to September 15, 1993 – when Scopo still lived in Brooklyn and Michael supposedly said, "Get this thing done before his [Michael's] brother went to trial." (FH 48-49, 253) Asked if he remembered any subsequent discussions, Russo replied, "No, not really; no." (FH 253)

### 2. Russo's Additional Fabrications and Inconsistencies

Aside from the discrepancies surrounding the statements he ascribed to Michael Persico, Russo's testimony was riddled with fabrications and inconsistencies.

---

[15] John Pappa was tried for the Scopo murder and others in 1999. The government introduced a chart summarizing the evidence presented at that trial.

For example, Russo testified that his August 26, 1992 prison release (FH 167) came in the middle of the Colombo War, with Vic Orena trying to take over the Family. (FH 30-31) Though Russo testified that Orena was on the street at the time (FH 181), he actually was incarcerated, having been indicted in April 1992 and detained pending trial. *See Orena*, 986 F.2d at 629. Indeed, Orena was convicted in December 1992 (*see id.* at 628) and sentenced to life in May 1993 (*see U.S. v. Orena*, 32 F.3d 704, 707 (2d Cir. 1994)) – long before the October 1993 Scopo murder.

Russo also testified at the *Fatico* hearing that, after directing Sparacino to leave the gun in the car, he took Sparacino's ski mask, put Russo's gloves inside and hid all three objects in a bush. (FH 57-58) In *Guerra*, however, Russo said Sparacino left the ski mask in the car and insisted that he (Russo) did not even know what had happened to it.

> Q    Had you left the MAC 10 machine gun and Sparacino's ski
>      mask in the stolen car?
> A    I didn't leave a ski mask in the car. I told him to leave the machine gun in
>      the car.
>                              * * *
> Q    Okay. So you didn't know the ski mask was there but it was left in the car?
> A    He had a ski mask on. He left it in the car.
>                              * * *
> Q    I assume he's not wearing the ski mask?
> A    No.
> Q    But you don't know where it is?
> A    I don't know what he did with it.

(GT 735-37)

Worse, at the *Fatico* hearing, Russo could not recall what he had said about the ski mask during his direct testimony *or* the *Guerra* trial. (FH 250-52) Russo did not even know whose gloves he ostensibly placed in a bush (FH 246-47), although he testified two weeks earlier on direct that the gloves were his. (FH 57) And in truth, the ski mask was found inside the car – not in a bush – and no gloves were found near the scene. *See* Young Testimony in *U.S. v. Guerra*, 10 CR 147, Ex. GGG at 1863-84; and Documents from Scopo homicide file, Ex. HHH.

Russo could not even remember whether he himself carried a gun during the homicide. (FH 197-98) While maintaining at the *Fatico* hearing that he had been armed (FH 195), Russo

16

flatly denied it in *Guerra*, claiming he was only "the driver." (GT 703-04) Confronted with the contradiction, Russo admitted, "Maybe I made a mistake." But he did not know which version was false, offering that going "over and over" the story "confused" him.  (FH 197)

Russo testified to seeing Teddy Persico Jr., furloughed from prison, at a funeral for Teddy's grandmother.  (FH 45) Although he placed the funeral within the period March-June 1993 in *Guerra* (GT 583), it actually occurred in August, which Russo clearly did not recall. (GT 584) Russo said that Teddy saw "[Russo], BF and Bob [Tarantola] all together," at which point "he asked if [they] could talk."  (GT 215) On cross, however, Russo was again unable to remember his direct testimony, saying he was ***not*** with BF and Tarantola when Teddy convened the conversation. Rather, they had to "call[ ] BF and Bobby over."  (GT  594-95).  To bolster his testimony, Russo even denied that Teddy was shackled at the funeral (GT 590-91) – a claim bluntly rejected by three corrections officers who guarded him throughout. *See* Testimony of Hill, Bivins and Huebsch in *U.S. v. Guerra*, 10 CR 147, Ex. III, at 2262-63, 2273-74, 2324.  Still, Russo insisted that he "remember[s] everything about that day" because it was an important event in his life.  (GT 598)

Having testified in *Guerra* that John Pappa first entered the picture ***after*** the funeral (GT 216-17), Russo detailed at the *Fatico* hearing Pappa's role as a shooter in an attempt to kill Cutolo (FH 44, 185-86), efforts that "stopped" when they began looking for Scopo (FH 43-44, 215), which was long ***before*** the funeral. (GT 214) And after implicating Sparacino in murder attempts on Cutolo in *Guerra* (GT 212), Russo again reversed himself and denied Sparacino's involvement at the *Fatico* hearing.  (FH 194)

Russo claimed to have almost killed Scopo near his home in Brooklyn.  He described driving past Scopo's home with BF and Pappa looking for a parking spot.  (FH 190-91) When they passed the home, Russo said, Scopo's head was in a garbage can, so Russo and the others could not tell it was him. (FH 191) When they drove back around and passed the home again, Russo went on, Scopo was already "up the stairs" entering his front door.  (FH 48-49, 191)

Government efforts to corroborate this tale were selective, missing key evidence that debunks it.  For example, the government secured a deed showing that Scopo sold his Brooklyn

home on September 15, 1993 – a few weeks before he was killed.  *See* Ex. AAA.   According to Russo, however, agents never even asked him to point out the home, although they took him on several drive-arounds to identify other locations (*see, e.g.,* 3500-AR-22, pp. 88-90, Ex. JJJ and 3500-AR-58, Ex. KKK) and knew exactly where Scopo had lived, having surveilled him there often.  *See, e.g.*, Carrie Testimony in *U.S. v. Guerra*, 10 CR 147 (Ex. LLL) at 1261.  Had they taken this simple step, agents would have learned that Russo's "memory" of this event was faulty.  For the home had no stairs leading to the entry, as verified in affidavits from Henrik and Etella Friedman, who bought the home in September 1993.  *See* Friedman Affidavits, Ex. MMM.   And as the Friedmans attest, the home looked substantially the same when purchased as it does in the annexed photographs.  *See* Photos of Scopo's Brooklyn home, Ex. F(1)–F(6). A certified report confirms that the New York City Buildings Department issued no permits to change the home's exterior.  *See* Ex. NNN.

Russo testified at the *Fatico* hearing that he recognized Scopo during repeated attempts to kill him from photos and observation at the Brooklyn house.  (FH 221) In *Guerra*, however, Russo conceded that he "didn't know what [Scopo] looked like" ***even on the murder night***, pegging him as the person in the Altima's passenger seat only because he "was an older gentleman" whereas "[t]he kid driving was a younger kid" so Russo "kind of figured the difference."  (GT 724)

And after killing Sparacino, cutting off his penis for calling him a blow job, helping dispose of the body (FH 65-66) and committing all sorts of other heinous crimes, Russo tried to cast himself as considerate.  In Russo's telling, he and Pappa nearly killed Cutolo as he exited his car by his home.  But an older woman got out of the back, so Russo stepped in and stopped Pappa from shooting because he "didn't want any innocent people getting hurt." (FH 44) He similarly claimed that he almost shot Scopo near his club, but walked away on seeing a woman with two children. (FH 51-52) In fact, Russo and his criminal partners brutally murdered Scopo, coolly firing 30 rounds into a car carrying two young strangers. (FH 57, 241) While he tried to discount the two as "part of that life" (FH 242), all Russo really knew was that the driver was "a younger kid."  (GT 724) Indeed, the pair's mere presence did ***not*** necessarily make them "part of that life." For a

18

"cease fire" obtained between the warring factions from Russo's 1992 prison release to the day he and his confederates killed Scopo – by Russo's own prior account.  (GT 578-59)

At the *Guerra* trial, Russo testified that the car used in the Scopo homicide was stolen "a few weeks" earlier, claiming they parked it on the street, moved it around and kept it in John Matera's garage for a while.  (GT 223) When confronted, however, Russo admitted that he really didn't know when the car was stolen; it could have been "[t]wo months, three weeks, three days" before the homicide. (GT 729) In the end, he conceded that he "didn't know for sure" whether it was stolen a couple of hours or a couple of weeks in advance.  (GT 769-70) And, having initially denied using the stolen car for surveillance (GT 729), Russo later insisted that he "definitely" used it to stake out Scopo. (GT 765-66) Confronted again about when the car was stolen, Russo could only manage, "Maybe I made a[nother] mistake."  (GT 770)

\* \* \* \* \*

It is evident that Russo has little memory of the events surrounding the Scopo homicide and that he just invented stories to implicate Michael Persico and make it seem like he remembers. Indeed, on cross in *Guerra*, **Russo entirely forgot to mention Michael Persico's name in connection with the Scopo murder** – even when asked specifically about his meeting with Curcio, who it was that directed the murder, and the guns used in the crime. (GT 576-78, 672-90, 694-95, 702-04) To the contrary, Russo freely admitted that he had no trouble getting guns, remarking: "When I needed one, I had one."  (GT 576)

In sum, Russo's efforts to tie Michael Persico to Scopo's death lack credibility and fail *any* standard of judicial scrutiny – let alone one of preponderant evidence.

### 3.  Additional Evidence Regarding the Scopo Homicide and Michael Persico's Lack of Involvement in the Colombo War

Evidence presented at the 1999 trial of John Pappa, convicted of killing Scopo, further erodes the government's newfound accusations.  A clutch of cooperators testified at that trial, implicating dozens in a string of murders. Yet none of them linked Michael Persico to the Scopo plot or any other – much less to assembling the crew or arranging the weapons.  Rather, the proof

19

indicated that three Colombo leaders – all serving life sentences for other war-related violence – directed the Scopo hit within two weeks of its occurrence. *See* Ex. EEE.

Testimony from cooperator Dino Basciano, a government witness at both the Pappa and Guerra trials whose credibility is unchallenged, likewise rebuts Persico's claimed involvement in killing Scopo. *See* Basciano Testimony in *U.S. v. Guerra*, 10 CR 147, Ex. OOO. Basciano had attempted several murders and distributed drugs with his friend Eric Curcio. *Id.* at 1147-48, 1211. A major gun dealer with access to serious firepower, Basciano also sold "thousands" of weapons to mobsters – Curcio among them – and many Mac-10s with silencers. *See id.* at 1137, 1143, 1148-49, 1186. In particular, Basciano sold guns exactly like the Mac-10 used to kill Scopo, perhaps that very one. *Id.* at 1209-10. Significantly, Russo placed his meeting with Curcio at a club on Henry Street (FH 211, GT 206) – a joint owned by the gun-dealing Basciano. *See* Ex. OOO at 1152. Another cooperator similarly told the government that the murder weapons were purchased from Basciano. *See* Govt. Brady Disclosure, Ex. PPP. And Joseph Iborti, a cooperating witness whose credibility is likewise uncontested, admitted in *Guerra* that Curcio had ready access to guns (*see* Iborti Testimony in *U.S. v. Guerra*, 10 CR 147, Ex. QQQ, at 987), including Mac-10s with silencers. *See id.* at 983.

In light of this evidence, it is extremely doubtful that Curcio and the other participants – all of whom, per multiple sources, had killed or tried to kill several times earlier – lacked access to guns and needed Russo to approach Michael for them.

Further, Basciano – though aware of Russo's and others' involvement in the Scopo murder – gave no inkling that Michael Persico played any role. The government may pin Basciano's ignorance on his source of information. But Basciano attributed his knowledge of the Scopo murder to Curcio, to whom Michael supposedly referred Russo. Thus, had Michael actually connected Russo and Curcio to kill Scopo – itself improbable where they had jointly tried to slay Cutolo – Basciano surely would have known it. Yet Curcio told Basciano that he was directed to kill Scopo while visiting his jailed uncle ***a couple weeks*** in advance (*see* Ex. OOO at 1158-59, 1244-45 and Ex. EEE), while Russo, for his part, claimed that Curcio had them casing Scopo

*several months* prior. (GT 213-14) Indeed, Basciano said that Curcio thought others were jealous of how fast he finished the job (Ex. OOO at 1159), whereas Russo – eager to tie in Michael Persico – made it seem they had taken months.

Other cooperators roundly refute the government's current contentions. For example, Alan Quattrache, a Persico loyalist who testified at various Colombo war trials (including against Michael's brother Alphonse), was intercepted before he began cooperating discussing Persico faction war efforts. *See* Quattrache Testimony in *U.S. v. Persico*, 02 CR 351 (Ex. UU) at 1376-82, 1431-40. Like Russo, he admitted in those recordings that *Michael is "not in this life"* – never mind involved in gangland murders – calling him a *"nice guy[]"* but *"[in]capable"* and squarely distinguishing him from his brother Alphonse. *Id.* at 1461-62. But unlike Russo, Quattrache *consistently* maintained – before and after cooperating – that *Michael was not "part of the [Colombo] family" or involved in the war. Id.* at 1648.

A government exhibit in *Guerra* confirms that Michael was a mere bystander. FBI Agent Robert Neuendorf testified that law enforcement searched the hideout of two Orena loyalists at the war's height, seizing guns and ammunition, bullet-proof vests, ski masks and other items. *See* Neuendorf Testimony in *U.S. v. Guerra*, 10 CR 147, Ex. XX, at 1112-13. Authorities also recovered a three-page document, introduced in *Guerra* as government exhibits (*see* Ex. RRR), naming several men and the places they frequented. *Id.* at 1113-16. Among those named were Danny Persico, BF, Robert Tarantola, Joey Fusco ("Goo"), Frank Tormenia, Eddie Garofalo and Angelo Fi-Fi (*id.*), individuals Russo identified as Colombo family associates and Persico allies. (FH 178-79) Indeed, the government touted the document as a "hit list" found in a "stash house for the Orena" faction, arguing that Guerra's inclusion implicated him in the fighting. *See* Govt. Closing Excerpt in *U.S. v. Guerra* at 2427-28, Ex. SSS. Michael Persico's name was conspicuously absent.

Finally, separate recordings made during the government's investigation show that Michael Persico only "*discourage[d]* violence." *See U.S. v. Persico*, 376 F. App'x 155, 157 (2d Cir. 2010) (emphasis supplied). In conversations secretly taped by yet another cooperating witness

(Steven Marcus), codefendant James Bombino continually called Mr. Persico a "legitimate" businessman, as distinct from a mobster:

> I know Michael.  Michael wears a cardigan sweater with elbow patches.  I mean, ***the guy ain't no fuckin' gangster.  Michael's as squeaky clean as they come***. More than likely he ain't getting convicted.  ***They'll indict him because of who his father is, who his brother is.  I mean, naturally, his last name is a curse***.

Audio Rec. and Tr.  dated 2/11/10, Ex. TTT and TTT(T).  Bombino praised "Michael [a]s really a good-hearted guy" who would "have been done with [Bombino]" if he believed Bombino behaved unprofessionally.  Audio Rec. and Tr. dated 9/1/09, Ex. UUU and UUU(T).

Once again, then, Russo's claims as to Mr. Persico's role in the Scopo slaying lack credibility, fall considerably below the requisite preponderance and should be dismissed out of hand.

## B.  THE LOAN SHARKING ALLEGATIONS

Russo testified at the *Fatico* hearing that he loan sharked from the 1980s to his 2011 arrest and cooperation. (FH 256-57) His various lenders included Anthony Stropoli and Perkie. (FH 113, 138-39) Having admitted in *Guerra* that he loan sharked with Frankie Martin, a Gambino member with whom Russo was associated in the 1980s (GT  166-67), Russo denied it at the *Fatico* hearing. (FH 138-89) Instead, he claimed to have borrowed $150,000-$200,000 from Mr. Persico, between 1993 and 1996-97, to loan shark with BF.  (FH 74) In *Guerra*, meanwhile, Russo put the sum at $100,000 and gave the time frame as 1993 to 1995-96.  (GT 259-60) And in earlier debriefing sessions, the number was lower – $70,000 or $80,000.  But when asked about these figures, Russo accused agents of "hear[ing] him] wrong."  (FH 259-60)

When confronted, Russo admitted to keeping loan sharking records until his 2011 arrest. (FH 256) But instead of giving them to the government, Russo insisted the records ***"got ripped up and destroyed" after he began cooperating.*** (FH 257-58) He did not recall who destroyed the records, whether he asked someone to do so or how it happened.  (FH 258) Yet while locked up and purporting to cooperate with the government, Russo's sole physical proof vanished. *Id.*  Still,

the government gave Russo a cooperation agreement and a glowing 5K1.1 letter, without informing his sentencing judge of the disappearance.[16]

Destroying the only potential piece of corroborating evidence strongly suggests that Russo's loan sharking records would have contradicted, not confirmed, Michael's claimed involvement.  Indeed, although the records apparently reflected loans from Russo to a "Lenny" (FH 261), the inescapable inference is that they did **not** identify Michael as the money's source. If the records proved Russo a truth-teller rather than a fibber, he would certainly have given them to the government instead of having them destroyed.

Russo's pre-cooperation statements also demonstrate that Michael neither loaned Russo money nor forgave any loans.  For example, Russo testified that, after he extorted a stockbroker, Alphonse Persico scolded him for taking his cut of the proceeds without Alphonse's permission and instructed Russo to give Michael the money. (FH 102) In multiple recordings, however, Russo confessed to cohorts that he was indebted to Alphonse ("Allie") – not Michael. Audio Rec. and Tr. dated 10/1/09, Ex. D and D(T), and 11/13/09, Ex. WWW and WWW(T).  The recordings similarly show that Allie rather than Michael forgave a debt Russo owed upon his 2000 imprisonment (*id.*) – not the other way around, as Russo suggested on the stand. (FH 103-04) Russo is also heard on tape discussing "Santos," a loan sharking victim he impulsively struck with a brick (*see* FH 79-80), but again mentions only Allie's name in connection with this person, not Michael's.  *See* Audio Rec. and Tr. dated 8/8/09, Ex. VV and VV(T).  In fact, Michael is ***never*** mentioned in connection with loan sharking or monies owed from extortion schemes.  *Id.*

Russo's destruction of evidence, together with the recordings, indicates that he has concocted Michael's involvement in loansharking, just as he did with the Scopo murder.

---

[16]  Russo has paid nothing toward a $110,000 forfeiture obligation, without consequence.  This although he admittedly works (FH 161), and despite a court order allocating at least 25% of his income to forfeiture (*see* Russo Sentencing Transcript, Ex. VVV, at 43), that the court informed only it could amend.  *Id.* at 46.

### C.  STOLEN VIDEO GAMES

Russo testified that after he agreed to buy stolen video games in the mid-1990s – the transaction never materialized – Michael Persico referred him to a potential purchaser and offered to store the load in a garage at his (Michael's) bus company.  (FH 81-85)

Not only did the transaction fail to materialize (*id.*), but Michael has never owned a bus company.  Again, the government's corroborative efforts fell short.  When agents asked Russo to show them the garage in question, he took them to 2733 W. 15th Street, Brooklyn. *See* Ex. JJJ at 90 and photo; FH 264-66.  But the agents failed to ascertain that Michael did not own the property.  Rather, it was owned by Emil Caucig, a stranger to Russo and Michael, from 1980 to 2002.  *See* Property Deeds, Ex. XXX.  Once again, instead of uncovering Russo's deceit, the government chose to take his word.

### D.  THE ALLEGED EXTORTION

Last, the government says Michael extorted Russo by excluding him and Anthony Stropoli from the valet parking business.

According to Russo, around 2009 or 2010, Stropoli directed Russo to meet with "a kid named Anthony" who "ran a couple of valet parking systems." (FH 122-23) Russo claimed that Michael attended the meeting.  (*Id.* at 123) Instead of their starting a competing business, Michael allegedly proposed that they refer restaurants affiliated with Stropoli to Anthony's existing valet business for a 20% commission. Though perhaps referring a restaurant or two, Russo and Stropoli opted not to open their own valet, ostensibly to avoid "problems" with Michael. (*Id.* at 124-25)

On cross, however, Russo could not recall if he referred any business to Anthony's valet, allowing that he "[p]robably" "declined" a percentage and that he did not "remember." (*Id.* at 272-73) And even accepting Russo's testimony, the conduct described does not amount to extortion or any crime.

## <u>CONCLUSION</u>

In sum, the recordings, Russo's own conflicting testimony and the additional evidence accompanying this brief wholly discredit his claims against Michael.  He is a congenital schemer who admittedly "lie[s] when [he] ha[s] to." (GT at 482) It follows that the government has failed to meet its burden of proof – by preponderant evidence or otherwise.

Dated:        New York, New York
              September 21, 2016


                              Respectfully submitted,
                              /s/
                              Marc Fernich
                              Maurice Sercarz
                              Sarita Kedia


25