UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,              :
                                       :    **OPINION AND ORDER**
           -against-                   :    10-CR-147 (DLI)
                                       :
MICHAEL PERSICO, *et al.*,             :
                                       :
                      Defendant.       :
------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

On June 8, 2012, Michael Persico ("Defendant") pled guilty to the Sixth Superseding Information, which charged him with a single count of conspiracy to engage in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892. *See* Superseding Info., Dkt. Entry No. 565; Change of Plea Hr'g, Dkt. Entry No. 566 at 1. On October 30, 2014, the Court ordered a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) (the "*Fatico* Hearing") as "to those acts that the [G]overnment allege[d] they can prove by a preponderance of the evidence . . . in order to make an informed decision" for sentencing. Oct. 30, 2014 Tr. of Crim. Cause for Sent'g ("Oct. 2014 Tr."), Dkt. Entry No. 823-1 at 4. At the time of his guilty plea and that pre-sentence conference, this case was assigned to the Hon. Sandra L. Townes, U.S.D.J. This matter was reassigned to this Court on November 24, 2015. *See* Nov. 24, 2015 Min. Entry.[1]

Upon reassignment to this Court, both the Government and Defendant claimed that no *Fatico* hearing was necessary. However, as Defendant continued to dispute that the Government could prove certain facts by a preponderance of the evidence, this Court determined that a *Fatico* hearing was necessary. Specifically, Defendant contested the Government's assertions that it could prove, by a preponderance of the evidence, that he participated in: (1) the 1993 murder of Joseph

---

[1] Notably, prior to the reassignment of this case to this Court, Judge Townes had denied various defense motions in connection with Defendant's attempts to withdraw his guilty plea. *See, e.g.*, Oct. 29, 2014 Mem. & Ord., Dkt. Entry No. 791; Feb. 27, 2015 Mem. & Ord., Dkt. Entry No. 811.

Scopo; (2) loansharking; (3) extortion; (4) a conspiracy to buy and sell stolen video games; and (5) racketeering. *See* Gov't Jan. 19, 2015 Ltr., Dkt. Entry No. 823, at 3; Def. Jan. 21, 2015 Ltr., Dkt. Entry No. 803, at 6-7.[2]

The *Fatico* Hearing was held on August 10 and 24, 2016. *See* Gov't Ex. A ("Hr'g Tr.").[3] During the *Fatico* Hearing, the Government presented testimony from Anthony Russo ("Russo"), an acting captain of the Colombo Crime Family ("Colombo Family") in New York City at the time of his arrest and indictment in 2011 in this District for, *inter alia*, participating in the murder of Joseph Scopo, receiving stolen video games, and conspiracies to commit extortionate extensions and collections of credit, illegal sports betting, and marijuana distribution. *See* Def. Ex. H; Hr'g Tr. at 12, 114. Defendant attempted to introduce testimony from Ronald Dwyer, a private investigator, pertaining to the physical condition of Joseph Scopo's former residence in Brooklyn at the time Scopo was murdered. Hr'g Tr. at 311-14. The Court precluded this testimony after determining that Mr. Dwyer would have no knowledge of the condition of the structure at the time of the murder over two decades ago. *Id.* at 314.

After the *Fatico* Hearing, the Court accepted additional briefing and evidence from the parties on the alleged acts. *See* Gov't *Fatico* Hr'g Br. ("Gov't Br."), Dkt. Entry No. 846; Def. *Fatico* Hr'g Br. ("Def. Br."), Dkt. Entry No. 849; Gov't Resp. to Def. *Fatico* Hr'g Br. ("Gov't Resp."), Dkt. Entry No. 853; Def. Resp. to Gov't *Fatico* Hr'g Br. ("Def. Resp."), Dkt. Entry No. 854; Def. May 9, 2017 Ltr., Dkt. Entry No. 863; Gov't May 31, 2017 Ltr., Dkt. Entry No. 865.

---

[2] The Government previously claimed it could prove other acts by a preponderance of the evidence, but decided not to pursue them (*e.g.*, participation in the 1992 murder of Michael Devine). *See* PSR, Dkt. Entry No. 667, at ¶¶ 38-39.

[3] Unless otherwise noted, the Court refers to the exhibits annexed to the Government's post-hearing submissions with the prefix "Gov't Ex.," and to those annexed to Defendant's post-hearing filings with the prefix "Def. Ex." throughout this Opinion and Order.

For the reasons set forth below, based upon Russo's testimony, which the Court finds credible, and upon due consideration of all the parties' submissions, the Court finds, by more than a preponderance of the evidence, that Michael Persico did participate in the five alleged activities. Accordingly, the Court shall consider all five activities in fashioning a reasonable sentence.

**DISCUSSION**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing Guidelines ("U.S.S.G.")] range." *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations omitted). This calculation provides "the starting point and initial benchmark." *Id*. However, the range provided by the U.S.S.G. is only advisory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The Court "may not presume that the Guidelines range is reasonable" for the facts and circumstances in every case. *Gall*, 552 U.S. at 50 (internal citations omitted). Rather, the Court must assess and consider, among other things, "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

To this end, sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure[] that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)); *See also United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013). This inquiry is "largely unlimited . . . as to the kind of information . . . consider[ed], or the source from which it may come." *Witte v. United States*, 515 U.S. 389, 398 (1995) (internal citations and quotation marks omitted). Indeed, the Court "may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment[,] and criminal activity resulting in an acquittal in determining sentence." *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)). "No limitation

3

shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Any conduct considered must be proven by a preponderance of the evidence. *See Witte*, 515 U.S. at 401. In this Circuit, courts may conduct this inquiry by way of a *Fatico* hearing, during which, "the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *Fatico*, 603 F.2d at 1053).

I. **FINDINGS OF FACT**

Russo's career in organized crime began as a teenager in the 1970s and ended with his arrest in 2011. Hr'g Tr. at 11-12. For over thirty years, he was associated with both the Gambino and Colombo Families in New York City.[4] *Id*. at 12-13. His association with the Colombo Family began when he was incarcerated with Theodore Persico, Jr. ("Theodore, Jr."), the nephew of the Colombo Family Boss, Carmine Persico ("Carmine"), in Coxsackie, New York.[5] *Id*. 18-20, 23-24.

Upon his release from prison in 1992, Russo joined the Colombo Family as an associate[6] and reported directly to Theodore Persico, Sr. ("Theodore, Sr."). *Id*. at 23-24, 26-28, 30. This reporting structure lasted until 1993 when Theodore, Sr. and other leaders of the Colombo Family were arrested. *Id*. at 31-32. With the leadership decapitated, Russo, along with his close friend and fellow Colombo Family associate Frank Guerra ("Guerra"), reported to Defendant. *Id*. at 29, 32.

---

[4] Russo explained that there are five "crime families" operating in New York City; the other three are the Bonanno, Genovese, and Lucchese Families. Hr'g Tr. at 13.

[5] Carmine is Defendant's father; Theodore, Jr. is Defendant's cousin. *Id*. at 21.

[6] Russo outlined the general crime family hierarchy along with the roles and responsibilities associated with each level. In ascending order, the positions are: (1) associate; (2) soldier; (3) captain; (4) consigliere; (5) underboss; and (6) boss. *Id*. at 13. Upon becoming a "soldier," individuals were formally inducted into, and made a member of, the particular family. *See Id*. at 14-17.

Although it was unusual for individuals to report to others with the same rank, Russo explained that reporting to Defendant made sense given Defendant's familial ties to the group's leaders. *Id.* at 32. Russo regularly met with Defendant and others at various locations[7] in Brooklyn, New York, to discuss loansharking. *Id.* at 33. He consistently observed other criminal associates of Theodore, Jr. follow a similar pattern and meet with Defendant as well. *Id.* at 33-34. Russo reported to Defendant until Alphonse Persico ("Al"), Defendant's brother, was released from jail in 1994. *Id.* at 68-69.

### A. *The 1993 Murder of Joseph Scopo*

When Russo joined the Colombo Family, it was in the midst of a civil war among family factions that required the organization's members to align themselves with either Carmine or Vic Orena ("Orena"), an acting boss who was trying to wrest control of the syndicate from the Persico family. *Id.* at 30-31; *See also* Def. Ex. C ("*Guerra* Tr.") at 186-87.[8] Russo sided with those loyal to Carmine, choosing to oppose the Orena faction led by Joseph Scopo ("Scopo") and "Wild Bill" Cutolo ("Cutolo"). Hr'g Tr. at 30-31. Shortly after joining the Colombo Family, Russo and other Persico loyalists began plotting to kill Cutolo.[9] *Id.* at 34.

---

[7] These locations included Defendant's limousine business in Brooklyn ("Romantique"), a bus company in Coney Island, and others. *Id.* at 27, 33.

[8] This exhibit contains Russo's testimony in *United States v. Guerra*, No. 10-CR-145 (SLT) (E.D.N.Y.).

[9] Defendant claims that Russo contradicted himself by testifying both that he participated in the war "the minute he got home" (Hr'g Tr. at 34) and "[s]ometime in '93" (*Guerra* Tr. at 204). *See* Def. Br. at 11-12. Any such disparity is trivial and inconsequential. It is undisputed that Russo was associated with the Colombo Family upon his release from prison. *Compare* Hr'g Tr. at 26-30, 34-35, *with Guerra* Tr. at 182, 204-05. Nor is there any incongruity between Russo's testimony that a "cease fire" existed from the time of his release until Scopo was murdered (*Guerra* Tr. at 578-79), and joining the war as soon as he came home (Hr'g Tr. at 34). *See* George James, *Man Tied to Crime Family Is Shot to Death in Queens*, N.Y. TIMES, Oct. 22, 1993, http://www.nytimes.com/1993/10/22/nyregion/man-tied-to-crime-family-is-shot-to-death-in-queens.html (noting that the murder "signaled a resumption of hostilities in the bloody civil war between factions" of the Colombo Family).

Following a few botched attempts to kill Cutolo,[10] Russo mentioned the failures to Defendant who, in turn, advised that Eric Curcio ("Curcio"), another Colombo Family member, "had a line" on (*i.e.*, knew where to find) Scopo. *Id*. at 35-36. Russo understood this as an instruction to contact Curcio, find Scopo, and kill him. *Id*. at 36. Russo followed the direction. Both he and Guerra visited Curcio, who told them that he knew where Scopo was, and asked if they would be willing to assemble "a crew" for the murder. *Id*. at 38. Russo and Guerra agreed to do so. *Id*. Shortly after that meeting, Russo and Guerra told Defendant of their plan to kill Scopo and asked for weapons. *Id*. at 40. Defendant directed them to "Smiley," another Colombo Family associate, who would "bring them a bag" of guns. *Id*. Later that day, Guerra received a black duffle bag containing a "MAC-10 with a silencer" and "a couple of pistols" from Smiley. *Id*. at 40-41.

Separate from Defendant's role in pushing the murder forward, Theodore, Jr. actively advocated for it as well. *See Id*. at 42, 45-46. In fact, during Russo's testimony, he recalled a particularly notable meeting during the summer of 1993. That summer, Theodore, Jr., who was incarcerated at the time, was transported to Brooklyn so that he could attend his grandmother's funeral. *See Id*. at 45-46; Gov't Ex. 861 (death certificate of Eleanor Avena); Gov't Ex. 862 (bill for funeral services for Eleanor Avena); Gov't Ex. 863 (a manifest noting that an inmate named Persico was transported to Brooklyn for funeral services on August 18, 1993). While meeting with his family and friends at the funeral home, Theodore, Jr. pressured Russo and others to murder Scopo. Hr'g Tr. at 46; *See also* Superseding Info., Dkt. Entry No. 562; Theodore, Jr. Guilty Plea, Dkt. Entry No. 563 (pleading guilty to a single count of conspiracy to murder Joseph Scopo in-aid-of racketeering).

---

[10] Defendant argues that Russo has not reliably testified about the order in which he planned to kill Cutolo and Scopo. *See* Def. Br. at 12-13. Any issue with the order of intended murders does not assail Russo's testimony vis-à-vis Defendant's role.

6

On the night of the murder in October 1993,[11] the "crew" consisted of Russo, Guerra, Curcio, Johnny Pappa ("Pappa"), and John Sparacino ("Sparacino") (collectively, the "Hit Crew"). Hr'g Tr. at 46-47. The murder occurred outside Scopo's home, around 111th or 110th Street and 109th Avenue, in Ozone Park, Queens. *Id*. at 52. Curcio provided Scopo's location. *Id*. The plan included the use of three vehicles: Curcio and Guerra each drove a "crash"[12] car and Russo drove the third (the "Hit Car"). *Id*. at 52-53. Pappa and Sparacino, the designated shooter who was armed with the MAC-10 Defendant helped procure, rode in the Hit Car. *Id*. at 53. While he could not recall the make or model of the car he drove during the murder, Russo testified that the Hit Car was a stolen, brown or beige, four-door vehicle. *Id*. at 53-54; Gov't Ex. 17(c) (a photograph of a brown, four-door Buick with a shattered windshield found on 106th Street after the murder). It was started with a screwdriver. Hr'g Tr. at 54; *See also* Gov't Ex. 20(d) (a photograph of the Buick's driver's seat, showing an exposed steering column and screwdriver).

That night, the Hit Crew waited outside their cars at a corner near Scopo's home. Hr'g Tr. at 54. Eventually, Curcio saw Scopo's car approaching, and the men entered their designated vehicles. *Id*. Russo testified that Scopo appeared in a small, light-colored Nissan Altima (the "Scopo Car"). *Id*.; *See also* Gov't Exs. 18(a), 18(c) (photographs of a white Nissan Altima with shattered windows and bullet damage found on 110th Street after the murder). Scopo was in the front passenger seat, and an unidentified youth drove the vehicle. Hr'g Tr. at 55. Russo planned to pull the Hit Car up alongside the Scopo Car, have Sparacino "kick [his] door open and . . . empty

---

[11] There were two attempts on Scopo's life before the actual murder. *See* Hr'g Tr. at 47-52. After Russo reported the first bungled attempt to Defendant, Defendant ordered, "You got to get this thing done before my brother [Al] goes to trial." *Id*. at 49. Defendant's challenge to the veracity of this statement (*See* Def. Br. at 13-14) is unavailing, as the Court finds Russo's testimony credible and there is other evidence tending to show that Defendant orchestrated Scopo's murder.

[12] A "crash" car is used to block off the street, prevent any unanticipated party from getting involved, and allow shooters to get away. Hr'g Tr. at 48.

7

that [MAC-10] . . . into the car." *Id*. at 54. As the Scopo Car was being parked, Russo pulled alongside, and positioned the backend of the Hit Car's rear passenger door along the Scopo Car's front bumper. *Id*. at 55. Sparacino then opened the rear passenger door and fired the MAC-10 into the Scopo Car. *Id*. at 55-57; *See also* Gov't Exs. 21(e), 21(i) (photographs of the Altima's rear passenger side and backseat). As Sparacino fired, a bullet "came through the back window of" the Hit Car and went through its windshield. Hr'g Tr. at 56; *See also* Gov't Ex. 20(c) (photograph of the Buick's shattered rear windshield); Gov't Ex. 20(g) (photograph of bullet casings on the Buick's backseat).

Russo fled the scene and drove to a prearranged spot a few blocks away, where the Hit Crew planned to abandon the Hit Car. Hr'g Tr. at 57; *See also* Gov't Ex. 17(c). After parking, Russo told Sparacino to leave the MAC-10 in the Hit Car, per Defendant's direction.[13] Hr'g Tr. at 57-58; *See also* Gov't Exs. 19(a), 19(b) (photographs of a weapon with a silencer found in the backseat of the Buick). Russo also testified that he took a ski mask off Sparacino's head, and threw it, along with a pair of gloves he was wearing, into a nearby bush. Hr'g Tr. at 57-58. Guerra pulled up nearby and the group fled the area. *Id*. at 58. Scopo died later that night. *Id*.

A few days after the murder, Russo was approached by members of the Colombo and Lucchese Families who asked about the murder. *Id*. at 59. Although Russo denied any knowledge of the incident, both he and Guerra complained to Defendant that Curcio was speaking openly about the murder.[14] *Id*. at 59-61. Defendant ordered Russo and Guerra to speak with Curcio about

---

[13] Defendant asserts that any testimony as to an instruction to leave the murder weapon in the vehicle is suspect based upon Russo's testimony in *Guerra*. Def. Br. at 14-15. The Court finds just the opposite. In *Guerra*, Russo testified that he told Sparacino to leave the weapon in the vehicle. *See Guerra* Tr. at 735-37. Here, he simply elaborated that Defendant was original source of the order. *See* Hr'g Tr. at 58.

[14] Defendant contends that the Colombo associate who approached Russo, another informant, claims Russo stated to him that "he, Guerra, John Sparacino and John Pappa were involved in the murder" of Joseph Scopo. Def. May 9, 2017 Ltr. This exchange allegedly occurred after the murder of Carmine Gargano, which was committed in July 1994. Gov't May 31, 2017 Ltr. at 2 n.2. This does not impugn Russo's testimony and, as the statement does not

8

his indiscretions, directly. *Id*. at 61. Additional testimony from Russo also demonstrated that those persons who had participated in Scopo's murder, and were talking about it or complaining that they were not properly recognized or compensated for the job, were murdered. *Id*. at 63-64.

Defendant suggests that much of Russo's testimony consists of outright lies, particularly as to: (1) whether Russo carried a gun during the murder (Def. Br. at 16-17); (2) what Russo did with his gloves and Sparacino's ski mask after the murder (*Id*. at 16); (3) when Pappa first became involved in the plot (*Id*. at 17); (4) when the Hit Car was stolen (*Id*. at 19); (5) the date and circumstances of Theodore Jr.'s grandmother's funeral (*Id*. at 17); (6) the failed attempt to kill Scopo at his home and whether Russo recognized him (*Id*. at 17-18); (7) Orena's liberty status in 1992 (*Id*. at 16); and (8) Defendant's role (*Id*. at 19).

The first seven points have no bearing on *Defendant's* role in the murder. Inconsistencies about tangential details unconnected to Defendant's participation, such as whether Russo carried a gun while driving the Hit Car (it is undisputed that he was not the shooter) or when Eleanor Avena's funeral was and who was near Russo when Theodore, Jr. approached him (it is undisputed that the meeting occurred), more than two decades after the fact, are irrelevant. The Court finds unavailing Defendant's eighth point, that Russo is incredible because, during his testimony in *Guerra*, he completely failed to mention Defendant's name "in connection with the Scopo murder." *Id*. at 19. The testimony cited by Defendant reads, in pertinent part:

> Q: And the only person that gave you the order to kill Joseph Scopo was Theodore Persico, Junior?
>
> A: He told us that day, yes.
>
> Q: Is he the only person that told you?

---

appear to proffer a comprehensive list of murder participants, it does not exonerate Defendant. There is no dispute that Defendant was not present at the murder scene. However, this detail does not alter the fact that he directed and facilitated the murder.

9

> A: I mean, basically, yes.

*Guerra* Tr. at 684. However, Russo also testified in *Guerra*, consistent with his *Fatico* Hearing testimony that, when Defendant told him that Curcio "ha[d] a line on" Scopo, he understood that Defendant "wanted [Russo] to help him kill [Scopo]." *Id*. at 205. Also consistent with his *Fatico* Hearing testimony, Russo testified in *Guerra* that Defendant helped procure the weapons for the murder. *Id*. at 208. There is no contradiction between Russo's testimony in *Guerra* and his testimony in this matter. While the "order" to kill Scopo "basically" may have come from Theodore, Jr. "that day," there is no deviation from the fact that Defendant advocated for and helped plan the murder.

Defendant also argues that the evidence accompanying the briefs defeats the Government's claims because: (1) Theodore, Jr. did not identify Defendant as a participant in the murder during his guilty plea allocution (Def. Resp. at 5); (2) Russo had the MAC-10 before Defendant allegedly got involved (*Id*. at 7); and (3) Judge Townes commented that Defendant's role in the murder seemed "vague" (*Id*. at 9-10). These arguments lack merit.

First, the fact that Defendant was not mentioned in Theodore, Jr.'s guilty plea allocution is inconsequential. In fact, Theodore, Jr. did not identify any other participants in the cited excerpt. Rather, he clearly admitted, "In or about 1993, for the purpose of maintaining my position in the charged enterprise, *I agreed with others* that members of the Arena [sic] side, including Joe Scopo, should be killed because they were trying to kill my family." Def. Ex. KKKK at 25 (emphasis added). This statement neither implicates nor exonerates any particular person.[15]

Second, Defendant argues that Russo could not have received the murder weapon from

---

[15] Defendant also argues that Theodore, Jr. "did not plead to participating in Scopo's murder." Yet, Defendant submitted a portion of the guilty plea transcript in which Theodore, Jr. confessed to doing just that. *See* Def. Ex. KKKK.

10

him *after* looking for Cutolo because Russo testified that a MAC-10 was used while searching for Cutolo. Def. Resp. at 7. This argument does not corrupt the core of Russo's testimony: the MAC-10 used in the Scopo murder was obtained with Defendant's help during the course of planning the murder. *See* Hr'g Tr. at 40-41, 43, 57; *Guerra* Tr. at 208-09, 226-29. Russo consistently has explained Defendant's role in procuring the MAC-10 that was used in the murder and was left in the backseat of the Hit Car, per Defendant's instructions.

Finally, the Court declines Defendant's invitation to rely on Judge Townes' 2011 characterization of Defendant's role to support his claim that the Government has failed to offer any "corroboration." At the time Judge Townes made her observations, she did not have the benefit, as this Court does, of having presided over the *Fatico* Hearing and having reviewed the additional submissions of the parties, consisting of over a thousand pages of argument, records, testimony, photographs, and recordings. Indeed, it was for just such a reason that Judge Townes had ordered that a *Fatico* hearing be held.

## B. *Loansharking Activities*

Russo made money throughout the 1990s by loansharking or "shylocking" with and for the Colombo Family.[16] *See* Hr'g Tr. at 33, 72-73. The procedure was simple. He and Guerra would borrow money from Defendant at the weekly interest rate of one percent, and then lend that money to their customers at a weekly interest rate of two to three percent. *Id*. 73-74. From 1993 until 1996 or 1997, Russo and Guerra had borrowed approximately $150,000 to $200,000 from Defendant for loansharking.[17] *Id*. at 74. However, in the mid-1990s, when the pair had difficulty paying the

---

[16] Defendant claims that Russo contradicted himself as to the identity of the person who supplied the money for his loansharking activities with the Gambino Family in the 1980s. Def. Br. at 22. This has no bearing on his loansharking activities with the Colombo Family.

[17] Defendant attacks these approximations. Def. Br. at 22. In *Guerra*, Russo testified that he received approximately $100,000 between 1993 and either 1995 or 1996. *Guerra* Tr. at 259-60. Here, he testified that he received approximately $150,000 to $200,000 between 1993 to either 1996 or 1997. Hr'g Tr. at 74. These

11

one percent tribute, Defendant demanded that the entire amount owed be repaid. *Id*. at 75-76. With this order, Russo and Guerra began to collect the outstanding debts, and a number of assaults to effectuate the collections followed. *Id*. at 76. In one instance, Russo assaulted "Fat Lenny" in order to collect a loan of $30,000, but Defendant intervened and arranged for repayment through a member of the Gambino Family. *Id*. at 76-77. In another incident, Russo assaulted "Tony," who owed $7,000 or $8,000. *Id*. at 77. In this situation, members of the Genovese Family interceded on Tony's behalf and asked Russo to reduce the debt to $2,000 or $3,000, but Russo refused to do so, as he lacked authority to negotiate debts owed to Defendant. *Id*. at 77-78. However, Russo relayed the information to Al, who, in turn, met with members of the Gambino Family to arrange repayment. *Id*. at 78-79.

On a separate, related occasion, Russo assaulted a stockbroker who owed a Colombo Family associate $100,000. *Id*. at 98-99. After the beating, Russo was approached by a member of the Gambino Family who negotiated a payment plan consisting of two installments of $50,000. *Id*. at 99-101. After receiving the first payment, Russo pocketed $5,000 and gave Al the remaining $45,000. *Id*. at 101-02. Al was enraged when he discovered that Russo took any part of the payment without prior authorization. *Id*. at 101-02. When Russo offered to return the money, Al stated, "[Y]ou owe my brother [Defendant] money. Give it to him." *Id*. at 102. During this exchange, Russo still had an outstanding debt to Defendant connected to loansharking. *Id*.

In 2000, Russo was arrested and federally prosecuted in the Southern District of New York. *Id*. at 102-03. While Russo was out on bail, Defendant contacted him "to make sure [he] was all right and if [he] had anything to look after," and to discuss his outstanding debt of approximately $60,000 to $70,000. *Id*. at 103-04. Defendant forgave the debt. *Id*. at 104. By making this gesture,

---

discrepancies are not jarring and they do not "indicate[] that [Russo] has concocted [Defendant]'s involvement in loansharking." Def. Br. at 23.

12

Russo felt that Defendant was recognizing the role he played in Scopo's murder and subtly asking that he "keep [his] mouth shut." *Id*. Later on, while serving his sentence, the Colombo Family provided Russo's then-girlfriend with hundreds of dollars every month so that she could deposit funds into his prison commissary account. *Id*. at 104-05. Sometime after his release, Russo learned that the monthly payments came from Defendant. *Id*. at 106.

Defendant claims that, since Russo's loansharking books were destroyed after his 2011 arrest, there is an "inference" that the records did not implicate him as a loan originator. Def. Br. at 22. Defendant is in error. There is no indication that the records contained any information as to whom Russo was indebted. All that was established is that the records noted who *received* loans and needed to make payments. *See* Hr'g Tr. at 261 (noting that Fat Lenny had a debt of $10,000 in the ledger). Defendant also argues that three recordings from 2009 establish that Russo was actually indebted to, and forgiven by, Al, Defendant's brother, at the time of his 2000 arrest. Def. Br. at 23; *See also* Def. Exs. D(T), VV(T), WWW(T). However, the recordings do not contradict the testimony concerning Defendant's participation. At most, the recordings indicate that Russo was indebted to Al and that Al forgave that debt. Notably, the debt associated with Al in the recordings is not connected definitively to loansharking. Nonetheless, even if the only debt owed and discharged in 2000 belonged to Al, that fact does not rebut the testimony that Defendant provided Russo with loansharking funds and received interest payments on those loans, and that those loans were collected in a violent manner at his bidding during prior years.

### C. *Valet Company Extortion*

In approximately 2010, Russo planned to start a valet parking company with Anthony Stropoli ("Stropoli"), an affiliate of the Colombo Family who sold fish to restaurants in New Jersey. Hr'g Tr. at 121-22. The two intended to use Stropoli's preexisting contacts to build their

13

business. *Id*. at 122. Before the endeavor began, Stropoli suggested that Russo speak with another "Anthony" who "ran a couple of valet parking systems." *Id*. at 122. Russo arranged to meet Anthony and, when he arrived, found Defendant waiting for him. *Id*. at 123. Defendant was upset because Russo's enterprise would compete with his own valet company. He asked Russo, "[H]ow would [Stropoli] and you like it if I opened up a -- a fish company?" *Id*. Instead of striking out on their own, Defendant suggested that Russo "make [his own] life easier" by selling Defendant's business to Stropoli's contacts in exchange for twenty percent of the profit from every customer brought on. *Id*. at 124.

Russo secured at least one restaurant for Defendant's valet business, an Italian restaurant in Red Bank, New Jersey. *Id*.; *See also* Gov't Ex. 7002 (sealed FBI report containing an interview with a restauranteur who was approached, and used a valet company suggested, by Russo for approximately six months); Gov't Exs. 838(a), 838(b) (sealed business records showing payments from the restaurant to two valet companies, located at the same address, on various dates between June 2009 and February 2011); Rev. PSR, Dkt. Entry No. 833 at ¶ 101 (Defendant's 2012 tax returns identify him as a co-owner of a valet company that invoiced the restaurant from June 2009 through June 2010). Russo's business never materialized because he "didn't want problems" with Defendant. Hr'g Tr. at 125.

Here, Defendant attacks Russo's testimony because, on cross-examination, he could not recall if he ever referred a business and took a percentage. Def. Br. at 24. Yet, the testimony cited by Defendant does not contain any indication that Russo "could not recall" if he referred any valet business; Russo said only that he did not remember whether he took a percentage of the profit. *See* Hr'g Tr. at 272-73. That does not undercut the testimony and substantial evidence supporting the conclusion that he *did*, in fact, refer a customer. Defendant further takes issue with the

14

Government's initial claim that the extortionate activity took place between 2007 and 2009 but now, with Russo's testimony, places the activity in 2009 or 2010. Def. Resp. at 9. This discrepancy is diminutive in light of the fact that 2009 was confirmed by Defendant's own tax returns as a year when his valet business invoiced the subject restaurant.[18]

### D. *Conspiracy to Sell Stolen Video Games*

Defendant also participated in a plan to procure and sell stolen handheld video games in late 1994. The plan first came into existence when Russo's father told him about a man named "Spider" who wanted to unload a truckload of stolen video games. Hr'g Tr. at 81. Russo met Spider and agreed to pay $70,000 for a "tractor trailer load" of video games. *Id.* at 82-83. Russo approached Defendant about this scheme and Defendant, in turn, referred him to a "friend" who provided the purchasing capital. *Id.* at 82-83. Defendant also agreed to store the stolen games in the garage of a bus company he owned. *Id.* at 83. Russo had his father rent a truck for Spider to use and deliver the games in two shipments, with a payment of $35,000 upon delivery. *Id.* at 83; *See also* Gov't Ex. 864 (lease agreement for a U-Haul truck dated October 26, 1994 and signed by "Anthony Russo").

However, when Spider arrived with the first load of games, Russo thought federal agents were monitoring the transaction. Hr'g Tr. at 84; *See also* Gov't Exs. 212(a), 212(b), 212(c) (photographs of Russo at the intended meeting location taken by FBI Special Agent Kevin Wevodau). After becoming suspicious, Russo took Spider into a nearby business to check and see if he was wearing a microphone. Hr'g Tr. at 84. After confirming that Spider was not an informant,

---

[18] Defendant makes a passing conclusory argument that it would be improper for the Court to consider his unconvicted conduct because "Judge Townes only considered the unconvicted conduct . . . to determine . . . the Guidelines range" for Guerra's sentence. Def. Resp. at 10. As already noted *supra*, this Court may consider all relevant conduct, whether Defendant is uncharged, or convicted or acquitted of it, in determining an appropriate sentence for Defendant.

15

Russo told Spider to abandon the truck, which still contained the games, so that he could report it as stolen. *Id*.; *See also* Gov't Exs. 865(a)-(e) (photographs of the truck and its contents); Gov't Exs. 7009, 7010, 7011 (reports concerning the truck and its contents completed by FBI Special Agent Matthew Tormey). The transaction never materialized. Hr'g Tr. at 84. A few days later, Defendant asked Russo to return the loan and he agreed to do so. *Id*. at 85.

Defendant's efforts to undermine Russo's testimony concerning this activity fall flat. Defendant argues that he has never owned a bus company, and when Russo identified the garage he planned to use for storage, Russo took federal agents to an address that was owned by an unknown third party from 1980 to 2002. Def. Br. at 24. Even if these arguments are true, they do not impugn Russo's testimony as to Defendant's role in securing the purchasing capital.

### E. *Other Racketeering Activities*

In addition to the actions outlined above that were geared toward making money and maintaining power, Russo offered various other anecdotes about the Colombo Family's activities. For example, during the 1990s, Russo owned and operated a liquor store on Staten Island which was registered in the name of his girlfriend's father. *See* Hr'g Tr. at 85, 88-89. His start-up capital for that endeavor came from Defendant, Frank Persico (Defendant's cousin), and Stropoli. *Id*. at 85-86. Russo ran the store until he was arrested in 2000, at which point he turned the business over to Defendant, who continued to run it with another Colombo Family member. *Id*. at 87-89. Defendant ultimately sold the store and Russo was not given any share of the proceeds. *Id*. at 89.

Russo also testified about the use of violence and intimidation that defined the Colombo Family during his tenure. For this, he offered an anecdote from the late 1990s, when he was angry that other people were being inducted into the Colombo Family before him, despite his role in the Scopo murder and his demonstration of loyalty to the Persicos. *Id*. at 90-91. He voiced his

frustrations to Guerra, who, in turn, informed Defendant. *Id*. at 91-92. The next day, Frank Persico and Stropoli confronted Russo about his commentary, suggesting such opinions would get him into "trouble." *Id*. at 92. By openly insinuating that Defendant and the Colombo Family had done wrong by him, Russo had insulted them and risked retribution; by informing Defendant about these statements, Guerra hoped to stop Russo from speaking in a way that "could get [him] killed."[19] *Id*.

Beyond illegal activities, Russo and Guerra tried to start a legitimate car detailing business in 2009. *Id*. at 115. The pair approached Defendant, who helped secure the business' initial capital by directing them to Scott Reback ("Reback"), who provided the money. *Id*. at 115-16. Defendant also assisted them in securing business from Colombo Family members who owned car dealerships. *Id*. at 117-18. The detailing business was opened at a space provided by Defendant. *Id*. at 116. Shortly thereafter, Russo approached Reback for additional help. *Id*. at 118-19. After Reback notified Defendant of the request, Colombo members met with Russo and cautioned him about acting outside the chain of command. *Id*. at 119-21.

## II.  FINDINGS OF CREDIBILITY

Russo is a Colombo Family associate turned informant. Throughout his cooperation with the Government, he has outlined the Colombo Family's hierarchy, identified actors along with their positions and responsibilities within that organization, provided information concerning two additional murders (beyond that of Joseph Scopo), and testified at trial. *See generally*, Hr'g Tr.; *Guerra* Tr. By providing this information and cooperating with the Government, Russo placed his life, and those of his loved ones, in peril. In fact, at his sentencing, the Hon. Kiyo A. Matsumoto, U.S.D.J., noted that the decision to become an informant rendered Russo "a marked man[,] and

---

[19] The issue of induction cropped up again in 2008, when Defendant informed Russo that Al finally wanted to induct him into the Colombo Family. Hr'g Tr. at 109-10. Defendant coached Russo on how to behave and carry himself in his new role. *Id*. at 110.

17

there are many who will take pride in killing him [or his family] as a result of his cooperation." Def. Ex. VVV at 39. At the present juncture, if Russo were to fabricate testimony or refuse to cooperate with the Government, he would risk all incentives and protections he negotiated in exchange for his guilty plea. *See* Hr'g Tr. at 149-50, 281; *See also United States v. Russo*, No. 11-CR-30 (KAM) (RER) (E.D.N.Y.), Gov't Mot. for D'wrd Depart., Dkt. Entry No. 1221, at 2; *Id.*, J'gmt as to A. Russo, Dkt. Entry No. 1233, at 4. This was the context within which Russo's testimony was proffered in this matter.

Nevertheless, Defendant launches a number of attacks to discredit Russo as a liar and a killer who is out to save himself. *See generally* Def. Br. at 3-10. In support of this position, Defendant argues that, if Defendant had been implicated in any criminal activity, he would have been mentioned alongside other "Persico loyalists" in a number of recordings from 2009 and 2010.[20] *See Id.* at 4-7. This argument is unpersuasive, as the cited recordings have little to do with the testimony and evidence provided by the Government on Defendant's activities at issue here. The recordings concern general Colombo Family administration and Russo's promotion (Def. Exs. Q(T), U(T), V(T), W(T), Z(T), FF(T)), Russo's son's behavior and participation in organized crime (Def. Exs. X(T), EE(T)), Russo's belief that there was a "rat" in their ranks (Def. Ex. Y(T)), the procedure for contacting him (Def. Ex. T(T)), and a brief reference to the night of the Scopo murder (Def. Ex. L(T)). None of these subjects necessarily would require mentioning Defendant. Furthermore, Defendant has not explained why Russo would volunteer information about Defendant's particular criminal conduct when: (a) the topics do not seem to naturally lend

---

[20] Defendant cites a recording from 2010 in which Russo told Peter Tagliavia, a Colombo Family member, that Defendant is "truly legitimate" and "has nothing to do with anything." Def. Br. at 4-5; *See also* Def. Ex. E(T) at 2. He also cites a recording in which James Bombino, another Colombo Family member, called Defendant "as squeaky clean as they come." Def. Br. at 22; *See also* Def. Ex. TTT(T). When considered alongside Russo's testimony here and in *Guerra*, the Court finds that these statements merely support the notion that Defendant also made money for the Colombo Family "through legitimate businesses, too." *Guerra* Tr. at 154.

18

themselves to discussing Defendant; (b) Russo feared the consequences of speaking liberally about crimes he committed or disrespecting Colombo Family leaders; and (c) Defendant is closely tethered to Colombo Family leadership. It seems logical to assume that Russo would not disclose any interaction with Defendant unless absolutely required to do so.

Defendant also claims that Russo had "substantial motive to implicate" Defendant (Def. Br. at 8) and that he "knew what to say" to prosecutors (*Id*. at 9). These arguments also are unconvincing. Defendant cites to various recordings wherein Russo allegedly is aware that the Government sought to prosecute Defendant (*See* Def. Exs. B(T), KK(T), LL(T), MM(T), NN(T), OO(T), PP(T)) and declares that cooperating witnesses are inherently untrustworthy and are coached on their testimony (*See* Def. Exs. E(T), QQ(T), RR(T), SS(T)).[21] Yet, no matter how Russo might have described the Government's objective or informants before he became one, the simple fact that he was not a "disinterested party" is insufficient, on its own, to "deprive [his] statements of probative value." *United States v. Chang*, 59 F. App'x 361, 364 (2d Cir. 2003).

Having conducted the *Fatico* Hearing and evaluated Russo's credibility alongside the other evidence submitted, the Court finds Russo's testimony credible, consistent, and detailed. As discussed throughout this opinion, Defendant's repeated attempts to attack Russo's testimony are, at times, irrelevant, or unpersuasive. *See United States v. Messina*, 806 F.3d 55, 64 (2d Cir. 2015) ("The law affords a factfinder considerable discretion in resolving evidentiary inconsistencies.").

---

[21] In one recording, Russo stated, "even if [Defendant] blows trial, he's only facing a couple of years." Def. Ex. PP(T) at 1. Defendant does not explain how Russo could believe Defendant risked "blow[ing] trial" if Russo knew Defendant was innocent of any wrongdoing.

19

## **CONCLUSION**

For the reasons stated above, the Court finds, by more than a preponderance of the evidence, that Defendant participated in a murder, a conspiracy to buy and sell stolen property, loansharking, extortion, and racketeering. Consequently, the Court shall consider these five activities in connection with the factors listed under 18 U.S.C. § 3553(a), in fashioning a reasonable sentence on Defendant's conviction for conspiracy to participate in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892.


SO ORDERED.

Dated: Brooklyn, New York
       July 19, 2017

/s/
DORA L. IRIZARRY
Chief Judge